# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ROZ TRADING LTD.<br>Elizabeth Square<br>P.O. Box 847<br>Grand Cayman<br>Grand Cayman Islands<br>British West Indies<br><br>and<br><br>ROZ TRADING LTD. (UZBEKISTAN)<br><br>          Plaintiffs,<br><br>v.<br><br>ZEROMAX GROUP, INC.<br>1310 Double Gate Ct.<br>Davidsonville, MD 21035;<br><br>ZEROMAX LOGISTICS, INC.<br>1310 Double Gate Ct.<br>Davidsonville, MD 21035;<br><br>ZEROMAX LLC<br>800 Delaware Ave.<br>Wilmington, DE 19801;<br><br>and<br><br>ZEROMAX GMBH<br>Poststrasse 30<br>6300 Zug ZG<br>Switzerland<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:06-cv-01040-CKK |

# FIRST AMENDED COMPLAINT FOR COMPENSATORY DAMAGES, PUNITIVE DAMAGES, TEMPORARY INJUNCTIVE RELIEF, AND <u>PERMANENT INJUNCTIVE RELIEF</u>

## INTRODUCTION

Plaintiffs had an ownership interest in a lucrative joint venture in the quickly growing soft drink industry in Uzbekistan.  Defendants and others have willfully and deliberately deprived the Plaintiffs of that interest, worth hundreds of millions of dollars.  Plaintiffs, by and through their undersigned counsel, bring this action for breach of contract and in tort seeking compensatory and punitive damages, as well as injunctive relief, arising out of the Defendants' conduct.

## PARTIES

1.      Plaintiff ROZ Trading Ltd. ("ROZ") is a limited liability company, located at Elizabeth Square, P.O. Box 847, Grand Cayman, Grand Cayman Islands, British West Indies.  ROZ is organized under the laws of the Cayman Islands, British West Indies, and its principal place of business is Morristown, New Jersey.

2.      Plaintiff ROZ Trading Ltd. (Uzbekistan) ("ROZ (Uzbekistan)") was a wholly-owned subsidiary of ROZ organized under the laws of Uzbekistan, until it was purportedly dissolved as part of the wrongful conduct relating to this civil action.  Until its dissolution, ROZ (Uzbekistan)'s principal place of business was Uzbekistan.

3.      Defendant Zeromax Group, Inc. was incorporated in Delaware on September 4, 2002.  During the relevant period, its principal place of business was located at 1725 I Street, NW, Suite 300, Washington, DC 20006.  To this day, Zeromax Group holds itself out as maintaining its principal place of business and U.S. headquarters at 1725 I Street, NW, Suite 300, Washington, DC 20006.  Upon information and belief, in connection with the events at issue in this case, Zeromax Group filed a certificate of dissolution with the state of Delaware, on August 2, 2005.  On February 2, 2006, Zeromax Group established a business address at 1310

Double Gate Ct., Davidsonville, MD, the home of Harry Eustace, Sr.  The directors and officers last in office were Harry Eustace, Sr. and Miradil Djalalov.

4.      Defendant Zeromax Logistics, Inc. was incorporated in Delaware on December 6, 2002.  Zeromax Logistics was a wholly-owned subsidiary of one of the Zeromax entities.  Upon information and belief, Zeromax Logistics operated out of 1725 I Street, NW, Suite 300, Washington, DC 20006, the U.S. headquarters and principal place of business of Zeromax Group, Inc.  It filed a certificate of dissolution on August 2, 2005.  The directors and officers last in office were Harry Eustace, Sr. and Miradil Djalalov.

5.      Defendant Zeromax LLC was formed in Delaware on September 20, 1999.  On June 4, 2002, Zeromax LLC amended its Certificate of Formation and vested management of the company in a single member, Miradil Djalalov.  In 2003, Zeromax LLC and Tijorat, an Uzbekistani state-owned food distribution company, formed a joint venture called Muzimpex.  Upon information and belief, Zeromax LLC operated out of 1725 I Street, NW, Suite 300, Washington, DC 20006, the U.S. headquarters and principal place of business of Zeromax Group, Inc.  Zeromax LLC cancelled its certificate of formation on September 28, 2005.

6.      Defendant Zeromax GmbH is a Swiss-registered company that was incorporated in July 2005 – shortly before the other Defendants were dissolved.  Its partners are Miradil Djalalov and Fatima Makhmudovna Djalalova.  Upon information and belief, its prior partners included Harry Eustace, Sr. and Zeromax Holdings AG.  After Zeromax LLC was dissolved, Zeromax GmbH acquired its interest in Muzimpex.  As of December 2005, Zeromax GmbH holds an 87.5% interest in Muzimpex.  Muzimpex currently holds a 57.1% interest in Coca-Cola Bottlers of Uzbekistan ("CCBU").  Thus, on information and belief, for purposes of this suit, Zeromax GmbH is the successor in interest to the other Defendants and party to a transfer of an

interest in CCBU designed to frustrate the ability of Plaintiffs and the courts of the United States
to recover Plaintiffs' interest or assets from other Defendants.

7.      Upon information and belief, Gulnora Karimova exercises full control over
Defendants.

## JURISDICTION AND VENUE

8.      Jurisdiction over the subject matter of this case arises from 28 U.S.C. § 1332, as
the parties are diverse in citizenship and more than $75,000 is at stake.

9.      Upon information and belief, Defendants are subject to personal jurisdiction in
this Court pursuant to D.C. Code §§ 13-334,  13-422, and 13-423.  Defendants are subject to
personal jurisdiction under § 13-334 because they are engaged in regular, systematic and
continuous business activities in D.C. through their agent or alter ego, Defendant Zeromax
Group, Inc., which maintains, and for the relevant period maintained, its principal place of
business in Washington, D.C., as reflected on its website and signage at the office building.  The
exercise of personal jurisdiction does not offend traditional notions of fair play and substantial
justice.  This is consistent with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, which
provides that service of a summons is effective to establish jurisdiction over a defendant who
could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the
district court is located.

10.     Defendants are subject to personal jurisdiction in this Court pursuant to D.C.
Code § 13-422 because Defendant Zeromax Group, Inc. maintains, and for the relevant period
maintained, its principal place of business in Washington, D.C., as reflected on its website and
signage at the office building.  The exercise of personal jurisdiction does not offend traditional
notions of fair play and substantial justice.  Upon information and belief, Zeromax Group, Inc. is

an agent or alter ego of the remaining Defendants in that the activities of Zeromax Group, Inc. were of such a character as to amount to doing the business of the other entities and in such a way as to disregard their separate corporate structures. Accordingly, its contacts in the District of Columbia may be attributed to the affiliated parties for jurisdictional purposes.

11.     Upon information and belief, Defendants are subject to personal jurisdiction in this Court pursuant to D.C. Code § 13-423(a)(1) since they have transacted business in the District of Columbia, either directly or by an agent, and the claims for relief arise from this transaction of business.  Defendants also are subject to personal jurisdiction in this Court pursuant to D.C. Code § 13-423(a)(4) because they caused tortious injury in the District of Columbia by an act or omission outside of the District of Columbia.  Upon information and belief, Defendants caused tortious injury in the District of Columbia in that Plaintiffs' interest in the joint venture were owned and held in the District of Columbia.  Upon information and belief, Zeromax GmbH, Zeromax Logistics and Zeromax LLC engaged in a persistent course of conduct, or derived substantial revenue from goods used or consumed, or services rendered in the District of Columbia by and through their agent or alter ego, Zeromax Group, Inc., which maintains, and for the relevant period maintained, its principal place of business in Washington, D.C., as reflected on its website and signage at the office building.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## ALLEGATIONS OF FACT

### Introduction: Formation of the Joint Venture

13.     On June 16, 1993, ROZ entered into a commercial Joint Venture Agreement ("JVA") with The Coca-Cola Export Corporation ("TCCEC"), a wholly-owned subsidiary of The Coca-Cola Company, and with the government of Uzbekistan.  According to the JVA, the

purpose of the joint venture was to "engage in and maximize the profitable growth of the business of the preparation, packaging, distribution and sale of [Coca-Cola] Beverages in authorized containers" pursuant to a Bottler's Agreement between the joint venture and The Coca-Cola Company.

14.    The joint venture was originally called Coca-Cola Bottlers Tashkent Ltd., but, in or around 1996, due to its expanded sales territory, the name was changed to Coca-Cola Bottlers of Uzbekistan Ltd. ("CCBU").

15.    Effective December 1, 1993, CCBU and The Coca-Cola Company entered into a Bottler's Agreement allowing CCBU to use Coca-Cola's Authorized Beverage Containers and to distribute and sell the beverages using The Coca-Cola Company's trademarks for five years.

16.    During the first three years of operation, CCBU needed additional capital in order to permit it to expand by, among other things, purchasing a more productive facility.   By the end of 1996, ROZ had contributed $8,152,000 of the total $14,807,000 capital infusion necessary to make these improvements.

17.    In October 1997, The Coca-Cola Company and CCBU executed a new Bottler's Agreement valid through November 30, 2003, with the option to renew for an additional five-year term.

18.    The joint venture was financially successful.  In the 2000 annual audit, assets of CCBU were valued at approximately $150 million.  Indeed, in terms of beverage production, CCBU was among The Coca-Cola Company's top 35 bottlers from over 200 countries worldwide.  CCBU was also the first bottler to receive the "Bottler of the Year" award from The Coca-Cola Company two years in a row.

19.     During the formation and early years of the joint venture, Mansur Maqsudi ("Maqsudi"), Managing Director of ROZ, was married to Gulnora Karimova ("Karimova"), the daughter of Islam Abduganievich Karimov, the President of Uzbekistan.  President Karimov had ruled Uzbekistan while it was part of the Soviet Union; he was "elected" President after its independence, a position he continues to hold.

20.     In July 2001, Maqsudi told Karimova that he was separating from her, citing irreconcilable differences.  This sparked a vicious and extreme reaction from Gulnora Karimova, giving rise, *inter alia*, to this lawsuit.

### Divorce Led to Seizure of Plaintiffs' Interest in CCBU (July 2001 – September 2002)

21.     Gulnora Karimova, with the support of her father, the President of Uzbekistan, immediately initiated attacks on Maqsudi's family and commercial business, using the apparatus of the state when convenient.

22.     Immediately after learning of Maqsudi's intent to divorce her, Gulnora Karimova kidnapped their two young children from their home in New Jersey and fled to Uzbekistan.  She attempted to extort money from Maqsudi and threatened him and his family with harm and even death.

23.     Maqsudi has not seen his children since Gulnora Karimova kidnapped them and took them to Uzbekistan over five years ago.  Maqsudi believes his children remain in Uzbekistan, but does not know their exact whereabouts.

24.     In December 2001, some of Maqsudi's family members were taken in the middle of a winter night from their homes in Uzbekistan to the border of Afghanistan and simply left there with no belongings.  His elderly grandmother was forced to leave her home without her diabetes medication.  Other family members were taken hostage in Uzbekistan and some remain

7

imprisoned today. Further, Maqsudi's mother's home was demolished. Neither Mr. Maqsudi nor his immediate family can travel to Uzbekistan without risking their lives.

25.    In September 2002, the Superior Court of New Jersey found that it had jurisdiction under the Uniform Child Custody Jurisdiction Act to hear the custody dispute over the Maqsudi children. After hearing the case, the court ordered Gulnora Karimova to return the children to New Jersey and to arrange immediate telephone contact between the children and their father. *See Maqsudi v. Maqsudi*, 830 A.2d 929 (N.J. Super. Ch. 2002).

26.    Gulnora Karimova has refused to comply with these court orders and Maqsudi has had no contact with his children – by phone, in person, or otherwise – since the court's decision.

27.    In addition to having his children kidnapped and several family members imprisoned, Maqsudi's business also was targeted. Beginning on August 13, 2001 and lasting several days, agents from Uzbekistan's feared National Security Service (the successor to the KGB in Uzbekistan), under the guise of a "tax audit," raided both ROZ's and CCBU's offices in Tashkent and seized company documents and employees. CCBU's Managing Director and his Deputy were both taken away by the Secret Police and held in isolation for interrogation for more than 24 hours. There was no legal or factual justification for these raids, which were nothing more than intimidation and harassment of Mr. Maqsudi and Plaintiffs' interest in CCBU.

28.    As part of Gulnora Karimova's and President Karimov's assault on Plaintiffs' business interest, Uzbekistan initiated a series of sham proceedings to eliminate the ability of Plaintiffs, its commercial business partners, to exercise their contractual rights to manage and control the joint venture.

29.    First, Uzbekistan arbitrarily confiscated a significant amount of Plaintiffs' shares in CCBU through a sham action begun at the Economic Court of Tashkent and ultimately

summarily affirmed by the Supereme Economic Court of Uzbekistan on February 5, 2002. Through this sham procedure, Plaintiffs' total holdings in the joint venture were reduced from 55.118% to 23.416% without any compensation to Plaintiffs for their loss of shares or for their investments and capital contributions to the joint venture. At this time, CCBU was worth over $150 million.

30.    The second set of sham proceedings were deliberately initiated by Uzbekistan, at the direction of the Karimovs, to completely purge Plaintiffs from any further participation and management of the joint venture. To obtain the remainder of Plaintiffs' interest in CCBU, the Ministry of Justice claimed that in forming ROZ(U), ROZ had failed to comply with its charter funding requirements (even though Uzbekistan's tax committee had acknowledged eight months earlier that the charter funds had, in fact, been properly paid). The Ministry of Justice petitioned the Tashkent Economic Court to liquidate ROZ(U) and the Court approved its liquidation on December 26, 2001, without allowing Plaintiffs counsel or an opportunity to participate in the proceedings.

31.    On June 3, 2002, the Economical Court of Tashkent ordered that ROZ's 23.416% share in CCBU be "liquidated" and used to pay the debts of ROZ (Uzbekistan). On September 11, 2002, days after Zeromax Group was incorporated, the Supreme Economic Court of Uzbekistan approved both the liquidation of ROZ (Uzbekistan) and the seizure of ROZ's remaining interest in CCBU, allegedly in satisfaction of ROZ (Uzbekistan)'s "debts," including those arising from alleged inadequate charter funding. Apart from the fact that Uzbekistan's own tax committee had acknowledged that ROZ (Uzbekistan)'s charter funding had indeed been adequate, the sham nature of these proceedings is demonstrated by the foreign court's reliance on false and inaccurate financial calculations to show a "debt", when, in fact, ROZ (Uzbekistan) had

over $50 million in cash and unencumbered net assets on hand, including land, automobiles, warehouses, offices, and rental property. These sham proceedings did not relate to any proper governmental functions, but instead were intended solely to benefit the private, commercial interests of Gulnora Karimova, the Government of Uzbekistan (a partner in the Joint Venture) and Defendants. It is well documented that the courts of Uzbekistan lack judicial independence and are wholly subservient to the corrupt government headed by President Karimov and his family, who have complete authority to appoint and remove judges at will.

32.    Soon after the beginning of Uzbekistan's reign of terror, TCCEC, with the active encouragement and participation of its parent company, The Coca-Cola Company, undertook to conspire with Gulnora Karimova to exclude Plaintiffs permanently from further participation in CCBU.

33.    The Coca-Cola Company was well aware from previous tax audits that this tax audit of CCBU was unlike any others in its scope, duration, and treatment of CCBU employees. The Coca-Cola Company nonetheless told the U.S. Department of State that the nature of the audit was not unusual, thereby undermining Plaintiffs' efforts to obtain protection and assistance from the United States government.

34.    As acknowledged in a letter dated August 29, 2001 from the Uzbekistani Ambassador to the United States to a United States Senator, "the representatives of the Coca-Cola Company's regional office have been closely collaborating with the government agencies of Uzbekistan, and share their position that the current audit of the joint venture's documentation is lawful . . . ."   The letter further stated that the government of Uzbekistan keeps in "close contact with the headquarters of the Coca-Cola Company."

35.    In January 2002, Plaintiffs' joint venture partners scheduled a general meeting of the participants of CCBU in Uzbekistan, knowing that no one from ROZ could safely travel there to participate.  At the meeting, a former employee of The Coca-Cola Company, Derek Willshee, was appointed President of CCBU and given the duties and authority previously held by Mr. Maqsudi, without any input or approval from Plaintiffs.

36.    In practice, Willshee was only a figurehead with no independent authority to manage CCBU.  CCBU was actually managed by Irena Avtaiknia, a close ally of Karimova. Avtaiknia formally succeeded Willshee after approximately six months.  TCCEC was fully aware that by appointing Willshee in name only, they were allowing Gulnora Karimova to control CCBU through her subordinate, Avtaiknia.

37.    In or about January 2002, Ahmet Bozer, President of The Coca-Cola Eurasia Division, met secretly with Avtaiknia and Karimova's then-assistant, Farhod Inogambaev, at the Intercontinental Hotel in Tashkent to set into motion arrangements under which Gulnora Karimova could formalize her control over and profit from CCBU.  As discussed in further detail below, this meeting was followed by further negotiations which culminated in a commercial agreement that allowed Defendants to obtain Plaintiffs' former interest in CCBU by unlawful means.

38.    By this time, Gulnora Karimova had formed companies within Uzbekistan and a company in Dubai, United Arab Emirates, called Revi Holdings, FZE, that were doing business with CCBU.  Karimova used these companies, in part, to further ROZ's and ROZ (Uzbekistan)'s exclusion from CCBU.

39.    Upon information and belief, Defendants, acting alone or in concert with Karimova, Uzbekistan, TCCEC and The Coca-Cola Company, furthered Plaintiffs' exclusion

from CCBU.  Defendants have had close business and personal ties with Karimova for many years.

40.    Defendants are involved in a shell game, creating, blending and destroying corporate identities in order to deprive Plaintiffs of their interest in CCBU while also avoiding the rule of law.

a.    Zeromax Group was incorporated on September 4, 2002.  The addresses and contact information for Zeromax GmbH's representative offices in Uzbekistan, Russian Federation, and Ukraine are the same as those listed on the Zeromax Group website for the Zeromax Group representative offices.  The logo for Zeromax is also the same for both companies' websites.

b.    The website for Zeromax Group lists "Bentonite" as one of its joint ventures.  Bentonite was created in February 2002 (about eight months before Zeromax Group was even incorporated).  In fact, it was Zeromax LLC that in February 2002 partnered with Uzgeoburneftegazdobycha, a subsidiary Uzbekneftegaz (Uzbek Oil and Gas), to create an Uzbek-American joint venture called "Bentonite."

c.    The Zeromax Group website, however, indicates that it was formed in 1999 and that it worked on the construction of the Shurtan - Sherabad gas pipeline that was completed in September 2003.  Zeromax GmbH, which was created in 2005, also boasts this accomplishment.  The website for Zeromax GmbH not only states that it was founded in 2000, but also states that "[i]n 2003 Zeromax was commissioned by Cabinet of Ministers of Uzbekistan to build a 193-kilometer gas pipeline system with diameter of 720-mm, running through extremely rugged terrain from the Shurtan Gas and Chemical Complex to the gas-main of Kelif-Dushanbe pipeline."

d.      Zeromax Logistics was incorporated on December 6, 2002 as a wholly-owned subsidiary of Zeromax Group or one of the other Defendant entities.   It is affiliated with another company called Temiryul-Khizmat, which is a wholly-owned freight-forwarding subsidiary of Zeromax GmbH.

e.      On August 2, 2005, Zeromax Logistics and Zeromax Group filed their certificates of dissolution with the State of Delaware.  Zeromax LLC was also dissolved and its cancellation certificate was filed on September 28, 2005.

f.      As these entities were dissolving, Zeromax GmbH was incorporated in Switzerland in July 2005.  As part of the unlawful acts designed to deprive Plaintiffs of their interests in CCBU, Zeromax GmbH acquired the interest formerly held by Zeromax LLC in Muzimpex once Zeromax LLC was dissolved.  Upon information and belief, Zeromax GmbH is the successor in interest to the other Defendants.

### Post-Seizure Furtherance of Transfer of Plaintiffs' Interest in CCBU

41.      At a follow-up meeting to the Bozer – Avtaiknia – Inogambaev meeting of January 2002, The Coca-Cola Company, on behalf on TCCEC, at a meeting in Switzerland in 2003 proposed the elimination of Plaintiffs as shareholders in CCBU.  The Coca-Cola Company also proposed a Management Contract between CCBU and a company owned and controlled by Gulnora Karimova; this Management Contract would strip Plaintiffs of any participation in the joint venture.  These negotiations ultimately culminated in a commercial agreement that allowed Defendants, companies closely associated with and/or controlled by Ms. Karimova, to take Plaintiffs' former interest in CCBU.

42.      In February 2003, Zeromax LLC and Tijorat, an Uzbekistani state-owned food distribution company, formed a private, commercial joint venture called Muzimpex.  Upon

information and belief, Karimova and Defendants act in concert to control the activities of

Muzimpex and CCBU.  Upon information and belief, Muzimpex does not have independent

management aside from that provided by Defendants, who direct all activities and operations of

Muzimpex.  Harry Eustace, Sr., who was the Chief Operating Officer for Zeromax Group and an

officer or director for Zeromax Logistics before they were both dissolved, is also the person to

whom the website for Muzimpex is registered.  Muzimpex is listed on the website for Zeromax

Group as a joint venture.  In 2005, ownership of Zeromax LLC's interest in Muzimpex passed to

Zeromax GmbH.  As the successor to Zeromax LLC, Zeromax GmbH now holds or controls the

interest in CCBU that belongs to Plaintiffs.

43.     In the Spring of 2003, Karimova assisted Defendants in obtaining a multi-million

dollar contract with Uzbekistan for the construction of the Shurtan-Sherabad natural gas pipeline.

On March 3, 2003, Uzbekistan's Cabinet of Ministers approved this contract.  Upon information

and belief, shortly thereafter, Defendants deposited a $1 million payment in Karimova's personal

account in the Rietumu Bank in Riga, Latvia.  In March 2003, Defendants entered into a contract

with a company called OA Stores, owned by Karimova.

44.     After fleeing Uzekistan and being granted political asylum in the United States,

Farhod Inogambaev, Gulnora Karimova's former assistant, sought out Mansur Maqsudi to

inform him of the actions taken against Maqsudi, ROZ, and ROZ (Uzbekistan) to complete their

exclusion from CCBU.  These actions at the behest of Karimova include the transfer of

Plaintiffs' interest in CCBU to Defendants, and preventing Plaintiffs from exercising ownership

rights under the JVA.

45.     In or about late 2004, Plaintiffs' interest in CCBU was transferred or sold to

Defendants without notice to Plaintiffs, as required by the JVA.  Nonetheless, ROZ learned

through news reports in late 2004 of the possible transfer to Defendants of its interest in CCBU. Plaintiffs immediately formally protested the transfer or sale by writing to the State Property Committee of the Republic of Uzbekistan. Despite these protests, Defendants proceeded with the purchase of Plaintiffs' interest in the joint venture. Indeed, Defendants' "ownership interest" in CCBU is confirmed by two of Defendants' websites which announced that "Coca-Cola Bottlers of Uzbekistan is an investment made by the Zeromax subsidiary, Muzimpex, with a 57.1% interest via a share purchase contract with the Case-by-Case Privatization Bureau." Upon information and belief, the Case-by-Case Privatization Bureau is an entity of the corrupt Uzbekistani Government, which was acting solely to further the private, commercial interests of Defendants. Defendants, through Karimova, were well aware that their holding of an interest in CCBU was the product of the wrongful exclusion of Plaintiff from CCBU.

46.     Not only were Plaintiffs' interests in CCBU transferred to Defendants, but their involvement further prevented ROZ from exercising its rights under the JVA. For example, Defendants have knowingly deprived ROZ of its management rights and of its termination rights under the JVA.

47.     As the successor in interest to Plaintiffs' interest, Defendants, reportedly through their joint venture, Muzimpex – now run CCBU, along with Uzbekistan and TCCEC. Under Article 5.5 of the JVA, Defendants, as a third party purchasing shares in CCBU, are required to agree to be bound by the JVA. Thus, as the successor in interest and assignee of Plaintiffs' interest in CCBU, each of the provisions of the JVA apply to Defendants.

48.     Once Defendants took control of Plaintiffs' interest in CCBU, Plaintiffs were finally and completely barred from exercising its property and management rights in CCBU. Section 12.2.3.6 of the JVA provides that Plaintiffs could terminate the Joint Venture if impeded

from exercising their rights of management. In light of Plaintiffs' deprivation of their
management rights in CCBU and the sale of their shares to Defendants, Plaintiffs provided a
notice of termination to Uzbekistan, through its representative Uzpishcheprom, and to TCCEC
on April 11, 2005. TCCEC responded by letter on May 10, 2005, denying that it was liable to
Plaintiffs for any amount or for an accounting of Plaintiffs' interest. Uzbekistan, represented by
Uzpishcheprom, responded by letter dated May 10, 2005, professing "surprise" at Plaintiffs'
assertion that it had, in effect, been precluded from participation and management in CCBU;
disagreeing with Plaintiffs' position on termination; and, for the first time, notifying Plaintiffs of
the transfer of Plaintiffs' interest in CCBU (but without naming the recipient). Plaintiffs
provided notice to Defendants on August 5, 2005. Defendants did not respond to the notice of
termination. Nonetheless, under Article 12.2.1, the joint venture was terminated on May 11,
2005, thirty days after the issuance of the notice of termination.

49.     Under Article 12.1 of the JVA, once a party terminates the agreement, "the Parties
hereto agree to call a Parties' Assembly and to adopt a Parties' resolution by virtue of which the
Joint Venture shall be liquidated . . . ." The liquidation is to be conducted in accordance with
Uzbekistani law and any proceeds are first to be used to pay any debts of the joint venture and
expenses associated with the liquidation, per Articles 12.4.1 and 12.4.4. Then, "[t]he balance
shall be distributed between the Parties in proportion to their share ownership, it being agreed
that any Hard Currency left shall be used to satisfy the part of the liquidation proceeds due to
TCCEC and ROZ." JVA, Article 12.4.5.

50.     Defendants, working with Karimova, TCCEC and Uzbekistan, breached the JVA
by failing to call this mandated Parties' Assembly or to initiate liquidation proceedings as
required under the JVA, or otherwise compensating Plaintiffs for its interest in CCBU.

16

51.     Upon receiving Uzbekistan's notice that another party had assumed Plaintiffs' position in the joint venture, Plaintiffs promptly forwarded notice of termination to Defendants on August 5, 2005.  Defendants' joint venture partners, TCCEC and Uzbekistan, had already received notice of the termination, as acknowledged by them in their letters dated May 10, 2005. Upon information and belief, Defendants had already learned of the notice of termination from TCCEC and Uzbekistan prior to receiving notice of termination from Plaintiffs on August 5, 2005, and had begun dissolving (as described in preceding paragraphs) as a way to try and evade and avoid the rule of law.

52.     Specifically, on August 2, 2005, Zeromax Logistics and Zeromax Group filed their certificates of dissolution with the State of Delaware.  Zeromax LLC  also was dissolved and its cancellation certificate was filed on September 28, 2005 (*after* notice of termination of the JVA had been sent to Defendants).

53.     Just as these entities were dissolving, Zeromax GmbH was incorporated in Switzerland in July 2005, and, as part of the unlawful acts designed to deprive Plaintiffs of their interests in CCBU, Zeromax GmbH acquired the interest formerly held by Zeromax LLC in Muzimpex.

54.     Under Section 278 of the General Corporation Law of the State of Delaware, Zeromax Logistics and Zeromax Group remain in existence for a term of at least three years from their date of dissolution for the purpose of defending suits and enabling them to gradually settle their business.  8 Del. C. § 278.

55.     Similarly, Zeromax LLC is required under the Limited Liability Company Act in Delaware to make provisions that will be sufficient to provide compensation for claims that may not have arisen but that, based on facts known to the LLC, are likely to arise or become known to

the LLC within 10 years after the date of dissolution.  6 Del. C. § 18-804.  Accordingly,

Zeromax Group, Zeromax Logistics and Zeromax LLC remain liable to Plaintiffs despite their

dissolution.

      56.     On June 6, 2006, ROZ Trading Ltd. filed for arbitration against TCCEC,

Uzbekistan, the Uzpishcheprom Association (an agency, instrumentality, and representative of

Uzbekistan), and Zeromax Group, Inc. in the International Arbitral Centre of the Austrian

Federal Economic Chamber under a provision of the original JVA.  *ROZ Trading Ltd. vs. The*

*Coca-Cola Export Corporation, Uzbekistan, Uzpishcheprom and Zeromax Group, Inc.* (Case

No. SCH-49806).  Zeromax Group, Inc. has filed an initial objection to jurisdiction in that

arbitration, which is currently pending.

**COUNT I**

**BREACH OF CONTRACT**

      57.     Paragraphs 1 through 56 are incorporated herein as if fully set forth.

      58.     Defendants, as a third party who purchased an interest in CCBU, are bound by the

Joint Venture Agreement.  The JVA requires that once a party terminates the agreement, as

Plaintiffs did, the parties must call a Parties' Assembly and conduct liquidation proceedings so

that the balance (once any debts or expenses of the JV are paid) shall be distributed between the

Parties in proportion to their ownership.

      59.     Defendants, working with Karimova, TCCEC and Uzbekistan, breached the JVA

by failing to call this mandated Parties' Assembly or to initiate liquidation proceedings as

required under the JVA, or otherwise compensating Plaintiffs for its interest in CCBU.

      60.     As a direct and proximate result of these acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of SIXTY MILLION DOLLARS ($60,000,000.00).

## COUNT II

### TORTIOUS INTERFERENCE

61.    Paragraphs 1 through 60 are incorporated herein as if fully set forth.

62.    Defendants, acting alone or in concert, knew of the business relationship that ROZ and ROZ (Uzbekistan) had with CCBU, and they acted intentionally to deprive Plaintiffs of their ownership interest, contractual rights, and economic advantage associated with CCBU.

63.    As a direct and proximate result of these malicious acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000.00).

## COUNT III

### CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE

64.    Paragraphs 1 through 63 are incorporated herein as if fully set forth.

65.    Defendants, acting alone or in concert, wrongfully conspired with others to interfere with Plaintiffs' interest in CCBU.  In furtherance of the conspiracy, these parties reached and executed an agreement to formalize ROZ's and ROZ (Uzbekistan)'s exclusion from the ownership and management of CCBU.

66.     The willful, wrongful, intentional, and reckless acts of Defendants constituted conspiracy to interfere with the Plaintiffs' ownership, economic interests, and management rights.

67.     As a direct and proximate result of these acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of SIXTY MILLION DOLLARS ($60,000,000.00).

### COUNT IV

### CONVERSION

68.     Paragraphs 1 through 67 are incorporated herein as if fully set forth.

69.     With full knowledge of the illegal steps to deprive Plaintiffs of their interests in CCBU, Defendants, acting alone or in concert, have unlawfully exercised ownership, dominion, and control of Plaintiffs' property, thus denying Plaintiffs' their rights to that property.  As a result, Defendants have achieved great financial benefit, whereas the Plaintiffs have experienced financial ruin.

70.     The willful, wrongful, intentional, and reckless acts of Defendants constituted conversion of the Plaintiffs' assets.

71.     As a direct and proximate result of these acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of EIGHTY MILLION DOLLARS ($80,000,000.00).

### COUNT V

### CONSPIRACY TO COMMIT CONVERSION

72.     Paragraphs 1 through 71 are incorporated herein as if fully set forth.

73.    Defendants wrongfully conspired with others to obtain illegal ownership of Plaintiffs' interest in CCBU.  In furtherance of the conspiracy, several entities reached and executed an agreement to formalize the transfer of ownership to Defendants.

74.    The willful, wrongful, intentional, and reckless acts of Defendants constituted conspiracy to convert the Plaintiffs' assets.

75.    As a direct and proximate result of these acts, Plaintiffs have been injured.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of SIXTY MILLION DOLLARS ($60,000,000.00).

## COUNT VI

## ACTION TO QUIET TITLE

76.    Paragraphs 1 through 75 are incorporated herein as if fully set forth.

77.    Plaintiffs have a present ownership interest in the CCBU property.

78.    Defendants, acting alone or in concert, claim a property interest that is adverse to the Plaintiffs.  Defendants' claim is without right, and Defendants have no right or lawful interest to such property.

WHEREFORE, Plaintiffs demand that Defendants shall be required to set forth the nature of its claim to the CCBU property.  Any and all adverse claims to this property shall be determined by a decree of this Court.  The decree shall adjudge that the Plaintiffs are the true and rightful owners of the property and that Defendants have no right to this interest.  This decree shall permanently enjoin Defendants from asserting any adverse claim to the ownership of the Plaintiffs' property.

## COUNT VII

### UNJUST ENRICHMENT

79.    Paragraphs 1 through 78 are incorporated herein as if fully set forth.

80.    Defendants, acting alone or in concert, have wrongfully obtained a substantial and valuable benefit from Plaintiffs by acquiring Plaintiffs' property interest in CCBU without payment or compensation to Plaintiffs. Defendants have knowledge of the benefit conferred as a result of owning this interest in property.

81.    Defendants acquired and retained the property interest in CCBU under such circumstances as to make it inequitable for them to retain the benefit without the payment of its value to Plaintiffs.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of FIFTY THREE MILLION DOLLARS ($53,000,000.00).

## COUNT VIII

### FRAUDULENT CONVEYANCE

82.    Paragraphs 1 through 81 are incorporated herein as if fully set forth.

83.    Upon information and belief, Defendants, acting alone or in concert, have sold or transferred their property interest in CCBU to their joint venture, Muzimpex, with actual intent to hinder, delay, or defraud creditor Plaintiffs.

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) demand that judgment be entered against Defendants in the amount of FIFTY THREE MILLION DOLLARS ($53,000,000.00); that Defendants' conveyance of their property interest in CCBU to Muzimpex be set aside and avoided; that the transferred property interest in CCBU be attached; and that

Defendants, its agents, employees, and subsidiaries be enjoined from transferring possession or control of the CCBU property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ROZ and Plaintiff ROZ (Uzbekistan) pray that this Court grant judgment in their favor and against Defendants, jointly and severally, on Counts I through VII, and grant Plaintiffs:

a) Compensatory damages as demanded in Paragraphs 60, 63, 67, 71, 75, 78, 81, and 83;

b) Appropriate Declaratory Relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 to quiet title as demanded in Paragraphs 76 through 78;

c) Appropriate Declaratory Relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 to set aside the conveyance from Defendants to Muzimpex as demanded in Paragraph 83;

d) Attachment of property interest transferred by Defendants as demanded in Paragraph 83;

e) Punitive damages against Defendants in an appropriate amount to be determined at trial;

f) Preliminary and Permanent injunctive relief. The wrongful conduct of Defendants, unless enjoined by an order of this Court, will continue to cause great and irreparable harm to the Plaintiffs. Plaintiffs have no adequate remedy at law for the injuries they have suffered. Plaintiffs request that this Court order Defendants and all of it agents, employees, and subsidiaries to immediately return full possession and control of the CCBU property to the Plaintiffs;

g) Preliminary injunctive relief.  Plaintiffs request issuance of a preliminary injunction preventing the Defendants and their agents, employees, and subsidiaries from transferring possession or control of the CCBU property interest;

h) Declaratory judgment.  Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, Plaintiffs request declaration that Defendants knowingly deprived Plaintiffs of their interest in CCBU by "purchasing" Plaintiffs' interest in CCBU;

i) Reasonable costs and expenses;

j) Reasonable attorneys' fees; and

k) Such other relief which this Court may determine to be just and equitable under the circumstances.

## JURY DEMAND

84.    Plaintiffs demand a trial by jury on all issues properly triable thereby.

Respectfully submitted,

Stuart H. Newberger, DC BAR #294793

Alan W.H. Gourley, DC BAR #358500
Clifton S. Elgarten, DC BAR #366898
Alyssa Gsell, DC BAR #490395
Sobia Haque, DC BAR # 483440
Peter J. Eyre
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
E-mail: snewberger@crowell.com
        agourley@crowell.com
        agsell@crowell.com
        shaque@crowell.com
        peyre@crowell.com

Attorneys for ROZ Trading Ltd. and
ROZ Trading Ltd. (Uzbekistan)

Dated:  September 1, 2006


Of Counsel:

Dr. Allan Gerson
2131 S Street, NW
Washington, DC 20008
Telephone:  (202) 966-8557
E-mail: gerson@gilgintl.org