# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROZ TRADING, LTD., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:06-cv-01040-CKK |
| | ) | |
| v. | ) | |
| | ) | |
| ZEROMAX GROUP, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

# PLAINTIFFS' OPPOSITION
# TO DEFENDANTS' MOTION TO DISMISS

CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

*Attorneys for ROZ Trading, Ltd. and
ROZ Trading, Ltd. (Uzbekistan)*

December 11, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................. 1

BACKGROUND OF CLAIMS .......................................................................... 2

    CCBU ........................................................................................................... 2

    Exclusion of ROZ ....................................................................................... 4

    Zeromax ....................................................................................................... 5

    Termination Notices and Subsequent Dissolution of Zeromax .............. 6

ARGUMENT .................................................................................................... 7

I.     THIS COURT HAS DIVERSITY SUBJECT MATTER
      JURISDICTION AND PERSONAL JURISDICTION OVER ALL
      DEFENDANTS .......................................................................................... 7

      A.    This Court Has Diversity Subject Matter Jurisdiction ................. 8

      B.    Plaintiffs Have Set Forth A Clear Basis For Personal
           Jurisdiction Against The Defendants ........................................... 11

           1.    Plaintiffs Have Pled A Clear Basis For Personal
                 Jurisdiction ....................................................................... 11

           2.    In The Alternative, The Court Should Order A
                 Period Of Jurisdictional Discovery So That
                 Plaintiffs Can Investigate The Relevant Facts ............... 14

II.    DEFENDANTS' *FORUM NON CONVENIENS* ARGUMENT
      FAILS BECAUSE THERE IS NO ALTERNATIVE, LET
      ALONE MORE CONVENIENT, FORUM .......................................... 16

      A.    There Is No Adequate Alternative Forum ................................... 16

      B.    The Private And Public Factors Favor This Forum ..................... 17

III.   PLAINTIFFS HAVE STANDING ........................................................ 19

IV.   THE ACT OF STATE DOCTRINE DOES NOT BAR THIS
      CASE ....................................................................................................... 21

A.     The Nature Of The Act Of State Doctrine..................................................21

B.     Plaintiffs' Principal Tort And Contract Claims Do Not Require The Court To Invalidate Any Official Act....................................22

C.     The Commercial Nature Of The Dispute Takes All Of ROZ's Claims Out Of The Act Of State Doctrine....................................25

D.     The Language Of The Joint Venture Agreement Confirms That The Act Of State Doctrine Cannot Reach These Issues....................28

E.     The Second Hickenlooper Amendment Applies To Plaintiffs' Claims..........................................................................29

V.     PLAINTIFFS HAVE STATED VIABLE CLAIMS...........................................33

A.     Choice Of Law...........................................................................34

B.     Plaintiffs' Allegations Against Defendants Support Valid Claims......................................................................................36

      1.     Breach Of Contract....................................................36

      2.     Tortious Interference .................................................37

      3.     Conversion................................................................37

      4.     Conspiracy To Commit Conversion And Tortious Interference.............................................................38

      5.     Action To Quiet Title ................................................39

      6.     Unjust Enrichment....................................................40

      7.     Fraudulent Conveyance .............................................40

C.     Plaintiffs' Claims Are Timely .......................................................41

      1.     Breach Of Contract....................................................41

      2.     Fraudulent Conveyance .............................................42

      3.     Other Claims............................................................42

      4.     Both Equitable Tolling And The Discovery Rule Would Extend The Limitations Period Here .................42

CONCLUSION ..............................................................................................45

## TABLE OF AUTHORITIES

**Page**

**CASES**

*4934, Inc. v. District of Columbia Dep't of Emp. Srvcs.*,
    605 A.2d 50 (D.C. 1992) ........................................................................40

\* *Alfred Dunhill of London, Inc. v. Republic of Cuba*,
    425 U.S. 682 (1976) ...................................................................21, 25

*Ampac Group, Inc. v. Republic of Honduras*,
    797 F. Supp. 973 (S.D. Fla. 1992) ......................................................22

*Arango v. Guzman Travel Advisors Corp.*,
    621 F.2d 1371 (5th Cir. 1980) ...................................................22, 28

*Artis v. Greenspan*,
    223 F. Supp. 2d 149 (D.D.C. 2002) .....................................................15

*Banco Nacional de Cuba v. Farr*,
    383 F.2d 166 (2d Cir. 1967) ...............................................................32

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964) ............................................................................21

*Beg v. Islamic Republic of Pakistan*,
    353 F.3d 1323 (11th Cir. 2003) ..........................................................32

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................20

*BPA Int'l, Inc. v. Sweden*,
    281 F. Supp. 2d 73 (D.D.C. 2003) ...............................................16, 19

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002) ............................................................33

*Cabalceta v. Standard Fruit Co.*,
    883 F.2d 1553 (11th Cir. 1989) ...................................................10, 11

*Camacho v. 1440 Rhode Island Ave. Corp.*,
    620 A.2d 242 (D.C. 1993) ...........................................................13, 36

---

\* Cases primarily relied upon by Plaintiffs are denoted by asterisk.

*Capitol Place I Assoc. L.P. v. George Hyman Constr. Co.*,
    673 A.2d 194 (D.C. 1996) ...............................................................................41, 43, 44

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................................19

*Clarke v. Sec. Indus. Ass'n.*,
    479 U.S. 388 (1987) ...........................................................................................20

*Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*,
    686 F.2d 322 (5th Cir. 1982) ............................................................................31

*Crane v. Carr*,
    814 F.2d 758 (D.C. Cir. 1987)...........................................................................15

*Crane v. New York Zoological Soc'y*,
    894 F.2d 454 (D.C. Cir. 1990)...........................................................................14

*Danjaq, S.A. v. Pathe Commc'ns Corp.*,
    979 F.2d 772 (9th Cir. 1992) ......................................................................10, 11

*Diamond Chem. Co. v. Atofina Chem., Inc.*,
    268 F. Supp. 2d 1 (D.D.C. 2003)...........................................................12, 13, 14, 15

*District of Columbia v. Coleman*,
    667 A.2d 811 (D.C. 1995) .................................................................................34

*Doe v. Medlantic Health Care Group, Inc.*,
    814 A.2d 939 (D.C. 2003) .................................................................................44

*Dresser Indus. Inc. v. Underwriters at Lloyd's of London*,
    106 F.3d 494 (3rd Cir. 1997)...............................................................................8

*Edmond v. United States Postal Serv. Gen. Counsel*,
    949 F.2d 415 (D.C. Cir. 1991)...........................................................................14

*El-Fadl v. Cent. Bank of Jordan*,
    75 F.3d 668 (D.C. Cir. 1996).......................................................................15, 16

*Ellis v. Dixie Highway Special Road & Bridge Dist.*,
    138 So. 374 (Fla. 1931) .....................................................................................39

*Ellsworth Assocs., Inc. v. U.S.*,
    917 F. Supp. 841 (D.D.C. 1996)..................................................................37, 40

*Esquivel v. GAC Express Inc.*,
    C.A. No. 05-CA1025XR, 2005 WL 3454114 (W.D. Tex. Nov. 28, 2005)................9

*Farris v. Compton,*
   652 A.2d 49 (D.C. 1994) ........................................................................43

*Faysound Ltd. v. Walter Fuller Aircraft Sales, Inc.,*
   748 F. Supp. 1365 (E.D. Ark. 1990) ....................................................30

*Goldberg v. Remsen Partners, Ltd.,*
   170 F.3d 191 (D.C. Cir. 1999)..............................................................34

*Grubart v. Great Lakes Dredge & Dock Co.,*
   513 U.S. 527 (1995) .........................................................................7, 10

*GTE News Media Servs., Inc. v. Bellsouth Corp.,*
   199 F.3d 1343 (D.C. Cir. 2000)............................................................15

\* *Gulf Oil Corp. v. Gilbert,*
   330 U.S. 501 (1947) .......................................................................16, 17

*Hall v. Clinton,*
   285 F.3d 74 (D.C. Cir. 2002)................................................................38

*Harris v. Ladner,*
   127 F.3d 1121 (D.C.Cir. 1997).............................................................33

*Hercules & Co., Ltd. v. Shama Rest. Corp.,*
   566 A.2d 31 (D.C. 1989) ......................................................................34

*Hunter v. Shell Oil Co.,*
   198 F.2d 485 (5th Cir. 1952) ..................................................................8

*In re Belmar,*
   319 B.R. 748 (Bankr. D.C. 2004)..........................................................36

*In re Lorazepam & Clorazepate Antitrust Litig.,*
   295 F. Supp. 2d 30 (D.D.C. 2003).........................................................40

*Jerguson v. Blue Dot Inves. Co.,*
   659 F.2d 31 (5th Cir. 1981) ............................................................10, 11

*Johnson-Tanner v. First Cash Fin. Serv., Inc.,*
   239 F. Supp. 2d 34 (D.D.C. 2003).........................................................13

*Karazanos v. Madison Two Assocs.,*
   147 F.3d 624 (7th Cir. 1998)..................................................................8

*Kingman Park Civic Ass'n v. Williams,*
   348 F.3d 1033 (D.C.Cir. 2003)............................................................33

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941) ...................................................................................34

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................7

*Martin & Earle v. Maxwell*,
  67 S.E. 962 (S.C. 1910) .............................................................................39

*Nat'l Coal. Gov't of the Union of Burma v. Unocal, Inc.*,
  176 F.R.D. 329 (C.D. Cal. 1997) ..............................................................21

*Newman Mach. Co. v. Newman*,
  166 S.E.2d 63 (N.C. 1969) .........................................................................39

*O'Callaghan v. District of Columbia*,
  741 F. Supp. 273 (D.D.C. 1990) ...............................................................37

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*,
  C.A. No. 04-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ...........22, 23

*Pace v. DiGuglielmo*,
  544 U.S. 408 (2005) ...................................................................................43

*Pain v. United Tech. Corp.*,
  637 F.2d 775 (D.C. Cir. 1980) ...................................................................17

*Phillips v. Heine*,
  984 F.2d 489 (D.C. Cir. 1993) ...................................................................42

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) ...................................................................................16

*Rong v. Liaoning Provincial Gov't*,
  362 F. Supp. 2d 83 (D.D.C. 2005) ........................................................30, 31

*Seretse-Khama v. Ashcroft*,
  215 F. Supp. 2d 37 (D.D.C. 2002) .............................................................12

*Shapiro, Lifschitz & Schram v. Hazard*,
  24 F. Supp. 2d 66 (D.D.C. 1998) ...............................................................12

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distrib. Pty*,
  647 F.2d 200 (D.C. Cir. 1981) ...................................................................14

*Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*,
  411 F.3d 1242 (11th Cir. 2005) .................................................................11

*Ungar v. Islamic Republic of Iran,*
211 F. Supp. 2d 91 (D.D.C. 2002)........................................................................39

*United States ex rel. New v. Rumsfeld,*
350 F. Supp. 2d 80 (D.D.C. 2004)........................................................................33

*United States v. Cicero,*
214 F.3d 199 (D.C. Cir. 2000)..............................................................................43

*United States v. Winstar,*
518 U.S. 839 (1996) ..............................................................................................28

*Universal Licensing Corp. v. Paola del Lungo S.p.A.,*
293 F.3d 579 (2d Cir. 2002) ...............................................................................10

*Virtual Def. and Dev. Int'l, Inc. v. Republic of Moldava,*
133 F. Supp. 2d 1 (D.D.C. 1999).........................................................................26

*Vuitch v. Furr,*
482 A.2d 811 (D.C. 1984) ....................................................................................13

* *W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l,*
493 U.S. 400 (1990) .................................................................................21, 22, 23

*Walker v. Armco Steel Corp.,*
446 U.S. 740 (1980) ..............................................................................................11

*Warth v. Seldin,*
422 U.S. 490 (1975) ..............................................................................................20

* *West v. Multibanco Comermex, S.A.,*
807 F.2d 820 (9th Cir. 1987) .........................................................................30, 31

*World Wide Minerals, Ltd. v. Kazakhstan,*
296 F.3d 1154 (D.C. Cir. 2002)...........................................................................21

*Wyatt v. Syrian Arab Republic,*
398 F. Supp. 2d 131 (D.D.C. 2005)................................................................33, 34

*Zenith Elec. Corp. v. Kimball Int'l Mfg., Inc.,*
114 F. Supp. 2d 764 (N.D. Ill. 2000).....................................................................9

*Zerilli-Edelglass v. N.Y. City Transit Auth.,*
333 F.3d 74 (2d Cir. 2003) ..................................................................................43

## STATUTES

22 U.S.C. § 2370(e)(2) ..........................................................................30, 31

28 U.S.C. § 1332(a)(3) ................................................................................8

28 U.S.C. § 1332(c) .....................................................................8, 10, 11

D.C. Code Ann. § 12-301 ..........................................................................41

D.C. Code Ann. § 28-3101(4) ...................................................................40

D.C. Code Ann. § 28-3101(6) ...................................................................40

D.C. Code Ann. § 28-3104 ........................................................................40

D.C. Code Ann. § 28-3104(b) ...................................................................41

D.C. Code Ann. § 28-3109(1) ...................................................................42

## OTHER AUTHORITIES

8 Del. Laws § 18-804 ................................................................................12

8 Del. Laws § 278 .....................................................................................12

FED. R. CIV. P. 12(g) .................................................................................12

FED. R. CIV. P. 12(h)(1) .............................................................................12

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 .................................34

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 453
   cmt. b (1987) .......................................................................................26

## INTRODUCTION

This Court is the proper venue to hold Defendants accountable for their wrongful conduct – stealing Plaintiffs' interest in a profitable commercial joint venture and taking it for themselves. The four Defendants – Zeromax Group, Inc.; Zeromax Logistics, Inc.; Zeromax LLC; and Zeromax GmbH (collectively, the "Zeromax Defendants" or "Zeromax") – have moved to dismiss the First Amended Complaint ("Amended Complaint") on a variety of grounds. Because none of those grounds is valid, the motion to dismiss should be denied in its entirety.

Initially, Zeromax misleads this Court by suggesting that the case should be stayed or dismissed because it belongs before an arbitral panel in Vienna, Austria. Although Defendants correctly state that Plaintiffs ROZ Trading, Ltd. and ROZ Trading, Ltd. (Uzbekistan) (collectively, "ROZ" or "Plaintiffs") recently initiated an arbitration in Vienna against several entities, including Zeromax,[1] they omit a critical piece of information – Zeromax has expressly declined to submit to the arbitration, asserting that the tribunal has no jurisdiction and that Zeromax has not agreed to arbitrate any dispute with ROZ.[2]

Notably, Zeromax here does *not* seek to *compel* arbitration. If it had, Plaintiffs would agree to stay this case pending adjudication of the merits in the Vienna arbitration. But Defendants have not done so, and are seeking to dismiss the Vienna proceedings on

---

[1]    *See* Consolidated Memorandum Of Points And Authorities In Support Of Zeromax Group, Inc.'s, Zeromax Logistics, Inc.'s, Zeromax LLC's, and Zeromax GmbH's Consolidated Motion To Dismiss The Amended Complaint In Its Entirety ("Motion") at 44. *See* ROZ's Statement of Claims filed in the International Arbitral Centre of the Federal Economic Chamber in Vienna, Austria (attached as Exhibit 4).

[2]    *See* Zeromax's Memorandum in Reply in the Austrian arbitration (attached as Exhibit 5) at ¶ 2.

jurisdictional grounds. *See* Exhibit 5. Zeromax's suggestion that the proceedings in Austria are implicitly the exclusive forum for resolution of this dispute is disingenuous.

Against this backdrop, we first provide the background of this dispute and then demonstrate how the case should proceed.

## BACKGROUND OF CLAIMS

Plaintiffs will not detail all of the events giving rise to this action. Instead, ROZ provides only a brief summary and refers the Court to the Amended Complaint for a full recitation of the facts. *See* Amended Complaint at ¶¶ 1-56.

### CCBU

In early 1993, ROZ, the Republic of Uzbekistan, and The Coca-Cola Export Corporation ("TCCEC"), signed a Letter of Intent memorializing their intention to form a commercial joint venture. That venture would prepare, market, distribute, and sell non-alcoholic beverages in Uzbekistan. *See* January 26, 2003 Letter of Intent (attached as Exhibit 6).

On June 16, 1993, ROZ, TCCEC, and Uzbekistan, acting through its agent, Beshaghash, entered into a Joint Venture Agreement ("JVA") establishing Coca-Cola Bottlers Uzbekistan, Ltd. ("CCBU"). Amended Complaint at ¶ 13. According to the JVA, each party committed money and/or in-kind contributions to the venture. *See* Joint Venture Agreement (attached as Exhibit 7) at ¶ 4.2.1. In August 1993, Uzpishcheprom, the Uzbekistani state-created entity with control over the food and beverage industry, entered the Joint Venture as Uzbekistan's representative, replacing Beshaghash and managing the government's ownership interest. *See* Directive of the Uzbekistani State Property Committee (attached as Exhibit 8).

Uzbekistan participated in the venture like any commercial entity:

1.  Uzbekistan's ownership interest fluctuated as its business partners bought and sold shares and added capital to the Joint Venture. *See* chart R1-5 of The Coca-Cola

2

Export Corporation's Memorandum in Reply in the Austrian arbitration (attached as Exhibit 9).

2.  ROZ, TCCEC, and Uzbekistan each nominated one representative to CCBU's Parties' Assembly, the "supreme governing body of the Joint Venture." This controlling body named a Managing Director, who directed the day-to-day activities of CCBU. (Exhibit 7 at ¶ 6.1).

3.  In 1997, Uzbekistan, through Uzpishcheprom, sold most of its remaining interest in CCBU to ROZ Trading, Ltd. (Uzbekistan). *See* December 31, 1997 Directive of the Uzbekistani State Property Committee (attached as Exhibit 10).

Uzbekistan was an equal commercial partner in the venture. Indeed, the JVA specifically waived rights that traditionally might run to the sovereign. For instance, the JVA provides:

1.  A binding arbitration clause:

    [A]ll such disputes shall be finally settled under the rules of arbitration and conciliation of the International Arbitral Centre of the Federal Economic Chamber in Vienna, Austria ("Vienna Rules"), by three arbitrators appointed in accordance with these rules. (Exhibit 7 at ¶ 15.2).

2.  A clause allowing ROZ to terminate the Joint Venture:

    TCCEC and ROZ shall be entitled to terminate this Agreement . . . [i]n the event of any adverse change in Uzbek law as it relates to the Joint Venture or if it becomes impossible in the judgment of TCCEC/ROZ for the Joint Venture to carry out its business in a manner consistent with its objectives . . . . (*Id.* at ¶ 12.2.3).

3.  A clause allowing ROZ to terminate the Joint Venture if it is "effectively impeded from exercising its rights of management," including by:

    The imposition of or compliance with any law, act, decree, regulation or order issued by a governmental agency or body . . . [or] the expropriation, nationalization or seizure of any property of the Joint Venture, or any direct or indirect ownership therein . . . . (*Id.* at ¶ 12.2.3.6).

By all accounts, the early years of CCBU were successful. CCBU was among The Coca-Cola Company's top 35 bottlers worldwide. Amended Complaint at ¶ 18.

**Exclusion of ROZ**

During the formation, and for the first eight years of the Joint Venture, Mansur Maqsudi, ROZ's Chief Executive Officer, was married to Gulnora Karimova, the daughter of Islam Karimov, President (and dictator) of Uzbekistan. Amended Complaint at ¶ 19. In July 2001, upon announcing his intention to end the marriage, Mr. Maqsudi, his relatives, his companies, and CCBU incurred Ms. Karimova's wrath. *Id.* at ¶¶ 20-31; *see also* Decl. of Mr. Mansur Maqsudi at ¶¶ 10-16, 20-21 (attached as Exhibit 1); Decl. of Mr. Farhod Inogambaev at ¶¶ 6-8, 10, 14-20 (attached as Exhibit 2). At her behest, the Uzbekistani National Security Service raided ROZ's and CCBU's offices in Tashkent, seized documents, and interrogated employees, while holding them in isolation. Amended Complaint at ¶ 27; *see also* Maqsudi Decl. at ¶¶ 15-16.

Ms. Karimova used her control over the Uzbekistani government, including its courts, to initiate a series of sham investigations and proceedings designed to transfer control of CCBU to Zeromax. Amended Complaint at ¶¶ 28-31; *see also* Inogambaev Decl. at ¶¶ 14-17; *see generally* Expert Report of Mr. Scott Horton at ¶¶ 11-20 (attached as Exhibit 3). For instance, Ms. Karimova forced one of her assistants, Farhod Inogambaev, to sign a statement falsely accusing Mr. Maqsudi and ROZ of illegal actions. Inogambaev Decl. at ¶ 10. In furtherance of the objective of eliminating ROZ from CCBU, during the course of a purported "fiscal audit," government narcotics investigators took a sample of the beverage concentrate, implementing the ploy of planting narcotics so that subsequent tests would reveal tainted samples. *See* August 17, 2001 e-mail among Coca-Cola executives (attached as Exhibit 11).

The government then trumped up a series of charges against ROZ, including failure to pay taxes, failure to maintain an adequate charter fund balance, and violation of the anti-monopoly laws. These accusations were created out of whole cloth by the government (and Ms.

Karimova) and were patently false. Amended Complaint at ¶¶ 28-31; Inogambaev Decl. at ¶¶ 14-16. Even the Uzbekistani tax committee, the entity responsible for monitoring payment of charter funds, acknowledged that those funds had been fully paid. *See* March 28, 2001 Audit Report (attached as Exhibit 12). Ms. Karimova worked with Zeromax in effecting her plan, intending to ensure that Zeromax would hold the interest in CCBU formerly held by ROZ.

This mechanism of using tax audits and other sham proceedings in order to transfer control of entities operating in Uzbekistan to companies like Zeromax, is consistent with a pattern, repeated now on a frequent basis in light of its apparent success with the Coca-Cola joint venture at issue here. *See generally* December 5, 2006 Radio Free Europe article "Uzbek Officials Say Deal to Help British Mining Group" (attached as Exhibit 13); November 21, 2006 Reuters article "Uzbeks Seeking Ways to Disregard International Arbitration" (attached as Exhibit 14); Inogambaev Decl. at ¶ 14.

Through these actions, Uzbekistan increased its ownership in CCBU – at ROZ's expense – from 2% to 57% in one year. *See* October 22, 2002 Minutes of the General Meeting of Participants of CCBU (attached as Exhibit 15). In 2002, Ms. Karimova installed one of her close allies at CCBU, Irina Avtaikina, to manage CCBU. Amended Complaint at ¶ 36. In 2004, Ms. Karimova succeeded in directly securing control of ROZ's former interest in CCBU for Zeromax. Amended Complaint at ¶¶ 37, 45-46; *see also* Inogambaev Decl. at ¶¶ 20-21.

**Zeromax**

Zeromax Group, Inc.; Zeromax Logistics, Inc.;  Zeromax LLC; and Zeromax GmbH (in their various manifestations at the relevant times) worked together with Ms. Karimova to ensure that ROZ's interest passed to Zeromax, a company she controlled. Amended Complaint at ¶¶ 39-46; *see also* May 5, 2005 NEFTE Compass article (attached as Exhibit 16). Ms. Karimova had worked with Zeromax prior to placing the control of CCBU with Zeromax. Amended

5

Complaint at ¶ 43; *see also* Inogambaev Decl. at ¶¶ 12-13. And during the course of these events, she made explicit her intention to take over ROZ's interest in CCBU and place that interest in the hands of one of her companies – which, it ultimately became clear, was Zeromax. Inogambaev Decl. at ¶¶ 11, 20.

In contrast to Defendants' assertions that "Muzimpex and the Zeromax Entities were and are separate and distinct corporate entities," the Amended Complaint alleges that Muzimpex is a mere extension of Zeromax, lacking corporate substance, and designed solely to facilitate the scheme described here. Motion at 13; Amended Complaint at ¶ 42. All of Muzimpex's activities and operations are controlled by Defendants, with no independent management. Amended Complaint at ¶ 42. The interests in CCBU and Muzimpex have been passed around the Zeromax entities to evade the rule of law. *Id.* at ¶¶ 42, 51-53.

### Termination Notices and Subsequent Dissolution of Zeromax

After it was completely excluded from its management interest in CCBU, ROZ sent termination notices, in accordance with the JVA, to all entities with an interest in CCBU, including Zeromax, which was purporting to hold ROZ's interest. Amended Complaint at ¶ 48 (describing provisions of the JVA that permit termination if Uzbekistan interfered with ROZ's management and participation in CCBU). These termination notices triggered certain obligations under the JVA. Exhibit 7 at ¶ 12.2. But instead of performing those obligations, the Zeromax entities took a different tack: they attempted to avoid liability through dissolution and by transferring their assets to a newly established company abroad. Amended Complaint at ¶¶ 51-53.

The timing of the purported dissolution of the Zeromax entities in the United States, and the creation of a Swiss replacement company – Zeromax GmbH – corresponds directly to ROZ's termination of the JVA. *Id.* It was done almost immediately after Uzbekistan received ROZ's

notice of termination.  *Id.*  Specifically, Zeromax GmbH was established, Zeromax entities were dissolved, and Muzimpex was passed from Zeromax LLC to Zeromax GmbH.  *Id.*  Indeed, many of these actions did not occur until *after* Zeromax had itself received the termination notice from ROZ, all in an effort to avoid the legal consequences of its activities.  *Id.*

## ARGUMENT

**I.    THIS COURT HAS DIVERSITY SUBJECT MATTER JURISDICTION AND PERSONAL JURISDICTION OVER ALL DEFENDANTS**

The Zeromax Defendants raise a number of jurisdictional defenses, all revolving around Zeromax GmbH.  They assert that this Court cannot exercise personal jurisdiction over Zeromax GmbH and that its presence in the case destroys diversity subject matter jurisdiction.  Both arguments are equally flawed.

In considering the jurisdictional objections at this stage, certain basic rules apply.  Under the Federal Rules, a plaintiff need not come to court with evidence in hand.  This is true with respect to jurisdiction, just as with any other issue.  At the threshold, a plaintiff must simply show that it is, in good faith, asserting a legal and factual basis for jurisdiction, including subject matter jurisdiction.  *See Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537 (1995) ("Normal practice permits a party to establish jurisdiction at the outset of a case by means of a nonfrivolous assertion of jurisdictional elements . . . ."); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (party may support jurisdictional elements at each stage of the case according to the level of proof required at that stage).  The trial court may accelerate resolution of factual issues bearing on jurisdiction, but a plaintiff that has made a good faith allegation is not put to its proof at the first "jurisdictional skirmish," *i.e., before* discovery.  In this case, still in its earliest stages, Plaintiffs have satisfied the *pleading* requirements and shown a basis for subject matter and personal jurisdiction.

As noted above, Defendants assert that the Court does not have personal jurisdiction over Zeromax GmbH and that its presence in the case defeats diversity subject matter jurisdiction in any event. Neither assertion is correct. We address subject matter jurisdiction first.

## A.     This Court Has Diversity Subject Matter Jurisdiction

Defendants' assertion that this Court lacks subject matter jurisdiction ignores the clear statutory basis for jurisdiction under 28 U.S.C. § 1332(a)(3). That section provides that federal district courts have jurisdiction over cases between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." § 1332(a)(3). The case law has consistently given effect to the plain language of this provision: jurisdiction is proper when no plaintiff is from the same state as any defendant, at least one plaintiff and one defendant are citizens of different states within the United States, and there are additional parties from one or more foreign states. *See, e.g.*, *Karazanos v. Madison Two Assocs.*, 147 F.3d 624, 627 (7th Cir. 1998) (citing *Hunter v. Shell Oil Co.*, 198 F.2d 485, 488 (5th Cir. 1952)) (citizen of state A v. citizen of state B and an alien); *Dresser Indus. Inc. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 497-98 (3rd Cir. 1997) ("[o]ur holding is consistent with the circuits that have squarely addressed this issue and have uniformly concluded that jurisdiction exists when diverse citizens are joined with aliens even if they appear on both sides of the dispute"). That is the case here.

On Plaintiffs' side, the decisive fact is that ROZ Trading, Ltd. is a citizen of New Jersey, where it has its principal place of business. *See* 28 U.S.C. § 1332(c) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business"). On Defendants' side, various entities are citizens of Delaware and Washington, D.C., but none of New Jersey. Thus, there is complete diversity between the U.S. citizens.

The foreign corporations are "additional parties" that, under the clear and unambiguous language of § 1332(a)(3), do not affect diversity. *See Zenith Elec. Corp. v. Kimball Int'l Mfg., Inc.*, 114 F. Supp. 2d 764, 768 (N.D. Ill. 2000) ("virtually every authority that has construed § 1332(a)(3) has held that the presence of aliens as additional parties on both sides of the action does not destroy diversity jurisdiction (provided there are diverse domestic citizens on both sides of the action who are legitimately interested parties in the dispute)"); *see also Esquivel v. GAC Express Inc.*, C.A. No. 05-CA1025XR, 2005 WL 3454114, at *2 (W.D. Tex. Nov. 28, 2005) ("Section 1332(a)(3) is an exception to the complete diversity rule where citizens of diverse states are present on both sides of the suit and citizens of foreign countries are additional parties"). Specifically, the Amended Complaint describes that:

1. ROZ Trading, Ltd. is organized under the laws of the Cayman Islands, with its principal place of business in New Jersey. Amended Complaint at ¶ 1.

2. ROZ Trading, Ltd. (Uzbekistan), until its purported dissolution, was organized and based in Uzbekistan. *Id.* at ¶ 2.

3. Zeromax Group, Inc. was incorporated in Delaware and has a principal place of business in Washington, D.C. *Id.* at ¶ 3.

4. Zeromax Logistics, Inc. was incorporated in Delaware and had a principal place of business in Washington, D.C. *Id.* at ¶ 4.

5. Zeromax LLC was formed in Delaware and had a principal place of business in Washington, D.C. *Id.* at ¶ 5.

6. Zeromax GmbH is a Swiss-registered company with an apparent principal place of business in Switzerland. *Id.* at ¶ 6.

In short, § 1332(a)(3) applies by its terms. Citizens of different states are on each side of the case – ROZ of New Jersey on one side, and three Zeromax entities ("Group," "Logistics," and "LLC") of Delaware and Washington, D.C. on the other -- with foreign entities, ROZ Trading Ltd. (Uzbekistan) and Zeromax GmbH, as "additional parties," filling out the picture.

Defendants make two arguments in response.  They contend that ROZ has not proven –
or alleged in sufficient detail – that its principal place of business actually is New Jersey.  Motion
at 5.  But at this stage, the clear and direct statement that ROZ's "principal place of business is
Morristown, New Jersey," is sufficient.  Amended Complaint at ¶ 1; *see also Grubart*, 513 U.S.
at 537.  Fed. R. Civ. P. 8(a) does not require more than this "short and plain" statement at this
stage.  *Id.*  In any event, there is no dispute on this issue – ROZ's headquarters are in New Jersey
and ROZ conducts its business there.  Maqsudi Decl. at ¶ 6.

Defendants also make the assertion that, notwithstanding the plain language of § 1332(c)
and the weight of the case law from outside this Circuit, "it remains an open question in the
District of Columbia Circuit whether an alien corporation is deemed to be a citizen of the place
in which it maintains its principal place for purposes of diversity."  Motion at 5.

Defendants' § 1332(c) argument is directly contrary to the text and unambiguous purpose
of the statute.  Section 1332(c) speaks in mandatory terms:  a corporation "shall be deemed to be
a citizen of any State by which it has been incorporated *and of the State where it has its principal
place of business*."  § 1332(c) (emphasis added).  That is exactly what the vast majority of
circuits to have considered the issue have held.  *See, e.g., Danjaq, S.A. v. Pathe Commc'ns
Corp.*, 979 F.2d 772, 773-75 (9th Cir. 1992); *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553,
1558 (11th Cir. 1989); *Jerguson v. Blue Dot Invs. Co.*, 659 F.2d 31, 35 (5th Cir. 1981).

Ignoring these precedents, Defendants refer the Court to a decision of the Second Circuit,
the only circuit that has refused to give § 1332(c) effect in connection with foreign corporations.[3]
The Second Circuit apparently focuses on "State" as a state of the United States.  A foreign

---

[3]    *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 580-81 (2d Cir. 2002)
(describing the law as it exists in the Second Circuit).

corporation is not incorporated in a U.S. state, but rather a foreign country. Thus, the first part of § 1332(c) – which refers to State of incorporation – would not, under that reading, apply to a foreign corporation.

But whether or not that conclusion is correct, the Second Circuit errs when it refuses to give effect to the *final* part of § 1332(c) – the relevant portion here – which deems a corporation to be a citizen of the State of its principal place of business. Even if a company is incorporated abroad, there is no reason why it cannot also have citizenship, solely for purposes of diversity, in a "State where it has its principal place of business." This is exactly what § 1332(c) says.

In light of the language of the statute and its legislative history, every other circuit to consider this issue has concluded that an alien corporation is a citizen of the State where it has its principal place of business. *See, e.g., Danjaq, S.A.*, 979 F.2d at 773-75; *Cabalceta*, 883 F.2d at 1558; *Jerguson*, 659 F.2d at 35. Indeed, several courts have explicitly decided that § 1332(c) applies to corporate entities, like ROZ, organized under the laws of the Cayman Islands. *See, e.g., Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247-48 (11th Cir. 2005). Significantly, the Supreme Court itself has not hesitated to treat a foreign corporation as a citizen of the State in which it has its principal place of business. *See Walker v. Armco Steel Corp.*, 446 U.S. 740, 741-42 (1980) (diversity exists where one party was "a resident of Oklahoma" and opposing party was "a foreign corporation having its principal place of business in a State other than Oklahoma").

**B.    Plaintiffs Have Set Forth A Clear Basis For Personal Jurisdiction Against The Defendants**

**1.    Plaintiffs Have Pled A Clear Basis For Personal Jurisdiction**

Just as Defendants' subject matter jurisdiction defense is based entirely on the presence of Zeromax GmbH in this case, Defendants challenge personal jurisdiction only over Zeromax

GmbH. They do not question this Court's personal jurisdiction over the other Zeromax Defendants. Thus, as a matter of law, the three Zeromax Defendants based in the United States have waived any and all objections to personal jurisdiction. *See* FED. R. CIV. P. 12(g) and 12(h)(1); *see also Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 39-40 (D.D.C. 2002). That concession is fatal to the Defendants' theory regarding Zeromax GmbH.

A defendant corporation's contacts with a forum are ordinarily not attributed to affiliated corporations. But there is a well-recognized exception when affiliated parties are "alter egos" of an entity over which the Court does have personal jurisdiction; in that case, the company's contacts may be attributed to the affiliated party for jurisdictional purposes.[4] *Diamond Chem. Co. v. Atofina Chem., Inc.*, 268 F. Supp. 2d 1, 7 (D.D.C. 2003) (citing *Shapiro, Lifschitz & Schram v. Hazard*, 24 F. Supp. 2d 66, 70 (D.D.C. 1998)). Plaintiffs have alleged sufficiently that the U.S. Zeromax Defendants are the alter ego of Zeromax GmbH, which was created, in large measure, to try to thwart this Court's jurisdiction over this dispute.

In considering whether entities are "alter egos," courts look first at whether there is a unity of ownership and interest. *Diamond Chem.*, 268 F. Supp. 2d at 7 (citing *Hazard*, 24 F. Supp. 2d at 70 n.3). Other factors include "failure to maintain corporate formalities," "commingling of funds or other assets," and "transfer of personnel back and forth between the parent corporation and its subsidiary." *Johnson-Tanner v. First Cash Fin. Serv., Inc.*, 239 F.

---

[4]    Delaware corporations and LLCs maintain "life" for three years after dissolution and the U.S. Zeromax Defendants have continued to act after their dissolution. *See* Amended Complaint at ¶ 54 (citing 8 Del. Laws § 278); *id.* at ¶ 55 (citing 8 Del. Laws § 18-804). Moreover, the U.S. Zeromax entities still maintain an active website and hold themselves out to the public as having an office in D.C. Amended Complaint at ¶¶ 10-11; *see also* hardcopy of Zeromax website (attached as Exhibit 17). Furthermore, Zeromax LLC transferred the interest in CCBU/Muzimpex to Zeromax GmbH *after* Zeromax LLC had already been dissolved. *See* September 28, 2005 certificate of cancellation of Zeromax LLC (attached as Exhibit 18); Muzimpex joint venture agreement, registered on November 7, 2005 (attached as Exhibit 19). *See also* Exhibit 5 at ¶ 27 (Zeromax acknowledging timing of transfer).

Supp. 2d 34, 38-40 (D.D.C. 2003). As discussed above (and in the Amended Complaint at ¶¶ 40, 42, 51-52), there was no respect for corporate form among Defendants, nor were there any meaningful distinctions, except minor variations in name. On their websites, Zeromax GmbH and Zeromax Group, Inc. claim credit for *identical* interests and undertakings. Amended Complaint at ¶ 40. Indeed, each Defendant shares the same management. *See, e.g.,* Certificate of Voluntary Dissolution of Zeromax Group, Inc. (attached as Exhibit 20); Certificate of Voluntary Dissolution of Zeromax Logistics, Inc., (attached as Exhibit 21). Available documentation suggests that Zeromax LLC's interest in Muzimpex was simply transferred to Zeromax GmbH without consideration. Exhibit 5 at ¶¶ 26-27.

But there is more here. The suspicious timing of events suggests that these transformations of corporate form have been designed expressly to try and evade legal duties. For instance, *after* ROZ issued the JVA termination notices, the Zeromax entities began dissolving and the ownership interest of ROZ in CCBU was shuffled among entities. Not only was there no adherence to corporate formalities, but the shifting corporate form is being used as a shell game to evade legal responsibilities for this very dispute. In these circumstances, "the separateness of the persons and the corporation has ceased and . . . an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice." *Diamond Chem.,* 268 F. Supp. 2d at 7 (*citing Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 248-49 (D.C. 1993)); *see also Vuitch v. Furr*, 482 A.2d 811, 815 (D.C. 1984). Where corporate form is being used in an effort to evade specific, fully-ripened legal duties, it becomes even more important to "pierce the veil" and assert personal jurisdiction under the alter ego theory.

Moreover, to the extent Defendants could show that they are *not* simply one functional entity, this Court *still* has jurisdiction over Zeromax GmbH. A nonresident defendant can be "transacting business" for jurisdictional purposes through an intermediary that is transacting business in the forum. *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distrib. Pty*, 647 F.2d 200 (D.C. Cir. 1981). Indeed, Zeromax GmbH appears to be a successor in interest – the only successor – to the Zeromax companies that have steadily done business in the U.S. and were involved in all the activities at issue here while they were in the U.S. and D.C.

Plaintiffs have alleged facts (some of which are uncontestable) that far exceed the burden of making a *prima facie* showing on "alter ego" and "doing business" theories. To be sure, some facts remain in dispute, and Defendants cling to the corporate form. Such dispute is expected given the early stage of the litigation, especially considering the background of purposeful falsehoods and efforts at evasion, as described in detail in the Amended Complaint. Amended Complaint at ¶ 40; *see also* Inogambaev Decl. at ¶ 21. But at this stage, this Court should resolve any fact issues in favor of the Plaintiffs and assume jurisdiction. *See Crane v. New York Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).

> ### 2.  In The Alternative, The Court Should Order A Period Of Jurisdictional Discovery So That Plaintiffs Can Investigate The Relevant Facts

Although Plaintiffs' allegations and the existing evidence are clearly sufficient to defeat Zeromax's personal jurisdiction motion, Plaintiffs have plainly alleged enough to allow them to engage in limited jurisdictional discovery to test the jurisdictional assertions raised by Zeromax. Discovery relating to personal jurisdiction should be freely permitted when consistent with a good faith belief that such discovery will enable a party to show that the Court has personal jurisdiction over the defendant. *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991); *Diamond Chem.*, 268 F. Supp. 2d at 15 ("[t]his Circuit's standard for

permitting jurisdictional discovery is quite liberal"); *see also Artis v. Greenspan*, 223 F. Supp. 2d 149, 154 (D.D.C. 2002) (allowing limited jurisdictional discovery to assess questions about subject matter jurisdiction).

If a party demonstrates that it can supplement its jurisdictional allegations through discovery, jurisdictional discovery is appropriate. *GTE News Media Servs., Inc. v. Bellsouth Corp.*, 199 F.3d 1343, 1351-52 (D.C. Cir. 2000) (jurisdictional discovery was necessary and appropriate because the record is "plainly inadequate. We do not even know for certain which defendants own and operate which websites."); *see also Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987) (holding that it was an abuse of discretion to deny jurisdictional discovery). Based on *GTE*, this Court found "it hard to imagine a situation where a plaintiff could not demonstrate [ ] that it can supplement its jurisdictional allegations through discovery." *Diamond Chem.*, 268 F. Supp. 2d at 15 (internal citations omitted). Thus, a plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information about its contacts with the forum. *Id.* (citing *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)).

If factual issues bearing on jurisdiction are to be addressed at this time – including the relationship among the various Zeromax Defendants, their businesses, and Muzimpex – Plaintiffs respectfully request a 120-day period of jurisdictional discovery. In that time, Plaintiffs would seek to obtain additional evidence demonstrating that the Zeromax entities based in the United States were and are mere alter egos of Zeromax GmbH. Plaintiffs will seek such documents and testimony from Defendants and third parties that are likely to have information concerning Zeromax GmbH. Of course, one hundred twenty days will be sufficient time *only* if Zeromax requires its agents, consultants, vendors, and former or current employees,

shareholders, and managers to provide *all* the documents they possess concerning contacts with the forum, the conduct of the business with respect to CCBU, and their corporate form. Thus, Plaintiffs request that the Court not only authorize jurisdictional discovery, but also order the Zeromax Defendants to cooperate fully.

## II.   DEFENDANTS' *FORUM NON CONVENIENS* ARGUMENT FAILS BECAUSE THERE IS NO ALTERNATIVE, LET ALONE MORE CONVENIENT, FORUM

Asserting *forum non conveniens*, Zeromax claims that this case must be litigated in Uzbekistan. Motion at 42-43. But any effort to invoke *forum non conveniens* in this case is unavailing. There is good and sufficient reason why this case should be pursued here – and why it *cannot* properly be pursued there.

As an initial matter, "plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). Even where a defendant demonstrates that an adequate alternative forum exists and shows some added convenience to litigating there, dismissal based on *forum non conveniens* is very much the exception, not the norm. It is the defendant's burden to establish (1) that an adequate alternative forum exists and, having done so, (2) that the balance of public and private factors tips decidedly in favor of dismissal. *BPA Int'l, Inc. v. Sweden*, 281 F. Supp. 2d 73, 85 (D.D.C. 2003) (citing *El-Fadl*, 75 F.3d at 677). The Zeromax Defendants have not done so, nor can they.

### A.    There Is No Adequate Alternative Forum

Defendants' *forum non conveniens* argument fails to overcome the first hurdle. To consider dismissal, the Court must first find an adequate alternative forum. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 238 (1981). On this point, Defendants refer us to the *Uzbekistani* courts. But Uzbekistan *cannot* provide an *adequate* forum.

First, the senior executives for Plaintiffs cannot travel to Uzbekistan without risking imprisonment and death.  Maqsudi Decl. at ¶ 21.  Currently, they are wanted by authorities as a result of faulty and bogus judicial proceedings.  *See, e.g.,* November 6, 2002 Uzbekistani Office of Public Prosecutor document regarding Mansur Maqsudi (attached as Exhibit 22).  If they were to travel to Uzbekistan for trial, Mr. Maqsudi and his colleagues undoubtedly would be arrested and subjected to the internationally recognized brutal practices of the Karimov regime.  Maqsudi Decl. at ¶ 21; *see* Report of the United Nations Economic and Social Council (attached as Exhibit 23) at ¶¶ 60-71.

Second, and equally important, the Uzbekistani judiciary system is corrupt and lacks any coherence or consistency, thus preventing litigants from receiving fair trials – particularly where the Karimov family is involved or has taken a personal interest.  The lack of an adequate system of justice and the subservience of the judicial system to the whim of the Karimov family is fully detailed in the attached expert report.  *See* Horton Report at ¶¶ 11-17, 20-27.  Moreover, it is well-known that the government of Uzbekistan frequently manipulates legal acts and records to alter the basic dynamics of the law.  *Id.* at ¶¶ 18-19.

**B.      The Private And Public Factors Favor This Forum**

Even if Zeromax could demonstrate that Uzbekistan was an adequate alternative forum, the balance of public and private interest factors cuts against Zeromax.  *See Pain v. United Tech. Corp.*, 637 F.2d 775, 784-85 (D.C. Cir. 1980).  Private factors include:

> relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gilbert*, 330 U.S. 501, 508 (1947).

Zeromax's assertion that "virtually all" of the evidence and witnesses in this case are in Uzbekistan is way off the mark. Given that the primary place of business of three of the Zeromax entities was (and is) the United States, many relevant documents and witnesses are in the United States.[5] The Coca-Cola Export Corporation (and its parent, The Coca-Cola Company), the key third party in this drama, is located in the United States and was directly involved in these events.[6] Furthermore, Defendants' assertion that "the majority of the allegations concern Uzbekistan" is inaccurate. Motion at 43. This case is based on the actions of Zeromax, which has offices in the U.S., including Washington, D.C. Amended Complaint at ¶¶ 3-5. The key Coca-Cola witnesses are no longer in Uzbekistan, and the former employees of CCBU have likewise fled that country. Maqsudi Decl. at ¶ 15. Even if we assumed *arguendo* that Uzbekistani courts were capable of providing a fair trial, there is no suggestion that those courts are in a position to compel attendance of witnesses or issue process through the Hague Convention, or otherwise.

The Zeromax Defendants assert that "[a]n additional burden of litigating in the District of Columbia would be the expense of translating the Uzbek and Russian-language documentary evidence into English." Motion at 43. The expense of translating is miniscule compared to the expense of transporting witnesses, representatives of Plaintiffs, representatives of Defendants, and counsel to Uzbekistan for trial. And any documents would have to be translated into English

---

[5]    There also may be documents in Switzerland, where Zeromax GmbH is registered. That these documents may be in Switzerland further weakens Defendants' argument that Uzbekistan is the proper forum.

[6]    Plaintiffs note that they are seeking discovery from The Coca-Cola Company in Atlanta, Georgia, pursuant to a proceeding under 28 U.S.C. § 1782, which is pending in the U.S. District Court for the Northern District of Georgia.

nonetheless, because many individuals involved in this case are native English speakers, and do not read, speak, or understand Uzbek or Russian.

Public factors include "whether the community where the action leading to the suit actually took place has an interest in the litigation" and "whether the suit is 'unnecessarily burdensome' on the court." *BPA Int'l*, 281 F. Supp. 2d at 85 (internal citations omitted). These factors also support this forum. ROZ Trading, Ltd. has its principal place of business in the United States and its executives are American citizens. Maqsudi Decl. at ¶¶ 3, 6-7. At least three of the four Zeromax Defendants conducted business from and in the U.S. This country has a vested interest in protecting its citizens.

## III.    PLAINTIFFS HAVE STANDING

Defendants' argument that ROZ lacks standing is misguided. Zeromax suggests that ROZ has not shown: (1) injury; (2) that Zeromax caused an injury; or (3) that ROZ's claims do not fall within the zone of interest protected by law. Motion at 25. The short answer is that the standing inquiry described in the Supreme Court cases cited by Defendants applies *primarily* to public law cases – the circumstances under which a citizen is allowed to complain about the general actions of the government or seeks to avail itself of the protection of a statute of uncertain scope. There is little doubt that if a person or entity has been injured, and has a cause of action at common law or statute (as a matter of tort or contract) for damages, or has a right of equitable relief, that person or entity has standing to pursue its claim.

The Amended Complaint describes how Zeromax interfered with ROZ's ownership and control of CCBU. Amended Complaint at ¶¶ 41-48. As a result, ROZ lost its interest in a valuable enterprise, for which it claims damages and equitable relief. The allegations of loss and harm obviously constitute actual injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983) (plaintiff must allege that he has sustained some direct injury as the result of the

challenged conduct). The Amended Complaint clearly links that injury to Zeromax's actions and seeks relief from Zeromax. Amended Complaint at ¶¶ 41-48. No more is required. *See Warth v. Seldin*, 422 U.S. 490, 498-500 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," but rather the injury prong of the standing analysis has been satisfied whenever an actual injury is alleged).

Zeromax suggests that ROZ lacks standing because Uzbekistan (as opposed to Zeromax) is actually to blame for ROZ's loss and injury. Motion at 22-23. But again, Defendants confuse questions about the existence of a cause of action with questions about standing. If ROZ has a cause of action against Zeromax – and it clearly does – then the common law entitles it to seek redress in damages (or equitable relief) and it has standing to pursue its claim.

Zeromax's argument about "zone of interest" is equally misguided. The "zone of interest" analysis is peculiar to certain types of federal constitutional or statutory claims. A litigant asserting a right under federal statute must show that "the interest sought to be protected . . . is arguably within the zone of interest to be protected or regulated" by the law in question. *Bennett v. Spear*, 520 U.S. 154, 162-65 (1997). In general, this "prudential standing requirement" applies in connection with cases in which a plaintiff is seeking review of agency action. *See Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388 (1987). The question is whether a plaintiff is the kind of person within the possible protection of the statute under which he is seeking review. But "zone of interest" has rarely been applied to a common law cause of action because if the plaintiff is a proper party to pursue the claim under the common law, then it is within the law's zone of interest. If ROZ has a claim – and as shown below, it clearly does – then it has standing to pursue it. ROZ is a party that is intended to benefit from the claims for breach of contract, conspiracy, tortious interference, and others that it has alleged.

## IV.    THE ACT OF STATE DOCTRINE DOES NOT BAR THIS CASE

Defendants' act of state theories are also unavailing.  First, the doctrine has no application to most of the claims against Zeromax.  Second, for the remainder, the doctrine does not reach the actions of a sovereign taken in a *commercial context*, for which it has expressly subjected itself to private remedies.  Finally, the doctrine does not apply here because the claims of this case fall within the parameters of the Second Hickenlooper Amendment.

### A.    The Nature Of The Act Of State Doctrine

The act of state doctrine is a non-jurisdictional, prudential doctrine of judicial self-restraint, reserved only – as Defendants acknowledge – for cases "inquiring into the validity of public acts a recognized foreign sovereign power committed within its own territory."  Motion at 13 (citing *World Wide Minerals, Ltd. v. Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002)).  The Supreme Court has made it clear that the act of state doctrine is not "an inflexible and all-encompassing rule."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964).  Rather, it is a flexible doctrine, employing "a sort of balancing approach" to determine whether polices underlying the doctrine justify its application in a given case.  *W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).  Further, the act of state doctrine "is not applied at every conceivable opportunity."  *Nat'l Coal. Gov't of the Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 350 (C.D. Cal. 1997).  The Supreme Court has emphasized that U.S. courts have the "power, and . . . *obligation*, to decide cases and controversies properly presented to them.  The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments . . . ."  *Kirkpatrick*, 493 U.S. at 409 (emphasis added).  The party asserting the doctrine has the burden of proving that its application is appropriate.  *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694 (1976); *Oceanic*

*Exploration Co. v. ConocoPhillips, Inc.*, C.A. No. 04-332, 2006 WL 2711527, at *5 (D.D.C. Sept. 21, 2006).

Use of the act of state doctrine has been "increasingly restricted" with the doctrine being "applied sparingly, and only where the validity of a foreign sovereign is at issue." *Ampac Group, Inc. v. Republic of Honduras*, 797 F. Supp. 973, 977-78 (S.D. Fla. 1992). While once considered an "expression of international law", it is now considered "a consequence of domestic separation of powers." *Kirkpatrick*, 493 U.S. at 404. Thus, while under specific circumstances, the act of state doctrine may restrict judicial inquiry into the legality, validity, and propriety of certain acts of foreign sovereigns acting within their borders, "it does not preclude judicial resolution of all commercial consequences stemming from the occurrence of such public acts." *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1380-81 (5th Cir. 1980).

**B.     Plaintiffs' Principal Tort And Contract Claims Do Not Require The Court To Invalidate Any Official Act**

Defendants assert that in order to "adjudicate [Plaintiffs'] claims against the Zeromax Defendants, . . . this Court would be required to pass judgment on the validity" of the sovereign acts of Uzbekistan. Motion at 14. In making this assertion, Defendants fundamentally ignore most of the claims raised by the Amended Complaint, including, for example, tortious interference and breach of contract. Those claims do not challenge any act of the sovereign.

For the act of state doctrine to apply, there must be a certain "factual predicate" that "requires the Court to declare invalid . . . the official act of a foreign sovereign." *Kirkpatrick*, 493 U.S. at 405. "Act of state issues only arise when a court must decide – that is, when the outcome of the case turns upon – the effect of official action by a foreign sovereign." *Id.* at 406 (emphasis omitted). As in *Kirkpatrick*, the "factual predicate" does not exist in the current case; the case against Zeromax does not turn upon undoing an action by a foreign sovereign.

*Kirkpatrick* involved the award of a Nigerian government construction contract as a result of a bribe. When the unsuccessful contract bidder became aware of the bribe, it filed an action for damages against the winning (bribing) bidder. The Court held that the act of state doctrine was inapplicable because "neither the claim nor any asserted defense requires a determination that Nigeria's contract with Kirkpatrick International was, or was not, effective." *Id.* The plaintiff in *Kirkpatrick*, like current Plaintiffs here, "was not trying to undo or disregard the governmental action, *but only to obtain damages from private parties who had procured [the contract].*" *Id.* at 407 (emphasis added). Thus, the Court need find only that Defendants' actions were wrongful in order to find for Plaintiffs and award the damages that flow from the wrongful acts. *See Oceanic Exploration,* 2006 WL 2711527, at **14-15 (applying *Kirkpatrick* and finding act of state did not apply where case focused on the non-sovereign defendant's conduct and resulting harm). Specifically, in *Kirkpatrick*, the Court needed only to find that the wrongful act caused the loss of the contract in order to award damages from the winning bidder who prevailed on account of bribery. Here, the Court is not required to "undo" any Uzbekistani judicial decision or other government action in order for ROZ to recover damages from Zeromax. The Court need only find that Zeromax's actions were wrongful and then award damages flowing from the wrongful acts.

In Counts II and III of the Amended Complaint, for instance, Plaintiffs allege that Zeromax tortiously interfered with ROZ's interest in CCBU and/or conspired with others to do so. *See* Amended Complaint at ¶¶ 27-45; *see also* Inogambaev Decl. at ¶¶ 10-11, 14-20. Such activity is distinct from the question of the ultimate title to property. To find Zeromax liable for tortious interference, this Court need not determine that the Uzbekistani court decisions related to ROZ were invalid, let alone undo them. Even if these decisions are untouchable, Zeromax

tortiously interfered with ROZ's interest. Thus, "the outcome of the case" does not hinge upon "the effect of official action by a foreign sovereign" and the act of state doctrine is not implicated. In sum, Zeromax's tortious interference is actionable, and Zeromax may be liable for damages resulting from that tort; nothing about the tort requires a U.S. court to undo the transfer of ROZ's ownership interest in CCBU.

Further, the act of state doctrine is irrelevant to Count I – Breach of Contract. Zeromax, working with Ms. Karimova, TCCEC, and Uzbekistan, breached the JVA by not calling a Parties' Assembly after ROZ terminated the Joint Venture, as required under the JVA. *See* Amended Complaint at ¶¶ 48-51. The breach gives rise to damages. Nothing in this count involves the legitimacy of any Uzbekistani court decision or other sovereign action; the contractual right to terminate *assumes* the legitimacy of the actions of the Uzbekistani government actions, but nonetheless provides a remedy where those actions have the *effect* of interfering with ROZ's (or Coca-Cola's) interest. *See* Exhibit 7 at ¶ 16.10. There are no facts that would require this Court to undo the Uzbekistani court decisions or to declare them invalid. As a new member of the Joint Venture, Zeromax became a party to the JVA and was obligated to follow every provision of the JVA, including the requirement of calling a Parties' Assembly. Exhibit 7 at ¶ 5.5. There is simply no reason why this Court would need to examine the validity of Uzbekistani court decisions or any other sovereign act in order to rule on breach of contract.

The same holds true for Count VIII – Fraudulent Conveyance. As discussed below, the elements of a fraudulent conveyance claim in no way implicate any acts by the government of Uzbekistan or require this Court to judge such acts. The fraudulent conveyance at issue here involves the conveyance of ROZ's interest in CCBU from Zeromax LLC to other entities,

including Muzimpex and Zeromax GmbH, *after* Zeromax gained control of the shares. Thus, there is no sovereign act at issue and no place for the act of state doctrine in this claim.

###### C.    The Commercial Nature Of The Dispute Takes All Of ROZ's Claims Out Of The Act Of State Doctrine

As shown above, the act of state doctrine simply does not apply to most of the claims asserted here against Zeromax. Like the bribery of public officials at issue in *Kirkpatrick* leading to an improper award of a government concession, most of the underlying claims in the present case can be asserted without directly challenging government action. Indeed, Defendants ignore those claims and address their theory to unjust enrichment, conversion and quiet title, which more closely involve a "right to ownership" of ROZ's shares.

But even these claims – indeed all of the claims – are beyond the reach of the act of state doctrine for a second reason. The nature of the present dispute is undoubtedly commercial. The claims arise from a commercial joint venture involving the production, bottling, and sale of Coca-Cola products in Uzbekistan. The venture is commercial in nature and the JVA itself provides a remedy that takes all claims out of the realm of the act of state doctrine. The general commercial nature of the dispute, coupled with the specific contract that provides a remedy in circumstances like those here, make it quite clear that the act of state doctrine has no place in the current proceedings.

The act of state doctrine cannot shield commercial conduct. In *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 706 (1976), a plurality of the Supreme Court "decline[d]

to extend the act of state doctrine to acts committed by foreign sovereigns in the course of their purely commercial operations."[7]  The plurality reasoned that:

> [i]n their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns . . . .  Subjecting them in connection with such acts to the same rules of law that apply to private citizens is unlikely to touch very sharply on 'national nerves'. . . . [Further, it] is beyond cavil that part of the foreign relations law recognized by the United States is that the commercial obligations of a foreign government may be adjudicated in those courts otherwise having jurisdiction to enter such judgments.

*Id.* at 704-05.  In *Dunhill*, the acts of state at issue involved the operation of cigar businesses for profit by Cuban agents.  The plurality found that such commercial activities were not protected from suit by the act of state doctrine.  *Id.* at 706.

Likewise, this Court has relied on the commercial nature of a foreign sovereign defendant's wrongful acts to deny a defendant's motion to dismiss on act of state grounds. *Virtual Def. and Dev. Int'l, Inc. v. Republic of Moldava*, 133 F. Supp. 2d 1 (D.D.C. 1999).  In *Virtual Defense*, plaintiff sued Moldova for an unpaid brokerage fee relating to the sale of several soviet-era MiG-29 fighter planes.  *Id.* at 2-3.  This Court rejected Moldova's act of state defense, finding that the sale of airplanes for profit was a commercial – not a sovereign – act. "Here, the court . . . is merely asked to adjudicate a contract claim."  *Id.* at 8 (citing approvingly, *Dunhill*, 425 U.S. at 706).  Indeed, "[t]he actions that took place between Virtual and Moldova in this case are more similar to the activities at issue in *Alfred Dunhill of London* than they are to the sovereign actions" of defendants in other act of state doctrine cases.  *Id.*

---

[7]    An activity is considered commercial in nature "if it is concerned with production, sale, or purchase of goods; hiring or leasing of property; borrowing or lending of money; performance of or contracting for the performance of services; and similar activities of the kind that are carried on by natural or juridical persons . . . ."  RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 453 cmt. b (1987).

The current dispute is undoubtedly commercial in nature. Uzbekistan entered into a contract with two private parties to produce and sell beverages. Amended Complaint at ¶ 13. It acted as a third private party, with rights and obligations under the JVA – just like the other private parties. Once bound by the JVA, however, Uzbekistan failed to meet its obligations to its Joint Venture partners. For example, Uzbekistan, with assistance from its private, commercial partner, TCCEC, held a meeting of the CCBU participants in Tashkent, knowing that no one from ROZ could safely travel there. Amended Complaint at ¶ 35. Uzbekistan, as a member of CCBU, actively replaced Mr. Maqsudi as President of CCBU, in violation of the terms of the JVA. *Id.* Uzbekistan, as a signatory to the JVA, then failed to call the required Parties' Assembly once Plaintiffs had given notice of termination of the JVA. *Id.* at ¶ 50. Uzbekistan continues to have some commercial interest in CCBU, through its agent Tijorat. *Id.* at ¶ 42. In other words, as a commercial partner, Uzbekistan failed to meet its obligations under the JVA; failed to afford its commercial partner – ROZ – its rights under the agreement; and, as a joint venture partner and commercial entity, forced ROZ out of CCBU. Violations of law stemming from these commercial failures cannot be protected by the act of state doctrine. Regardless of what Uzbekistan did while acting as a sovereign outside of the JVA, Uzbekistan, as a commercial partner, would be required to resolve internal disputes – and respect its obligations – under the JVA.

Further, Uzbekistan entered into the JVA as a commercial entity, seeking profit, just like its joint venture partners. It was not acting as a sovereign when it agreed to the JVA, with its termination and dispute resolution clauses. In other words, Uzbekistan was wearing its commercial hat. Uzbekistan cannot then be allowed to put on its sovereign hat, with the sole purpose of avoiding liability to one of its partners under the very same JVA. *Cf. United States v.*

*Winstar*, 518 U.S. 839, 895-99 (1996). Uzbekistan cannot have it both ways; it cannot hide commercial acts behind the act of state doctrine.

Defendants try to obscure the commercial nature of these issues by asserting that all of this was officially sanctioned pursuant to "Uzbekistan's judicial, regulatory and other official acts" as well as "Uzbek privatization law." Motion at 14, 20. This is beside the point. Plaintiffs do not dispute the official nature of some of Uzbekistan's acts. However, the fact that any actions by Uzbekistan were officially sanctioned or undertaken pursuant to a purported policy does not rob it of its commercial character where the underlying wrongful conduct took place in the context of a commercial relationship, governed by a private contract. *See Arango,* 621 F.2d at 1380-81 (act of state doctrine does not preclude judicial resolution of all commercial consequences stemming from the occurrence of public acts). Uzbekistan entered into an agreement and, through its agent, participated in the governance of the Joint Venture: its own behavior was commercial and Zeromax, as a co-tortfeasor, breacher, and beneficiary, cannot assert the act of state doctrine as a means of defeating the claims against it.

### D. The Language Of The Joint Venture Agreement Confirms That The Act Of State Doctrine Cannot Reach These Issues

The Joint Venture Agreement at issue itself recognizes the possibility of an act of state that would adversely impact the commercial interests of TCCEC and/or ROZ. The JVA allows for termination of the Agreement and, if necessary, legal proceedings against any of the parties, including Uzbekistan, making clear that Uzbekistan's "sovereign act" can trigger that legal remedy. In particular, Section 16.10 of the JVA allows:

> In the event The Republic of Uzbekistan adopts any new, or repeals or makes changes in any existing law, decree, regulation or order which materially adversely affects TCCEC's or ROZ's economic interest in the Joint Venture or under this Agreement, the Parties shall consult together and adjust the economic benefits to them under this Agreement. In the Event the Parties are unable to agree upon an adjustment to these economic benefits acceptable to TCCEC or/and

> ROZ, as the case may be, then TCCEC or/and ROZ shall be entitled to exercise
> its/their rights under Section 12.2.3.

Section 12.2.3 of the JVA – the termination provision – deals with the obligation to address the

consequences of the acts of the Uzbekistani government within the commercial context of the

contract. Thus, the clear language of the contract – language agreed to by Uzbekistan through

Uzpishcheprom – creates a remedy for the sovereign's misdeeds via termination. A third party,

such as Zeromax, cannot rely on the act of state doctrine when (1) the sovereign's "act" at issue

is commercial and (2) the "state" itself has agreed that the act of state doctrine does *not* apply by

ensuring that certain relief would be available to parties, including ROZ, whose interests were

"materially adversely affect[ed]" by an act of state.

Uzbekistan is notoriously corrupt, run by a dictator who controls the judicial system of

the country. *See* Horton Report at ¶¶ 11-19. Any intelligent foreign investor in Uzbekistan –

including worldwide leaders in their industry, like The Coca-Cola Company – knows that it

would be most imprudent to invest there without ensuring a proper remedy in the all too likely

event that the government performs some action to undermine such investment. Section 16.10 of

the JVA provides such a remedy, with Uzbekistan agreeing to that remedy through an

independent judicial body outside of its borders, and not its own domestic courts. In the flexible

world of the act of state doctrine, it would defy logic that a sovereign would be held liable for its

commercial acts, but a third party involved in the same commercial acts could hide behind the

act of state doctrine.

### E.    The Second Hickenlooper Amendment Applies To Plaintiffs' Claims

In response to the Supreme Court's decision in *Sabbatino*, which barred adjudication of

an expropriation claim on act of state grounds, Congress adopted the Second Hickenlooper

Amendment, a statute overriding the act of state doctrine by *requiring* federal courts to examine

certain expropriation claims. *See* 22 U.S.C. § 2370(e)(2). When the Second Hickenlooper

Amendment applies, a court may not invoke the act of state doctrine. To the extent that any of

Plaintiffs' claims depend on their right to their interest in CCBU, the Second Hickenlooper

Amendment applies, and act of state does not.

> Under the Second Hickenlooper Amendment:
>
> [N]o court in the United States shall decline on the ground of the federal act of
> state doctrine to make a determination on the merits . . . in a case in which a claim
> of title or other rights to property is asserted by any party . . . based upon (or
> traced through) a confiscation or other taking . . . by an act of that state in
> violation of the principles of international law, including the principles of
> compensation . . . .

22 U.S.C. § 2370(e)(2). "The purposes of the [Second Hickenlooper] [A]mendment include the

promotion and protection of United States investment in foreign countries . . ., and securing the

right of a property holder to a court hearing on the merits." *Rong v. Liaoning Provincial Gov't*,

362 F. Supp. 2d 83, 99 at n.11 (D.D.C. 2005) (internal citations omitted). Further, "[t]he

legislative history to Hickenlooper supports the rejection of a constricted interpretation and

makes it clear that the protection afforded U.S. investments was to be broad in scope." *West v.*

*Multibanco Comermex, S.A.*, 807 F.2d 820, 830 (9th Cir. 1987) (Second Hickenlooper

Amendment applies to expropriation of Mexican certificates of deposit owned by American

investors); *see also Faysound Ltd. v. Walter Fuller Aircraft Sales, Inc.*, 748 F. Supp. 1365, 1371

(E.D. Ark. 1990) (noting expansive scope of Second Hickenlooper Amendment).

The U.S. investments meant to be protected by the Second Hickenlooper Amendment

range from "land, minerals, and large fixed immovables" to intangible financial investments.

*See West*, 807 F.2d at 830 (tangible/intangible characterization of property interests is a

distinction without a difference with regard to the Second Hickenlooper Amendment); *Rong*, 362

F. Supp. 2d at 100. Finally, while not required by the language of the statute, some courts have

held that a form of the expropriated property must be located in the United States in order for the Second Hickenlooper Amendment to apply. *See, e.g., Rong*, 362 F. Supp. 2d at 99 (citing cases requiring that proceeds of expropriated property or the property itself has made its way back to the United States at some point in time); *Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322, 327 (5th Cir. 1982) (requiring expropriated property or proceeds in the U.S.).

Specifically, the Second Hickenlooper Amendment has three requirements: there must be (1) a claim of title or right to property; (2) based upon or traced through a confiscation or other taking; (3) in violation of international law. 22 U.S.C. § 2370(e)(2).

First, ROZ appropriately has claimed title and rights in property. In the Amended Complaint, Plaintiffs have alleged sufficiently – and Defendants have not contradicted in their motion to dismiss – that they were the rightful owners of an interest in CCBU. Amended Complaint at ¶¶ 13, 16. Specifically, Plaintiffs "are the true and rightful owners of the property and . . . Defendants have no right to this interest" and request a decree setting forth this ownership. *Id.* at Count VI. Further, as discussed above, the case law provides that an investment, such as Plaintiffs' in CCBU, was meant to be protected by the Second Hickenlooper Amendment. *See West*, 807 F.2d at 830. By the clear language of the Amended Complaint, then, Plaintiffs have claimed title to their property interest in CCBU at issue, thus fulfilling the first requirement of the Second Hickenlooper Amendment.

Second, ROZ has properly alleged that their claim to their property interest in CCBU was the result of a confiscation and taking by Uzbekistan, with the assistance of Ms. Karimova and Zeromax. Amended Complaint at ¶¶ 28-31, 39-40, 44-45, 48, and Count VI. Uzbekistan expropriated, through sham proceedings, ROZ's interest in CCBU. There simply is no dispute

that ROZ's interest in CCBU was confiscated and taken from Plaintiffs – therefore, ROZ has met the second requirement of the Second Hickenlooper Amendment.

Third, Uzbekistan's expropriation and taking of ROZ's property violated principles of international law in that the expropriation involved alien property, taken without compensation or legal basis. "International law prohibits expropriation of alien property without compensation." *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1328 at n.3 (11th Cir. 2003); *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 170 (2d Cir. 1967). Plaintiff ROZ Trading, Ltd. is a corporation with its principal place of business in New Jersey. ROZ is not a citizen of Uzbekistan.[8] ROZ has not received compensation for the value of its expropriated property interest. *See* Maqsudi Decl. at ¶ 23. Thus, Uzbekistan's taking violated the basic tenet of international law that requires compensation. Further, Uzbekistan's expropriation violated international law in that Plaintiffs' property was carried out by a bogus legal process and taken for retaliatory reasons, rather than public reasons. *See Banco Nacional de Cuba*, 383 F.2d at 170 (finding Cuban expropriation of sugar motivated by a retaliatory purpose not a legitimate public purpose, thereby violating international law).

Finally, as discussed earlier, although the language of 22 U.S.C. § 2370(e)(2) does not require that the property or its proceeds return to the United States, some courts have interpreted the statute to include such a requirement. Whether or not it is a requirement is of no moment here. The majority interest in CCBU, prior to the expropriation, was held by two corporations located in the United States: ROZ, located in New Jersey, and TCCEC, located in Atlanta. After the expropriation, ROZ's interest was held by Defendants in Delaware, Maryland, or the District

---

[8]    ROZ (Uzbekistan)'s separate property may stand on a different footing.

of Columbia.[9] Thus, ROZ's expropriated property returned to the United States and belongs in the United States.[10]

## V.    PLAINTIFFS HAVE STATED VIABLE CLAIMS

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint. *Wyatt v. Syrian Arab Republic,* 398 F. Supp. 2d 131, 135 (D.D.C. 2005). Under the Federal Rules, the complaint "need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests." *Id.* (citing *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003)). In ruling on a Rule 12(b)(6) motion, the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor. *See Harris v. Ladner*, 127 F.3d 1121, 1123 (D.C. Cir. 1997). A complaint should not be dismissed for failure to state a claim unless it is beyond doubt that plaintiffs can prove no set of facts that would entitle them to relief. *See United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88-89 (D.D.C. 2004); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). As detailed below, Plaintiffs in this case have alleged sufficient facts to support their clams against the Zeromax Defendants.

---

[9]    Plaintiffs' interest in CCBU was held by one of the U.S.-based Zeromax entities before it was fraudulently conveyed to Zeromax GmbH.

[10]    Furthermore, one of the express purposes of the Second Hickenlooper Amendment was to protect U.S. investors in foreign countries. ROZ was a U.S. investor in Uzbekistan, thus protection of ROZ furthers the goal of the Second Hickenlooper Amendment.

A.    **Choice Of Law**

A federal court sitting in diversity will apply the choice of law rules for the state in which

it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Defendants skip over the

application of District of Columbia choice of law rules and instead leap to a somewhat disjointed

choice of law analysis that, at bottom, is premature.

On the one hand, Zeromax asserts that "international law" should govern the case on the

theory that the claim is that of a foreign national against the government of Uzbekistan. Motion

at 25. But, of course, there is no such claim (against a foreign sovereign) in this case at all. And,

in any event, as described above, Zeromax's focus on expropriation misses most of the claims in

this case.

Alternatively, Zeromax suggests (without actually applying D.C. choice of law rules)[11]

that Uzbekastani law should apply. But while suggesting that Uzbekastani law is its first choice,

---

[11]    District of Columbia choice of law principles contemplate a "constructive blending" of the traditional
"governmental interests" analysis and the "most significant relationship" test. *Wyatt*, 398 F. Supp. 2d at
138. Under the "governmental interests" analysis, the court determines which jurisdiction's policy would
be most advanced by having its law applied to the facts of the case. *Id.* (citing *Hercules & Co., Ltd. v.
Shama Rest. Corp.*, 566 A.2d 31, 40 (D.C. 1989)). Here it appears to be Zeromax's assumption that
under Uzbekistani law, there is simply no way to overcome the fraud and corruption that allowed the
daughter of the current dictator of Uzbekistan and Zeromax to achieve their goal of forcing ROZ out of
CCBU and seizing its interest, by among other things, fabricating documents. If that were true, then
Uzbekistani law is not law at all. Horton Report at ¶¶ 11-17. There is certainly a U.S. governmental
interest in ensuring that basic legal principles are applied.

The other D.C. choice of law component involves assessment of which jurisdiction has the most
significant relationship to the dispute, looking to traditional factors such as the domicile of the parties and
the place where the injury was felt. *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995);
*See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188; *Goldberg v. Remsen Partners, Ltd.*, 170 F.3d
191, 194 (D.C. Cir. 1999). Here, when it becomes time truly to determine choice of law, those factors
will point to U.S. law.

We note that the JVA's choice of law provision points to Uzbekistani law for *contract* questions –
and this case raises many claims arising in tort. But so far, the only "defense" raised on the contract claim
is that no claim can arise against Zeromax because the claim lies against Muzimpex. That question does
not directly involve the contract but rather whether the corporate veil of these U.S. companies and their
subsidiaries can properly be pierced – an issue about which the U.S. has a dominant interest.

Zeromax does not actually try to demonstrate that there is no cause of action under Uzbekistani

law for the kinds of acts at issue here.  To the contrary, Zeromax resorts to Uzbekistani law on

two general notions.  The first is essentially a restatement of its act of state argument.  Zeromax

suggests that Uzbekastani law would not allow any acts of Uzbekistan to be challenged and

incorrectly asserts that *every* claim made by Plaintiffs rests on an expropriation and, since the

expropriation is not challengeable, all of the claims must fail.  *See* Motion at 26.  But for the

reasons discussed above (*supra* at § IV), that is not an accurate description of the claims and the

act of state doctrine would not apply here in any event.  Zeromax also suggests – albeit vaguely –

that the reason that Zeromax must win is because Uzbekistan has papered over the record, for

which they offer affidavit support of various decrees.  Zeromax contends that this record of

decrees, orders and other documents amounts to a defense that Zeromax can assert in support of

its own actions.  Zeromax ignores that such fabricated decrees and records were the result of

corruption and fraud.  The one aspect of Uzbekistani "law" that would assuredly not be accepted

for choice of law purposes in the United States is the choice of corrupt and corrupted *procedures*

masquerading as law.

        To the contrary, if Zeromax wants to show that it would prevail under actual Uzbekistani

law (as opposed to its corrupt procedures), it would have to show that Uzbekistani *law* does not

contemplate a cause of action for the deception, corruption, tort, and violations of contract at

issue here.  Zeromax does not do so.  There is no discussion of Uzbekastani tort or contract law

at all, let alone persuasive argument that Plaintiffs have failed to state a claim under Uzbekistani

law.

Zeromax does purport, however, to do an analysis of whether Plaintiffs have stated a cause of action under Zeromax's third choice: D.C. law. Because it is very likely that D.C. law would in fact govern at the merits stage, Plaintiffs turn to Zeromax's D.C. law theory.

### B.    Plaintiffs' Allegations Against Defendants Support Valid Claims

#### 1.    Breach Of Contract

A breach of contract claim requires a showing: (1) that a contract existed; (2) that plaintiffs performed their contractual obligations; (3) that defendants breached the contract; and (4) that plaintiffs suffered damages from the breach.[12]  Plaintiffs pled a valid contract: the JVA. Amended Complaint at ¶ 13. Under the JVA, Defendants, as holders of Plaintiffs' interest in CCBU, were bound by the terms of the JVA. *Id.* at ¶ 47. Zeromax breached the JVA by failing to call a Parties' Assembly and conduct proceedings in accordance with the JVA. *Id.* at ¶¶ 47, 49. Plaintiffs, on the other hand, performed their contractual obligations and provided notices of termination, pursuant to Section 12.2.3.6 of the JVA, once they were finally and completely barred from exercising their property and management rights in CCBU. *Id.* at ¶ 48. Zeromax's breach caused damages to Plaintiffs by preventing them from receiving payment due upon termination and subsequent liquidation. *Id.* at ¶ 50.

Zeromax argues that Muzimpex is the party to the contract, but it has not been sued. Motion at 30. But, as alleged, Zeromax controls Muzimpex, and Muzimpex was interposed here in furtherance of the scheme. The actions of Muzimpex, then, may be attributed to Zeromax. *See generally Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 248-49 (D.C. 1993). In addition, Zeromax suggests that ROZ somehow lacks "standing" to pursue its breach of contract

---

[12]    *See, e.g.*, *In re Belmar*, 319 B.R. 748, 759-60 (Bankr. D.C. 2004) (applying D.C. law).

claim because the JVA was "null and void." Motion at 31. This argument must fail, because the JVA itself specifically contemplates that ROZ (or TCCEC) may terminate the Joint Venture in the event of "expropriation." Exhibit 7 at ¶ 12.2.3.6. By definition then, the right to terminate continues *after* some event has compromised ROZ's right to participate in the Joint Venture.

### 2.    Tortious Interference

Tortious interference with business relations requires a showing of: (1) the existence of a valid business relationship; (2) knowledge of the relationship; (3) intentional interference inducing a breach or termination of the relationship; and (4) resultant damage. *See, e.g., Ellsworth Assocs., Inc. v. U.S.*, 917 F. Supp. 841 (D.D.C. 1996) (applying D.C. law).

ROZ had a valid business relationship in CCBU. Amended Complaint at ¶¶ 13-14. Defendants (with Ms. Karimova, or through her) knew of this relationship and intentionally interfered with it by causing the fabrication of false documents and causing the Uzbekistani government to interfere with the business and seize ROZ's interest. *Id.* at ¶¶ 37, 39; Inogambaev Decl. at ¶¶ 10-11, 14-17, 20-21. The resultant damage occurred when Plaintiffs' interest in CCBU was transferred to Defendants in 2004 – finally and completely barring Plaintiffs from exercising their rights in CCBU. Amended Complaint at ¶¶ 45, 48. Plaintiffs have plainly alleged that Defendants interfered with Plaintiffs' valid business relations.

### 3.    Conversion

A claim for conversion requires: (1) wrongful exercise of ownership; (2) dominion or control over the personal property of another; (3) in denial of that person's right. *See O'Callaghan v. District of Columbia*, 741 F. Supp. 273, 279-80 (D.D.C. 1990).

Plaintiffs owned an interest in CCBU. Amended Complaint at ¶¶ 13-18. Zeromax has wrongfully exercised ownership, dominion, and control over Plaintiffs' interest. *Id.* at ¶¶ 41, 45-

46. Defendants' actions prevented Plaintiffs from exercising their rights under the JVA. *Id.* at ¶¶ 46-50.

Defendants assert: (1) that Defendants' possession of Plaintiffs' property is not unlawful; (2) that conversion cannot be sustained against a third-party purchaser; (3) that Defendants do not possess any property belonging to Plaintiffs; and (4) that Defendants did not proximately cause the deprivation of Plaintiffs' property. Motion at 33-36. Each must fail:

(1) Despite Zeromax's contention to the contrary, the act of state doctrine does not shield Zeromax here. *See supra* at § IV.

(2) Defendants' argument that it is a third-party purchaser might have some validity if Defendants were *innocent* third-party purchasers, or perhaps even if they transferred to such innocents. But, in fact, they were not and did not.

(3) Defendants' argument that they do not possess Plaintiffs' property is also beside the point. Motion at 35. With Zeromax having stolen ROZ's interest, Zeromax's conversion cannot be avoided by the device of depositing the converted interest into the hands of Muzimpex, which it controls. Amended Complaint at ¶¶ 42, 47.

(4) Defendants contend that they could not have proximately caused Plaintiffs' injury since they did not become associated with the shares until late 2004. Motion at 36. But in fact Defendants were assuredly involved with Ms. Karimova long before then. Inogambaev Decl. at ¶¶ 12-13; Amended Complaint at ¶ 37.

### 4. Conspiracy To Commit Conversion And Tortious Interference

To state a claim for conspiracy, Plaintiffs must show: (1) agreement between two or more persons to take part in unlawful action or lawful action in an unlawful manner, and (2) an overt act in furtherance of the agreement. *See, e.g., Hall v. Clinton*, 285 F.3d 74, 82 (D.C. Cir. 2002) (applying D.C. law). Here, the Zeromax Defendants, with Ms. Karimova and others,

engaged in concerted behavior to transfer control of Plaintiffs' interest in CCBU to Defendants. Amended Complaint at ¶¶ 31, 37-40. As described in Mr. Inogambaev's declaration, it is alleged, and there is assuredly reason to believe (given Ms. Karimova's statements and the ultimate result) that Zeromax was directly involved in all or most of these efforts. Inogambaev Decl. at ¶¶ 10-21. Moreover, the precise timing of the conspiracy is largely irrelevant. Once the conspiracy was formed, Zeromax became liable both for its own actions and for Ms. Karimova's activities. Under well-settled law, the joint and several liability of a conspirator applies to damages accruing *prior* to joining the conspiracy as well as to damages resulting thereafter. *See Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002).

### 5.    Action To Quiet Title

Zeromax complains that there is no case law supporting a right to quiet title to personal property. But courts have held that an action to quiet title is available for personal property as well. *See Martin & Earle v. Maxwell*, 67 S.E. 962, 964 (S.C. 1910) ("no doubt that a complaint to remove a cloud on the title to personal property may be maintained . . . . Any distinction between real estate and personal property in this respect must be purely artificial. . . ."); *Ellis v. Dixie Highway Special Road & Bridge Dist.*, 138 So. 374, 375-76 (Fla. 1931) (action to quiet title is appropriate to clarify ownership of bonds). As explained in *Newman Mach. Co. v. Newman*, 166 S.E.2d 63, 68-69 (N.C. 1969), "since we have no statute regarding suits in equity to remove cloud or quiet title to personalty, we apply to such suits the same principles . . . as when title to land was involved. . . . [T]here is no sound reason why this equitable remedy should not be available to quiet title to personalty as well as realty." Here, Plaintiffs assert a right to property; Defendants assert a right to the property. By any definition, a dispute exists as to the proper owner and a quiet title claim is one way to resolve the dispute.

### 6.    Unjust Enrichment

To state a claim for unjust enrichment, Plaintiffs must show that a party retained a benefit that in justice and equity belongs to another. *Ellsworth Assoc.*, 917 F. Supp. at 848 (citing *4934, Inc. v. District of Columbia Dep't of Emp. Srvcs.*, 605 A.2d 50, 55 (D.C. 1992)). It is not necessary for a plaintiff to have directly conferred a benefit on a defendant. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50 (D.D.C. 2003) (applying D.C. law).

Here, the ownership interest in a lucrative Coca-Cola franchise was the benefit retained by Zeromax. Amended Complaint at ¶¶ 37-45. Defendants possessed an appreciation or knowledge of the benefit, and in fact, actively sought to take over Plaintiffs' interest in CCBU. *Id.* Furthermore, Defendants retained this benefit under inequitable circumstances. *Id.* Thus, Plaintiffs have a valid claim for unjust enrichment.

Defendants contend that Uzbekistan conferred any alleged benefit and that Muzimpex, rather than Zeromax, received the benefit. Motion at 40. This suggestion ignores the Amended Complaint, which alleges that Zeromax has in fact received the benefit. The allegation is that Zeromax is using Muzimpex, its alter ego, to evade liability. Amended Complaint at ¶¶ 42, 47.

### 7.    Fraudulent Conveyance

A claim of fraudulent conveyance requires that a debtor make a transfer: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor, or (2) without receipt of reasonable equivalent value in exchange for the transfer or obligation. *See* D.C. Code Ann. § 28-3104.

ROZ is the creditor, and the Zeromax Defendants are the debtors, meaning the "person who is liable on a claim." D.C. Code Ann. §§ 28-3101(4), 28-3101(6). A transfer is defined as "every mode, direct or indirect . . . of disposing of, or parting with, an asset or an interest in an asset." Here, Defendants made this transfer by taking a series of steps to avoid legal responsibility – specifically by forming Muzimpex in 2003 to hold the interest in CCBU and

then by transferring the ownership interests to Zeromax GmbH in order to circumvent legal process.

In determining actual intent, consideration is given to factors such as whether:  (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; and (3) the debtor had been sued or threatened with suit before the transfer was made.  D.C. Code Ann. § 28-3104(b).  The facts show that Defendants possessed the actual intent to defraud.  The transfers here involved insiders given that Muzimpex is controlled by Defendants and all the Defendants are mere alter egos.  Defendants retained possession or control over the interest in CCBU all along.  Moreover, many of the transactions designed to defraud ROZ did not occur until *after* Zeromax had received its notice of termination, which provided notice of the existence of a likely claim.  Amended Complaint at ¶¶ 40, 42, 47, 51-53.

### C.    Plaintiffs' Claims Are Timely

Defendants' statute of limitations theories also lack merit.  Motion at 28.  For statute of limitations purposes, a cause of action must be brought within a certain period "from the time the right to maintain the action accrues."  D.C. Code Ann. § 12-301; *Capitol Place I Assoc. L.P. v. George Hyman Constr. Co.*, 673 A.2d 194, 198 (D.C. 1996).  All of the claims raised by Plaintiffs in this case are timely either because they did not accrue until the past three years (or four years in the case of the fraudulent conveyance claim), rendering them within the applicable statute of limitations, or because the applicable statute of limitations was tolled.

### 1.    Breach Of Contract

Plaintiffs' breach of contract claim against Defendants did not arise until after Plaintiffs terminated the JVA, triggering Defendants' obligation to call a Parties' Assembly and to initiate liquidation proceedings.  Amended Complaint at ¶¶ 46-50.  Plaintiffs provided notice of termination to Uzbekistan and TCCEC on April 11, 2005, and notice to Zeromax on August 5,

2005. *Id.* at ¶¶ 51-52. Accordingly, Plaintiffs were not injured by Zeromax's failure to abide by the JVA's liquidation provisions until 2005. Given that Plaintiffs' complaint was filed in 2006, the breach claim is clearly within the limitations period.

### 2.    Fraudulent Conveyance

Plaintiffs' fraudulent conveyance claim is within the applicable four-year statute of limitations. D.C. Code Ann. § 28-3109(1). This claim is based on Defendants' transfer or sale of their property interest in CCBU in order to avoid paying ROZ for the value of the interest in CCBU. Thus, fraudulent conveyance has clearly been raised within the statute of limitations.

### 3.    Other Claims

Similarly, Plaintiffs' claims for tortious interference, conspiracy to commit tortious interference, conversion, conspiracy to commit conversion, action to quiet title, and unjust enrichment are also timely. Plaintiffs' interest in CCBU was transferred or sold to Defendants in or about late 2004. Amended Complaint at ¶ 45. Thus, the injury required for these claims to mature did not occur until late 2004, when Defendants took ownership over Plaintiffs' interest in CCBU. It was this final step that completed ROZ's exclusion from CCBU. Therefore, these claims are within the statute of limitations.

### 4.    Both Equitable Tolling And The Discovery Rule Would Extend The Limitations Period Here

Even assuming *arguendo* that the limitations periods might otherwise have presented some difficulty on the facts of this case, each and every claim is nonetheless timely under the doctrines of equitable tolling and the discovery rule.

The purpose of equitable tolling is to prevent unfairness to a diligent plaintiff. *See Phillips v. Heine*, 984 F.2d 489 (D.C. Cir. 1993). Statutes of limitation are tolled until the plaintiff, employing due diligence, could have discovered facts fraudulently concealed.

Equitable tolling applies where a plaintiff demonstrates "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 80-81 (2d Cir. 2003). Extraordinary circumstances are circumstances beyond the control of the complainant which make it impossible to file a complaint within the statute of limitations. *United States v. Cicero,* 214 F.3d 199, 203 (D.C. Cir. 2000).

In the present case, there were several extraordinary circumstances delaying Plaintiffs' filing. Mr. Maqsudi, the Chairman and Chief Executive Officer of ROZ, was in the United States at the time that he sought to separate from Ms. Karimova – the occurrence which sparked the chain of events giving rise to these claims. In short order, his children were kidnapped and his relatives in Uzbekistan were taken hostage and their lives put in grave danger. Amended Complaint at ¶ ¶ 22-24. It was nearly impossible for him to get information about what was happening in Uzbekistan with regard to CCBU, particularly in light of the very real dangers to his family members and colleagues. Maqsudi Decl. at ¶¶ 17-22. Furthermore, Defendants added to Plaintiffs' difficulties by taking steps to obscure the truth about their activities, such as re-registering several times, changing ownership, and creating false documents. Inogambaev Decl. at ¶¶ 10-11, 21. It is simply impossible to see how this action could have been brought until the Uzbekistani government proceedings had run their course and Zeromax had emerged as a culprit.

In addition, Plaintiffs' claims are timely under the discovery rule (sometimes termed the "discovery exception"), which is a statute of limitations tolling device recognized by the District of Columbia (and other courts) in order to avoid the injustice that might occur from a mechanical application of a limitations period. *Capitol Place*, 673 A.2d at 199; *Farris v. Compton*, 652 A.2d 49, 55 (D.C. 1994) ("the determination as to when a claim accrued has been guided by

considerations of basic fairness; the legislature should not be presumed to have intended to deny a plaintiff who did not know, and could not reasonably have known, of her injury at the time that it occurred, her day in court, provided that she filed suit in timely fashion after she learned or should have learned the facts"). More specifically, "accrual occurs pursuant to the discovery exception when a party knows or by the exercise of reasonable diligence should know: (1) of the injury; (2) the injury's cause in fact; and (3) of some evidence of wrongdoing." *Capitol Place*, 673 A.2d at 199. The "record must be construed 'in the light most favorable to the party opposing the motion.'" *Id.*

Without knowing about Zeromax's involvement, Plaintiffs' causes of action could not have accrued. *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 954 (D.C. 2003) ("Even where a plaintiff might know, or be deemed to know, of wrongdoing on the part of one defendant, accrual of his action against another, unknown defendant responsible for the same harm is not automatic"). As explained above, Mr. Maqsudi had very limited information as to what was happening with CCBU in Uzbekistan. Maqsudi Decl. at ¶¶ 17-24. He could not go to Uzbekistan to investigate since he understandably feared for his life. Maqsudi Decl. at ¶ 21. Diligent inquiries were frustrated by actions prompted by secret falsification of documents. Inogambaev Decl. at ¶ 21. Plaintiffs did not even know that their interest in CCBU had been transferred or sold to Defendants until 2004. Maqsudi Decl. at ¶ 24; Amended Complaint at ¶ 45. Not only are Plaintiffs' claims timely under the applicable statutes of limitations, as discussed above, but any lingering dispute about timeliness is resolved through application of the equitable tolling and discovery rule doctrines.

# CONCLUSION

For the foregoing reasons, the Zeromax Defendants' motion to dismiss should be denied in its entirety.

Respectfully submitted,

Stuart H. Newberger, DC Bar #294793
Alan W.H. Gourley, DC Bar #358300
Clifton S. Elgarten, DC Bar #366898
Alyssa Gsell, DC Bar #490395
Sobia Haque, DC Bar #483440
Peter J. Eyre, DC Bar #500053
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

Attorneys for ROZ Trading, Ltd. and
ROZ Trading, Ltd. (Uzbekistan)

Dated:  December 11, 2006

Of Counsel:

Dr. Allan Gerson
2131 S Street, NW
Washington, DC 20008
Telephone:  (202) 966-8557
E-mail: gerson@gilgintl.org

45

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROZ TRADING, LTD., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:06-cv-01040-CKK |
| | ) | |
| v. | ) | |
| | ) | |
| ZEROMAX GROUP, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## **PROPOSED ORDER**

Upon consideration of the Zeromax Defendants' Motion to Dismiss, dated

November 6, 2006, and Plaintiffs' response thereto, IT IS HEREBY ORDERED, that the

Zeromax Defendants' Motion to Dismiss be denied;

IT IS SO ORDERED.

_____
Judge Colleen Kollar-Kotelly
United States District Court