# EXHIBIT 5

INTERNATIONAL ARBITRAL CENTRE OF THE AUSTRIAN FEDERAL ECONOMIC CHAMBER

ROZ TRADING LTD.,

*Claimant*

v.

THE COCA-COLA EXPORT CORPORATION,
REPUBLIC OF UZBEKISTAN,
OZIQOVQATSANOAT,
AND
ZEROMAX GROUP, INC.,

*Respondents.*

CASE NO. SCH-4986

**FOURTH DEFENDANT ZEROMAX GROUP, INC.'S
MEMORANDUM IN REPLY**

October 25, 2006

**DLA PIPER WEISS-TESSBACH**
Dr. Gerhard Benn-Ibler
Mag. Peter Solt
Andreas Daxberger
Rotenturmstrasse, 13
A-1010 Vienna
AUSTRIA

**WHITE & CASE**LLP
Carolyn B. Lamm, Esq.
Francis A. Vasquez, Jr., Esq.
Nicole E. Erb, Esq.
Claire A. DeLelle, Esq.
Jonathan C. Ulrich, Esq.
701 Thirteenth Street, N.W.
Washington, D.C. 20005 U.S.A.

Stephen R. Bond, Esq.
11, Boulevard de la Madeleine
75001 Paris
FRANCE

*Counsel for Fourth Defendant
Zeromax Group, Inc.*

## TABLE OF CONTENTS

I.   JURISDICTIONAL MATTERS ..................................................................................3

    A.   Zeromax Did Not Consent To This Arbitration ............................................3

        1.   Zeromax Never Consented To The Arbitration Clause
            Contained In The 1993 CCBU JVA .........................................................4

        2.   Article 5.5 Of The 1993 CCBU JVA Does Not  Constitute
            Consent By Zeromax To The Arbitration Clause Contained
            In The 1993 CCBU JVA .........................................................................5

        3.   Zeromax Cannot Be Deemed To Have Consented  To The
            Arbitration Clause Contained In The 1993 CCBU JVA By
            Virtue Of Muzimpex's Acquisition Of Shares In CCBU From
            The State In 2004...................................................................................7

        4.   Zeromax Could Not Have Consented To The Arbitration Clause
            Contained In The 1993 CCBU JVA Because That Agreement Is
            Null And Void As A Matter Of Uzbek Law ...........................................11

    B.   The Statement Of Claims Is Beyond The Scope Of The
        Arbitration Agreement...................................................................................12

    C.   Zeromax Lacks Capacity To Be Sued ..........................................................14

II.  FACTUAL BACKGROUND.......................................................................................15

    A.   Muzimpex Acquired The State's Interest In CCBU Through
        A Privatization Sale Conducted In Accordance With Uzbek Law.......................15

    B.   The State Acquired The CCBU Interest Sold To Muzimpex Through
        A Series Of Regulatory Enforcement Actions Pursuant To Uzbek Law .............17

        1.   Anti-Monopoly Proceedings....................................................................18

        2.   Liquidation Proceedings .........................................................................20

III. CLAIMANT IS NOT ENTITLED TO THE RELIEF IT SEEKS .....................................27

    A.   ROZ Is Not Entitled To Compensation For Uzbekistan's Regulatory
        Acts In The Exercise Of Its Police Power ..........................................................27

        1.   A State's Regulatory Acts Taken For The Purpose Of Promoting
            The General Welfare Do Not Give Rise To A Claim For
            Compensation From A Third-Party Purchaser .........................................27

2.    ROZ's Claims Against Zeromax Are Based On Valid
Regulatory Acts Of The Uzbek Government ...........................................29

B.    ROZ Cannot Seek Redress From Zeromax For Uzbekistan's Alleged
Expropriatory Acts ...................................................................................32

1.    ROZ's Alleged Injury Arises From Uzbekistan's Sovereign Acts...........32

2.    Uzbekistan's Sovereign Acts Transferred Title To The Shares
To The State Thereby Precluding Claims Against Zeromax As
A Purported Third-Party Purchaser ...........................................................33

C.    Zeromax Did Not Violate The Terms Of The 1993 CCBU JVA .........................35

D.    Zeromax Denies Any And All Other Claims Against It Contained In The
Statement Of Claims.................................................................................36

IV.    PRAYER FOR RELIEF ...........................................................................................37

V.    APPOINTMENT OF ARBITRATOR AND CONSTITUTION OF
THE TRIBUNAL ....................................................................................................38

INTERNATIONAL ARBITRAL CENTRE OF THE AUSTRIAN FEDERAL ECONOMIC CHAMBER

---

ROZ TRADING LTD.,
*Claimant*

v.

THE COCA-COLA EXPORT CORPORATION,
REPUBLIC OF UZBEKISTAN,
OZIQOVQATSANOAT,
AND
ZEROMAX GROUP, INC.,
*Respondents.*

---

CASE NO. SCH-4986

**FOURTH DEFENDANT ZEROMAX GROUP, INC.'S
MEMORANDUM IN REPLY**

1.    Fourth Defendant Zeromax Group, Inc. ("Zeromax"), a corporation incorporated and dissolved under the laws of the State of Delaware, United States of America, appears in this arbitration to contest the jurisdiction of the Tribunal on the ground that Zeromax has not consented to the arbitration agreement that serves as the jurisdictional predicate for these proceedings.  Claimant ROZ Trading Ltd. ("ROZ" or "Claimant") relies on the arbitration clause contained in Article 15 of the Joint Venture Agreement of Coca-Cola Bottlers Uzbekistan Ltd. ("CCBU"), dated June 16, 1993, by and among Claimant ROZ, First Defendant The Coca-Cola Export Corporation ("TCCEC"), and Third Defendant OziqOvqatSanoat (also known as "Uzpishcheprom") ("1993 CCBU JVA").[1]

---

[1] 1993 CCBU JVA (Claimant Ex. 1).  The original third party to the 1993 CCBU JVA was the Uzbek State-owned entity The Tashkent Soft Drink Plant at Beshaghash ("Beshaghash"), and not Uzpishcheprom.  Uzpishcheprom, a State-owned entity, later became a founding member of CCBU.  As later amended and re-registered, the 1993 CCBU JVA identified Uzpishcheprom, and not Beshaghash, as a founding member.

2.    Zeromax is not and never was a party to the 1993 CCBU JVA, and Zeromax never consented to the arbitration agreement contained in Article 15 of the 1993 CCBU JVA. Therefore, the Tribunal lacks competence to decide Claimant's claims against Zeromax in this arbitration.

3.    Further, even if Zeromax had consented to this arbitration (which it did not), as a dissolved corporation, Zeromax lacks the capacity to be sued. Additionally, the subject matter of ROZ's claims largely extends beyond the scope of consent of the arbitration clause contained in Article 15 of the 1993 CCBU JVA. Accordingly, the Tribunal's consideration of such claims would be manifestly in excess of its authority and ultra vires.

4.    In the event the Tribunal concludes it is competent to decide the claims against Zeromax, such claims lack any merit. Claimant alleges that the Republic of Uzbekistan unlawfully expropriated ROZ's ownership interest in CCBU. ROZ's claims against Zeromax are based on Zeromax's alleged purchase of that interest through its purported subsidiary Muzimpex JV ("Muzimpex") with the knowledge that Uzbekistan had acquired ROZ's CCBU interest unlawfully. Zeromax never acquired any shares in CCBU. Rather, Muzimpex, a separate and distinct juridical entity organized and operating under the laws of Uzbekistan, acquired shares in CCBU from the State through a privatization sale conducted pursuant to Uzbek law. The Claimant has alleged no basis (and there is none) from which this Tribunal can attribute Muzimpex's acquisition of the State-owned shares in CCBU to Zeromax. Muzimpex is not a subsidiary of Zeromax and, even if it was, Muzimpex is a separate corporate entity actively engaged in operations in Uzbekistan.

5.    Even if Zeromax could be deemed somehow to have acquired the State-owned shares in CCBU through Muzimpex, which it cannot, ROZ cannot seek redress from Zeromax, a purported third-party purchaser of the shares, for either Uzbekistan's exercise of its regulatory authority in the enforcement of its own laws, or Uzbekistan's alleged unlawful expropriation of ROZ's interest in CCBU.

6.    In light of the foregoing, and reserving all rights to submit further explanations, arguments and exhibits in response to the Claimant's claims and arguments, Zeromax submits that the claims in the Statement of Claims are jurisdictionally defective as to Zeromax and

requests that the Tribunal, in accordance with Article 14(1) of the Vienna Rules, bifurcate these proceedings so as to conduct a preliminary jurisdictional phase of the proceedings limited to the question of the Tribunal's jurisdiction over the claims against Zeromax.

## I.       JURISDICTIONAL MATTERS

### A.       Zeromax Did Not Consent To This Arbitration

7.       ROZ alleges that a Tribunal constituted by the International Arbitral Centre of the Austrian Federal Economic Chamber (the "Centre") has jurisdiction to decide an alleged dispute among the above-captioned parties.  Claimant further alleges that the parties' consent to arbitration — and therefore the scope of the Tribunal's jurisdiction — is manifested by an arbitration clause contained in the 1993 CCBU JVA.[2]

8.       Article 15 of the 1993 CCBU JVA on "Dispute Resolution" provides:

> 15.1    All disputes arising out of or in connection with this Agreement or related to its violation or termination shall be amicably settled.
>
> 15.2    In the event that amicable settlement shall not obtain within 90 days following written notice by one Party to the other(s) of the existence of any such dispute, all such disputes shall be finally settled under the rules of arbitration and conciliation of the International Arbitral Centre of the Federal Economic Chamber in Vienna, Austria ("Vienna Rules"), by three arbitrators appointed in accordance with these rules.
>
> 15.3    The language of this arbitration shall be English.
>
> 15.4    The seat of the arbitration shall be Vienna.
>
> 15.5    The applicable law shall be the substantive law of Austria, excluding its choice of law rules.  The Parties expressly

---

[2] Statement of Claims ¶¶ 1.1-1.2.

waive the application of paragraph 595(1) fig. 7 of the
Austrian Code of Civil Procedure (ZPO).[3]

### 1.    Zeromax Never Consented To The Arbitration Clause Contained In The 1993 CCBU JVA

9.      Fourth Defendant Zeromax Group, Inc. ("Zeromax") is not a party to the 1993
CCBU JVA and never consented to the arbitration clause contained therein.  Accordingly,
Zeromax denies any and all allegations contained in the Statement of Claims that Zeromax
consented to this arbitration, including the allegations contained in Paragraphs 2.4, 3.58 of the
Statement of Claims.

10.     Zeromax was incorporated on September 4, 2002 and was voluntarily dissolved
on August 2, 2005 under the laws of the State of Delaware, United States of America.[4]  Zeromax
was formed for the purpose of participating in a joint venture that never materialized.  Zeromax
never transacted any business in the United States, Uzbekistan or elsewhere and never earned
any income or generated any revenue.  Zeromax never held any shares or otherwise participated
in Muzimpex JV ("Muzimpex"), the entity alleged to have acquired ROZ's former interest in
CCBU.

11.     As is evident from the face of the 1993 CCBU JVA, Zeromax is not a party to that
agreement.  Further, Zeromax never was a party to that agreement, nor was it a party to any
subsequent CCBU joint venture agreement.  Therefore, Zeromax is not bound by the terms of the
1993 CCBU JVA and has not consented to the arbitration clause contained in that agreement.

12.     To the extent Austrian law applies in this arbitration, Austrian law requires that
arbitration agreements be in writing and that they be signed by the parties as a manifestation of
the parties' consent to arbitration.  Article 577(3) of the Austrian Civil Procedure Code ("ZPO")

---

[3] Notwithstanding the choice-of-law clause contained in Article 15.5, Article 14 of the 1993 CCBU JVA on "Governing Law" provides:  "The Joint Venture shall be conducted in conformity with the mandatory provisions of Uzbek law.  All matters not governed by mandatory Uzbek law concerning the relationship between the Parties shall be governed by this Agreement and the Articles of Association."

[4] Zeromax Certificate of Incorporation (Sept. 4, 2004) (Zeromax Ex. 1) & Zeromax Certificate of Dissolution (Aug. 2, 2005) (Zeromax Ex. 2).

provides: "The arbitration agreement *must* be in writing or be contained in telegrams, telexes or in electronic representations exchanged by the parties."[5]  Pursuant to this mandatory rule, a valid arbitration agreement must be in *writing* or evidenced in documentation exchanged *between the parties*.  Further, Austrian law requires that where an arbitration agreement is to be evidenced by a written document, the document must be *signed* by the parties to the agreement.[6]  These requirements under Austrian law are strict.[7]  Accordingly, unilateral declarations by one party that an arbitration agreement exists do not constitute a valid arbitration agreement under Austrian law.

13.    There is no valid written or signed agreement to arbitrate between ROZ and Zeromax, nor any other exchange of documents between ROZ and Zeromax that would evidence a valid agreement to arbitrate.  The Tribunal therefore lacks competence in respect of the claim against Zeromax and such claim should be dismissed on those grounds.

### 2. Article 5.5 Of The 1993 CCBU JVA Does Not Constitute Consent By Zeromax To The Arbitration Clause Contained In The 1993 CCBU JVA

14.    Claimant alleges that Zeromax became a party to the 1993 CCBU JVA, under Article 5.5, when Zeromax supposedly acquired shares in CCBU.[8]  Article 5.5 of the 1993 CCBU JVA provides:  "Any Third Party transferee must agree in writing to be bound by this Agreement."  Claimant does not allege that Zeromax *did in fact* agree in writing to be bound by the terms of the 1993 CCBU JVA, and does not provide any such writing.  Rather, Claimant alleges that Zeromax *had to* or that it *was required to* so agree.

15.    Zeromax is not a "Third Party transferee" within the meaning of Article 5.5 of the 1993 CCBU JVA because, as discussed in Section I.A., *supra*, Zeromax never agreed in writing

---

[5] Since the Statement of Claims was filed before July 1, 2006, this issue is governed by the ZPO prior to the coming into force of the latest amendments to the law as of July 1, 2006.  The German original text of ZPO Article 577(3) provides:  "Der Schiedsvertrag muss schriftlich errichtet werden oder in Telegrammen oder in Fernschreiben enthalten sein, die die Parteien gewechselt haben."

[6] *See* Rechberger/Melis in ZPO – Zivilprozessordnung, 2nd ed., paragraph 1 recital 9, on Section 577.

[7] *See* Fasching, Zivilprozessrecht, 2nd ed., p.1070, paragraph 2179.

[8] Statement of Claims ¶¶ 2.4, 3.58.

to be bound by the terms of the 1993 CCBU JVA, and because shares in CCBU were never transferred to Zeromax.

16.     As discussed in detail in Section II.A., *infra*, Muzimpex, an Uzbek-registered limited liability company acquired shares in CCBU in late 2004 from the Uzbek State Property Committee ("GKI"). In connection with this acquisition, Muzimpex was a party to the Second Amended and Restated CCBU Joint Venture Agreement, dated December 7, 2004, among Muzimpex and TCCEC ("2004 CCBU JVA"). Muzimpex never transferred any CCBU shares to Zeromax and Zeromax never was a party to the 2004 CCBU JVA nor, for that matter, to any other CCBU joint venture agreement.[9]

17.     Moreover, under Austrian law, Article 5.5 of the 1993 CCBU JVA constitutes an internal arrangement among the original shareholders of CCBU. Pursuant to Article 1406 of the Austrian Private Law Code ("ABGB"), the transfer of any contractual obligation, including obligations in shareholder agreements, requires the express consent of all of the parties to the contract as well as the consent of the transferee.[10] The transfer of an obligation without consent of the transferee represents a violation of the freedom of contract ("*Vertrag zu Lasten Dritter*"). Furthermore, shareholder agreements do not automatically bind any future shareholder that may acquire shares of the company; rather, the transfer of obligations under a shareholder agreement requires separate assumption of the contract ("*Vertragsübernahme*").[11] A contractual provision that purports to bind the transferee without the transferee's consent is void under Austrian law.[12]

18.     Thus, even if Zeromax had acquired shares in CCBU (which it did not do), this acquisition by itself would not be sufficient to bind Zeromax to the terms of the 1993 CCBU JVA or to the arbitration clause contained therein. Zeromax would have had to assume the obligations contained in the 1993 CCBU JVA separately by providing its express written consent

---

[9] On September 22, 2003, Uzpischeprom and TCCEC executed an Amended and Restated CCBU Joint Venture Agreement ("2003 CCBU JVA"), to which neither Muzimpex nor Zeromax was a party. *See* 2003 CCBU JVA (Zeromax Ex. 3).

[10] *See* Ertl in Rummel, Kommentar ABGB 2nd ed. paragraph 2 on Section 1406.

[11] *See* Tichy, Syndikatsverträge bei Kapitalgesellschaften, Manz Verlag 2000, 198.

[12] *See* Tichy, Syndikatsverträge bei Kapitalgesellschaften, Manz Verlag 2000, 198.

to be bound by the terms of that Agreement.[13]  Notably, under Austrian law, even in the absence of such consent, Zeromax's purported acquisition of the CCBU shares nevertheless would have remained valid.

19.     Even assuming Zeromax was a party to the 2004 CCBU JVA (which it is not), Article 16.5 of that agreement expressly states that that agreement contains the entire agreement between the parties and supersedes all prior shareholder agreements.[14]  By its terms, therefore, the 2004 CCBU JVA constitutes a new and entirely separate shareholder agreement involving different parties from the parties to the 1993 CCBU JVA.  Thus, even assuming Zeromax was a party in the 2004 CCBU JVA, such participation would not constitute a transfer of contract ("*Vertragsübernahme*") and Zeromax could not be considered to have acceded to the 1993 CCBU JVA.

20.     Since Zeromax never acquired shares in CCBU and never agreed to be bound by the terms of the 1993 CCBU JVA, Zeromax is not bound by the terms of the 1993 CCBU JVA, including the arbitration clause contained therein.

### 3.     Zeromax Cannot Be Deemed To Have Consented To The Arbitration Clause Contained In The 1993 CCBU JVA By Virtue Of Muzimpex's Acquisition Of Shares In CCBU From The State In 2004

21.     Muzimpex's acquisition of state-owned shares in CCBU cannot be attributed to Zeromax because, contrary to Claimant's allegations, Zeromax never controlled or directed Muzimpex's activities.  Indeed, Claimant does not and cannot present any evidence of such

---

[13] *See* HS 8491 (OGH 12.1.1971, 405622/70) in which the Austrian Supreme Court held that an arbitration clause contained in the articles of association of a company was valid as between the relevant parties only if the articles of association were signed or otherwise agreed to in writing by a new shareholder and therefore executed in writing by all parties to the proceedings.

[14] Article 16.5 provides: "**Entire Agreement.**  This Agreement contains the entire agreement between the Participants with respect to the subject matter hereof and supersedes all prior agreements and undertakings between the Participants relating to the Company [CCBU]." 2004 CCBU JVA, art. 16.5.  This identical provision is contained in the 2003 CCBU JVA. *See* 2003 CCBU JVA, art. 16.5.

control.[15]  In fact, Muzimpex is a separately incorporated and distinct juridical entity from Zeromax, and Zeromax never owned any interest in Muzimpex.

22.    Under Uzbek law, the shareholders of a limited liability company generally cannot be held liable for the acts of the company, unless the shareholders cause the insolvency of the company through illegal action.  Neither the Uzbek Civil Code nor the Law "On limited and additional liability companies." (adopted on December 6, 2001) ("Law On LLCs") provides any other basis for liability of shareholders for the acts of the company.

23.    Under Austrian law, the corporate form comparable to the status of Muzimpex is the "*Gesellschaft mit beschränkter Haftung*" ("GmbH").  Austrian law recognizes the liability of a third party for liabilities of a GmbH only in very limited situations, for example, in cases of undue influence by a shareholder (which Zeromax is not).  Cases of shareholders' liability ("*Durchgriffshaftung*") are currently recognized only in cases, where there is undue commingling of assets ("*Vermögens- oder Sphärenvermischung*"); where the subsidiary is undercapitalized ("*Qualifizerte Unterkapitalisierung*"); or where there has been a flagrant abuse of shareholders' rights (such as voting rights or the right to instruct the management of the subsidiary).[16]  Claimant does not allege any of these circumstances, and none is applicable under the facts of this case.

24.    Muzimpex is a separately incorporated Uzbek-registered limited liability company that was founded and operates in accordance with Uzbek law, including the Law On LLCs.[17]  Pursuant to the Law on LLCs, the constitutive documents required for the establishment of a limited liability company include the foundation agreement and the company charter (collectively, "Foundation Documents"). The foundation agreement is a contract made among the shareholders of the limited liability company regulating *inter alia* their respective rights and obligations, profit-sharing procedures, and management, whereas the charter is a document of

---

[15] *See* Statement of Claims ¶ 2.4 ("Zeromax is engaged, directly and through various affiliates which it controls and directs, including Muzimpex . . . .").

[16] *See* Torggler, Fünf (Anti-) Thesen zur Haftungsdurchgriff, JBL 2006, 85.

[17] Prior to the adoption of this law, the status and activities of limited liability companies in Uzbekistan were regulated by the Law "On business entities and partnerships" (adopted on December 9, 1992).

the company itself that defines its shareholders, charter fund and proportion of shares, as well as the company's principal activities and management structure.

25.     The state registration of limited liability companies with foreign investment is carried out by the Ministry of Justice of the Republic of Uzbekistan ("MOJ"). Upon review of the requisite application and supporting documents, the MOJ issues the limited liability company a Certificate on State Registration and returns the company's Foundation Documents certified by the seal of the MOJ and marked "Registered." After such state registration, the limited liability company becomes a legal entity.

26.     In February 2003, Zeromax LLC (which is *not* a respondent in this arbitration), a now-defunct limited liability company organized and dissolved under the laws of the State of Delaware in the United States of America, and RTPF-Tijorat ("Tijorat"), an Uzbek state-owned food distribution company, formed the Uzbek-American agro industrial joint venture Muzimpex JV ("Muzimpex"). On February 12, 2003, Zeromax LLC and Tijorat executed new Foundation Documents for Muzimpex.[18] Zeromax LLC contributed cash assets and property (goods) to the joint venture, whereas Tijorat contributed property by means of its subsidiary UP Muzimpex-Tijorat.[19] On February 17, Muzimpex applied to the MOJ for registration and on February 28, the MOJ duly registered Muzimpex as an Uzbek-American limited liability company.[20]

27.     Following the dissolution of Zeromax LLC on September 28, 2005,[21] Zeromax GmbH, a Swiss limited liability company ("*Gesellschaft mit beschränkter Haftung*"), acquired Zeromax LLC's interest in Muzimpex. On October 11, 2005, Zeromax GmbH and Tijorat executed new Foundation Documents for Muzimpex.[22] On October 27, 2005, Muzimpex applied

---

[18] Muzimpex 2003 Charter (Zeromax Ex. 4); Muzimpex 2003 JVA (Zeromax Ex. 5).

[19] Muzimpex 2003 Charter, art. 6.2.

[20] Muzimpex 2003 Certificate of Registration, dated Feb. 28, 2003 (Zeromax Ex. 6).

[21] *See* Certificate of Cancellation of the Certificate of Formation of Zeromax LLC, dated Sept. 28, 2005 (Zeromax Ex. 7).

[22] Muzimpex 2005 Charter (Zeromax Ex. 8); Muzimpex 2005 JVA (Zeromax Ex. 9).

to the MOJ for registration and on November 7, 2005, the MOJ duly registered Muzimpex as an Uzbek-Swiss limited liability company.[23]

28.    Thus, Muzimpex's current status is that of an Uzbek-registered limited liability joint venture company between Zeromax GmbH and Tijorat established in accordance with Uzbek law and duly registered with the Ministry of Justice, with amendments to its charter fund duly registered as recently as March 13, 2006.[24]  Muzimpex's initial charter expressly provides that Muzimpex was established pursuant to Uzbek law[25] and sets forth in detail the business activities of Muzimpex including, *inter alia*, the manufacturing, processing, storage and sales of agricultural products.[26]

29.    Muzimpex *never* was a subsidiary of Zeromax.  Furthermore, Muzimpex and Zeromax, when Zeromax existed, were separate and distinct corporate entities.  Muzimpex maintained and still maintains its own offices and facilities at 11, Loyihachi Street, Nazarbek, Zangiota District, Tashkent Region, Republic of Uzbekistan, 702043.[27]  Muzimpex had and has its own directors, officers, and employees and carries on separate businesses.  Finally, Muzimpex maintained and still maintains its own financial accounts and records.  Unlike Zeromax, which is a dissolved Delaware corporation, Muzimpex remains a going concern today with active operations and customers.

30.    Upon these facts, there is no basis from which to attribute Muzimpex's activities, including the acquisition of the CCBU shares, to Zeromax.

---

[23] Muzimpex 2005 Certificate of Registration, dated Nov. 9, 2005 (Zeromax Ex. 10).

[24] *See* Letter to E. Tolipov from MOJ, dated Mar. 13, 2006 (Zeromax Ex. 11).

[25] Muzimpex was formed in accordance with the laws of Uzbekistan "About limited liability companies", "About foreign investments", and "About guarantees and measures on protection of rights of foreign investors".  Muzimpex 2003 Charter, art. 1; *see also* Muzimpex 2003 JVA, art. 1; Muzimpex 2005 Charter, art. 1; Muzimpex 2005 JVA, art. 1.

[26] Muzimpex 2003 Charter, art. 3; *see also* Muzimpex 2003 JVA, art. 4; Muzimpex 2005 Charter, art. 3; Muzimpex 2005 JVA, art. 4.

[27] Muzimpex 2003 Charter, art. 2.1.3; Muzimpex 2003 JVA, art. 2.1.3; Muzimpex 2005 Charter, art. 2.1.3; Muzimpex 2005 JVA, art. 2.1.3.

**4.      Zeromax Could Not Have Consented To The Arbitration Clause Contained In The 1993 CCBU JVA Because That Agreement Is Null And Void As A Matter Of Uzbek Law**

31.      Article 14 of the 1993 CCBU JVA, on "Governing Law," provides:

> The Joint Venture shall be conducted in conformity with the mandatory provisions of Uzbek law.  All matters not governed by mandatory Uzbek law concerning the relationship between the Parties shall be governed by this Agreement and the Articles of Association.[28]

32.      Under Uzbek law, the 1993 CCBU JVA is null and void and without legal force and effect in Uzbekistan.  Uzbek law provides for two options of introducing amendments to the Foundation Documents of a limited liability company.  Under the first option, the shareholders of the company draft an Addendum to the Foundation Documents reflecting the agreed-upon amendments and register this Addendum with the MOJ.  Upon registration with the MOJ, the Addendum becomes an integral part of the Foundation Documents and those provisions of the Foundation Documents that are not affected by the Addendum continue to be valid and in force.

33.      Under the second option, instead of drafting and registering an Addendum to the Foundation Documents, the shareholders of the company may choose to sign and adopt completely restated Foundation Documents.  Upon registration with the MOJ, these amended and restated Foundation Documents become valid and enforceable.[29]  By operation of law, the prior version of the Foundation Documents is rendered invalid and no one (neither the participants in the limited liability company nor any third parties) may refer or rely on the former Foundation Documents that were since replaced by the amended and restated versions.[30]

---

[28] 1993 CCBU JVA, art. 14.

[29] Law "On Limited and Additional Liability Companies," art. 11.

[30] Article 384 of the Uzbek Civil Code provides that an amendment to an agreement should be made in the same form as the agreement itself such that if the agreement was subject to registration under Uzbek law, then its amendments would also be subject to registration in order to be valid and enforceable. Article 385 of the Uzbek Civil Code further provides that the parties' obligations under an amended agreement are governed by that agreement, not by the former agreement, and these obligations are considered to be amended from the date of conclusion of the amended agreement.

34.     Thus, registration by the MOJ of CCBU's amended and restated Foundation Documents in 2003 nullified the 1993 CCBU JVA, rendering it invalid and unenforceable. Likewise, registration by the MOJ of CCBU's amended and restated Foundation Documents among TCCEC and Muzimpex in 2004 nullified the Amended and Restated Joint Venture Agreement among TCCEC and Uzpischeprom, dated September 22, 2003 ("2003 CCBU JVA"). Thus, as a matter of Uzbek law, even if Zeromax somehow was deemed to be a party to the 2004 CCBU JVA (which it is not), it could not be bound by the terms of the 1993 CCBU JVA because that agreement is a nullity and without force and effect under Uzbek law.

35.     In sum, there is an insufficient nexus between Zeromax and this dispute. Zeromax is not and never was a party to the 1993 CCBU JVA (nor to any subsequent CCBU joint venture agreement); Zeromax never acquired any shares in CCBU, directly or indirectly; and Muzimpex's acquisition of the CCBU shares cannot be attributed to Zeromax because Muzimpex is a separate and distinct corporate entity from Zeromax.  Accordingly, the claim against Zeromax should be dismissed for lack of jurisdiction.

## B.     The Statement Of Claims Is Beyond The Scope Of The Arbitration Agreement

36.     Even if Zeromax had consented to the arbitration clause contained in the 1993 CCBU JVA, which it did not, such consent, if any, would extend only to "disputes arising out of or in connection with this Agreement or related to its violation or termination . . . ."[31]  The claims against Zeromax do not arise out of or in connection with the 1993 CCBU JVA.

37.     Similarly, Uzbekistan is not a signatory to the 1993 CCBU JVA and, therefore, did not consent to have this Tribunal review the legitimacy of its acts as alleged by Claimant. Moreover, the legitimacy of Uzbekistan's confiscation of property to satisfy debts owed to the national treasury and to enforce its own laws — including anti-monopoly laws, capital contribution currency controls, and tax laws — and Uzbekistan's privatization of state-owned property, is not subject to this Tribunal's jurisdiction because such acts of the state do not

---

[31] 1993 CCBU JVA, art. 15.1 (Claimant Ex. 1).

"aris[e] out of or in connection with" the 1993 CCBU JVA. As broad as that language might be, the 1993 CCBU JVA is not a bilateral investment treaty or other instrument of consent that establishes the rights in the Claimant-investor for review of such conduct by the State. To the extent the claims against Zeromax arise out of these alleged acts of the State, Zeromax likewise has not consented to their review by the Tribunal. Any consideration of such issues by this Tribunal would constitute a manifest excess of its power. Thus, the allegations concerning Uzbekistan's acts in the Statement of Claims, including paragraphs 3.20-3.21, 3.24-3.25, 3.28, 3.34-3.45 and 3.56, are outside the scope of the arbitration clause and beyond the competence of the Tribunal, and, therefore, must be disregarded.[32]

38.     Claimant's allegations related to the divorce of its officer, Mansur Maqsudi, and to the custody disputes with his ex-wife, Gulnora Karimova, also are not within the scope of the dispute to be considered under the arbitration clause contained in Article 15. Any consideration of such matters by this Tribunal would constitute a manifest excess of the Tribunal's power. Accordingly, all allegations related to such matters in the Statement of Claims, including paragraphs 3.31-3.34, 3.37, 3.39, and 3.61, cannot be considered and decided by this Tribunal.

39.     The language "All disputes arising out of or in connection with this agreement . . ." does not include consent by the State for this Tribunal's review of alleged bad-faith administrative acts (paragraphs 3.36 and 3.38) or acts of alleged terror, torture, and intimidation of alleged relatives and shareholders of Claimant (paragraphs 3.37-3.38). Such claims are beyond the scope of the arbitration clause contained in Article 15, and therefore such claims cannot be decided by this Tribunal.

40.     Further, the language "All disputes arising out of or in connection with this agreement . . . or its termination" clearly does not contemplate arbitration of claims of extraneous alleged conspiracies by Zeromax and others, including Gulnora Karimova and Irena Avtoikina (paragraphs 3.55-3.57) to deprive Claimant of its shares. Such activities are not within the scope

---

[32] This interpretation is also consistent with the position adopted by Austrian legal literature. *See* Fasching, 2nd ed., recital 7; Dr. Wolf-Georg Schärf in AnwBl 2005, 504.

of the arbitration clause and therefore cannot be decided by this Tribunal under the consent in Article 15.

### C.    Zeromax Lacks Capacity To Be Sued

41.    According to Article 1 ZPO, as interpreted by case law and literature,[33] legal status ("*Parteifähigkeit*") is a fundamental prerequisite to an entity's involvement as a party in legal proceedings such as the present arbitration claim.  A non-existing entity, such as a formerly existing corporation that has been completely dissolved, does not possess the required legal status.[34]

42.    Since Zeromax is a dissolved corporate entity, it does not have adequate legal status to appear in the arbitration as a party.  Accordingly, the claim against Zeromax should be dismissed on procedural grounds.

*          *          *

43.    In light of the foregoing, and reserving all rights to submit further explanations, arguments and exhibits in response to Claimant's claims and arguments, Zeromax submits that the claims in the Statement of Claims are procedurally and jurisdictionally defective as to Zeromax.  Accordingly, Zeromax respectfully requests that the Tribunal, in accordance with Article 14(1) of the Vienna Rules, bifurcate these proceedings so as to conduct a preliminary jurisdictional phase on the question of the Tribunal's competence over the claims against Fourth Defendant Zeromax Group, Inc.

---

[33] *See* Rechberger/Melis, 2nd ed., before paragraph 1, recital 5.

[34] *See* Fasching, Kommentar ZPO; Rechberger/Simotta, Zivilprozessrecht; Rechberger, Parteiexistenz, in FS Fasching, 389.

## II.    FACTUAL BACKGROUND

### A.    Muzimpex Acquired The State's Interest In CCBU Through A Privatization Sale Conducted In Accordance With Uzbek Law

44.    The principal law governing the privatization of State-owned property in Uzbekistan is the Law "On Denationalization and Privatization" No. 425-II dated November 19, 1991, which provides that the State Property Committee is the primary government entity responsible for the privatization of State property.[35]  Under regulations issued by Cabinet of Ministers Decree No. 325, dated July 24, 2003,[36] specific State Property Committee functions include rendering decisions on the privatization of State property, acting as the seller of State property, and establishing the initial price for any such sale.  In this capacity, the State Property Committee remains accountable to the Cabinet of Ministers which, pursuant to Decree No. 272 dated June 30, 1997 (in force at the time in question), retains final approval authority for the sale of State assets in enterprises not subject to preservation under special decree.

45.    Muzimpex's acquisition of the State's interest in CCBU complied in full with the requirements of Uzbek privatization law.  According to the correspondence, on or about April 20, 2004, Muzimpex approached Uzpishcheprom with a proposal to purchase the State's 57.118% interest in CCBU.[37]  Uzpishcheprom notified the State Property Committee of Muzimpex's proposal on April 21, 2004.[38]  On May 14, 2004 the Chairman of the State Property Committee wrote to Deputy Prime Minister M.Z. Usmanov, citing the Cabinet of Ministers approval requirement of Decree No. 272 and asking that Usmanov submit the Muzimpex proposal to the Cabinet of Ministers for consideration.[39]  On August 13, 2004 the State Property

---

[35] The State's acquisition of ROZ's shares in CCBU is discussed *infra* at II.B.

[36] Regulations "On the State Committee of the Republic of Uzbekistan for Management of State Property," attached to Cabinet of Ministers Decree No. 325, dated July 24, 2003, Section 8.  Under Articles 94 and 98, respectively, of the Constitution of the Republic of Uzbekistan, the President and Cabinet of Ministers are empowered to issue compulsory decrees, resolutions and instructions which are enforceable throughout Uzbekistan.

[37] *See* Letter from Uzpishcheprom to State Property Committee, Ref. #10/21-109, dated Apr. 21, 2004 (Zeromax Ex. 12) (referencing Muzimpex proposal letter of April 20, 2004).

[38] *Id.*

[39] Letter from M. Askarov, Chairman of the State Property Committee, to M.Z. Usmanov, Deputy Prime Minister of Uzbekistan, dated May 14, 2004 (Zeromax Ex. 13) (requesting instruction for submission of Muzimpex purchase proposal to Cabinet of Ministers).

Committee again asked for Cabinet of Ministers approval, concluding that the Committee "deem[ed] it expedient" to make the sale to Muzimpex at a price of $14,136,880.[40] By seal dated August 13, 2004, the Cabinet of Ministers officially approved the sale.[41]

46.    On September 13, 2004, the State Property Committee issued Order No. 120k-no, by which it announced the Cabinet of Ministers approval for the Muzimpex proposal, confirmed the purchase price of Uzpishcheprom's shares at $14,136,880, and ordered the drafting of an agreement.[42]  The State Property Committee, Uzpishcheprom, and Muzimpex subsequently executed a final sale-purchase agreement.[43]  The State Property Committee co-signed the agreement in the capacity of Seller because Uzpishcheprom, as a State-owned entity, was not authorized to enter into the agreement by itself.

47.    Under the express terms of the agreement, Muzimpex "agree[d] to acquire the participatory interest of the State, relying on statements [and] guarantees fixed in the [sale-purchase] Agreement."[44]  The State Property Committee guaranteed, *inter alia,* that it was *"authorized on behalf of the [S]tate to own, use and to deal with the share interest . . . which belongs to the State."*[45]  The State Property Committee further guaranteed that *"[t]he State-owned 57.118% participatory interest in the Charter capital of CCBU is not pledged and is free from liens and claims of third parties."*[46]  By letter dated December 7, 2004, the State Property Committee notified TCCEC that the right of control of the 57.118% interest in CCBU officially had passed from the State to Muzimpex under the September 13 sale-purchase agreement.[47]

---

[40] Letter from M. Askarov, Chairman of the State Property Committee, to M.Z. Usmanov, Deputy Prime Minister of Uzbekistan, dated Aug. 13, 2004 (Zeromax Ex. 14).

[41] Seal of Approval, Directive No. 04/23-31, by M. Uzmanov, dated Aug. 13, 2004 (Zeromax Ex. 15).

[42] State Property Committee Order No. 120k-no, dated Sept. 13, 2004 (Zeromax Ex. 16).

[43] Purchase Agreement between State Property Committee and Muzimpex Ltd., dated Sept. 13, 2004 (Zeromax Ex. 17).

[44] *Id.* ¶ 1.1.

[45] *Id.*, Appendix #1, ¶ 1.2 (emphasis added).

[46] *Id.*, Appendix #1, ¶ 1.4 (emphasis added).

[47] Letter from State Property Committee to TCCEC, Ref. 04/11-366, dated Dec. 7, 2004 (Zeromax Ex. 18).

48.     On December 7, 2004, TCCEC and Muzimpex executed the 2004 CCBU JVA and the Second Amended and Restated CCBU Charter.[48] Under the amended constitutive documents, TCCEC and Muzimpex were the only two Participants in the joint venture, with TCCEC holding a 42.882% interest and Muzimpex 57.118%.[49] On December 20, 2004, the Second Amended and Restated Charter was duly registered with the Ministry of Justice.[50]

49.     As discussed in Section I.A., *supra*, Zeromax does not own any interest in Muzimpex; Zeromax was not involved in Muzimpex's acquisition of the state-owned CCBU shares; and Zeromax was not a party to the 2004 CCBU JVA, or to any other CCBU joint venture agreement. Muzimpex is not a respondent in this arbitration.

**B.      The State Acquired The CCBU Interest Sold To Muzimpex Through A Series Of Regulatory Enforcement Actions Pursuant To Uzbek Law**

50.     The State acquired its 57.118% interest in CCBU through a series of regulatory enforcement actions initiated in response to numerous breaches of Uzbek law including, *inter alia*, anti-monopoly and tax laws, charter capital requirements and currency control regulations by ROZ, its subsidiary ROZ Trading Ltd. (Uzbekistan) ("ROZ(U)"), and Mansur Maqsudi and members of his family in their capacities as majority owners and officers of both CCBU and the ROZ entities.[51]

51.     Through these regulatory enforcement actions, the State removed ROZ's CCBU shares and held them through Uzpishcheprom, a State-authorized entity. The State held the shares for nearly two years until it disposed of them through the above-described privatization sale to Muzimpex in September 2004.

---

[48] Second Amended and Restated Joint Venture Agreement among Muzimpex and TCCEC, dated Dec. 7, 2004 (Zeromax Ex. 19); Second Amended and Restated CCBU Charter, dated Dec. 7, 2004 (Zeromax Ex. 20).

[49] *Id.*

[50] *See* Second Amended and Restated CCBU Charter, dated Dec. 7, 2004 (Zeromax Ex. 20) (Uzbek copy bearing Ministry of Justice seal, dated Dec. 20, 2004).

[51] Zeromax's understanding of the facts set forth herein is based, in large part, on review of the relevant Uzbek judicial decisions, certain correspondence, and publicly available news reports and other materials.

### 1.    Anti-Monopoly Proceedings

52.    Uzbek law contains specific limitations on the extent to which any one party may exercise ownership control over a company. Article 15 of the Law "On Competition and Limitation of Monopolist Activity on Commodity Markets" ("Anti-Monopoly Law") requires the prior approval of the Committee for Demonopolization and Development of Competition ("Anti-Monopoly Committee") for any transaction in which a party acquires an interest in a company exceeding 35%. Article 15 further provides that any transaction made in violation of this prior approval requirement is subject to invalidation. Pursuant to antimonopoly procedures governing from 1997 to 2005, the Anti-Monopoly Committee was fully authorized to invalidate such transactions. In the alternative, the Committee could initiate invalidation proceedings before the Uzbek Economic Courts.

53.    Under the 1993 CCBU JVA as amended and clarified, TCCEC, ROZ and Uzpishcheprom (together, the "Participants") each possessed a 33.3% ownership interest in CCBU.[52] Beginning in April 1995, the Participants agreed upon a series of capital contributions and share sales through which ROZ acquired majority control and ROZ(U) became the fourth Participant.[53] By March 1998, ROZ possessed a 55.055% interest in CCBU, while TCCEC held 32.998%, ROZ(U) 9.947%, and Uzpishcheprom 2%.[54] Despite acquiring an interest well in excess of 35% — and holding that interest for several years — ROZ reportedly did not obtain, or even seek, Anti-Monopoly Committee approval for these changes.

54.    No further adjustments were made to CCBU's ownership structure until 2001, when ROZ agreed to sell TCCEC a 9.884% interest. Under the proposed sale, TCCEC would exceed the 35% threshold of Anti-Monopoly Law Article 15 for the first time. In contrast to the

---

[52] 1993 CCBU JVA, art. 4.2.2 (establishing equal share ownership of TCCEC, ROZ and Bashaghash, whose interest was subsequently transferred in full to Uzpishcheprom) (Claimant Ex. 1).

[53] See Parties' Assembly and Supervisory Board Resolution, dated Apr. 6, 1995 (Claimant Ex. 14) (establishing ROZ as a 51.58% owner of CCBU). The citation to Claimant's exhibits in this Memorandum does not in any way constitute Zeromax's acceptance of the content of the documents as true. Further, Zeromax's reliance on Claimant's translations of certain foreign language documents does not in any way constitute the acceptance of those translations as authoritative. Zeromax relies on Claimant's translations solely in the interest of streamlining this initial submission.

[54] See Ministry of Justice Decree No. 318, dated Mar. 17, 1998 (Claimant Ex. 19).

unauthorized transactions by which ROZ had surpassed and remained above the statutory limit, the Participants obtained Anti-Monopoly Committee approval for TCCEC's acquisition. The Anti-Monopoly Committee's Expert Council agreed on February 16, 2001 to permit the transaction,[55] and the Anti-Monopoly Committee followed with final authorization on April 18.[56]

55.    Pursuant to its authority under Article 15, the Anti-Monopoly Committee commenced an action in the Economic Court of Tashkent on September 28, 2001 to invalidate all CCBU share reallocations, citing violations of the prior approval requirement.[57] On October 17, 2001, the Economic Court found that ROZ and TCCEC both had exceeded the statutory 35% threshold without authorization of the Anti-Monopoly Committee, and granted the Committee's petition.[58]

56.    CCBU and TCCEC appealed the Economic Court's decision, which was amended by the Tashkent Municipal Commercial Court on December 4, 2001.[59] The Commercial Court ruled that TCCEC's 2001 purchase of 9.884% from ROZ was, in fact, valid because the Anti-Monopoly Committee had approved it as required by Article 15.[60] Further determining that documentation of the Anti-Monopoly Committee's approval had not been available to the Economic Court, the Court reversed the decision to invalidate the 2001 transaction.[61] With respect to all previous transactions, pursuant to which ROZ had illegally acquired a greater than 35% interest without Anti-Monopoly Committee approval, the Commercial Court affirmed the Economic Court's invalidation decision.[62] The Court concluded that ROZ was entitled to only a 23.416% interest in CCBU, reflecting ROZ's investment before the illegal acquisition of

---

[55] Decision No. R-05/5 of the Anti-Monopoly Committee's Expert Council, dated Feb. 16, 2001 (Claimant Ex. 23).

[56] Anti-Monopoly Committee letter no. AU-05-9/119 to JV Coca-Cola Bottlers Uzbekistan Ltd., dated Apr. 18, 2001 (Claimant Ex. 26).

[57] Anti-Monopoly Committee's Petition to the Economic Court of Tashkent City, No. AB-059/293, dated Sept. 28, 2001 (Claimant Ex. 34).

[58] Judgment of the Economic Court of Tashkent City dated Oct. 17, 2001 (Case No. 2494/01-t) (Claimant Ex. 35).

[59] Judgment of the Tashkent Municipal Commercial Court, dated Dec. 4, 2001 (Case No. 2494/01-t) (Claimant Ex. 37).

[60] *Id.*

[61] *Id.*

[62] *Id.*

majority control, less its approved sale of 9.994% to TCCEC.[63]  By virtue of the same transaction, TCCEC held a 42.882% interest, and Uzpishcheprom owned the remaining 33.702%.[64]  On February 5, 2002, the Supreme Economic Court affirmed the Commercial Court's decision without change.[65]

### 2.    Liquidation Proceedings

57.    The confiscation of ROZ's remaining 23.416% interest in CCBU was the result of ROZ's violations of Uzbek capital charter requirements, tax laws, and currency controls.  Under Article 17 of the Law "On Business Entities and Partnerships," enacted December 9, 1992, companies must pay their declared charter capital in full within one year of registration.[66]  The total amount of the charter fund and each shareholder's contribution to the fund is defined by agreement of the parties, and formalized in the constitutive documents.[67]  Pursuant to Presidential Decree No. UP-2331, dated June 28, 1999, and Cabinet of Ministers Decree No. 327, dated July 3, 1999,[68] companies failing to establish their charter funds in due time are subject to forced dissolution.  Companies may also be liquidated if they do not carry out any business activities for more than six months.

### a.    ROZ(U)'s Dissolution And Bankruptcy Proceedings

58.    ROZ(U)'s charter fund had been set at $500,000 when the company was first registered in 1993, but apparently was never paid.[69]  Investigations conducted into ROZ(U) as early as September 1997 — years before the events giving rise to this dispute — revealed this

---

[63] *Id.*

[64] *Id.*

[65] Judgment of the Supreme Economic Court, dated Feb. 5, 2002 (Case No. 2494/01-t) (Claimant Ex. 38).

[66] The Law "On Business Entities and Partnerships," in force at the time of the November 2001 Ministry of Justice letter, was later replaced by the Law "On Limited and Additional Liability Companies," enacted December 6, 2001. Article 14 of the 2001 Law provided the same one-year requirement for capitalization.

[67] Law "On Business Entities and Partnerships," art. 3; *see also* Law "On Limited and Additional Liability Companies," arts. 12-13.

[68] Regulations "On the Procedures of Forced Liquidation of Legal Entities Which Do Not Carry Out Any Activities and Do Not Have Their Charter Funds Fully Paid Up" were attached to Cabinet of Ministers Decree No. 327.

[69] *See* Ministry of Justice letter to ROZ Trading Ltd. Foreign Enterprise, dated Nov. 26, 2001 (Claimant Ex. 39).

charter capital inadequacy, and the government officially warned ROZ(U) management several times to remedy the shortfall.[70]

59.    In November 2001, the Ministry of Justice notified ROZ(U) that it had failed to comply with charter funding requirements.[71]  Citing this continued failure to pay its charter capital, as well as separate resolutions of the Prosecutor's Office and State tax authorities, the Ministry of Justice warned ROZ(U) that the Ministry would be petitioning the Economic Court to liquidate the company.[72]  The Ministry subsequently filed a petition with the Economic Court of Tashkent, which formally ordered ROZ(U)'s liquidation on December 26, 2001.[73]  The Economic Court found, in accordance with the Law "On Business Entities and Partnerships," Presidential Decree No. UP-2331, and Cabinet of Ministers Decree No. 327, that liquidation was justified because ROZ(U) had not paid its charter capital and had not engaged in any business activity for more than six months.[74]

60.    Following this decision, the commission overseeing ROZ(U)'s liquidation discovered that the company's debts far exceeded its assets and, accordingly, initiated bankruptcy proceedings before the Economic Court.[75]  The Court finalized these bankruptcy proceedings on April 29, 2002, when it found that ROZ(U) was over 13.318 billion soum in debt — more than 13.225 billion of which was money owed to the State.[76]  In a subsequent June 3, 2002 decision, affirmed by the Supreme Economic Court on September 11, 2002,[77] the Court

---

[70] *Id.* ("As said earlier, based on the checks and investigations of September 1997 at ROZ Trading, there were some short-comes [*sic*] established and reported.  But as of today none of those shortages were eliminated or appropriate measures were taken.  *Despite that the management of the company was notified and officially warned several times, they failed to demonstrate that the declared charter capital was formed.*") (emphasis added).

[71] *Id.*

[72] *Id.*

[73] *See* Decision of the Economic Court of Tashkent (Case No. 10-0207/1409), dated June 3, 2002 (Zeromax Ex. 21) (citing Decision of the Economic Court of Tashkent (Case No. 3027-01-c), dated Dec. 26, 2001).

[74] *See id.*

[75] *See id.*

[76] *See id.*; *see also* Decision of the Supreme Economic Court (Case No. 10-0207/1409), dated Sept. 11, 2002 (Claimant Ex. 42).

[77] Decision of the Supreme Economic Court (Case No. 10-0207/1409), dated Sept. 11, 2002 (Claimant Ex. 42) ("The decision of the first-level court . . . is lawful and well-grounded because [ROZ(U)] was driven into bankruptcy

attributed this considerable debt to the State to unlawful actions by the company's ROZ-dominated management.[78]

### b.    Illegal Activities Of ROZ And The Maqsudi Family

61.    At the time of the Economic Court proceedings, the General Prosecutor's Office and State Taxation Committee were both investigating the involvement of ROZ and the Maqsudi family in a myriad of criminal activities including, *inter alia*, violations of Uzbek tax laws and currency controls.  News reports indicate that government investigations into the Maqsudis' unlawful conduct were initiated as early as April 2001[79] — again, well in advance of the events giving rise to this dispute.

62.    Since the introduction of the soum as the national currency in 1994, the government of Uzbekistan has maintained stringent controls on the conversion of soum to foreign currency, and on the mandatory conversion of hard currency revenue to soum.  Under Cabinet of Ministers Decree No. 405, dated November 19, 1996, companies importing and selling consumer goods were required to obtain a license from the Central Bank of Uzbekistan to convert soum into hard currency.  Unlicensed parties could also purchase foreign currency under the practice of "one-off conversion," but were subject to currency quotas instituted by the government.  In addition, under past and existing regulations, all legal entities must convert fifty percent of their hard currency revenues to soum by selling such revenue to authorized Uzbek banks.  While new regulations introduced by the Cabinet of Ministers in 2001 slightly eased certain controls, the strict currency conversion regime remains largely in place.

63.    It is widely reported that Uzbek authorities have determined the Maqsudi family's criminal conduct included "transfer pricing" schemes by which they misappropriated CCBU

---

due to the fact that management of the enterprise's financial and economic activities was conducted by an executive body comprising representatives of the firm [ROZ Trading] who, *in the course of managing the enterprise, permitted unlawful actions that resulted in development of a multibillion sum of creditor indebtedness*, consequently bringing upon recognition of the enterprise as bankrupt.") (emphasis added).

[78] Decision of the Economic Court of Tashkent (Case No. 10-0207/1409), dated June 3, 2002 (Zeromax Ex. 21).

[79] *See, e.g.*, Douglas Burton, *Divorce Drama Goes International*, UPI Insight Magazine, Sept. 1, 2003 (Zeromax Ex. 22).

funds and evaded Uzbek tax liabilities and currency conversion obligations.[80]  Claimant
identifies a series of transactions that ROZ orchestrated between it, its Dubai-based subsidiary
Valuelink FZE ("Valuelink"), and CCBU, purportedly to enable CCBU to convert its soum to
U.S. dollars and purchase concentrate from The Coca-Cola Company ("Coca-Cola").[81]
Apparently, ROZ purchased raw materials, including oil and cotton, in soum on behalf of
CCBU; CCBU sold the materials to Valuelink for dollars; and Valuelink sold the commodities
on the international market.  According to Claimant, CCBU benefited from the transactions by
obtaining the necessary concentrate, "Coca-Cola profited by having its outstanding invoices paid
and the Republic of Uzbekistan profited by receiving taxes on the sale of the goods."[82]

64.    Investigative documents indicate that ROZ, Valuelink, and ultimately the
Maqsudis also profited greatly from these sales, exploiting the Maqsudis' controlling interest and
management positions in CCBU at the expense of both CCBU and the Republic of Uzbekistan.
In the years 2000-2001, CCBU purchased 551,085,478 soum in cotton lint from the Uzbek
government, which the Maqsudis directed CCBU to sell to Valuelink for $4.594 million.[83]
Valuelink then sold the cotton lint on the international market for $6.476 million, while
arranging for the initial government seller to deliver the goods to the end buyers — profiting
nearly $2 million for very little work.[84]  ROZ, in turn, apparently charged CCBU an additional
fifteen percent commission on each transaction for "intermediary and marketing services" that
were actually performed by CCBU staff at CCBU's offices.[85]

65.    The export of oil products was governed by similar terms: CCBU sold oil,
purchased from the government in soum, to Valuelink for $15.938 million; Valuelink resold the
commodity abroad for $19.637 million, while arranging for direct shipment from the original

---

[80] See generally http://www.mansurmaqsudi.net; see also Paul Klebnikov, Coke's Sinful World, Forbes vol. 172:3, Dec. 22, 2003 (Zeromax Ex. 23); Douglas Burton, Divorce Drama Goes International, UPI Insight Magazine, Sept. 1, 2003 (Zeromax Ex. 22).

[81] Statement of Claims ¶ 3.24.

[82] Id.

[83] Public Prosecutor's Office Tables for Criminal Case No. 119 (Zeromax Ex. 24) at 2.

[84] Id.

[85] Audit of Konsauditinform Agency, dated Feb. 18, 2005 (Zeromax Ex. 25) at 7.

seller to the end buyers; and ROZ earned a fifteen percent commission for marketing services it did not render.[86] Finally, under both cotton and oil export transactions, the Maqsudis directed CCBU to pay the twenty percent taxes levied on ROZ's commissions, in direct violation of Uzbek tax law.[87]

66.    The Maqsudis orchestrated similarly fraudulent import schemes, pursuant to which Valuelink purchased raw materials (e.g., sugar) on the international market and then resold them to CCBU at significantly overstated prices (in dollars).[88] By underpaying CCBU for its exports and overcharging CCBU for imports, through these and other transactions, the Maqsudis appear to have channeled significant amounts of foreign currency from the joint venture to their overseas companies, while evading Uzbek tax liabilities and currency conversion requirements.[89]

### c.    Collection Of ROZ(U)'s Debt To The State

67.    Following the formal determination of ROZ(U)'s bankruptcy in April 2002, the liquidation commission petitioned the Economic Court to remove ROZ's remaining 23.416%

---

[86] Public Prosecutor's Office Tables for Criminal Case No. 119 (Zeromax Ex. 24) at 2.

[87] *Id.*; *see also* Tax Code of the Republic of Uzbekistan, art. 35 (providing that "taxpayers and other persons doing business in the Republic of Uzbekistan [cannot] undertake to bear expenditures associated with the discharge of all taxes and duties due to be paid by foreign legal entities").

[88] *See, e.g.*, Audit of Konsauditinform Agency, dated Feb. 18, 2005 (Zeromax Ex. 25) at 10-11; Public Prosecutor's Office Tables for Criminal Case No. 119 (Zeromax Ex. 24) at 3.

[89] *See, e.g.*, Uzbek Deputy Attorney General's Resolution on Placement in Custody and Announcement on Search of M. Maqsudi, dated Nov. 6, 2002, available at http://www.mansurmaqsudi.net (Zeromax Ex. 26) ("[M]embers of the Maqsudi family purposefully overestimated the cost of contracts for delivery of consumer goods to Uzbekistan . . . . By those contracts they illegally received hard currency . . . ."); Publication of Interpol International Wanted Notice for Mansur Maqsudi, dated December 25, 2002 (Zeromax Ex. 27) (charging Maqsudi with, *inter alia*, "plundering by appropriation or embezzlement," "illegal trade . . . activity," and "evasion from the payment of taxes or other payments"); *see also* Paul Klebnikov, *Coke's Sinful World*, Forbes vol. 172:3, Dec. 22, 2003 (Zeromax Ex. 23) ("Most of the goods CCBU imported . . . went through the Maqsudi-owned companies.  And while Coke was paid, often late, in wobbly Uzbek currency that couldn't be taken out of the country, Maqsudi's properties . . . were paid in hard currency, often in advance.  From 1998 to 2001 . . . almost $100 million was wired from Uzbekistan to Maqsudi affiliates, including a Dubai-based trading firm, Valuelink FZE, and various offshore affiliates of ROZ Trading . . . according to Uzbek Central Bank records.  The Uzbek prosecutor general's office now claims that by overcharging for these imports and taking straightforward trading commissions, the Maqsudis siphoned off much of CCBU's profits and stashed it in offshore accounts to avoid tens of millions of dollars in taxes.").

CCBU interest to satisfy ROZ(U)'s debt to the State.[90] In its June 3, 2002 decision attributing ROZ(U)'s debts to the illegal activities of ROZ management (i.e., the Maqsudis), the Economic Court sustained the commission's claim.[91]

68.     Under Uzbek law, the shareholders of a limited liability company generally cannot be held liable for any debt or obligation of the company. Article 48 of the Uzbek Civil Code, however, serves as an exception to this general rule, and provides that the founder or owner of an entity may be held liable for that subsidiary's debts if the subsidiary becomes insolvent as a result of the founding party's unlawful actions. The Economic Court found that ROZ(U) was majority-owned and managed by ROZ, and that the management's illegal conduct had caused ROZ(U)'s bankruptcy.[92] Accordingly, the Economic Court concluded that Article 48 justified holding ROZ liable for ROZ(U)'s debt.[93]

69.     The Court also relied upon Uzbek Civil Code Article 227, which enables the creditor of a joint venture participant to demand apportionment of that debtor's interest in the venture in order to satisfy the creditor's claims.[94] The Court held that, pursuant to Article 227, ROZ's ownership interest in CCBU could properly be removed to satisfy the State's claims against ROZ(U).[95]

70.     Applying these provisions of Uzbek law, the Court ordered the removal of ROZ's 23.416% participatory interest in CCBU, valued at 9.877 billion soum, to pay ROZ(U)'s debt to the State.[96] Even with such payment, the Court acknowledged that ROZ(U)'s debt to the State of

---

[90] Decision of the Economic Court of Tashkent (Case No. 10-0207/1409), dated June 3, 2002 (Zeromax Ex. 21).

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

over 13 billion soum still was not fully satisfied.[97]  On September 11, 2002, the Supreme Economic Court affirmed the Economic Court's June 3 ruling without change.[98]

71.    By Decree No. 420-F dated July 5, 2002, the Cabinet of Ministers acknowledged the Economic Court's decision to remove ROZ's interest in CCBU to satisfy ROZ(U)'s debt to the State.[99]  In addition, the Cabinet of Ministers formally endorsed the transfer of ROZ's participatory interest to the State, through Uzpishcheprom, in satisfaction of that debt.[100]  The Decree further ordered Uzpishcheprom to amend the CCBU constitutive documents to reflect these changes in ownership, and for the Ministry of Finance and State Tax Committee to adjust the debt of ROZ(U) by the amount of ROZ's removed share.[101]

72.    In accordance with Decree 420-F, on September 22, 2003, Uzpishcheprom and TCCEC executed an Amended and Restated Joint Venture Agreement[102] and Amended and Restated Charter.[103]  Under the amended constitutive documents, Uzpishcheprom and TCCEC were the only two Participants in the joint venture, with Uzpischeprom holding a 57.118% interest and TCCEC 42.882%.[104]  The 57.118% interest held by Uzpishcheprom on behalf of the State was ultimately transferred to Muzimpex under the 2004 sales-purchase agreement.

73.    Zeromax was not involved in any way in the State's enforcement proceedings against ROZ through which the State acquired its interest in CCBU.

---

[97] Id.

[98] Decision of the Supreme Economic Court (Case No. 10-0207/1409), dated Sept. 11, 2002 (Claimant Ex. 42).

[99] Cabinet of Ministers Directive No. 420-F, dated July 5, 2002 (Zeromax Ex. 28).

[100] Id.

[101] Id.

[102] 2003 CCBU JVA, dated Sept. 22, 2003 (Zeromax Ex. 3).

[103] 2003 CCBU Charter, dated Sept. 22, 2003 (Zeromax Ex. 29).

[104] 2003 CCBU JVA, dated Sept. 22, 2003 (Zeromax Ex. 3); 2003 CCBU Charter, dated Sept. 22, 2003 (Zeromax Ex. 29).

## III.    CLAIMANT IS NOT ENTITLED TO THE RELIEF IT SEEKS

74.    In the event the Tribunal concludes it is competent to decide the claims against Zeromax in this arbitration, Zeromax sets forth its preliminary reply on the merits as follows.

### A.    ROZ Is Not Entitled To Compensation For Uzbekistan's Regulatory Acts In The Exercise Of Its Police Power

75.    ROZ's claims against Zeromax appear to stem from Uzbekistan's alleged violations of international law.  Uzbekistan's alleged acts regarding ROZ, however, constituted valid regulatory action taken in accordance with Uzbek law, for which no remedy is afforded — particularly not against Zeromax as a purported third-party purchaser.  Further, Uzbekistan's subsequent sale of the property in question to Muzimpex was permissible under both Uzbek and international law, precluding any claims against Zeromax or, for that matter, Muzimpex.[105]

#### 1.    A State's Regulatory Acts Taken For The Purpose Of Promoting The General Welfare Do Not Give Rise To A Claim For Compensation From A Third-Party Purchaser

76.    ROZ's claims against Zeromax are untenable because the acts it complains of were regulatory acts taken solely by Uzbekistan against ROZ in the valid exercise of Uzbekistan's police power.  Under international law, a *bona fide* generally applicable regulation, adopted and enforced within the confines of a state's police power, will not result in a state's responsibility to provide compensation.

77.    Regulatory regimes in areas such as antitrust, consumer protection, securities, environmental protection, planning and land use will not constitute compensable takings where public harm has already resulted or is anticipated.  In this regard, *prima facie* examples of permissible non-compensable regulations include ordinary taxation measures, forfeiture of private property for crime and currency regulations.

---

[105] Morever, Claimant does not — and cannot — cite to any treaty rights that would expand its claims beyond customary international law.  Indeed, in the absence of a treaty right, ROZ cannot assert international law claims against a State, because international law governs the rights and obligations between States and not between States and private parties.

78.    States are entitled to take measures to enforce a court judgment in a civil case or impose a fine or penalty in criminal proceedings in the course of their governmental functions. International tribunals have recognized that where national law has been violated due to non-payment of taxes owed to the state, the application of the national law, even if it results in a taking of property, does not violate international law.

79.    International law affirms the "sovereign right of a State, under international law," to take measures without paying compensation that "deprive owners, including aliens, of property which is within its territory, in the pursuit of its political, social or economic ends."[106] Such measures are "accepted as part of the normal governmental process,"[107] and include "[t]he imposition of taxation of a general and non-confiscatory character; the forfeiture of goods smuggled through the customs . . . ; the payment of fines upon conviction for crime; [and] the enforcement of court judgments."[108]  The European Convention on Human Rights also recognizes that the property protections in the Convention "shall not . . . in any way impair the right of a state to enforce such laws as it deems necessary to control the use of property in accordance with the general interest or to secure the payment of taxes or other contributions or penalties."[109]  G.C. Christie, a pre-eminent international law scholar, has concluded that "the operation of a State's tax laws, changes in the value of a State's currency, actions in the interest

---

[106] OECD Draft Convention on the Protection of Foreign Property, dated Oct. 12, 1967, 7 I.L.M. 117, 125 (1968) ("OECD Convention").

[107] OECD Convention at 131 (noting that this is a state measure that parties to the Convention are "entitled to take and the legality of which, in relation to the Convention, is not dependent upon the invocation of a derogation clause"), *Responsibility of States for Injuries to the Economic Interest of Aliens -- Draft Convention*, Art. 10(5), *reprinted in* Louis B. Sohn and Richard R. Baxter, 55 AM. J. INT'L L. 545, 561 (1961) (noting that lawful, uncompensated takings "incidental to the normal operation of the laws of the State" refer to the "carrying out of a judgment of a court in a civil case or a fine or penalty in criminal proceedings").

[108] *Id.* Similarly, the Draft Convention on the Responsibility of States for Injuries to Aliens also expressly recognized that "[a]n uncompensated taking of property of an alien or a deprivation of the use or enjoyment of property of an alien which results from *the execution of the tax laws*; from a general change in the value of currency; from the action of the competent authorities of the State in the maintenance of public order, health, or morality; or from the valid exercise of belligerent rights; or is *otherwise incidental to the normal operation of the laws of the State* shall not be considered wrongful . . . ." *Responsibility of States for Injuries to the Economic Interest of Aliens -- Draft Convention*, Art. 10(5), *reprinted in* Louis B. Sohn and Richard R. Baxter, 55 AM. J. INT'L L. 545, 554 (1961).

[109] Protocol to the Convention for the Protection of Human Rights and Fundamental Freedoms, opened for signature Mar. 20, 1952, art. 1, 213 U.N.T.S. 262, 262.

of the public health and morality, will all serve to justify actions which because of their severity would not otherwise be justifiable . . . ."[110]

80.    Thus, unless a state makes a specific commitment to an investor, foreign investors cannot claim compensation for expropriation based on a state's application of its generally applicable regulations, enacted in accordance with due process, or *bona fide* changes to the generally applicable legal regime.  This is, however, precisely the nature of ROZ's claims — which are untenable under international law.

81.    To the extent that Austrian law applies, ROZ's claims are equally untenable under that law.  The general principles of public international law are an integral part of Austrian law.[111]  Moreover, the case law of the Austrian Constitutional Court ("VfGH") has developed a clear definition of "expropriation" and has determined how to distinguish an expropriation from other events of seizure or "taking" of private property by operation of law.  A similar distinction can also be found in Article 1 para. 2 of Protocol No. 1 to the European Convention of Human Rights, which is (as a ratified international treaty) an integral part of Austrian law.

82.    The Austrian Constitutional Court has recognized that certain seizures of assets by operation of law or sovereign acts do not constitute expropriations.  In particular, levying of taxes or other monetary contributions to the state cannot be understood to constitute an "expropriation."[112]  Accordingly, a taking of an asset in order to collect overdue tax obligations also cannot be regarded as an expropriation under Austrian law.

### 2.    ROZ's Claims Against Zeromax Are Based On Valid Regulatory Acts Of The Uzbek Government

83.    ROZ's claims arise from Uzbekistan's enforcement of its regulations, which were generally applicable and enacted for the purpose of regulating the operation of commercial

---

[110] G. C. Christie, *What Constitutes A Taking Of Property Under International Law?*, 38 Brit. Y.B. Int'l L. 307, 331-332 (1962).

[111] *See* Austrian Federal Constitution, art. 9(1) ("Die allgemein anerkannten Regeln des Völkerrechtes gelten als Bestandteile des Bundesrechtes.").

[112] *See, e.g.*, VfGH in VfSlg 3666/1959; VfGH in VfSlg 4086/1961.

enterprises within Uzbekistan's sovereign territory.  International law recognizes this as legitimate state action and does not afford a remedy for investors who violate local laws. Specifically, after widely publicized investigations, Uzbekistan discovered that: (1) certain CCBU stock transactions had violated Uzbekistan's Anti-Monopoly Laws because those transactions were consummated without prior government approval; (2) ROZ(U) had violated Uzbekistan's charter funding requirements for foreign-owned enterprises, and owed substantial debts to the State; and (3) ROZ had violated currency controls and tax laws.

84.    Legitimately exercising its police powers, Uzbekistan — acting through its governmental agencies, the Anti-Monopoly Committee and the Ministry of Justice — brought two separate judicial proceedings to enforce its laws, decrees and regulations.  These judicial proceedings culminated in ROZ(U)'s liquidation and the removal of ROZ's participatory interest in CCBU pursuant to Uzbek law to satisfy the State-owed debts of ROZ(U).  These regulatory measures do not amount to a compensable expropriation under international law, particularly since ROZ had no legitimate expectation of protection of its investment when it repeatedly had violated Uzbek law.[113]

### a.    Uzbekistan's Enforcement Of Its Anti-Monopoly Laws Against ROZ Constitutes A Non-Compensable Regulatory Act

85.    It is beyond dispute that foreign-controlled companies formed under the laws of a state must comply with the local applicable laws and regulations.[114]  Foreign entities must operate within the confines of the company and securities legislation of the host state.  State interference based on such legislation is justified when carried out in accordance with applicable procedures.

---

[113] *See, e.g.*, I. Brownlie, PRINCIPLES OF PUBLIC INTERNATIONAL LAW 535 (4th ed. 1990) ("Jurists supporting the compensation rule [for injury to persons and property of aliens on state territory] recognize the existence of exceptions, the most widely accepted of which are as follows . . . as a legitimate exercise of police power, including . . . confiscation as a penalty for crimes; seizure by way of taxation or other fiscal measures . . . .").

[114] *See, e.g.*, *Case Concerning Elettronica Sicula S.p.A. (ELSI)*, Judgment of 20 July 1989, I.C.J. Rpts. 15, 51 (1989) (noting that U.S.-controlled corporations in Italy "must conform to the local applicable laws and regulations").

86.     Uzbekistan's enforcement of its anti-monopoly laws and regulations falls within the ambit of permissible regulatory action of a state.  The Anti-Monopoly Committee judicial proceeding reducing ROZ's interest in CCBU thus represents a *bona fide* regulatory action and not a compensable expropriation under international law.

### b.    Uzbekistan's Judicial Liquidation Of ROZ Represents A Classic Example Of The Valid Exercise Of A State's Police Powers

87.     Similarly, the second series of judicial proceedings initiated by the State, which resulted in ROZ(U)'s liquidation and bankruptcy, and the removal of ROZ's participatory interest in CCBU to satisfy ROZ(U)'s debts to the State, constitute non-compensable regulatory actions under international law.  Measures taken in connection with judicial liquidation proceedings have long been recognized as outside the scope of expropriation under international law, as a legitimate exercise of a state's police powers in regulating corporations operating within its sovereign territory.

88.     In addition, international tribunals have upheld property takings for non-payment of taxes, fines or duties as an exercise of a state's police power.  International courts and tribunals also have found that forced bankruptcy proceedings do not constitute compensable takings.  Recent cases have affirmed the proposition that the application of a *bona fide* regulation taken within a state's police power — even where it is devastating to an investment — is not an expropriation.

### c.    The Judicial Removal Of ROZ's Interest In CCBU Constitutes A Valid Exercise Of Uzbekistan's Police Powers

89.     The judicial removal of ROZ's participatory interest in CCBU to satisfy ROZ(U)'s debts also does not give rise to a claim for compensation under international law.

90.     The European Court of Human Rights has ruled (in a case involving leasehold reform legislation) that a "compulsory transfer" of property from one individual to another —

such as the removal of ROZ's CCBU interest for the benefit of ROZ(U) to satisfy the latter's debt to the State — may constitute a legitimate means of promoting the public interest, "even if the community at large has no direct use or enjoyment of the property taken."[115] The European Court of Human Rights thus implicitly rejected the argument that "the transfer of property from one person to another for the latter's private benefit alone can never be 'in the public interest.'"[116] The Court concluded that "no common principle can be identified in the constitutions, legislation and case law of the Contracting States that . . . outlaw[s] compulsory transfer between private parties."[117]

91.     Similarly, here, the compulsory transfer of ROZ's interest to satisfy ROZ(U)'s public debts *was* for the public interest.

*        *        *

92.     In sum, international law recognizes the state's authority to regulate for the general welfare and the generally accepted view is that a state's *bona fide* exercise of this authority cannot be deemed an expropriation for which compensation is afforded. As the tribunal in *LG&E Energy Corp. v. Argentine Republic* stated most recently, "[i]t is important not to confound the State's right to adopt policies with its power to take an expropriatory measure."[118]

**B.      ROZ Cannot Seek Redress From Zeromax For Uzbekistan's Alleged Expropriatory Acts**

**1.      ROZ's Alleged Injury Arises From Uzbekistan's Sovereign Acts**

93.     Even assuming *arguendo* that Uzbekistan's regulatory acts constituted a compensable expropriation, as alleged, ROZ's claims against Zeromax must still be denied

---

[115] *James v. United Kingdom*, 8 E.H.R.R. 123, 140, 142 (1986) (finding that leasehold reform legislation did not amount to a prohibited deprivation under the European Convention on Human Rights).

[116] *Id.*, at 140.

[117] *Id.*

[118] *LG&E Energy Corp. v. Argentine Republic*, ICSID Case No. ARB/02/1, Award of Oct. 3, 2006, ¶ 194, *available at* www.investmentclaims.com.

because ROZ cannot seek redress from Zeromax, a purported third-party purchaser, for such acts of state. This is true under either Austrian or international law.

94.    Claimant's alleged injury occurred through the exercise of Uzbekistan's inherent sovereign powers within its own territory. These sovereign acts included several judicial proceedings: (1) State-initiated judicial proceedings against ROZ for its violation of Uzbekistan's Anti-Monopoly Laws; (2) State-initiated judicial proceedings against ROZ(U) for its violation of charter capital regulations; (3) State-initiated bankruptcy proceedings against ROZ(U); and (4) State-initiated proceedings to remove ROZ's interest from CCBU to pay ROZ(U)'s debts to the State. The sovereign acts also involved the Cabinet of Ministers which, by Decree No. 420-F, transferred ROZ's CCBU interest to Uzpishcheprom. None of the acts of state involved Zeromax or, indeed, Muzimpex.

### 2.    Uzbekistan's Sovereign Acts Transferred Title To The Shares To The State Thereby Precluding Claims Against Zeromax As A Purported Third-Party Purchaser

95.    Regardless of the lawfulness of Uzbekistan's alleged expropriatory acts, those acts transferred valid title to the expropriated property to Uzbekistan. As a result, Muzimpex obtained good title to the property at issue. It follows that a foreign investor injured by an alleged unlawful expropriation may not seek recourse against a third-party purchaser, particularly if the *situs* of the property remains in the expropriating State.[119]

96.    The nature of title to expropriated property under international law is discussed in the context of the remedies available to injured parties. It is generally accepted that compensation is the appropriate remedy for expropriatory acts. As a general proposition, customary international law thus rejects restitution as an available remedy and recognizes that

---

[119] *See* Opinion of the Inter-American Juridical Committee in Response to Resolution AG/DOC .3375/96 of the General Assembly of the Organization, Entitled "Freedom of Trade and Investment in the Hemisphere," OAS Doc. CJI/SO/II/doc.67/96 rev. 5, 35 I.L.M. 1329 (1996) (stating that legislation penalizing third-party purchasers of expropriated property violates international law because, *inter alia*, a "State does not have the right to attribute liability to nationals of third States for use of expropriated property located in the territory of the expropriating State where such use conforms to the laws of this latter State.").

title to expropriated property vests in the state.[120]  Accordingly, the state conveys good title to third-party purchasers through privatization measures.

97.    Austrian law also adopts this position.[121]  The Austrian Supreme Court has held on several occasions that an expropriation involves the  "original" acquisition of title ("*originärer Eigentumserwerb*") rather than a transfer of previously existing rights to the state. Under Austrian law, an expropriation creates an independent "new" title of ownership.[122]

98.    Thus, even assuming that Uzbekistan unlawfully expropriated the disputed property, which it did not, Muzimpex obtained good title to that property because the title vested in Uzbekistan upon the alleged expropriation.  Moreover, under the principles of territorial sovereignty and *lex situs*, Uzbekistan's actions and the resulting transfer of ownership are presumed to be valid under Uzbek law and are entitled to recognition by other nations and their courts, as well as by international tribunals.[123]

99.    In the *Indonesian Tobacco Case*, a German Court of Appeals held that the validity of the Indonesian expropriation authority "can only be reviewed on the basis of the *lex rei sitae* . . . all the more as the expropriation itself took place within the sovereign territory of Indonesia."[124]  Hence, if expropriation, and the resulting passing of title, are valid under the laws

---

[120] August Reinisch, *Widening the US Embargo Against Cuba Extraterritorially: A Few Public International Law Comments on the 'Cuban Liberty and Democratic Solidarity Act (LIBERTAD) Act of 1996*, 7 Euro. J. Int'l L. 545, 558 (1996) (stating that "an expropriation, even if unlawful under international standards cannot be equated with 'stealing'" and no claim for conversion can be pled against a third party purchaser because "a State's confiscatory act will effect a transfer of title to the property involved").

[121] The general principles of public international law are an integral part of Austrian law.  *See* Austrian Federal Constitution, art. 9(1) ("Die allgemein anerkannten Regeln des Völkerrechtes gelten als Bestandteile des Bundesrechtes.").  As clarified in several instances by the Austrian Supreme Court, such principles include cases involving expropriation of property by a sovereign state.  *See* OGH, Nov. 19, 1958, 27Cg 407/57; OGH Oct. 11, 1954, 3ob 692/54 (SZ 27/286)); OGH Dec 22, 1965, 10b212/65 (SZ 38/226) (recognizing the principle of territorial sovereignty of a State).

[122] *See, e.g.*, OGH, Dec 2, 1975 (EuBL 1976/141); IGH Dec 18, 1894 (ZBL 1895, 207).

[123] *Libyan American Oil Co. v. Libya*, 20 I.L.M. 1, 62-64 (1974) (citing an Austrian Supreme Court decision dated December 22, 1965 for the proposition that the remedy of restitution is inconsistent with "respect due for sovereignty of the nationalizing state.").

[124] *Indonesian Tobacco Case, cited in* Martin Domke, *Indonesian Nationalization Measures Before Foreign Courts*, 54 A.J.I.L. 305, 311 (1960).

of the expropriating state, the validity of that expropriation cannot be questioned and the title that subsequently passes to a third-party purchaser cannot be disturbed.

100.    Here, Muzimpex purchased the property in question through a state-privatization sale in 2004 — nearly *two years* after Uzbekistan, through Uzpishcheprom, allegedly expropriated ROZ's CCBU shares in accordance with Uzbek law.[125]  The State acquired valid title to the shares at the time of the alleged expropriation and passed on good title to Muzimpex. Under the express terms of the sale-purchase agreement, the State guaranteed Muzimpex that it was "*authorized on behalf of the [S]tate to own, use and to deal with the share interest . . . which belongs to the State,*"[126] and that "*[t]he State-owned 57.118% participatory interest in the Charter capital of CCBU is not pledged and is free from liens and claims of third parties.*"[127] Hence, even if Zeromax were deemed the actual purchaser of the State's CCBU interest through Muzimpex — which it is not — Zeromax acted in good faith.  Accordingly, ROZ is not entitled to any remedy from Zeromax for Uzbekistan's alleged wrongful acts.[128]

### C.    Zeromax Did Not Violate The Terms Of The 1993 CCBU JVA

101.    As discussed in Section I.A., *supra*, Zeromax is not a party to the 1993 CCBU JVA and never agreed to be bound by its terms.  Zeromax therefore denies any violation of any of the terms of the 1993 CCBU JVA, including the violations of the termination and liquidation provisions alleged in the Statement of Claims in Paragraphs 3.62-3.63.

102.    Under Uzbek law, Zeromax cannot be held responsible for the terms of the 1993 CCBU JVA because that agreement was rendered a legal nullity when the 2003 and 2004 CCBU

---

[125] State Property Committee Order No. 120k-no, dated Sept. 13, 2004 (Zeromax Ex. 16); Purchase Agreement between State Property Committee and Muzimpex Ltd., dated Sept. 13, 2004 (Zeromax Ex. 17).

[126] Purchase Agreement between State Property Committee and Muzimpex Ltd., dated Sept. 13, 2004 (Zeromax Ex. 17), Appendix #1, ¶ 1.2 (emphasis added).

[127] *Id.*, Appendix #1, ¶ 1.4 (emphasis added).

[128] Even assuming ROZ Trading could pursue a damages' claim against Zeromax for Uzbekistan's sovereign acts of expropriation, this claim is nevertheless barred by ROZ Trading's own wrongdoing.  Customary international law recognizes the defense of unclean hands as a bar to a claimant's recovery.  Dicke, *Unjust Enrichment and Compensation*, in Foreign Investment in the Present and a New International Economic Order 27 (1987). This principle applies even if the transaction tainted by such methods has led to an unjust or one-sided situation. Birks, Introduction to the Law of Restitution 425 (1989).

JVAs were registered with the Ministry of Justice. Further, under Uzbek law, the acts of Muzimpex, including Muzimpex's acquisition of the state-owned CCBU shares, cannot be attributed to Zeromax.

103.    Under Austrian law, as a non-signatory, Zeromax cannot be held responsible for any purported violation of the terms of the 1993 CCBU JVA, including contract terms relating to termination and liquidation. In order for a person to be liable for breach of a contractual obligation under Austrian law, such person has to be a party to the contract from which such obligation arises. In order to be bound by such contract, a person has to be either an original party upon execution of the contract or it must have acceded to or accepted a transfer of the contract. Similarly, under Uzbek law, there is no basis for attribution of any other entities' conduct to Zeromax.

104.    The present case — involving Muzimpex's acquisition of the State's CCBU shares from a party other than the Claimant and Muzimpex's execution of the 2004 CCBU JVA to which the Claimant is not a party — does not constitute a transfer of contract. As a consequence, Zeromax cannot be held responsible for an alleged breach of the 1993 CCBU JVA.

### D.    Zeromax Denies Any And All Other Claims Against It Contained In The Statement Of Claims

105.    In addition to the denials otherwise set forth in this Memorandum in Reply, Zeromax hereby expressly denies all claims in the Statement of Claims not expressly admitted herein including, without limitation, the following:

> (A)    claims regarding Zeromax's alleged conduct (Paragraphs 2.4, 3.56, 3.58-3.60, 3.62, 4.3, 5.1, 5.3, 5.6, 6.0);

> (B)    claims regarding Zeromax's alleged actions in concert with other respondents or any other individuals or entities (Paragraphs 2.4, 3.56, 3.58-3.63, 4.3, 5.1, 5.3, 5.6, 6.0); and

> (C)    claims regarding Zeromax's direction and control of Muzimpex or that Muzimpex's actions should be imputed to Zeromax (Paragraphs 2.4, 3.58).

## IV.    PRAYER FOR RELIEF

106.    In light of the foregoing, and reserving Zeromax's rights to submit further explanations, arguments and exhibits in response to the Claimant's claims and arguments, Zeromax submits that the claims in the Statement of Claims are procedurally and jurisdictionally defective as to Zeromax, and wholly without merit.

107.    Accordingly, Zeromax hereby respectfully requests:

(A)    the Tribunal, in accordance with Article 14(1) of the Vienna Rules, to bifurcate these proceedings so as to conduct a preliminary jurisdictional phase of the proceedings as to Zeromax limited to procedural and jurisdictional issues;

(B)    the Tribunal to issue an award dismissing the claims against Zeromax for lack of *ratione personæ* and *ratione materiæ* jurisdiction for the reasons stated in Section I, *supra*;

(C)    *in eventu*, the Tribunal to issue an award rejecting the claims on the merits against Zeromax as unfounded for the reasons stated in Section III, *supra*; and

(D)    the Tribunal to award costs and legal fees of Fourth Defendant Zeromax to be specified.

## V.    APPOINTMENT OF ARBITRATOR AND CONSTITUTION OF THE TRIBUNAL

108.    Subject to the procedural and jurisdictional objections set forth in Section I, *supra*, Zeromax has appointed Dr. Robert Briner as arbitrator in accordance with Article 10(6) of the Vienna Rules.[129]  Dr. Briner's contact details are as follows:

> Dr. Robert Briner
> Lenz & Staehelin
> Route de Chêne 30
> CH-1211 Genève 17
> Switzerland
>
> Tel:    + 41 22 318 70 00
> Fax:    + 41 22 318 70 01

109.    Subject to the procedural and jurisdictional objections set forth in Section I, *supra*, and under Article 9(1) of the Vienna Rules, the Arbitral Tribunal shall consist of three arbitrators.

---

[129] *See* Zeromax's letter to Dr. Manfred Heider, dated Sept. 11, 2006.

Respectfully submitted,

*Carolyn B. Lamm*

Dated:  October 25, 2006

**WHITE & CASE** LLP
Carolyn B. Lamm, Esq.
Francis A. Vasquez, Jr., Esq.
Nicole E. Erb, Esq.
Claire A. DeLelle, Esq.
Jonathan C. Ulrich, Esq.
701 Thirteenth Street, N.W.
Washington, D.C. 20005 U.S.A.
Telephone:    +1 202 626 3600
Facsimile:     +1 202 639 9355

Stephen R. Bond, Esq.
11, Boulevard de la Madeleine
75001 Paris
FRANCE
Telephone:    + 33 1 55 04 15 15
Facsimile:     + 33 1 55 04 15 16

**DLA PIPER WEISS-TESSBACH**
Dr. Gerhard Benn-Ibler
Mag. Peter Solt
Andreas Daxberger
Rotenturmstrasse, 13
A-1010 Vienna
AUSTRIA
Telephone:    + 43 1 531 78 0
Facsimile:     + 43 1 533 52 52

*Counsel for Fourth Defendant*
*Zeromax Group, Inc.*