UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JUN 2 6 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**World Wide Minerals Ltd.,** *et al.*, )
)
    **Plaintiff,** )
)
**v.** )
) C.A. No. 98-CV 1199 (RCL)
)
**Republic of Kazakhstan, et al.,** )
)
    **Defendant.** )
)
)
_____)

## MEMORANDUM OPINION

This case comes before the Court on a Renewed Motion to Dismiss the complaint for lack of personal jurisdiction by defendant Nukem, Inc. [71]. After a careful review of the motion, the applicable law, and the record in this case, the Court will grant defendant's Renewed Motion for Dismissal on Remand.

### I. BACKGROUND

The background of this complex and long-running litigation has been set out in previous opinions and need not be exhaustively restated here. For extensive factual background information, see *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002); *World Wide Minerals Ltd. v. Republic of Kazakhstan*, 116 F. Supp. 2d 98 (D.D.C. 2000). The Court instead focuses on the points salient to the pending motion to dismiss.

Plaintiffs Word Wide Minerals Ltd., World Wide Resources Finance Inc., Kazuran Corporation, and Nuclear Fuel Resources Corporation (hereinafter "World Wide") brought suit over a contract dispute with the Republic of Kazakhstan concerning the mining export of uranium. World



Wide sued the Republic of Kazakhstan, the State Committee on the management of State Property, and the National Atomic Energy Company Kazatomprom (hereinafter collectively referred to as 'Kazakhstan'), as well as Nukem, Inc., a New York corporation that World Wide contends conspired with Kazakhstan in committing wrongful acts against World Wide.

The contract dispute centers around four agreements that World Wide entered into with the Republic of Kazakhstan in 1995 and 1997. Pursuant to those agreements, World Wide took over the management of one of Kazakhstan's major uranium complexes and loaned Kazakhstan several million dollars to pay off debts and fund the restoration of the facility. In exchange for investment and restoration of uranium mining capabilities, World Wide alleges that Kazakhstan agreed to grant World Wide the unrestricted right to export and market Kazakhstan uranium internationally. Am. Compl. ¶ 18.

In June 1992, prior to World Wide's agreements with Kazakhstan, Nukem entered into a joint venture and non-exclusive marketing agreement with Kazakhstan for Kazakhstan source Uranium. Under the agreement, Nukem was a broker committed to purchasing 1.04 million pounds of uranium per year. Later in 1992 the United States and Kazakhstan signed a "Suspension Agreement" which established a sliding range of annual quotas based on market prices and limited the amount of Kazakhstan uranium that could be imported for end use into the United States. *Id.* ¶ 33. Nukem contends that, given this development and pursuant to an October 1995 amendment to the 1992 contract, Kazakhstan authorized and granted Nukem the exclusive right to market the entire quota of Kazakhstan uranium allowed to be imported into the United States.

According to the amended complaint, World Wide learned of the existence of brokerage agreements with Nukem and another company during contract negotiations with Kazakhstan in June 1996. However, World Wide was not shown copies of the brokerage agreements, and World Wide

contends that Kazakh officials represented to World Wide that the agreements did not conflict with World Wide's right to market the uranium world-wide, including in the United States. *Id.* ¶ 46. World Wide claims that it relied on these representations in entering the contract agreements with Kazakhstan. *Id.* ¶ 47. Under the agreements with Kazakhstan, World Wide was entitled to terminate the contract if the export license was not received by December 16, 1996. *Id.* ¶ 73.

In reliance on the agreements, World Wide entered into a contract with Consumers Energy Company, a Michigan utility, to deliver approximately $4.1M worth of Kazakhstan uranium. In order to fulfill this contract, World Wide needed to receive an export license by May 30, 1997. World Wide and Kazakhstan had already extended the initial December 16, 1996 export license deadline to March 16, 1997. By April, however, World Wide had not yet received the necessary license from Kazakhstan and suspended its mining operations in Kazakhstan on April 30, 1997. *Id.* ¶¶ 71-73.

World Wide negotiated several extensions of its contract with Consumers Energy and made continuous efforts to secure the export license from Kazakhstan. However, World Wide's final extension ran out on July 4, 1997, and on July 10 the contract between World Wide and Consumers Energy was terminated. *Id.* ¶ 82. World Wide alleges that, during World Wide's efforts to obtain an export license, Nukem approached Consumers Energy and offered to supply the uranium required under World Wide's contract in the event that World Wide was unable to obtain an export license, and that Nukem did, in fact, sell Kazakhstan uranium to Consumers Energy. *Id.* ¶¶ 83-84. Kazakhstan terminated the remaining agreements between Kazakhstan and World Wide on August 1, 1997 and allegedly seized $1 million worth of World wide's uranium and other property. *Id.* ¶¶ 86-87.

World Wide alleges that Kazakhstan breached its agreements by failing to grant World Wide a uranium export license. *Id.* ¶¶ 77, 78. The basis of World Wide's claims against Nukem stems from alleged conspiratorial meetings between Nukem and Kazakh officials. *Id.* ¶ 6, 13. World Wide brought claims against Kazakhstan and Nukem for tortious interference, conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *at seq.* After World Wide filed the Complaint and First Amended Complaint, numerous motions to dismiss were filed by the defendants. As to defendant Kazakhstan, this Court determined that the claims of plaintiff World Wide were barred by the act of state doctrine and granted Kazakhstan's motion to dismiss. Order of Sept. 27, 2000 [62]. The U.S. Court of Appeals for the D.C. Circuit affirmed the dismissal of World Wide's claims against the Kazakhstan entities. *World Wide*, 296 F.3d at 1164.

As to defendant Nukem, this Court determined that it lacked personal jurisdiction and granted Nukem's motion to dismiss. However, the parties agreed on appeal that there had been a misunderstanding as to the date of the allegedly conspiratorial embassy meeting. They further agreed that the relevant allegation is that Nukem and Kazakhstan met at Kazakhstan's embassy in Washington, D.C. in late May 1997 and conspired for Kazakhstan to unlawfully breach its contract with World Wide. *Id.* at 1169. The D.C. Circuit remanded the claims against Nukem for a determination of the sufficiency of the allegations regarding personal jurisdiction in light of the parties' agreement that there had been a misunderstanding in the district court regarding the date upon which the conspiratorial embassy meeting, the basis for personal jurisdiction, allegedly occurred. Defendant Nukem now brings this renewed motion on remand to dismiss the action for lack of personal jurisdiction.

## II. ANALYSIS

The issue before this Court on remand is to determine whether it may properly exercise personal jurisdiction over Nukem in light of the new date of the allegedly conspiratorial embassy meeting. Plaintiff World Wide contends that the late May 1997 embassy meeting took place at a "key juncture when certain key Kazakhstan officials were trying to determine whether in fact plaintiffs could receive an export license," that the injury occurred *after* the May 1997 embassy meeting, and that, accordingly, this Court may exercise personal jurisdiction over Nukem. Opp'n to Renewed Mot. to Dismiss [71] p.2.

Under Fed. R. Civ. P. 12(b)(2), federal courts may dismiss actions for lack of personal jurisdiction unless the plaintiff proves that the defendants maintain sufficient contact with the forum to enable the court's proper exercise of judicial power over the defendants. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 (1990). This Court has already determined that the embassy meetings constituted "contact" with the District of Columbia. *World Wide*, 116 F. Supp. 2d at 106. The remaining determination is whether such contact occurred in a temporal proximity that would confer personal jurisdiction over Nukem.

This Court previously decided that World Wide's claims arose "either on April 30, 1997 or May 6, 1997, when Kazakhstan indicated that no export license would be granted." *Id.* Kazakhstan's failure to issue the export license by the already extended March 16, 1997 deadline gave rise to World Wide's injuries in this case, including the April 30, 1997 cessation of mining operations, World Wide's inability to perform the Consumers Energy contract in July 1997, and the August 1997 seizure of World Wide's assets. World Wide's suspension of the mining operation on April 30, 1997 and the subsequent May 6, 1997 letter confirming that the export license could not be granted are clear signals that World Wide was aware of the violation of the agreement and took

action in response to the injury. Am. Compl. ¶ 76. The Court's finding as to the date of the injury was not disturbed on appeal; therefore it stands as the law of the case on remand. *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) ("[T]he same issue presented a second time in the same case in the same court should lead to the same result.").

Because World Wide's claims arose on either April 30, 1997 or May 6, 1997, the sole jurisdictional contact alleged against Nukem, the late May 1997 embassy meeting, took place after World Wide's claims had arisen. The Court of Appeals accepted this Court's logic that a jurisdictional contact that occurs after a party's injury cannot confer personal jurisdiction.

> Under the District's Long-Arm statute, local courts may exercise personal jurisdiction over any person "as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia." D.C. Code § 13-423(a)(1). The statute makes clear that, where jurisdiction is predicated solely upon the long-arm statute, "only a claim for relief arising from acts enumerated in this section may be asserted." *Id.* at §12-423(b). Thus, personal jurisdiction under this theory is limited to claims arising from the particular transaction in the District.

*World Wide*, 296 F.3d at 1168-69 (citations omitted) (internal quotation marks omitted).

World Wide's assertion that this Court may exercise personal jurisdiction over Nukem is based on its claim that "at the very least the decision to deny plaintiffs an export license was in doubt at the time of defendant's [embassy] meeting with Kazakhstan [in the District of Columbia]." Opp'n to Renewed Mot. to Dismiss p. 2. World Wide relies on a May 30 letter between Kazakh officials in this assertion. Am. Compl. ¶ 78. It may be true that after Kazakhstan denied World Wide the export license, Kazakh officials reconsidered whether they might reallocate the quota of uranium to be exported to the United States promised to Nukem in order to allow World Wide to fulfill its contract with Consumers Energy. *Id.* ¶ 79. However, any reconsideration of Kazakhstan's position only supports this Court's determination that Kazakhstan had already denied World Wide the export

license and the injury had already occurred. Thus, World Wide's allegation "fails to demonstrate a sufficient connection between the injury and the contacts to meet the 'arising from' requirement." *World Wide,* 116 F. Supp. 2d at 106. As such, this Court cannot exercise personal jurisdiction over Nukem on the basis of the "arising from" requirement of the D.C. Long Arm Statute.

Likewise, the facts do not establish personal jurisdiction under conspiracy jurisdiction. To establish conspiracy jurisdiction, the plaintiff must "plead with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1031 (D.C. Cir. 1997) (internal quotation marks omitted). The only overt act alleged with particularity involving the conspiracy is the embassy meeting. This Court has determined that the occurrence of the injury precedes the date of the embassy meeting. Thus, the late May 1997 embassy meeting could not have been used to plan or further a conspiracy between Nukem and Kazakhstan, nor could it have contributed to World Wide's injuries. Hence, the embassy meeting cannot confer conspiracy jurisdiction over Nukem.

## III. CONCLUSION

According to the Court of Appeals, "the amended complaint identifies Kazakhstan's denial of [World Wide's] application for an export license as the very heart of this matter." *World Wide,* 296 F.3d at 1159. This Court determined that the injury from denial of the export license occurred on either April 30, 1997 or May 6, 1997. World Wide did not appeal the Court's finding; consequently, World Wide will not be allowed to relitigate the issue. Accordingly, the embassy meeting is irrelevant and cannot confer jurisdiction over Nukem: it occurred in late May 1997, after the date of the injury, and could not have contributed to the injury, regardless of whether the objective of the meeting was to discuss whether Kazakhstan would reverse its position and grant the

export license to World Wide. This Court lacks personal jurisdiction because any transactions that the defendant Nukem conducted in the District of Columbia occurred after the date of the injury; therefore defendant's motion for dismissal on remand [71] will be granted.

    A separate order shall issue this day.

DATE: 6-26-03

*Royce C. Lamberth*

Royce C. Lamberth

United States District Judge