DECLARATION OF BARRY E. CARTER

ON INTERNATIONAL LAW AND ITS APPLICABILITY IN U.S. LAW

I, Barry E. Carter, declare and state as follows:

1.      I am currently a Professor of Law at Georgetown University Law Center in Washington, D.C., primarily teaching international law courses that cover both public international law and international business and trade.  I also serve as the Director of International and Transnational Programs.  I have served as the Director of the Program on International Business and Economic Law.  In 2006, I received the Law Center's excellence in teaching award.  I also teach frequently in developing and transition countries about international law and business.

2.      I returned to Georgetown in August 1996 after over three years as the Deputy Under Secretary of Commerce for Export Administration.  During 1993-96, I also served as the U.S. vice chair to Secretary of Defense William Perry on bilateral defense conversion committees with Russia, Kazakhstan, Ukraine, and Belarus and as a member of the committee with China.  As discussed further below, during 1995-96, I was also the U.S. chair of the defense conversion committee with Uzbekistan.  My responsibilities included implementing and enforcing a variety of U.S. nonproliferation laws.  I also helped other countries strengthen their export controls, and I assisted countries in converting some of their defense facilities to civilian production, often in joint ventures with U.S. companies.

3.      Before entering the government, I had been a Georgetown professor since 1979 and was Executive Director of the American Society of International Law during

1992-93.  I was a visiting law professor at Stanford in 1990.  I served as a senior counsel

on the Senate Select Committee on Intelligence Activities in 1975.  I was a Fellow at the

Institute of Politics at Harvard's Kennedy School of Government and an International

Affairs Fellow at the Council on Foreign Relations in 1972.  As member of Dr. Henry

Kissinger's National Security Council staff from 1970-72, I worked on U.S.-Soviet issues

and Europe.  While an Army officer, I was a program analyst in the Office of the

Secretary of Defense in 1969-70.  I have also been a trial and appellate lawyer in private

practice in California and Washington, D.C.

4.      I graduated Phi Beta Kappa from Stanford University in 1964, received a

master's degree in economics and public policy from Princeton's Woodrow Wilson

School of Public and International Affairs in 1966, and graduated in 1969 from Yale Law

School, where I was the Projects Editor of the *Yale Law Journal*.

5.      My book on *International Economic Sanctions: Improving The

Haphazard U.S. Legal Regime* (Cambridge Univ. Press: 1988) received the 1989 annual

award from the American Society of International Law (ASIL) for the outstanding new

book on international law subjects.  I am a co-author of the widely-used casebook on

*International Law* (Aspen: 4th ed. 2003) and the editor of the accompanying *Selected

Documents* (Aspen: 7th ed. 2005).  A new edition of the casebook and documentary

supplement will be published in May-June 2007.  I have also published articles in the

*California Law Review*, *Yale Law Journal*, *Scientific American, Daedalus*, *Washington

Post*, *Wall Street Journal*, and other periodicals.

6.      I am a member of the Council on Foreign Relations, the American Law

Institute, the American Bar Association, and the ASIL.  I am on the board of directors of

an international trading company and on the advisory council of a political risk insurance company. I have been a member of two binational arbitration panels that reviewed trade matters under the North American Free Trade Agreement. I have also served as Chairman of the Advisory Committee of the Defense Budget Project and as the Vice President of the Arms Control Association. A copy of my resume is attached here as Exhibit A.

7. As noted above, I have had past experience with Uzbekistan. In 1995, Secretary of Defense William Perry made a productive trip to Uzbekistan as the most senior U.S. government official in the Clinton administration to visit there. The U.S. government's objective was to expand ties with this new country that had declared its independence in August 1991 and was seeking better relations with the United States. Secretary Perry asked me to help by leading a U.S. business delegation there and working to create a U.S.-Uzbekistan committee on defense conversion. (I had already been working with Secretary Perry and the Defense Department on nonproliferation controls for the United States and other countries, and I was Secretary Perry's U.S. vice-chair on bilateral defense conversion committees with Russia, Kazakhstan, and Belarus.) In the course of the next two years, I made three trips to Uzbekistan on behalf of the U.S. Government, traveling to a number of cities. I also met with Uzbek government officials in Washington, D.C.

8. During December 5-8, 1995, I led a delegation that included U.S. government officials from other departments and senior American business executives from 15 U.S. companies. On this trip, I hand carried a signed letter from President Bill Clinton to Uzbek President Islam Karimov. President Clinton wrote, "I am sending a

Defense Conversion Industry Delegation, led by Deputy Under Secretary of Commerce Barry E. Carter . . . ."  He indicated his "hope that these meetings will contribute to the economic well-being of our countries, deepen the commercial ties between our peoples and strengthen relations between us."  President Karimov met with the delegation, and the trip led to the creation of the U.S.-Uzbekistan Committee on Defense Conversion.  I then served as U.S. chair of the committee and Prime Minister Utkur Sultanov was the chairman for Uzbekistan.

9.      Since leaving the U.S. government in 1996 and returning to Georgetown University Law Center, I have kept informed of developments in Uzbekistan not only by general reading, but also by my service since 1998 as outside director on the board of directors of Nukem, Inc., a New York corporation.  This trading company has with Navoi Mining and Metallurgical Combinate, an Uzbek entity, a business relationship that includes the purchase of tens of millions of dollars a year in uranium.  Nukem, Inc. then helps prepare the uranium for use in power reactors and sells it to major electricity companies in the United States, Mexico, and elsewhere.

10.      Also, in 2004, as a law professor, I spent a week in Uzbekistan teaching Uzbek government officials how Uzbekistan could take the steps necessary to join the World Trade Organization, the international organization that has extensive rules regarding international trade.  My trip was organized and paid for by a non-government organization that was funded by the U.S. Agency for International Development (U.S. AID).

11.      I have been asked by counsel for Zeromax Group, Inc., Zeromax Logistics, Inc., Zeromax LLC, and Zeromax GmbH (collectively, "the Defendants") to

4

address certain questions under international law and how international law relates to U.S. law, in connection with the claims asserted by Plaintiffs in *Roz Trading Ltd., et al. v. Zeromax Group, Inc., et al.,* CA No. 1:06-CV-01040 CKK (D.D.C.). I have reviewed the Amended Complaint, the Defendants' Motion to Dismiss, the Plaintiffs' Opposition to the Defendants' Motion to Dismiss, the Expert Report of Scott Horton, and some accompanying exhibits. My statements here are based on my own personal knowledge and on the legal research and authorities described here.

12. Counsel for the Defendants has asked me to address the following questions:

     a. What are the applicable sources of international law?

     b. How is international law incorporated in U.S. law?

     c. Does international law provide a basis for Plaintiffs' claims in this case?

     d. How does the act of state doctrine apply in this case and what, if any, exceptions apply?

     e. Is the Declaration of Scott Horton relevant to the act of state doctrine?

     f. How does the *lex situs* rule inform this case?

## A.    <u>The Applicable International Law</u>

13. Article 38 (1) of the Statute of the International Court of Justice defines the sources of international law to include:

     a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;

    b.   international custom, as evidence of a general practice accepted as law;

    c.   the general principles of law recognized by civilized nations;

    d.   subject to the provisions of Article 59, judicial decisions and the teachings of the most highly-qualified publicists of the various nations, as subsidiary means for the determination of rules of law.[1]

14.    In drawing upon the sources of international law, two important notes are relevant here. First, it does not appear that this case involves any particular international treaties (which include conventions and agreements among countries).

15.    Second, the scope and content of international custom, or customary international law, needs to be carefully determined. One generally accepted starting point for determining the sources and content of customary international law is the American Law Institute's *Restatement (Third) of the Foreign Relations Law of the United States* (1987) (*Restatement (Third)*). For example, Section 102(2) of the *Restatement (Third)* states: "Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation." The Comment to this Section adds:

> *"b. Practice as customary law.* 'Practice of states' … includes diplomatic acts and instructions as well as public measures and other governmental acts and official statements of policy. . . . A practice can be general even if it is not universally followed; there is no precise formula to indicate how widespread a practice must be, but it should reflect wide acceptance

---

[1]    The sources of international law rules are similarly indicated in Section 102 of the *Restatement (Third)*. It provides, in part:

    "(1)   A rule of international law is one that has been accepted as such by the international community of states
         (a)  in the form of customary law;
         (b)  by international agreement; or
         (c)  by derivation from general principles common to the major legal systems of the world."

among the states particularly involved in the relevant activity.  Failure of a significant number of important states to adopt a practice can prevent a principle from becoming general customary law. . . .  A principle of customary law is not binding on a state that declares its dissent from the principle during its development.

"*c.  Opinio juris*.  For a practice of states to become a rule of customary international law it must appear that the states follow the practice from a sense of legal obligation (*opinio juris sine necessitatis*); a practice that is generally followed but which states feel legally free to disregard does not contribute to customary law."

The precise content of customary norms of international law can be difficult to ascertain.  Sources can vary in their definitions.  Moreover, state practice can also vary over time and among countries or regions.

16.     Traditionally in customary international law, a private person (whether natural or juridical) did not have a personal right of action to sue a foreign sovereign state, and even more certainly another private person, for an alleged contract breach, expropriation or other tort.  This reflected the traditional view that international law in general was "defined as the body or rules and principles of action which are binding upon civilized states in their relations with one another."  J. L. Brierly, *The Law of Nations* 1 (6th ed. 1963).  Similarly, the *Restatement (Second) of the Foreign Relations Law of the United States* (1965) (*Restatement (Second)*) begins with Section 1:  " 'International law,' … means those rules of law applicable to a state or international organization that cannot be modified unilaterally by it."

17.     In recent years, there has been some limited recognition of the rights of private persons under international law.  For example, the *Restatement (Third)* (1986) expanded the *Restatement (Second)*'s definition of international law, which was quoted above.  The revised definition of the *Restatement (Third)* is that:  "International law, as

used in this Restatement, consists of rules and principles of general application dealing

with the conduct of states and of international organizations and with their relations *inter*

*se*, as well as with some of their relations with persons, whether natural or juridical."

Section 101.  This definition of international law includes treaties (which so far have not

been invoked in this case) as well as customary international law.  Section 102.  As for

customary international law, the *Restatement (Third)* acknowledges:  "Customary law

does not ordinarily confer legal rights on individuals or companies." Section 111, Reptr.

Note 4.  Indeed, as I will discuss further below, my research indicates that customary

international law does not provide a right of action by a private person against another

private person for breach of contract, expropriation or any of the torts alleged in the

Complaint.

### B.    The Role of International Law in U.S. Law

18.    International law is, within certain limits, part of U.S. law.  Treaties are

specifically addressed in the U.S. Constitution.  Moreover, Article VI of the Constitution

provides, in part, that:

> "[2] This Constitution, and the Law of the United States which shall be
> made in Pursuance thereof; and all Treaties made, or which shall be made,
> under the Authority of the United States, shall be the supreme law of the
> Land; and the Judges in every States shall be bound thereby, any Thing in the
> Constitution or Law of any State to the Contrary notwithstanding."

19.    Since early in U.S. history, the U.S. Supreme Court has recognized a

distinction between "self-executing" and "non-self-executing" treaties.  It has held that,

in the absence of implementing legislation, only self-executing treaties are judicially

enforceable.  *E.g.*, *Foster v. Neilson*, 27 U.S. (2 Pet.) 253 (1829).  As noted above,

however, it does not appear at this point that this particular case involving the Zeromax

Defendants includes treaty issues.

20.     Customary international law can also be a part of U.S. law.  As the U.S.

Supreme Court indicated in the seminal case of *The Paquete Habana*, 175 U.S. 677, 700

(1900),

> "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.  For this purpose, where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat."

21.     The U.S. Supreme Court recently had the occasion to provide possibly its

most careful analysis of customary international law since the *The Paquete Habana* case.

In *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004), the six-Justice majority recognized

that some norms of customary international law could become part of U.S. federal

common law.  Id. at 729-730.  The Court went on to conclude that "federal courts should

not recognize private claims under federal common law for violations of any international

law norm" unless it had widespread acceptance and "is sufficiently definite to support a

cause of action."  That determination "should (and, indeed, inevitably must) involve an

element of judgment about the practical consequences of making that cause available to

litigants in the federal courts."  Id. at 732-733.  In one footnote during this analysis, the

Court identified another issue:  "A related consideration is whether international law

extends the scope of liability for a violation of a given norm to the perpetrator being sued,

if the defendant is a private actor such as a corporation or individual. . . ."  Id. at 732 n. 20.

22.    Federal common law is supreme over state law.  In *Sosa*, the U.S. Supreme Court explicitly made clear that certain norms of international law could become part of the federal common law.  Id. at 729-732 .  Earlier, the *Restatement (Third)* had indicated:  "[Customary] international law, while not mentioned explicitly in the supremacy clause, [is] also federal law and as such [is] supreme over state law." Section 111, cmt. d.

**C.    International Law Does Not Provide Any Basis for Plaintiffs To Recover against the Zeromax Defendants**

23.    Plaintiffs ROZ Trading Ltd. ("ROZ") and ROZ Trading Ltd. (Uzbekistan) ("ROZ (Uzbekistan)") are suing the Zeromax Defendants in this action, even though the Plaintiffs' alleged injuries arise out of what the government of Uzbekistan did through regulatory and judicial actions.  Indeed, the Plaintiffs admit that the Uzbek government caused their injuries.  In Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Pl. Opp. Mem.") (at pages 31-32), Plaintiffs specifically claim that:  "Uzbekistan expropriated, through sham proceedings, ROZ's interest in CCBU.  There simply is no dispute that ROZ's interest in CCBU was confiscated and taken from Plaintiffs."

24.    On the other hand, Plaintiffs fail to allege any facts by the Zeromax Defendants where the Defendants took title from Plaintiffs.  Plaintiffs are disguising their claims against the government of Uzbekistan as claims against the Zeromax Defendants.

25.    It seems useful to recall the basic chain of events here.  In essence, Plaintiffs allege that the official acts of the government of Uzbekistan (1) led ROZ, a

Cayman Islands company, and ROZ (Uzbekistan), an Uzbek company organized, located, and dissolved in Uzbekistan, to lose their interest in Coca-Cola Bottlers Uzbekistan Ltd. ("CCBU") in 2002.  (2) Plaintiffs allege then that two years later in 2004, an Uzbek government agency sold the State's interest in CCBU through a privatization sale to Muzimpex, an Uzbek limited liability company in which one of the Zeromax Defendants held an ownership interest.

26.     A little more detail might be helpful.  As alleged in the Complaint and as set forth in Azamat Fayzullaev's Declaration of Uzbek Law (and the attachments to it) that was submitted with the Defendants' Motion to Dismiss, the State Committee for the Demonopolization and Development of the Republic of Uzbekistan, a governmental body, initiated antimonopoly proceedings against CCBU, which culminated in the February 5, 2002 judicial decision affirming the reduction of ROZ's interest in CCBU and the elimination of ROZ (Uzbekistan)'s interest in CCBU (*see* Motion to Dismiss at 15-16); Ex. F attached to the Fayzullaev Decl.).

27.     Uzbekistan initiated further judicial proceedings that culminated in the final decision of the Supreme Economic Court, dated September 11, 2002, that removed ROZ's remaining interest in CCBU for the benefit of ROZ (Uzbekistan) to pay the latter's debts—including tax obligations—to the State Budget (*see* Mot. to Dismiss at 16; Ex. G attached to the Fayzullaev Decl.).

28.     Following the judicial removal of ROZ's interest in CCBU to satisfy ROZ (Uzbekistan)'s debts to the State, Uzbekistan formally acquired the interest pursuant to an official decree of the Cabinet of Ministers of the Republic of Uzbekistan (*see* Mot. to Dismiss at 17-18; Exh. H attached to the Fayzullaev Decl.).

29.    <u>Two years later</u> in 2004, the State Property Committee of the Republic of Uzbekistan ("SPC") sold the State's interest in CCBU through a privatization sale.  The SPC is an Uzbek governmental body responsible for implementing Uzbekistan's denationalization and privatization procedures.  Muzimpex, an Uzbek limited liability company in which one of the Zeromax Defendants held an ownership interest, acquired the State's interest in CCBU through the State's privatization sale for over $14 million.  The SPC approved the sale of the State's interest in CCBU to Muzimpex in an official Order.  (*See* Mot. to Dismiss at 20-21; Ex. I to Fayzullaev Decl.)

30.    In short, ROZ and ROZ (Uzbekistan) lost their interest in CCBU through state proceedings and an official judicial decree.  The government of Uzbekistan was the cause of the Plaintiffs' alleged injuries.  Muzimpex was a third-party purchaser that later obtained its interest in CCBU through official privatization sale of the state's interest.  The Zeromax Defendant that held an ownership interest in Muzimpex might be described as an indirect third-party purchaser or even a fourth-party purchaser.

31.    Plaintiffs, apparently recognizing the cause of their injuries, commenced an arbitration in Vienna, Austria, against the government of Uzbekistan.  However, they choose not to sue the government in this Court, but Plaintiffs instead sued only the Zeromax Defendants, which were not the cause of any of their alleged injuries.

32.    In their Complaint, it does not appear that the Plaintiffs formally make any claims for a cause of action under international law.  Their formal counts are for breach of contract, tortious interference, conspiracy to commit tortious interference, conversion, conspiracy to commit conversion, action to quiet title, unjust enrichment, and fraudulent conveyance.  All seem to be grounded in domestic law.  As discussed below, there is a

choice-of-law question whether the substantive domestic law should be the law of Uzbekistan or the law of one of the U.S. states.

33.     Whatever domestic law might apply (if any), not only do Plaintiffs not claim that the Complaint's formal counts could be causes of action under international law, but in my view none of those formal counts by individual corporations against other corporations could constitute causes of action under international law.  As I discussed above in paragraph 17, the *Restatement (Third)* recognizes:  "Customary [international] law does not ordinarily confer legal rights on individuals or companies."  Section 111, Reptr. Note 4.  More specifically, Oxford Professor Brownlie notes that "breach of a private law contract is not an international wrong."  Ian Brownlie, *Principles of Public International Law* 522 (6th ed. 2003).  I have not found any case or other authority for the proposition that any of Plaintiffs' formal counts could constitute causes of action under international law.

34.     Plaintiffs do not have a formal count in their Complaint for expropriation. However, in their Opposition Memorandum, Plaintiffs explicitly recognize that all, or at least some of their counts, are directly linked to alleged claims of expropriation or confiscation by the government of Uzbekistan.  (*See* pages 29-33.)  For example, Plaintiffs allege:  "Uzbekistan *expropriated*, through sham proceedings, ROZ's interest in CCBU." [Coca-Cola Bottlers Uzbekistan, Ltd.]."  Id. at p. 31, italicization added.  Even more pointedly, Plaintiffs implicitly suggest they might be considering some possible claims for expropriation when they argue that:  "Zeromax's focus on expropriation misses *most* of the claims in this case."  Id. at 34, italicization added.

35.    Plaintiffs fail to specify in their Complaint or their Opposition Memorandum what constitutes an expropriation, never even providing the criteria for determining what is an expropriation.  In fact, what might constitute an expropriation is a matter of considerable debate.  As the U.S. Supreme Court observed in the seminal case of *Banco Nacional de Cuba v. Sabbatino, Receiver*, 376 U.S. 398, 428-29 (1964),

> "There are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens. . . .
>
> The disagreement as to relevant international law standards reflects an even more basic divergence between the national interests of capital importing and capital exporting nations and between the social ideologies of those countries that favor state control of a considerable portion of the means of production and those that adhere to a free enterprise system.  It is difficult to imagine the courts of this country embarking on adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations."[2]

The criteria for expropriation have since been clarified in various regional and bilateral treaties and hence provide criteria for the situations where they are applicable.[3]  However, there is no applicable treaty for Uzbekistan and the Plaintiffs.  One must still look to customary international law and there is still considerable debate over what might constitute an expropriation.  For example, in the recent edition of his treatise, Professor Brownlie tried to reach some conclusions on the customary international law regarding expropriation.  He wrote:

> "The present position, including the element of confusion, can be expressed in a number of independent propositions:

---

[2]    The U.S. Supreme Court indicated in an accompanying footnote:  "There are, of course, areas of international law in which consensus as to standards is greater and which do not represent a battleground for conflicting ideologies.  This decision in no way intimates that the courts of this country are broadly foreclosed from considering questions of international law." Id. at 429 n. 34.

[3]    *E.g.*, North American Free Trade Agreement, Art. 1110, entered into force on Jan. 1, 1994, www.state.gov; Treaty Between the Government of the United States of America and the Government of the Republic of The Ukraine Concerning the Encouragement and Reciprocal Protection of Investment, Article III, entered into force on Nov. 16, 1996, www.state.gov.

1. A considerable number of states insist that expropriation can only take place on payment of adequate, effective compensation. In practice deferred payments are regarded as sufficient provided effective compensation takes place. . . .

2. The majority of states accept the principle of compensation, but not on the basis of the 'prompt, adequate, and effective' formula. …

3. Certain categories of expropriation are illegal *per se* and not merely in the absence of compensation.

4. Reference to reprisal action, as a type of expropriation illegal *per se*, only leads to secondary questions as to the legality of the reprisal. . . .

5. The 'orthodox' compensation rule is stated to have exceptions, principally on the basis of police power. Here the concept of public utility in certain societies is employed to explain cases where no compensation is payable. The exceptions are an embarrassment since, as a matter of principle, this position is not very different from the view taken by some states with a different view of public utility, viz., that the compensation rules does not apply, at least in the 'prompt, adequate, and effective' form." *Principles of Public International Law* 519-520 (6th ed. 2003) (footnotes omitted).

Brownlie expanded on the exceptions mentioned in paragraph 8 of the excerpt above:

"Jurists supporting the compensation rule recognize the existence of exceptions, the most accepted of which are as follows: under treaty provisions; as a legitimate exercise of police power, including measures of defence against external threats; confiscation as a penalty for crimes; seizure by way of taxation or other fiscal measures; . . . ." Id. at 511-12.

36. Plaintiffs' failure to provide the criteria for determining whether there has been an expropriation or not is highlighted, *inter alia*, by their failure to address clearly why the actions of the agencies and courts of Uzbekistan were not appropriate regulatory and judicial measures allowed under Uzbek law. For example, Brownlie specifically noted above an exception from what might be an expropriation in the case of "seizure by

way of taxation or other fiscal measures."[4]  Also, the Section 712, comment *g*, of the

*Restatement (Third)* explains:

> "A state is not responsible for loss of property or for other economic disadvantage resulting from bona fide general taxation, regulation, forfeiture for crime, or other action of the kind that is commonly accepted as within the police power of states, if it is not discriminatory, . . . and is not designed to cause the alien to abandon the property to the state or sell it at a distress price.  As under United States constitutional law, the line between 'taking' and regulation is sometimes uncertain."

Among the many court cases and arbitral decisions supporting this proposition that a

State's appropriate regulatory and judicial measures do not constitute an expropriation

are *Saluka Investments BV v. Czech Republic,* Partial Award of March 17, 2006, ¶¶ 255-

276, at www.investmentclaims.com; and *Methanex v. United States,* Final Award of Aug.

3, 2005, Part IV, Chap. D, ¶ 7, in *North American Free Trade Agreements:  Dispute*

*Settlement,* Booklet C.19T (James R. Holbein & Donald J. Musch eds., 2006).

37.    The ambiguity, even "confusion," in customary international law

regarding expropriation that Brownlie summarizes seems clearly to fall short of meeting

*Sosa's* strict criteria for causes of action in federal common law that are based on

customary international law norms.  Hence, it is my view that this 2004 U.S. Supreme

Court decision makes it unlikely that a U.S. court would today allow a suit to go forward

for an alleged violation of customary international law for expropriation.

---

[4]    This is a well-recognized exception.  In Protocol No. 1 to the European Convention for the Protection of Human Rights and Fundamental Freedoms, which at least 43 European countries have ratified, Article 1 on the Protection of Property provides:

> Every natural or legal person is entitled to the peaceful enjoyment of his possessions.  No one shall be deprived of his possessions except in the public interest and subject to the conditions provided for by law and by the general principles of international law.

> The preceding provisions shall not, however, in any impair the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest or to secure the payment of taxes or other contributions or penalties.

38.    All the discussion above from *Sabbatino,* Brownlie and other sources addressed the possible rights of an alien against a government that allegedly expropriated its property.  Here, although Plaintiffs' pleading sometimes fails to distinguish between ROZ (Uzbekistan), which is organized in Uzbekistan, and ROZ, which is a Cayman Islands company, it would appear that at least some of the actions by the agencies and courts of Uzbekistan were against the Uzbekistan company.  A national of a State does not have a cause of action for expropriation against the national's own State.  In *Rong v. Liaoning Provincial Government*, 362 F. Supp. 2d 83, 101   (D.D.C. 2005), the court concluded that a Chinese corporation could not claim against the Chinese government "a taking in violation of international law because 'expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law.' *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1105 (9th Cir. 1990) (citing *De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1396-98 (5th Cir. 1985))."

39.    Moreover, as discussed in paragraphs 23-31 above, Plaintiffs are not suing here the government of Uzbekistan that caused their alleged harms.  Rather, they are suing the Zeromax Defendants, who did not cause Defendants' alleged harms.  One of the Defendants obtained an interest in a joint venture, Muzimpex, which obtained an interest in CCBU in 2004 through a state privatization sale.  This was two years after the government of Uzbekistan, through formal court order, had ended Plaintiffs' interest in CCBU.  It is significant that the Zeromax interest is indirect.  The government of Uzbekistan sold the interest in CCBU to Muzimpex, an Uzbek company, in which one of the Zeromax Defendants has an interest.  So, the Zeromax Defendants are at most indirect third-party purchasers.  These attenuated ties provide no basis for any possible cause of

action by the Plaintiffs against the Zeromax Defendants for expropriation or any claim to

the property interest that the Zeromax Defendants have in Muzimpex or CCBU.

**D.    The *Lex Situs* Rule of Private International Law Makes Clear that**

**Defendants' Interest in Muzimpex and Indirectly in CCBU Are Determined by the**

**Laws of Uzbekistan**

40.    One important principle of private international law is the *lex situs* rule.

As two English law professors describe it:

> "The rule is that the transfer of a movable is governed by the lex situs, the law
> of the country where the movable is situated at the time of the alleged transfer.
> The lex situs determines whether a given act or event does or does not transfer
> proprietary rights and to what extent.   The reason is that a person who
> acquires goods, or rights in goods, should be able to rely on any title which he
> obtains according to the law of the country where the goods are when he
> acquires them and to rely on that law for the retention of title he obtains."  C.
> M. V. Clarkson & Johnathan Hill, *Jaffey on Conflict of Laws* 484 (2d ed.
> 2005).

*Starke's International Law* 272 (I. A. Shearer ed., 11th ed. 1994) concludes that, where

title to property is affected by regulation or alleged expropriation, the normal rule of

private international law is that

> "the *lex situs* of a recognised state applies.  Thus the English courts will give
> effect to the foreign expropriatory decree, even if the expropriation is contrary
> to international law, if the property concerned was situated within, or was
> under the control of, the expropriating state at the time of expropriation."

Accord, Christopher Staker, *Public International Law and The Lex Situs Rule in Property*

*Conflicts and Foreign Expropriations*, 58 B.Y. Int'l Law 151, 163 (1988) ("If a State is

required to determine ownership for international law purposes of an object not situated

in its territory at the time, it will do so by reference to the municipal law of the State

whose territory it is in.").[5]

> 41.    In 1988 an Australian expert concluded that:
>
> "Given the unusual consistency of State practice in the application of this rule, the number of authorities supporting it as a rule of private international law are too vast to mention, and in fact its use has become so common that today often little is said about it.  Of interest to the . . . international lawyer is the fact that the rule appears to be applied by every State in the world . . . , and the fact that some municipal judgments use broad language which suggests the local courts have an international obligation to apply the rule."  Staker, id. at 164 (footnotes omitted).

For example, in *City of New York v. Permanent Mission of India to the United Nations*,

376 F. Supp.2d 429, 434 (S.D.N.Y. 2005), in addressing a question about a foreign

country's immunity from jurisdiction, the court relied heavily on the *lex situs* rule to help

determine the applicable law for real property and immovables in New York City.  The

court quoted approvingly from a report of the International Law Commission:

> "[T]he concept of ownership and other proprietary rights or interests can only exist within the framework of the legal system of the situs, and such a concept is bound to be inherently absorbed within the notion of territorial sovereignty of the State of the situs itself. . . .  The applicable law is unmistakably the lex situs as no other law can be more proper than the law of the place where the property is situated."  International Law Commission, *Documents of the Thirty-Fifth Session,* [1983] II Y.B. Int'l L. Comm'n 46-47, U.N. Doc. A/CN.4/SER.A/ 1983/Add.1 (Part 1).

See also *F. & H.R. Farman-Farmaian Consulting Engineers Firm v. Harza Engineering

Co.*, 882 F.2d 281, 285-87 (7th Cir. 1989) (expropriation complete within the foreign

state; no action allowed in United States); *Braka v. Bancomer*, 762 F.2d 222 (5th Cir.

1985) ("situs" of Mexican bank's obligation to pay was within Mexico; U.S. lawsuit

dismissed).

---

[5]    The *lex situs* of the shares of a corporation is located where the property of the corporation is located. Staker, 58 *B.Y. Int'l Law* at 200; *see also, Jaffey on the Conflict of Laws*, supra at 488, 493.

42.    The rationale underlying the rule of *lex situs* is linked with the international law rule of territorial sovereignty and the Act of State doctrine—i.e., a sovereign nation's laws should control the disposition of property within its borders.  In its purest conception, however, the *lex situs* rule is a conflict of laws doctrine; the law of the location in which the property is situated should control disposition of any claims.  See, e.g., *Williams & Humbert Ltd v. W & H. Trade Marks* (Jersey) [1986] AC 368.  In *Williams & Humbert*, the House of Lords upheld an expropriation by Spain of a Spanish company owned in part by an English company.  The trademarks at issue had been later transferred to another British company on the Island of Jersey in Great Britain.  In refusing to apply British law to the alleged expropriation, the House of Lords held that:

> "English law recognizes the authority of a foreign state to legislate about property within its borders. And if that property has been brought under control, within the foreign jurisdiction, of the person to whom title is given by the foreign legislation, the English Courts will not interfere with his title or possession." Id. at 392.

43.    In addition, the *lex situs* rule also provide assurances of reliance, i.e., purchasers of property should be able to rely on title procured pursuant to the laws of the country in which title was obtained, and those who own property in a particular country should expect that country's laws to govern disposition of that property.  *Jaffey on the Conflict of Laws*, supra at 484.  This aspect of reliance is important because conflicts often arise, not only between two parties, but three or more, where the first owner claims rights of property against a third-party purchaser.  Id.  A purchaser like Muzimpex should be able to rely on the laws of the State where its property is located and where the acquisition of the property occurred.  In this case, application of the rule of *lex situs*

preserves Muzimpex's appropriate expectation that the laws of Uzbekistan would govern disputes related to its purchase of shares in CCBU.

**E.     The Act of State Doctrine Is Applicable To All of Plaintiffs' Claims**

44.     The Act of State Doctrine would appear to be an important rule of decision in this case.  The doctrine has evolved over the years.  The U.S. Supreme Court enunciated a broad formulation in *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897): "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."  In a major case in 1964, the Supreme Court addressed Fidel Castro's expropriation of property in Cuba and held that the Act of State Doctrine:

> "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory. . . . [T]he Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government [subject to certain possible limitations]."  *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 428 (1964).

45.     When the doctrine does apply, it serves as "a principle of decision binding on federal and state courts alike."  Id. at 427; *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).  Hence, the doctrine is applicable whether the Plaintiffs' claims might be for an alleged international law violation (discussed above) or the Plaintiffs' formal causes of action in their Complaint, which they seem to base on District of Columbia law (discussed below).

46.     Although the Supreme Court's rationales for the doctrine have evolved over the years, the Court most recently described it "as a consequence of domestic separation of powers, reflecting the strong sense of the Judicial Branch that its

engagement in the task of passing on the validity of foreign acts may hinder the conduct

of foreign affairs." *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493

U.S. 400, 404 (1990) (quoting *Sabbatino*, 376 U.S. at 423). "The policies underlying the

doctrine include 'international comity, respect for the sovereignty of foreign nations on

their own territory, and the avoidance of embarrassment to the Executive Branch in its

conduct of foreign relations.' [*Kirkpatrick*] at 408." *World Wide Minerals*, 296 F.3d at

1165.

      47.    Significantly for the present case, the Court in *Sabbatino* considered that a

"serious consequence" of making an exception to the Act of State Doctrine in the case of

expropriated property "would be to render uncertain title in foreign commerce, with the

possible consequence of altering the flow of international trade." Id. at 433. The Court

was specifically concerned about the effect on a third-party purchaser. Id. at 434-5; see

*Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918) (held that former owners of private

property expropriated during the Mexican revolution could not sue the new owners of the

property, because the new owners' title derived from an act of state).

      48.    Given the essential role of the decisions of the government of Uzbekistan

in the situation that is subject to litigation here, the Act of State Doctrine applies. The

Doctrine would preclude this Court from examining, much less declaring invalid, the

official Uzbek government's acts that (1) led Plaintiffs to lose their interest in CCBU in

2002 and (2) two years later in 2004, had a government agency sell the State's interest in

CCBU through a privatization sale to Muzimpex, an Uzbek company in which one of the

Zeromax defendants held an ownership interest. (See further discussion of the chain of

events in paragraphs 25-30 above.)

49.    Hence, Plaintiffs lost their interest in CCBU through state proceedings and an official judicial decree.  Two years later, Muzimpex (in which one of the Zeromax Defendants held an interest at the time) was a third-party purchaser that obtained its interest in CCBU through an official privatization sale of the state's interest.  This situation seems a classic case for the application of the Act of State Doctrine.

50.    Further, the legal status of the situation is clear in Uzbekistan under Uzbek law.  For this Court to now somehow change ownership or title to the interest in CCBU would be to "render titles uncertain," given that there would be competing judicial pronouncements.  See *Sabbatino*, 376 U.S. at  433; *Oetjen v. Central Leather Co.,* 246 U.S. at 203. (See also the earlier discussion in paragraphs 40-43 about the *lex situs* rule of private international law.)

51.    Plaintiffs try to argue, in a convoluted way, that somehow these official Uzbek government acts are not at issue in this case, citing *Kirkpatrick*, 493 U.S. at 409-10.  (Pl. Opp. Mem. at 21-25.)  I believe that the details in the paragraphs above about the chain of events clearly demonstrate that the Uzbek government's acts were essential to Plaintiffs' loss of their property interest and to Muzimpex's later acquisition of its interest.  Indeed, Plaintiffs themselves at other points in their Opposition Memorandum admit that the Uzbek government's acts are central to this case and caused their injury.  As Plaintiffs acknowledge, "Uzbekistan expropriated, through sham proceedings, ROZ's interest in CCBU.  There simply is no dispute that ROZ's interest in CCBU was confiscated and taken from Plaintiffs. …"  (Pl. Opp. Mem. at 31-32.)

52.    The factual situation here is unlike *Kirkpatrick* where an unsuccessful bidder for a Nigerian government contract sued the successful bidder for damages on the

theory that the winner had succeeded by bribing a government official. Rather, the situation here is similar to that in *Sabbatino* and other cases where the governmental acts were at issue and the Act of State Doctrine was applied, such as *Oetjen v. Central Leather Co.*, supra; *Glen v. Club Mediterranee, S.A.,* 450 F.3d 1151, 1256-57 (11th Cir. 2006) ("[t]he act of state doctrine is properly applied to claims, like the Glens', that necessarily require U.S. courts to pass on the legality of the Cuban government's expropriation of property within Cuba . …"); *World Wide Minerals,* 296 F.3d at 1166 ("the relief sought here would require us to question the 'legality' of Kazakhstan's denial of the export license").

### E.    The Expert Report of Scott Horton Is Legally Irrelevant to the Act of State Doctrine

53.    Plaintiffs attached to their Opposition Memorandum the Expert Report of Scott Horton. In it, Mr. Horton questions the integrity and independence of the Uzbek judicial system and also concludes that Mr. Mansur Maqsudi did not receive fair treatment in the divorce proceeding between him and Ms. Gulnora Karimova. He does not specifically address in any detail the proceedings involving CCBU discussed above in paragraphs 25-30 nor does he indicate any familiarity with these proceedings. Nevertheless, without any analysis of the particular situation involving CCBU, Mr. Horton states his speculation that Mr. Maqsudi or any interest associated with him have "no expectation of justice or fair treatment in Uzbekistani courts." (Para. 27.) It is unclear what Mr. Horton's purpose is here.

54.    However, Mr. Horton's report is *not* relevant to the question of the applicability of the Act of State Doctrine and should have *no* legal effect. The rationales

for the Act of State Doctrine, as discussed above in paragraphs 46-47, are based on separation of powers, international comity, respect for the sovereignty of a foreign nation on its own territory, and concerns about third-party purchasers. The doctrine is not an award for good behavior. Indeed, the doctrine has been found applicable by the U.S. Supreme Court and other U.S. courts in a variety of situations where the foreign government might well have acted in ways that offend the U.S. sense of due process— e.g., Fidel Castro's expropriation without compensation of American-owned property in Cuba (*Sabbatino* and *Club Mediterranee,* cited above) and expropriations during revolutionary turmoil in Mexico (*Oetjen*) and Iran (*Harza Engineering*). See also *Hunt v. Mobil Oil Co.*, 550 F.2d 68, 72, 77 (2nd Cir. 1977) (applied Act of State Doctrine to dismiss suit where plaintiff's alleged damage resulted from the government of Libya's actions, even though the court characterized a U.S. Department of State note as saying that Libya's actions were "political reprisal against the United States government and economic coercion against other U.S. nationals in Libya"). The issue under the Doctrine is essentially whether the act (or acts) in question is a formal act of a foreign sovereign on its territory. Mr. Horton's report does not address this.

**F.**   **There Is No Commercial Activity Exception to the Act of State Doctrine**

55.    Plaintiffs incorrectly claim a "commercial activity" exception to the Act of State Doctrine. First, they seriously misread the relevant case law, putting much reliance on *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976). In that case the Cuban government named "interventors" to operate the businesses of nationalized Cuban companies. Dunhill paid these interventors both for new purchases and also on old accounts receivable, apparently on the assumption that the interventors were entitled

to collect the accounts receivable.  The former owners of the Cuban businesses sued and Cuba was allowed to intervene.  The issue before the Supreme Court was whether the Act of State doctrine applied to protect the interventors from an obligation to return the money they received for the old accounts receivable.

56.    A majority of the Court found that the Act of State doctrine did not apply because the interventors' refusal to repay the over-payment was not a "formal act" of state.  "No statute, decree, order, or resolution of the Cuban Government itself was offered in evidence indicating that Cuba had repudiated its obligations . . . or that it had as a sovereign matter determined to confiscate the amounts due to [Dunhill and two other] foreign importers." Id. at 695.  In contrast, the acts of the government of Uzbekistan meet the requirement of formality.

57.    The Court also addressed the question whether there was a "commercial activity" exception to the Act of State Doctrine.  Justice Marshall, writing for himself and three other Justices, firmly said no.  Id. at 724.  Another four Justices, out of the five Justices[6] who had voted for the formal act requirement, supported the idea of a commercial activity exception for "the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities."  These four Justices made the distinction between "public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other. . . ." Id. at 695.  They then categorized the question of repayment of a commercial debt there as a commercial act.  Very importantly for the present case, those four Justices indicated that "expropriation" was a public or governmental act, not a commercial act.  Specifically,

---

[6]    The fifth Justice, Justice Stevens, supported the formal act requirement and took no position on the commercial activity exception.

these four Justices noted that: "Cuba's debt to Dunhill arose out of the *conduct* by Cuba's agents of a commercial business for profit. The same may not be said of conventional expropriations of foreign assets located ab initio inside a country's territorial borders." Id. at 697 n. 11. These Justices later distinguished again between expropriations and commercial dealings.

> "There may be little codification or consensus as to the rules of international law concerning exercises of *governmental* powers, including military powers and expropriations, within a sovereign state's borders affecting the property or persons of aliens. However, more discernible rules of international law have emerged with regard to the commercial dealings of private parties in the international market." Id. at 704.

So, all eight Justices who addressed the question of the commercial activity exception would have found the extensive regulatory and judicial activity in this case—activity which the Plaintiffs have specifically labeled "expropriation" on many occasions in their Opposition Memorandum (e.g., at pages 31-33)—to be public, governmental acts. In other words, no Justice would have supported the application of the commercial activity exception to this case.

58.    Since *Dunhill,* there does not appear to have been substantial support for a commercial activity exception to the Act of State Doctrine, and none whatsoever for cases, like the present one, that involved considerable regulatory and judicial steps by the foreign state where the property was located.

59.    It is worth noting that I have not found evidence of a commercial activity exception in other countries that have a doctrine similar to this country's Act of State Doctrine.[7] For example, Great Britain, which has substantially the same rule of judicial

---

[7]    For a discussion of the existence of the Act of State Doctrine, or variants on it, in other countries, see *Oppenheim's International Law* (Robert Jennings and Arthur Watts eds., 9th ed. 1992). For example, "the

restraint as the United States,[8] has "three well-recognised exceptions to [its] act of state

doctrine."  Shaheed Fatima, *Using International Law in Domestic Courts* 395 (2005).

They are: (1) acts for which a statute permits justiciability; (2) acts which arise out of an

alleged fundamental violation of human rights; and (3) overlapping with the human rights

exception, acts which arise out of foreign legislation that is contrary to British public

policy.  Id. at 395-98.  The public policy exception does not appear to include seizures of

immovable or movable property whether or not compensation has been paid in

accordance with international law.  Id. at 398, quoting *In re Claim by Herbert Wagg &

Co. Ltd*, [1956] Ch 323, 349 A-D (Upjohn, J.) ("[C]ourts have not … recognized any

principle that confiscation without adequate compensation is per se ground for refusing

recognition to foreign legislation"; see also *Luther v. Sagor* [1921] 3 KB 532 (CA).

## G.    The Second Hickenlooper Amendment Is Inapplicable and Does Not Prevent the Court from Applying the Act of State Doctrine

60.    The Second Hickenlooper Amendment is inapplicable here based on the

case law and the facts.

61.    The longstanding case law is clear that the Amendment does not apply to

prevent the use of the Act of State Doctrine except possibly when (1) there are claims of

*title to property* (rather than breach of contract claims), and (b) the property or its

proceeds is presently located in the United States.  See, e.g., *Compania de Gas de Nuevo

Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322, 327 (5th Cir. 1982); *Banco Nacional de Cuba v.

First National City Bank of New York*, 431 F.2d 394 (2d Cir. 1970), rev'd on other

---

Italian Court of Cassation has … held the non-justiciability of acts of foreign states to be a principle of international law, forming part of the Italian legal system."  Id. at 370-371.

[8]    Id. at 368-369.

grounds, 406 U.S. 759; see *Restatement (Third),* § 444 cmt. e (1987) (The Amendment is

"limited to actions asserting title to property before the court. … [T]he plaintiff must

allege and prove that the property that is the subject of the claim is in the United States or

was there at the time the action was commenced.").  Even the Plaintiffs' own citations

support the conclusion that the Amendment does not apply when the property is not

located in the United States.  Plaintiffs cite several times *Rong v. Liaoning Provincial

Gov't*, 362 F. Supp. 2d 83 (D.D.C. 2005) at Opp. Mem. pages 30-31.  Yet, the court held

there that "the Amendment is inapplicable because the property at issue is not located in

the United States."  Id at 99.

62.     As detailed earlier in paragraphs 25-30 above, the shares that Plaintiffs

used to hold in CCBU were taken over by the government of Uzbekistan by 2002 and

then sold by the government, through a privatization sale, to Muzimpex, an Uzbek

company.  Muzimpex in Uzbekistan holds the CCBU shares as a third-party purchaser.

**H.          In Choosing the Applicable Law, This Court Should Take Into

Account the *Lex Situs* Rule of Private International Law**

63.     I do not believe it is my role to address the District of Columbia's choice

of law rules.  However, it seems worth noting that this Court should be sensitive to Uzbek

law since this case very much involves the governmental interests of Uzbekistan and

there are many relationships to Uzbekistan—e.g., CCBU was organized in and is located

there, Muzimpex is an Uzbek company, ROZ (Uzbekistan) was organized in Uzbekistan,

and agencies and courts of the government of Uzbekistan took many formal acts in this

case (see paragraphs 25-30 above).

64.    Moreover, given the international nature of many of the parties and activities involved here, this Court should be sensitive to international law. (See the discussion above in paragraphs 18-20 about the role of international law in U.S. law.) One important principle of private international law is the *lex situs* rule. This rule provides that title to property should be determined by the law of the country where the property was located at the time of transfer, even if an expropriation were involved. This rule is widely accepted in the world, including in the United States. (See the discussion above at paragraphs 40-43).


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 7th day of February 2007 in Washington, D.C.

By: _Barry Carter_____

Barry E. Carter