**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ROZ TRADING, LTD., *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:06-cv-01040-CKK |
| | ) | |
| v. | ) | |
| | ) | |
| ZEROMAX GROUP, INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO THE
U.S. ZEROMAX DEFENDANTS' REVISED MOTION TO
DISMISS THE AMENDED COMPLAINT IN ITS ENTIRETY**

CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

*Attorneys for ROZ Trading, Ltd. and
ROZ Trading, Ltd. (Uzbekistan)*

December 21, 2007

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ............................................................................ 1

BACKGROUND OF CLAIMS .................................................................. 4

    CCBU ................................................................................. 4

    Exclusion of ROZ ..................................................................... 5

    Zeromax Entities ...................................................................... 7

    Termination Notices and Subsequent Dissolution of the U.S. Zeromax
        Entities ........................................................................ 8

ARGUMENT ............................................................................... 8

    I.     PLAINTIFFS HAVE NOT FAILED TO JOIN AN
            INDISPENSABLE PARTY ........................................................ 8

          A.    Zeromax GmbH Is Not A Necessary Party Under Rule
                19(a) .................................................................. 9

          B.    Zeromax GmbH Is Not An Indispensable Party Under Rule
                19(b) ................................................................. 11

    II.    THIS COURT HAS PERSONAL JURISDICTION OVER THE
            U.S. ZEROMAX DEFENDANTS ................................................. 15

    III.   THE ACT OF STATE DOCTRINE DOES NOT BAR THIS
            CASE ...................................................................... 17

          A.    The Act of State Doctrine Does Not Apply Where
                Adjudication of Plaintiffs' Claims Does Not Require The
                Court To Invalidate Any Official Act ..................................... 18

          B.    The Commercial Nature Of The Dispute Removes All of
                Plaintiffs' Claims From The Purview Of The Act Of State
                Doctrine .............................................................. 22

          C.    The Language Of The Joint Venture Agreement Confirms
                That The Act Of State Doctrine Cannot Reach These Issues ................. 25

          D.    The Second Hickenlooper Amendment Applies To
                Plaintiffs' Claims ...................................................... 25

E.    The Act of State Doctrine Does Not Apply Where the Alleged "Acts of State" Were Orchestrated by Defendants.................... 29

IV.    PLAINTIFFS HAVE STATED VIABLE CLAIMS ........................................... 31

A.    Choice Of Law.................................................................................. 31

B.    Plaintiffs' Allegations Against Defendants Support Valid Claims ............................................................................................... 34

    1.    Breach Of Contract.................................................................. 34

    2.    Tortious Interference ................................................................ 35

    3.    Conversion ................................................................................ 35

    4.    Conspiracy To Commit Conversion And Tortious Interference .............................................................................. 36

    5.    Action To Quiet Title ............................................................... 36

    6.    Unjust Enrichment.................................................................... 37

    7.    Fraudulent Conveyance ........................................................... 37

C.    Plaintiffs' Claims Are Timely ................................................. 38

    1.    Breach Of Contract.................................................................. 38

    2.    Fraudulent Conveyance ........................................................... 39

    3.    Other Claims ............................................................................ 39

    4.    Both Equitable Tolling And The Discovery Rule Would Extend The Limitations Period Here .............................. 39

V.    DEFENDANTS' *FORUM NON CONVENIENS* ARGUMENT FAILS BECAUSE THERE IS NO ALTERNATIVE, LET ALONE MORE CONVENIENT, FORUM ....................................... 42

A.    There Is No Adequate Alternative Forum................................ 42

B.    The Private And Public Factors Favor This Forum................................ 43

CONCLUSION ........................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### FEDERAL CASES

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004) ............................................................. 30

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976) ...................... 18, 22, 23

*Ampac Group, Inc. v. Republic of Honduras*, 797 F. Supp. 973 (S.D. Fla. 1992) ....................... 18

*In re Application of Roz Trading Ltd.*, 469 F. Supp. 2d 1221 (N.D. Ga. 2006) ......................... 14

*Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371 (5th Cir. 1980) ................................ 24

*BPA International, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73 (D.D.C. 2003) .............42, 45

*Banco Nacional de Cuba v. Farr*, 383 F.2d 166 (2d Cir. 1967) .................................................. 28

*Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323 (11th Cir. 2003) ........................................ 28

*In re Belmar*, 319 B.R. 748 (Bankr. D.C. 2004) ......................................................................... 34

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2001) ................................................................. 18

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) ........................................................ 32

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) .................................................................. 31

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ......................................................................... 8

*Clackamas County, Or. v. McKay*, 219 F.2d 479 (D.C. Cir. 1954) ............................................. 11

*Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322 (5th Cir. 1982) .............. 27

*Dainippon Screen Manufacturing Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266
   (Fed. Cir. 1998) ......................................................................................................................... 13

*Edmond v. U.S. Postal Serv. General Counsel*, 949 F.2d 415 (D.C. Cir. 1991) ......................... 17

*Ellsworth Associates, Inc. v. U.S.*, 917 F. Supp. 841 (D.D.C. 1996) ....................................35, 37

*Faysound Ltd. v. Walter Fuller Aircraft Sales, Inc.*, 748 F. Supp. 1365 (E.D. Ark. 1990) .......... 26

*Gardiner v. Virgin Islands Water & Power Authority*, 145 F.3d 635 (3d Cir. 1998) .................. 13

*Glen v. Club Mediterranee S.A.*, 450 F.3d 1251 (11th Cir. 2006) ............................................... 21

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) .................................................42, 44

*Hall v. Clinton*, 285 F.3d 74 (D.C. Cir. 2002) ........................................... 36

*Harris v. Ladner*, 127 F.3d 1121 (D.C. Cir. 1997) .................................... 31

*Heckler v. Mathews*, 465 U.S. 728 (1984).................................................. 8

*Hilton v. Guyot*, 159 U.S. 113 (1895)......................................................... 32

*Industrial Investment Development Corp. v. Mitsui & Co.*, 594 F.2d 48 (5th Cir. 1979)........... 19

*Jaser v. New York Prop. Insurance Underwriting Association*, 815 F.2d 240
   (2d Cir.1987) .......................................................................................... 12

*Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) .......................... 13

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491
   (D.C. Cir. 1995)....................................................................................10, 12

*Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941).................................. 32

*In re Lorazepam & Clorazepate Antitrust Litigation*, 295 F. Supp. 2d 30
   (D.D.C. 2003).......................................................................................... 37

*Material Supply International, Inc. v. Sunmatch Indust. Co., Ltd.*, 62 F. Supp. 2d 13
   (D.D.C. 1999).......................................................................................... 19

*O'Callaghan v. District of Columbia*, 741 F. Supp. 273 (D.D.C. 1990) ..................................... 36

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005) ................................................ 40

*Pain v. United Tech. Corp.*, 637 F.2d 775 (D.C. Cir. 1980)........................ 44

*In re Philipine National Bank*, 397 F.3d 768 (9th Cir. 2005)..................... 21

*Phillips v. Heine*, 984 F.2d 489 (D.C. Cir. 1993)....................................... 40

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ...............................43, 44

*Pujol v. Shearson/American Express, Inc.*, 877 F.2d 132 (1st Cir. 1989)................................... 13

*Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986) ............... 18

*Republic of Philippines v. Westinghouse Electric Corp.*, 774 F. Supp. 1438

(D. N.J. 1991) ................................................................................................... 30

*Rong v. Liaoning Provincial Government*, 362 F. Supp. 2d 83 (D.D.C. 2005).....................26, 27

*Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37 (D.D.C. 2002) .................................................. 15

*Shelton v. Exxon Corp.*, 843 F.2d 212 (5th Cir. 1988) ............................................................... 12

*Smith v. American Federation of Musicians of U.S. & Can.*, 47 F.R.D. 152
(S.D.N.Y. 1969)...................................................................................................................... 13

*Snap-On Tools Corp. v. Mason*, 18 F.3d 1261 (5th Cir. 1994) .................................................. 11

*Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191 (D.C. Cir. 1999).................. 33

*Summit Health, Ltd. v. Pinhas*, 500 U.S. 322 (1991) ................................................................. 31

*Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597
(9th Cir. 1976) ...................................................................................................................29, 30

*Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002) ...................................... 37

*United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004)................................ 31

*United States v. Cicero*, 214 F.3d 199 (D.C. Cir. 2000)............................................................. 40

*United States v. Merit*, 962 F.2d 917 (9th Cir. 1992)................................................................ 21

*United States v. Sisal Sales Corp.*, 274 U.S. 268 (1927)............................................................ 30

*United States v. Sweeny*, 418 F. Supp. 2d 492 (S.D.N.Y. 2006) ............................................ 9, 12

*United States v. Winstar, Corp.*, 518 U.S. 839 (1996) ............................................................... 24

*Universal Reinsurance Co., Ltd. v. St. Paul Fire and Marine Insurance, Co.*,
312 F.3d 82 (2d Cir. 2002)................................................................................................10, 12, 14

*Virtual Defense and Development International, Inc. v. Republic of Moldova*,
133 F. Supp. 2d 1 (D.D.C. 1999)........................................................................................... 23

*W.S. Kirkpatrick, & Co., Inc. v. Environmental Tectonics Corp., International*,
493 U.S. 400 (1990)..........................................................................................................19, 21

*West v. Multibanco Comermex, S.A.*, 807 F.2d 820 (9th Cir. 1987) ......................................26, 27

*Wheaton v. Diversified Energy*, LLC, 215 F.R.D. 487 (E.D. Pa. 2003) ..................................... 13

*Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131 (D.D.C. 2005)....................................31, 32

*Zerilli-Edelglass v. N.Y. City Transit Authority*, 333 F.3d 74 (2d Cir. 2003)............................. 40

## STATE CASES

*Camacho v. 1440 Rhode Island Avenue Corp.*, 620 A.2d 242 (D.C. 1993) ............................... 34

*Capitol Place I Associate L.P. v. George Hyman Construction Co.*, 673 A.2d 194 (D.C. 1996)....................................................................................................................................39, 41

*District of Columbia v. Coleman*, 667 A.2d 811 (D.C. 1995) ..................................................... 33

*Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939 (D.C. 2003) ..................................... 42

*Ellis v. Dixie Highway Special Road & Bridge District*, 138 So. 374 (Fla. 1931) ..................... 37

*Farris v. Compton*, 652 A.2d 49 (D.C. 1994).............................................................................. 41

*Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 566 A.2d 31 (D.C. 1989) ............................ 32

*Martin & Earle v. Maxwell*, 67 S.E. 962 (S.C. 1910) ................................................................. 37

*Minute Man Anchors, Inc. v. Oliver Technologies, Inc.*, 2005 WL. 1871164 (W.D.N.C. 2005).............................................................................................................................................. 13

*North American Integrated Marketing, Inc. v. Adviseurs Software, Inc.*, 1995 WL. 152538 (S.D.N.Y. 1995)................................................................................................................ 19

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ....................................................................................................... 21

## DOCKETED CASES

*GlobalOptions Inc. v. Livingstone*, Civ. A. No. 1:07-cv-00608 (PLF) ....................................... 11

*Maqsudi, et al. v. GlobalOptions, Inc., et al.*, Civ. A. No. 1:07-cv-01252 (RJL)........................ 2

*ROZ Trading Ltd. v. Coca-Cola Export Corp., Uzbekistan, Uzpishcheprom Associate & Zeromax Group, Inc.*, Case No. SCH-4986 (Int'l Arbitral Centre of the Austrian Fed. Econ. Chamber) ..................................................................................................................................... 3

## FEDERAL AUTHORITIES

22 U.S.C. § 2370(e)(2) ...............................................................................26, 28

22 U.S.C. § 2370(e)(2) (2007) ..................................................................... 25

28 U.S.C. § 1782 ......................................................................................... 44

28 U.S.C. sec. 1782 ..................................................................................... 14

Fed. R. Civ. P. 12 ...................................................................................*passim*

Fed. R. Civ. P. 19 ...................................................................................*passim*

## STATE STATUTES

D.C. Code § 12-301(2007)............................................................................ 39

D.C. Code § 28-3101 (2007)......................................................................... 38

D.C. Code § 28-3104 (2007)......................................................................... 38

D.C. Code § 28-3109 (2007)......................................................................... 39

6 Del. C. § 18-804(2007) .......................................................................10, 14

8 Del. C. § 278 (2007) ................................................................................. 10

## OTHER AUTHORITIES

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §§ 1607-1608
      (3d ed. 2001) ....................................................................................11, 12

Restatement (Second) of Conflict of Laws § 188(2)................................... 33

Restatement (Third) of Foreign Relations Law of the United States  § 443 (1987) .................... 18

Restatement (Third) of Foreign Relations Law of the United States  § 453 (1987) ..............22, 23

## INTRODUCTION

Contrary to the assertions of Defendants Zeromax Group, Inc., Zeromax Logistics, Inc., and Zeromax LLC (collectively, "Defendants" or "the U.S. Zeromax Defendants"), the claims of Plaintiffs ROZ Trading Ltd. and ROZ Trading Ltd. (Uzbekistan) (collectively, "ROZ" or "Plaintiffs") are not wholly based "on the alleged sovereign acts of Uzbekistan."[1]  In fact, they are not based on Uzbekistan's sovereign acts at all, but rather, on Defendants' *own* actions to exclude Plaintiffs from Coca-Cola Bottlers Uzbekistan Ltd. ("CCBU"), a very successful joint venture in Uzbekistan.  Defendants' actions were (and still are) part of a larger plan set in motion by their ultimate controller, Gulnora Karimova, to seek retribution from Mansur Maqsudi for divorcing her.  *See* Decl. of Mr. Mansur Maqsudi ("Maqsudi Decl.") at ¶¶ 15-24 (attached as Exhibit 1).  Ms. Karimova's goal was not only to eliminate Mansur Maqsudi and his company, ROZ, from their part ownership of CCBU, but to also ensure that Plaintiffs' valuable shares in the very lucrative CCBU would somehow remain under her control.  This could not be achieved without Defendants.  As Ms. Karimova told Mr. Farhod Inogambaev, one of her former assistants, "she intended to take control of CCBU, with the assistance of one of her companies." Decl. of Mr. Farhod Inogambaev dated Dec. 6, 2006 ("2006 Inogambaev Decl.") at ¶11 (attached as Exhibit 2). This company was Zeromax.

As part of her plan to control CCBU through Zeromax, Ms. Karimova coordinated with top officials in the Uzbek government to initiate proceedings against Plaintiffs to bar them from participating in and managing their joint venture.  Amended Complaint ("Am. Compl.") at ¶¶ 28-31; 2006 Inogambaev Decl at ¶¶ 14-16; Decl. of Mr. Farhod Inogambaev dated Dec. 7, 2007

---

[1]    *See* The U.S. Zeromax Defendants' Revised Motion to Dismiss The Amended Complaint In Its Entirety ("Rev. Mot.") at 2, 27.

("2007 Inogambaev Decl.") at ¶¶27-30 (attached as Exhibit 3). Around the same time that the Uzbek courts were issuing decisions against Plaintiffs, Zeromax GmbH was being formed. *See* Am. Compl. at ¶ 3 (Zeromax Group incorporated on Sept. 4, 2002), ¶ 31 (Supreme Economic Court of Uzbekistan approved the liquidation of ROZ (Uzbekistan) and the seizure of ROZ's remaining interest in CCBU). Zeromax LLC was also partnering with Tijorat, an Uzbek state-owned food distribution company, to form Muzimpex, the joint venture company that would eventually come to hold Plaintiffs' interest in CCBU. *See* Am. Compl. at ¶ 42 (Muzimpex formed in February 2003). Defendants did not stop there. Once Plaintiffs learned that Muzimpex acquired their interest in CCBU, they exercised their rights under the JVA to terminate the joint venture. Am. Compl. at ¶ 48. Plaintiffs' termination triggered an obligation under the JVA to call a Parties' Assembly and to initiate liquidation proceedings. Defendants, acting with Ms. Karimova and its other joint venture partners, The Coca-Cola Export Corporation ("TCCEC") and Uzbekistan, did not call such a meeting, initiate liquidation proceedings, or otherwise compensate Plaintiffs for their interest in CCBU. Am. Compl. at ¶ 50. Rather, knowing they would be liable to Plaintiffs for their actions, Defendants dissolved their U.S. entities, and reincarnated outside the country, in Switzerland, in the form of Zeromax GmbH. Am. Compl. at ¶¶ 48-53.

Defendants' attempts to evade legal responsibility for their actions are to no effect. Although successful in having Zeromax GmbH dismissed from this case for lack of personal jurisdiction, Defendants now argue that Zeromax GmbH is an indispensable party.[2] The U.S.

---

[2]    Zeromax GmbH, the party which argued strenuously that it had no business contacts with this jurisdiction, secretly came to the District of Columbia and engaged a security firm, GlobalOptions, Inc, to conduct a smear campaign against the Maqsudi family, the principals of ROZ Trading. That conduct had one purpose – to investigate and harass the Maqsudis for bringing legal proceedings against them. They

(continued…)

Zeromax Defendants, however, are no different from Zeromax GmbH, and this is fatal to their argument. Zeromax GmbH is not even necessary, let alone indispensable.

With regards to personal jurisdiction, Defendants once again seek to benefit from their shell game, arguing that they were dissolved in the U.S. at the time of Plaintiffs' action. Defendants, however, have already consented to this Court's exercise of personal jurisdiction over them.

Defendants also argue that the act of state doctrine bars the Court from inquiring into the underlying actions giving rise to this and the Vienna dispute – even though defendants themselves were directly involved in the orchestration of the "state acts" which not only harmed Plaintiff's economic interests but also benefited their own economic interests. The law does not provide Defendants with a sanctuary for this unlawful and harmful conduct.

Finally, Defendants argue that that there are alternative fora available for this dispute, yet, when Plaintiffs included Zeromax Group in the related arbitration case pending in Vienna against Uzbekistan, Uzpishcheprom and TCCEC,[3] Zeromax Group expressly declined to submit to the arbitration, asserting that the tribunal lacked jurisdiction and that it has not agreed to

---

(…continued)

effected this by posting websites that contained grossly false and harmful "facts" about the Maqsudis and their prior work in Uzbekistan. Upon learning of these websites, the Maqsudis pursued legal action, including the filing of an action for defamation and false light invasion of privacy in this Court. This case is currently pending before Judge Leon. *See Maqsudi, et al. v. GlobalOptions, Inc., et al.,* Civ. A. No. 1:07-cv-01252 (RJL). The allegations and record in that pending case underscore the lengths to which Defendants have gone to destroy Plaintiffs and the Maqsudis – even here in Washington, D.C. *See e.g.,* Complaint, *Maqsudi, et al. v. GlobalOptions, Inc., et al.,* Civ. A. No. 1:07-cv-01252 (RJL) (attached as Exhibit 5). A hearing on the Motions to Dismiss in that case will be held in early March 2008. *See* Minute Entry, *Maqsudi, et al. v. GlobalOptions, Inc., et al.,* Civ. A. No. 1:07-cv-01252 (Dec. 17, 2007).

[3]    *See ROZ Trading Ltd. v. Coca-Cola Export Corp., Uzbekistan, Uzpishcheprom Assoc. & Zeromax Group, Inc.,* Case No. SCH-4986 (Int'l Arbitral Centre of the Austrian Fed. Econ. Chamber) ("Vienna Arbitration"). *See* ROZ's Statement of Claims filed in the Vienna Arbitration (attached as Exhibit 6). The Arbitral Tribunal includes Prof. Dr. Karl-Heinz Böckstiegel (Chairman), Dr. Robert Briner, and The Hon. Thomas Penfield Jackson.

arbitrate any dispute with ROZ.[4]  In light of their refusal to participate in the Vienna-based arbitration, ROZ elected to proceed there without them so that the arbitration could move forward in an efficient and timely manner.  Indeed, the arbitration briefing is well along, and the hearing on merits and damages will be held in September 2008. Because Defendant Zeromax Group is no longer a party in the Vienna arbitration, Defendants here have no basis to argue that this action should be stayed pending the outcome in Vienna.[5]  Rev. Mot. at 42 n. 28.  Moreover, Defendants' argument that Uzbekistan is a better forum for Plaintiffs' to pursue their claims is not only wrong as a matter of law, but frivolous – Defendants are well aware of the biased and indeed dangerous treatment Plaintiffs would receive in Uzbekistan.  For these reasons, detailed below, Defendants' Revised Motion to Dismiss must be denied in its entirety.

## BACKGROUND OF CLAIMS

Plaintiffs provide below a summary of the background facts in this case and refer the Court to the Amended Complaint for a full recitation of the facts.  *See* Am. Compl. at ¶¶ 1-56.

### CCBU

In early 1993, ROZ, the Republic of Uzbekistan, and TCCEC, signed a Letter of Intent memorializing their intention to form a commercial joint venture.  That venture would prepare, market, distribute, and sell non-alcoholic beverages in Uzbekistan.  *See* January 26, 1993 Letter of Intent (attached as Exhibit 8).

---

[4]     *See* Zeromax Group's Memorandum in Reply in the Vienna Arbitration at ¶ 2 (attached as Exhibit 7).

[5]     With regards to the partial award terminating the proceedings as to Zeromax Group and awarding it costs in the Vienna arbitration, Plaintiffs submit that the Tribunal was in error.  Perhaps that is why, Zeromax Group has not attempted to enforce this award under the Federal Arbitration Act or New York Convention.

On June 16, 1993, ROZ, TCCEC, and Uzbekistan, acting through its agent, Beshaghash (later replaced by Uzpishcheprom),[6] entered into a Joint Venture Agreement ("JVA") establishing "CCBU."  Am. Compl. at ¶ 13.

Uzbekistan participated in the venture like any *commercial* entity.  For instance, its ownership interests fluctuated as its partners bought and sold shares and added capital to the joint venture.  *See* chart R1-5 of TCCEC's Memorandum in Reply in the Austrian arbitration (attached as Exhibit 11).  And like its business partners, Uzbekistan also nominated one representative to the CCBU's Parties' Assembly.  Exhibit 9 at ¶ 6.1.  In 1997, Uzbekistan, through Uzpishcheprom, sold most of its remaining interest in CCBU to ROZ (Uzbekistan).  *See* December 31, 1997 Directive of the Uzbek State Property Committee (attached as Exhibit 12).  Indeed, the JVA specifically waived rights that traditionally might run to the sovereign.[7]

By all accounts, the early years of the commercial venture known as CCBU were successful.  CCBU was among The Coca-Cola Company's most profitable bottlers worldwide.  Am. Compl. at ¶ 18.

### Exclusion of ROZ

During the formation, and for the first eight years of the Joint Venture, Mansur Maqsudi, ROZ's Chief Executive Officer, was married to Gulnora Karimova, the daughter of Islam Karimov, President (and dictator) of Uzbekistan.  Am. Compl. at ¶ 19.  In July 2001, upon announcing his intention to end the marriage, Mr. Maqsudi, his relatives, his companies, and CCBU incurred the wrath of Ms. Karimova.  *Id.* at ¶¶ 20-31; *see also* Maqsudi Decl. at ¶¶ 10-16,

---

[6]  *See* Directive of the Uzbek State Property Committee (attached as Exhibit 10).

[7]  *See* Exhibit 9 at ¶ 15.2 (providing for binding arbitration), ¶¶ 12.2.3 and 12.2.3.6 (allowing ROZ to terminate the joint venture).

20-21; 2006 Inogambaev Decl. at ¶¶ 6-8, 10, 14-20. At her behest, the Uzbek National Security Service raided ROZ's and CCBU's offices in Tashkent, seized documents, and interrogated employees, while holding them in isolation. Am. Compl. at ¶ 27; *see also* Maqsudi Decl. at ¶¶ 15-16.

Ms. Karimova used her control over the Uzbek government, including its courts, to initiate a series of sham investigations and proceedings designed to transfer control of CCBU to Zeromax. Am. Compl. at ¶¶ 28-31; *see also* 2006 Inogambaev Decl. at ¶¶ 14-17; s*ee* Expert Report of Mr. Scott Horton ("Horton Report") at ¶¶ 11-20 (attached as Exhibit 4). She forced one of her assistants, Farhod Inogambaev, to sign a statement falsely accusing Mr. Maqsudi and ROZ of illegal actions. 2007 Inogambaev Decl. at ¶ 24-25. In furtherance of the objective of eliminating ROZ from CCBU, during the course of a purported "fiscal audit," government narcotics investigators took a sample of the beverage concentrate, implementing the ploy of planting narcotics so that subsequent tests would reveal tainted samples. *See* August 17, 2001 e-mail among Coca-Cola executives (attached as Exhibit 13). The government then trumped up a series of charges against ROZ, including failure to maintain an adequate charter fund balance. Such accusations were created out of whole cloth by Ms. Karimova, who instructed officials in her father's Government to adopt them – knowing they were patently false. Am. Compl. at ¶¶ 28-31; 2006 Inogambaev Decl. at ¶¶ 14-16; 2007 Inogambaev Decl. at ¶¶25-30. Even the Uzbek tax committee, the entity responsible for monitoring payment of charter funds, had previously acknowledged that those funds had been fully paid. *See* March 28, 2001 Audit Report (attached as Exhibit 14). Ms. Karimova – not the Government itself – worked with

Defendants in effecting her plan, intending to ensure that Defendants (which she controls) would hold the interest in CCBU formerly held by ROZ.[8]

Through these actions, Uzbekistan increased its ownership in CCBU – at ROZ's expense – from 2% to 57% in one year. *See* October 22, 2002 Minutes of the General Meeting of Participants of CCBU (attached as Exhibit 17). In 2004, Ms. Karimova succeeded in directly securing control of ROZ's former interest in CCBU for Defendants. Am. Compl. at ¶¶ 37, 45-46; *see also* 2006 Inogambaev Decl. at ¶¶ 20-21. Thus, this is not a case involving the type of traditional "governmental conduct" upon which Defendants rely to shield their efforts.

### Zeromax Entities

Zeromax Group, Inc.; Zeromax Logistics, Inc.; Zeromax LLC; and Zeromax GmbH (in their various manifestations at the relevant times) worked together with Ms. Karimova to ensure that Plaintiffs' interest passed to Defendants, companies within her control. Am. Compl. at ¶¶ 39-46; *see also* May 5, 2005 NEFTE Compass article (attached as Exhibit 18). Ms. Karimova had worked with the Zeromax entities *prior* to placing the control of CCBU with Defendants. Am. Compl. at ¶ 43; *see also* 2006 Inogambaev Decl. at ¶¶ 12-13. And during the course of these events, she made explicit her intention to take over ROZ's interest in CCBU and place that interest in the hands of one of her companies – a Zeromax entity. 2006 Inogambaev Decl. at ¶¶ 11, 20. Moreover, Muzimpex is a mere extension of the Zeromax entities, lacking corporate substance, and was designed solely to facilitate the scheme described here. Am. Compl. at ¶ 42. All of Muzimpex's activities and operations are controlled by Defendants, with no independent

---

[8]   The mechanism of using tax audits and other sham proceedings in order to transfer control of entities operating in Uzbekistan to companies like Defendants, is consistent with a pattern. *See generally* December 5, 2006 Radio Free Europe article "Uzbek Officials Say Deal to Help British Mining Group" 

(continued…)

management.  Am. Compl. at ¶ 42.  The interests in CCBU and Muzimpex have been passed

around the various Zeromax entities to evade the rule of law.  *Id.* at ¶¶ 42, 51-53.

### Termination Notices and Subsequent Dissolution of the U.S. Zeromax Entities

After it was completely excluded from its management interest in CCBU, ROZ sent

termination notices, in accordance with the JVA, to all entities with an interest in CCBU,

including Defendants, which were reported to hold ROZ's interest.  Am. Compl. at ¶ 48, 51.

These termination notices triggered certain obligations under the JVA.  Exhibit 9 at ¶ 12.2.  But

instead of performing those obligations, the Zeromax entities took a different course: they

attempted to avoid liability through dissolution and by transferring their assets to a newly

established company in Switzerland.  Am. Compl. at ¶¶ 51-53.  Right after ROZ's notice of

termination was sent, the U.S. Zeromax entities were dissolved, Zeromax GmbH was

established, and interest in Muzimpex was passed from Zeromax LLC to Zeromax GmbH –

demonstrating Defendants' efforts to avoid the legal consequences of its activities.  *Id.*[9]

### ARGUMENT

## I.    PLAINTIFFS HAVE NOT FAILED TO JOIN AN INDISPENSABLE PARTY

In Plaintiffs' case against the U.S. Zeromax Defendants, Zeromax GmbH is not an

indispensable party under Rule 19 of the Federal Rules of Civil Procedure.[10]  Rule 19 sets forth a

---

(…continued)

(attached as Exhibit 15); November 21, 2006 Reuters article "Uzbeks Seeking Ways to Disregard International Arbitration" (attached as Exhibit 16); 2006 Inogambaev Decl. at ¶ 14.

[9]    Zeromax LLC transferred the interest in CCBU/Muzimpex to Zeromax GmbH *after* Zeromax LLC had already been dissolved.  *See* September 28, 2005 certificate of cancellation of Zeromax LLC (attached as Exhibit 19); Muzimpex joint venture agreement, registered on November 7, 2005 (attached as Exhibit 20).

[10]    Contrary to Defendants' argument, Plaintiffs have standing to bring this case.  Rev. Mot. at 22-25.  Under Article III's standing requirement, a plaintiff must show that "he personally has suffered some
(continued…)

two-step inquiry for determining whether an action must be dismissed for failure to join an indispensable party. *United States v. Sweeny,* 418 F. Supp. 2d 492, 499 (S.D.N.Y. 2006). "The first step is to determine whether the party must be joined, if feasible. If a party is deemed necessary under the language of Rule 19 but cannot be joined due to infeasibility, then the second step is for the court 'to assess whether or not, in equity and good conscience, the action should proceed in the necessary party's absence.'" *Id.* (internal citations omitted).

The burden is on the moving party to demonstrate the "nature of the unprotected interests of the absent individuals . . . and the possibility of injury to them or that the parties before the court will be disadvantaged by their absence." *Id.* Defendants have failed to satisfy their burden.

### A.  Zeromax GmbH Is Not A Necessary Party Under Rule 19(a)

Under Federal Rule of Civil Procedure 19(a), an absent party is necessary to the litigation if (1) in their absence complete relief cannot be accorded among those already parties, or (2) the absent party claims an interest relating to the subject matter of the action and is so situated that their absence may (i) as a practical matter impair or impede the absent party's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the absent party's

---

(…continued)

actual or threatened injury as a result of the putatively illegal conduct of the defendant." Rev. Mot. at 23 (citing *Heckler v. Mathews*, 465 U.S. 728, 738 (1984) (quotations omitted). As alleged, Plaintiffs have lost their ownership interest in CCBU. Am. Compl. at ¶¶ 41-48. Such allegations of loss and harm constitute actual injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983) (plaintiff must allege that he has sustained some direct injury as the result of the challenged conduct). Moreover, the Amended Complaint clearly links that injury to Defendants' actions. *See* Am. Compl. at ¶ 39 (furthering Plaintiffs' exclusion from CCBU) , ¶ 40 (shifting corporate identities to avoid the rule of law), ¶ 42 (forming Muzimpex), ¶¶ 46-50 (preventing Plaintiffs from exercising their rights under the JVA). No more is required.

claimed interest.  *See* FED. R. CIV. P. 19(a); *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1495 n.2 (D.C. Cir. 1995).

In this case, complete relief can be accorded among those already parties.  Pursuant to Delaware law, dissolved LLCs, such as Zeromax LLC, are required to make provisions "sufficient to provide compensation for claims that have not been made known to the [LLC] or that have not arisen but that, based on facts known to the [LLC], are likely to arise or to become known to the [LLC] within 10 years after the date of dissolution."  6 Del. C. § 18-804(b)(3) (2007); Am. Compl. at ¶ 55.  Similarly, dissolved corporations, such as Zeromax Group and Zeromax Logistics, "shall nevertheless be continued, for the term of 3 years from such expiration or dissolution . . . for the purpose of prosecuting and defending suits . . . and of enabling them gradually to settle and close their business . . . ."  8 Del. C. § 278 (2007).  Thus, Plaintiffs can still continue their suit against the U.S. Zeromax Defendants, obtain a judgment and attempt to recover damages from them.  In cases such as this, where relief can be accorded without joining additional parties, dismissal of the claim is not warranted.  *Universal Reinsurance Co., Ltd. v. St. Paul Fire and Marine Ins., Co.*, 312 F.3d 82, 88 (2d Cir. 2002).

Moreover, Zeromax GmbH, as an absent party with an interest relating to the subject matter of the action, is not necessary given that Zeromax GmbH and the Defendants in this case are essentially one and the same as alter egos.  As discussed in the Amended Complaint (at ¶¶ 40, 42, 51-52), there was no respect for corporate form among the various U.S. Zeromax Defendants and Zeromax GmbH, nor were there any meaningful distinctions, except minor variations in name.  On their websites, Zeromax GmbH and Zeromax Group, Inc. claim credit for *identical* interests and undertakings.  Am. Compl. at ¶ 40.  Indeed, the U.S. Zeromax Defendants and Zeromax GmbH share the same management.  *See, e.g.,* Certificate of Voluntary

10

Dissolution of Zeromax Group, Inc. (attached as Exhibit 21); Certificate of Voluntary

Dissolution of Zeromax Logistics, Inc. (attached as Exhibit 22). They are all controlled by the

same person, Gulnora Karimova, and further the same objective – the destruction of Plaintiffs

and its owners.[11] *See* 2006 Inogambaev Decl. at ¶¶ 13-14, 20-21. Documentation suggests that

Zeromax LLC's interest in Muzimpex was simply transferred to Zeromax GmbH without

consideration. *See* Exhibit 7 at ¶¶ 26-27. As demonstrated by these factors, Zeromax GmbH is

no different from Defendants in this case. Accordingly, its absence from this litigation does not

prevent relief from being accorded, nor does it impede its ability to protect its interest.[12]

Zeromax GmbH is not a necessary party under Rule 19(a).

### B.    Zeromax GmbH Is Not An Indispensable Party Under Rule 19(b)

Where a party is not considered necessary under Rule 19(a), as is the case with Zeromax

GmbH here, the Court need not engage in analysis under Rule 19(b). 7 Charles Alan Wright &

Arthur R. Miller, Federal Practice and Procedure § 1607 (3d ed. 2001); *Snap-On Tools Corp. v.

Mason,* 18 F.3d 1261, 1266 n.5 (5th Cir. 1994) (no need to apply Rule 19(b) standard when

joinder not mandated under Rule 19(a)).

However, assuming *arguendo* that this Court were to find that that Zeromax GmbH is a

necessary party, the next step is to determine "whether in equity and good conscience the actions

should proceed among the parties before it, or should be dismissed, the absent [party] being thus

---

[11]   This is further demonstrated by Zeromax GmbH's hiring of GlobalOptions, a Washington, D.C. security firm, to create websites posting false and defamatory statements about Farid Maqsudi, Mansur Maqsudi, and their father, Abdul Rauf Maqsudi. *See* Decl. of Neil Livingstone in *GlobalOptions Inc. v. Livingstone,* Civ. A. No. 1:07-cv-00608 (PLF) (D.D.C.) ("Livingstone Decl.") at Attachment A (attached as Exhibit 23) (listing Zeromax as a client).

[12]   Defendants' reliance on *Clackamas County, Or. v. McKay,* 219 F.2d 479, 491 (D.C. Cir. 1954) is unavailing, as the interests of the absent party in this case are represented by the parties. Moreover, the

(continued…)

regarded as indispensable." FED. R. CIV. P. 19(b).  If the lawsuit can proceed, the party is only a

necessary one.  Unless the party is found to be indispensable, the court has no discretion, "except

in the most exceptional cases, to dismiss the case even if a necessary party cannot be joined."

*Shelton v. Exxon Corp.,* 843 F.2d 212, 216 (5th Cir. 1988) (citation omitted).

　　　To distinguish an indispensable party from a necessary one, the court must focus on four

factors established in Rule 19(b): (1) the extent to which a judgment rendered in the person's

absence might be prejudicial to him or those already parties; (2) the extent to which by protective

provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be

lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate;

and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for

nonjoinder.  *See* FED. R. CIV. P. 19(a); *Kickapoo,* 43 F.3d at 1495; *Shelton,* 843 F.2d at 216.

District courts have "substantial discretion" in considering which factors to weigh.  Rule 19(b)

does not require that every factor support the district court's determination.  *Sweeny,* 418 F.Supp.

2d at 500; 7 Charles A. Wright & Arthur R. Miller, *supra* at § 1608; *Universal Reinsurance,* 312

F.3d at 88-89.  Moreover, in most cases under Rule 19(b), the preference is to continue the suit

rather than dismiss it.  *Jaser v. New York Prop. Ins. Underwriting Ass'n,* 815 F.2d 240, 243 (2d

Cir. 1987).

　　　Application of the Rule 19(b) factors to the facts in this case weighs in favor of

continuing the lawsuit.  Zeromax GmbH's absence does not cause prejudice to Defendants in this

---

(…continued)

property interest at issue in *Clackamas* was not transferred intentionally to a non-party in order to avoid
accountability.

case, nor does it prejudice itself.[13]  When the interests of existing defendants are substantially similar, if not identical, to those of the absent party, the potential for prejudice to the absent party is largely non-existent.  *Kansas v. United States,* 249 F.3d 1213, 1226-27 (10th Cir. 2001).  As discussed above, Zeromax GmbH is nothing more than a reincarnated version of the U.S. Zeromax Defendants.  Am. Compl. at ¶¶ 40, 42, 51-52.  Related parties have often been held to adequately represent the interests of an absent party.  *See Wheaton v. Diversified Energy, LLC*, 215 F.R.D. 487, 490 n. 2 (E.D. Pa. 2003) (holding that a subsidiary is adequately represented by the parent when its shareholder interests may be impacted); *Pujol v. Shearson/American Express, Inc.,* 877 F.2d 132, 135-36 (1st Cir. 1989) (holding that the parent company could adequately represent the subsidiary in a suit against parent company implicating subsidiary).  In this case, there is no question that the U.S. Zeromax Defendants adequately represent Zeromax GmbH. Indeed, they even share the same counsel, White & Case LLP.  *See Dainippon Screen Mfg Co., Ltd. v. CFMT, Inc.,* 142 F.3d 1266, 1272 (Fed. Cir. 1998) ("Indeed, because the same attorney who represents [the licensee] in this action would apparently also represent [the patentee] if it intervened, the presence of [the patentee] would not change the course of the action in the slightest degree."); *Minute Man Anchors, Inc. v. Oliver Technologies, Inc.*, 2005 WL 1871164 at *12 (W.D.N.C. 2005) (quoting same).  Given their common ownership, control and purpose, Zeromax GmbH will not be prejudiced by its absence from this case.[14]  Rev. Mot. at 13.

---

[13]    In any case, Zeromax GmbH could have avoided prejudice to itself by remaining in the action.  *See Smith v. American Fed'n of Musicians of U.S. & Can.,* 47 F.R.D. 152, 155 (S.D.N.Y. 1969).

[14]    Furthermore, there are protective provisions in the law that prevent the U.S. Zeromax Defendants from being prejudiced by Zeromax GmbH's absence.  The entity claiming prejudice is free to seek contribution or indemnity from the other.  *See Gardiner v. Virgin Islands Water & Power Auth.,* 145 F.3d 635, 641 (3d Cir. 1998) (nothing that a party's right to contribution or indemnity from a person not joined does not render that absentee indispensable; "the United States does not want to become a party to the suit, strongly suggesting that its interests will not be impeded if the suit goes forward without it.").

In cases such as this one, where relief can be accorded without joining additional parties, dismissal of the claim is not warranted. *Universal Reinsurance,* 312 F.3d at 88. As discussed above, Delaware law allows Plaintiffs to continue their suit against the U.S. Zeromax Defendants and recover the claimed damages. *See* 6 Del. C. § 18-804(b)(3); 8 Del. C. § 278.

The dismissal of this suit due to the infeasibility of joining Zeromax GmbH would be in stark contrast to the analysis required under Rule 19(b), that of "equity and good conscience." Here, the interests of Zeromax GmbH are adequately represented by the U.S. Zeromax Defendants, and relief can be accorded without the participation of Zeromax GmbH. Furthermore, Plaintiffs will not have an adequate remedy against Defendants if this action is dismissed. Zeromax Group has already been dismissed from the Vienna arbitration, and a suit in Uzbekistan against any of the Zeromax entities would be futile in light of the corruption and prejudice that Plaintiffs would receive in the Uzbek court system, and indeed have already received. *See* Horton Report at ¶27. In light of these considerations, Zeromax GmbH is not an indispensable party.

Defendants briefly argue that Muzimpex and Uzbekistan are also necessary and indispensable parties. Rev. Mot. at 14. This is not the case. Much like Zeromax GmbH, Muzimpex is an extension of the Zeromax entities participating in this case.[15] Am. Compl. at ¶ 42. All of Muzimpex's activities and operations are controlled by Defendants, with no independent management. Am. Compl. at ¶ 42. Thus, for the same reasons discussed above

---

[15]   This is confirmed by documents that Plaintiffs have received from Coca-Cola pursuant to its 28 U.S.C. sec. 1782 request for documents that was filed with the United States District Court for the Northern District of Georgia on August 29, 2006. *In re Application of Roz Trading Ltd.*, 469 F. Supp. 2d 1221 (N.D. Ga. 2006). These documents confirm, *inter alia*, that: the Zeromax entities exercised full control over Muzimpex and that Muzimpex was merely a shell used to gain favorable tax treatment and enhance the international nature of the investment. Since these documents are subject to a Confidentiality Agreement, they cannot be used in this proceeding at this time.

with regards to Zeromax GmbH, Muzimpex is not a necessary party because complete relief can be accorded without it.  Moreover, its absence does not impede its ability to protect its interest, given that Defendants share the same interests as Muzimpex.  As a non-necessary party, Muzimpex is clearly not indispensable.

Similarly, Uzbekistan is also not necessary and indispensable.  It is the actions of the U.S. Zeromax entities that is at issue here, and Plaintiffs' Complaint is infused with allegations of actions taken by Defendants to deprive Plaintiffs of their ownership rights.  This includes, *inter alia*, Defendants' failure to call a mandated Parties' Assembly and initiate liquidation proceedings, their collusion with Gulnora Karimova to deprive Plaintiffs of their ownership interest in CCBU, as well as their fraudulent transfer of their property interest in CCBU in order to hinder, and defraud Plaintiffs.  *See* Am. Compl. at ¶¶ 57-83.  In sum, the absence of Uzbekistan as a party in this case, does not implicate the factors of Rule 19(a) in that relief can be accorded in its absence and Uzbekistan is not claiming an interest relating to the subject of this action.  Since it is not a necessary party, the Court need not continue its analysis under Rule 19(b), as a non-necessary party such as Uzbekistan cannot be considered an indispensable party.

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER THE U.S. ZEROMAX DEFENDANTS

This Court has personal jurisdiction over the U.S. Zeromax Defendants.  A defense of lack of personal jurisdiction is waived if it is omitted from a Rule 12 motion, and it cannot be asserted later in a subsequent motion.  FED. R. CIV. P. 12(g) and 12(h)(1); *see also Seretse-Khama v. Ashcroft*, 215 F.Supp.2d 37, 39-40 (D.D.C. 2002) ("Rule 12(g) unequivocally states that respondents cannot make a second motion-whether written or oral-to raise the omitted defense of lack of personal jurisdiction over [respondent].").  In this case, Defendant Zeromax Group initially raised a personal jurisdiction argument in its Motion to Dismiss Plaintiffs'

Complaint (filed August 23, 2006).  At the time, Zeromax Group was the only Defendant in the

case.  Plaintiffs then filed an Amended Complaint, adding as Defendants, Zeromax Logistics,

Zeromax LLC, and Zeromax GmbH.  *See* Am. Compl. (filed on Sept. 1, 2006).  In response, the

four Zeromax Defendants that were parties to the case at the time filed a Motion to Dismiss the

Amended Complaint in its Entirety on November 6, 2006, in which they decided to only

challenge personal jurisdiction over Zeromax GmbH, thereby waiving their arguments with

respect to personal jurisdiction over the remaining U.S. Zeromax Defendants.

  Defendants themselves and this Court have recognized Defendants' personal jurisdiction

argument as a waiver of objection to personal jurisdiction with regards to the U.S. Zeromax

Defendants.  In their Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss, the U.S.

Zeromax Defendants acknowledged that they submitted to the personal jurisdiction of the Court.

Defendants Reply at 8 ("Contrary to Plaintiffs' suggestion (Opp'n at 12), the U.S. Zeromax

Defendants' *decision to submit to the personal jurisdiction of the Court* does not in any way

constitute a "concession" that they are "doing business" here.")  (emphasis added).  The Court's

Memorandum Opinion accompanying its September 28, 2007 Order clearly recognized that

"[t]he U.S. Zeromax Defendants have specifically acknowledged that they have submitted to the

personal jurisdiction of this Court . . . .")  (Memo Opinion of Sept. 28, 2007, at 2).  *See also*

Memo Opinion of Sept. 28, 2007, at 6 ("For reasons unclear to the Court, the U.S. Zeromax

Defendants have decided to submit to the personal jurisdiction of this Court . . . .").  The U.S.

Zeromax Defendants' attempt to now raise a personal jurisdiction objection must be rejected, as they have waived any such challenges they may have had.[16]

### III.    THE ACT OF STATE DOCTRINE DOES NOT BAR THIS CASE

Defendants seek to evade legal responsibility for their actions by hiding behind Uzbekistan.  There is one over-arching problem with this approach – it is Defendants' acts that are at issue here – and *not* the acts of the Uzbek state.  Defendants are directly responsible for partnering up with Ms. Karimova to set in motion a series of activities allowing them to obtain Plaintiffs' interest and managements rights in the lucrative joint venture that Plaintiffs helped form in 1993.  Moreover, Defendants are responsible for their own failure to comply with the termination procedures outlined in the JVA, denying Plaintiffs of compensation upon liquidation.

Because this case concerns the actions of Defendants, and not those of Uzbekistan, there are no "acts of state" at issue, and thus, the act of state doctrine simply has no has application here.  *First*, the act of state doctrine does not apply to most of Plaintiffs' claims since they do not seek or require invalidation of a government act.  *Second*, for the remainder of Plaintiffs' claims, the doctrine does not reach the actions of a sovereign taken in a *commercial context* for which it has expressly subjected itself to private remedies.  *Third*, the doctrine does not apply here because the claims of this case fall within the parameters of the Second Hickenlooper Amendment.  *Finally*, even if the act of state doctrine was applicable, it cannot be invoked by

---

[16]    Although Defendants' waiver of personal jurisdiction moots the issue, Plaintiffs have plainly alleged enough to allow them to engage in limited jurisdictional discovery to test the jurisdictional assertions raised by Defendants.

Discovery relating to personal jurisdiction should be freely permitted when consistent with a good faith belief that such discovery will enable a party to show that the Court has personal jurisdiction over the defendant. *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991).  A short period of jurisdictional discovery would yield documents demonstrating that Defendants conducted business in the District or that they transacted business in the District that gave rise to Plaintiffs' claims.

Defendants as a shield from liability where it helped orchestrate the very "sovereign acts" at

issue.

>   **A.    The Act of State Doctrine Does Not Apply Where Adjudication of
>         Plaintiffs' Claims Does Not Require The Court To Invalidate Any
>         Official Act**

Defendants assert that in order to adjudicate Plaintiffs' claims against the U.S. Zeromax

Defendants, this Court would be required to "pass judgment on the validity" of the sovereign acts

of Uzbekistan. Rev. Mot. at 27. In making this assertion, Defendants and their expert, Professor

Carter, fundamentally ignore most of the claims raised in the Amended Complaint that do not

challenge any act of the sovereign. Thus, they do not implicate the act of state doctrine.

Under the act of state doctrine, "courts in the United States will generally refrain from

examining the validity of a taking by a foreign state of property within its own territory, or from

sitting in judgment on other acts of a governmental character done by a foreign state within its

own territory and applicable there." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW §

443(1) (1987). The burden of establishing the doctrine's applicability to a particular dispute

rests with the party that invokes it. *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 453 (2d Cir. 2001);

*Republic of Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir. 1986); *Alfred Dunhill of London,*

*Inc. v. Republic of Cuba,* 425 U.S. 682, 694 (1976). It is a narrow doctrine, to be "applied

sparingly, and only where the validity of a foreign sovereign is at issue." *Ampac Group, Inc. v.*

*Republic of Honduras*, 797 F. Supp. 973, 978 (S.D. Fla. 1992).

The adjudication of most of Plaintiffs' claims does not, in any way, require this Court to

pass on the legality of the acts of Uzbekistan. Specifically, Plaintiffs' claims for breach of

contract (Count I), tortious interference and conspiracy to do so (Counts II and III), and

fraudulent conveyance (Count VIII) do not call into question the validity of actions by the Uzbek

government. Courts have held that when the defendant's conduct can be judged without

deciding the legality of the acts of the foreign government, the act of state doctrine should not be applied. *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (holding that "[r]egardless of what the court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit, and there is thus no occasion to apply the [act of state doctrine]" in a case where finding a U.S. businessman guilty of bribing a Nigerian official in order to secure a contract would not require invalidation of the underlying contract.); *Industrial Inv. Dev. Corp. v. Mitsui & Co.*, 594 F.2d 48, 48 (5th Cir. 1979) (in an antitrust action "the mere fact that members of the Indonesian government were to play a part in the alleged scheme does not insulate defendants' accountability for conduct which might prove to be prohibited by our antitrust laws.").

With respect to Plaintiffs' breach of contract claim, it is Defendants, working through their controlled affiliate, Muzimpex, who breached their obligations under the JVA. Am. Compl. at ¶ 42 (stating that Defendants "direct all activities and operations of Muzimpex").[17] Under Article 5.5 of the JVA, Defendants' affiliate, as a third party purchasing shares in CCBU, was required to agree to be bound by the JVA. Exhibit 9 at ¶ 5.5. This obligated Muzimpex to follow every provision of the JVA, including the proper procedures that were triggered when Plaintiffs issued their termination notice,[18] including calling a Parties' Assembly and

---

[17]    Defendants can be held liable for the acts of Muzimpex. *See Material Supply Int'l, Inc. v. Sunmatch Indust. Co., Ltd.*, 62 F. Supp. 2d 13, 20 (D.D.C. 1999) (A parent corporation may be held liable for the acts of its subsidiary where the "parent corporation so dominated the subsidiary corporation as to negate its separate personality.") (internal citations omitted) ; *see also North American Integrated Mktg., Inc. v. Adviseurs Software, Inc.*, 1995 WL 152538 (S.D.N.Y. 1995); Am. Compl. at ¶ 42.

[18]    *See* Exhibit 9 at ¶¶ 12.2.3.1., 12.2.3.6 (allowing ROZ to terminate the joint venture if there is "breach by any other Party of any material term of this Agreement . . . ." or if it is "[e]ffectively impeded from exercising its rights of management in the Joint Venture due to causes beyond its control, . . . .").

liquidating.[19]  Muzimpex, controlled by Defendants, did not follow any of these procedures.

Accordingly, this breach gives rise to damages, and nothing in this claim involves the legitimacy

of any Uzbek court decision or other sovereign action.  Rather, the contractual right to terminate

*assumes* the legitimacy of the actions of the Uzbek government actions, but nonetheless provides

a remedy where those actions have the *effect* of interfering with ROZ's (or Coca-Cola's) interest.

*See* Exhibit 9 at ¶ 16.10.  This claim simply does not require this Court to undo the Uzbek court

decisions or to declare them invalid.

Plaintiffs' claims for tortious interference and conspiracy to commit tortious interference

are similarly unaffected by the act of state doctrine.  Defendants, controlled by Ms. Karimova,

knew of the business relationship that Plaintiffs had with CCBU.  Am. Compl. at ¶ 62.  Despite

this – rather, *because of this*, Defendants acted to deprive Plaintiffs of their ownership interest

and management rights in CCBU, and conspired with others to do so.  *See* Am. Compl. at ¶¶ 27-

45; *see also* 2006 Inogambaev Decl. at ¶¶ 10-11, 14-20; 2007 Inogambaev Decl. at ¶¶ 23-32.

This was simply a part of Ms. Karimova's overall plan to visit retribution on Plaintiffs for Mr.

Maqsudi's divorce.  These actions are independent from any act of state.  To the extent that

Uzbekistan was involved in implementing the initial taking of Plaintiffs' interest, this does not

immunize Defendants from responsibility for teaming up with Ms. Karimova and allowing her to

take control of CCBU.  2006 Inogambaev Decl. at ¶¶ 19-20. Moreover, Defendants tortiously

interfered with Plaintiffs' contractual rights by failing to follow the proper termination

procedures.  Adjudication of Plaintiffs' claims for these actions does not require the Court to

---

[19]    Upon termination of the JVA, the parties must "call a Parties' Assembly and [agree] to adopt a
Parties' resolution by virtue of which the Joint Venture shall be liquidated . . . ."  Exhibit 9 at ¶ 12.1.
After liquidation, the debts of the joint venture are to be paid first and the remaining proceeds are to be
distributed to the parties, in proportion to their ownership share.  Exhibit 9 at ¶ 12.4.5.

pass judgment on Uzbek court decisions, let alone to undo them.  Thus, the act of state doctrine is not implicated.

The same holds true for Count VIII – Fraudulent Conveyance.  The elements of a fraudulent conveyance claim in no way implicate any acts by the government of Uzbekistan or require this Court to judge such acts.  The fraudulent conveyance at issue here involves the conveyance of ROZ's interest in CCBU from Zeromax LLC to other entities, including Muzimpex and Zeromax GmbH, *after* Defendants gained control of the shares.  By creating and destroying Zeromax entities, and transferring the interest in CCBU between such entities, Defendants have delaying and defrauded Plaintiffs.  With this claim, there is no sovereign act issue and thus, no place for the act of state doctrine.

In sum, Plaintiffs' claims for breach of contract, tortious interference, conspiracy to commit tortious interference and fraudulent conveyance do not seek or require the invalidation or undoing of any action by Uzbekistan.  They simply seek damages from the party causing the harm.  *Kirkpatrick*, 493 U.S. at 407 (declining to apply the act of state doctrine where the plaintiff "was not trying to undo or disregard the governmental action, *but only to obtain damages from private parties who had procured [the contract]).*" (emphasis added); s*ee Oceanic Exploration Co. v. ConocoPhillips, Inc.,* No. 04-332, 2006 WL 2711527, at **14-15 (D.D.C. Sept. 21, 2006) (applying *Kirkpatrick* and finding act of state did not apply where case focused on the non-sovereign defendant's conduct and resulting harm).[20]

---

[20]    The cases Defendants cite are inapposite to this litigation.  Rev. Mot. at Motion at 30-32.  This Court is not being asked to resolve the effect of the Uzbek government's actions by restoring the Plaintiffs' interest in ROZ.  *Cf. Glen v. Club Mediterranee S.A.,* 450 F.3d 1251 (11th Cir. 2006).  Nor is the validity of Uzbekistan's domestic action or the actions of its officials at stake.  *Cf. United States v. Merit,* 962 F.2d 917 (9th Cir. 1992); *In re Philipine National Bank,* 397 F.3d 768 (9th Cir. 2005).

**B.    The Commercial Nature Of The Dispute Removes All of Plaintiffs'
Claims From The Purview Of The Act Of State Doctrine**

As shown above, the act of state doctrine simply does not apply to most of the claims

asserted here against Defendants because they can be adjudicated without directly challenging

government action.  Plaintiffs' claims – indeed all of them – are beyond the reach of the act of

state doctrine for a second reason: they are commercial in nature.  The act of state doctrine

cannot shield commercial conduct.  *See Dunhill*, 425 U.S. at 706.  The claims here arise from a

commercial joint venture involving the production, bottling, and sale of Coca-Cola products in

Uzbekistan.  The venture is commercial in nature and the JVA itself provides a remedy that takes

all claims out of the realm of the act of state doctrine.  The general commercial character of the

dispute, coupled with the specific contract that provides a remedy in circumstances like those

here, make it quite clear that the act of state doctrine has no place in the current proceedings.

In *Dunhill,* 425 U.S. at 706, a plurality of the Supreme Court "decline[d] to extend the act

of state doctrine to acts committed by foreign sovereigns in the course of their purely

commercial operations."[21]  The plurality reasoned that:

> [i]n their commercial capacities, foreign governments do not exercise powers
> peculiar to sovereigns . . . .  Subjecting them in connection with such acts to the
> same rules of law that apply to private citizens is unlikely to touch very sharply
> on 'national nerves'. . . . [Further, it] is beyond cavil that part of the foreign
> relations law recognized by the United States is that the commercial obligations of
> a foreign government may be adjudicated in those courts otherwise having
> jurisdiction to enter such judgments.

---

[21]    An activity is considered commercial in nature "if it is concerned with production, sale, or purchase
of goods; hiring or leasing of property; borrowing or lending of money; performance of or contracting for
the performance of services; and similar activities of the kind that are carried on by natural or juridical
persons . . . ."  RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 453
cmt. b (1987).

*Id.* at 704-05.  In *Dunhill*, the acts of state at issue involved the operation of cigar businesses for profit by Cuban agents.  The plurality found that such commercial activities were not protected from suit by the act of state doctrine.  *Id.* at 706.

Likewise, this Court has relied on the commercial nature of a foreign sovereign defendant's wrongful acts to deny a defendant's motion to dismiss on act of state grounds. *Virtual Def. and Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1 (D.D.C. 1999).  In *Virtual Defense*, the plaintiff sued Moldova for an unpaid brokerage fee relating to the sale of several soviet-era MiG-29 fighter planes.  *Id.* at 2-3.  This Court rejected Moldova's act of state defense, finding that the sale of airplanes for profit was a commercial – not a sovereign – act. "Here, the court . . . is merely asked to adjudicate a contract claim."  *Id.* at 8 (citing approvingly, *Dunhill*, 425 U.S. at 706).  Indeed, "[t]he actions that took place between Virtual and Moldova in this case are more similar to the activities at issue in *Alfred Dunhill of London* than they are to the sovereign actions" of defendants in other act of state doctrine cases.  *Id.*

The actions at issue in this case are similarly commercial, rather than sovereign. Uzbekistan entered into a contract with two private parties to produce and sell beverages.  Am. Compl. at ¶ 13.  It acted as a third private party, with rights and obligations under the JVA – just like the other private parties.  Once bound by the JVA, however, Uzbekistan failed to meet its obligations to its Joint Venture partners.  For example, Uzbekistan, with assistance from its private, commercial partner, TCCEC, held a meeting of the CCBU participants in Tashkent, knowing that no one from ROZ could safely travel there.  Am. Compl. at ¶ 35.  Uzbekistan, as a member of CCBU, actively replaced Mr. Maqsudi as President of CCBU, in violation of the terms of the JVA.  *Id.*  Uzbekistan, as a signatory to the JVA, then failed to call the required Parties' Assembly once Plaintiffs had given notice of termination of the JVA.  *Id.* at ¶ 50.

Uzbekistan continues to have some commercial interest in CCBU, through its agent Tijorat. *Id.* at ¶ 42.  In other words, as a commercial partner, Uzbekistan failed to meet its obligations under the JVA; failed to afford its commercial partner – ROZ – its rights under the agreement; and, as a joint venture partner and commercial entity, forced ROZ out of CCBU.  Violations of law stemming from these commercial failures cannot be protected by the act of state doctrine.  Regardless of what Uzbekistan did while acting as a sovereign outside of the JVA, Uzbekistan, as a commercial partner, would be required to resolve internal disputes – and respect its obligations – under the JVA.

Further, Uzbekistan entered into the JVA as a commercial entity, seeking profit, just like its joint venture partners.  It was not acting as a sovereign when it agreed to the JVA, with its termination and dispute resolution clauses.  In other words, Uzbekistan was wearing its commercial hat.  Uzbekistan cannot then be allowed to put on its sovereign hat, with the sole purpose of avoiding liability to one of its partners under the very same JVA.  *Cf. United States v. Winstar, Corp.*, 518 U.S. 839, 895-99 (1996).  Uzbekistan cannot have it both ways; it cannot hide commercial acts behind the act of state doctrine.

Defendants try to obscure the commercial nature of these issues by asserting that this conduct was sanctioned as "Uzbekistan's judicial, regulatory and other official acts" and under "Uzbek privatization law."  Rev. Mot. at 2, 20.  This is irrelevant.  Plaintiffs do not dispute the official nature of some of Uzbekistan's acts.  But the fact that any actions by Uzbekistan were officially sanctioned or undertaken pursuant to a purported policy does not rob it of its commercial character where the underlying wrongful acts took place in the context of a commercial relationship, governed by a private contract.  *See Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1380-81 (5th Cir. 1980) (act of state doctrine does not preclude judicial

resolution of all commercial consequences stemming from the occurrence of public acts).

Uzbekistan entered into an agreement and, through its agent, participated in the governance of

the Joint Venture: its own behavior was commercial and Defendants, as co-tortfeasors,

breachers, and beneficiaries, cannot assert the act of state doctrine as a bar to Plaintiffs' claims.

### C.    The Language Of The Joint Venture Agreement Confirms That The Act Of State Doctrine Cannot Reach These Issues

The Joint Venture Agreement at issue itself recognizes the possibility of an "act of state"

that would adversely impact the commercial interests of TCCEC and/or ROZ.  The JVA allows

for termination of the Agreement and, if necessary, legal proceedings against any of the parties,

*including Uzbekistan*, making clear that Uzbekistan's "sovereign act" can trigger that

commercial legal remedy.  *See* Exhibit 9 at ¶ 16.10.  Section 12.2.3 of the JVA – the termination

provision – also deals with the obligation to address the consequences of the acts of the Uzbek

government within the commercial context of the contract.  Thus, the clear language of the

contract, agreed to by Uzbekistan through its commercial entity Uzpishcheprom, creates a

remedy for the sovereign's misdeeds via termination.  Thus, third parties, such as Defendants,

cannot rely on the act of state doctrine when (1) the sovereign's "act" at issue is commercial and

(2) the "state" itself has agreed that the act of state doctrine does *not* apply by ensuring that

certain contractual  relief would be available to parties, including ROZ, whose interests were

"materially adversely affect[ed]" by an act of state.  In the flexible world of the act of state

doctrine, it would defy logic that the  sovereign itself could be held liable for its commercial acts,

but a third party involved in the same commercial acts could hide behind the act of state doctrine.

### D.    The Second Hickenlooper Amendment Applies To Plaintiffs' Claims

There is also a statutory exception to the act of state doctrine - the Second Hickenlooper

Amendment.  22 U.S.C. § 2370(e)(2) (2007).  The Amendment *requires* federal courts to

examine certain expropriation claims.  *See* 22 U.S.C. § 2370(e)(2).  When the Second

Hickenlooper Amendment applies, as it does here, a court may not invoke the act of state

doctrine.

> Under the Second Hickenlooper Amendment:
>
> [N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits . . . in a case in which a claim of title or other rights to property is asserted by any party . . . based upon (or traced through) a confiscation or other taking . . . by an act of that state in violation of the principles of international law, including the principles of compensation . . . .

22 U.S.C. § 2370(e)(2).  "The purposes of the [Second Hickenlooper] [A]mendment include the

promotion and protection of United States investment in foreign countries . . ., and securing the

right of a property holder to a court hearing on the merits."  *Rong v. Liaoning Provincial Gov't*,

362 F. Supp. 2d 83, 99 n.11 (D.D.C. 2005) (internal citations omitted).  Further, "[t]he legislative

history to Hickenlooper supports the rejection of a constricted interpretation and makes it clear

that the protection afforded U.S. investments was to be broad in scope."  *West v. Multibanco*

*Comermex, S.A.*, 807 F.2d  820, 830 (9th Cir. 1987) (Second Hickenlooper Amendment applies

to expropriation of Mexican certificates of deposit owned by American investors); *see also*

*Faysound Ltd. v. Walter Fuller Aircraft Sales, Inc.*, 748 F. Supp. 1365, 1371 (E.D. Ark. 1990)

(noting expansive scope of Second Hickenlooper Amendment).

Specifically, the Second Hickenlooper Amendment has three requirements:  there must

be (1) a claim of title or right to property; (2) based upon or traced through a confiscation or

other taking; (3) in violation of international law.  22 U.S.C. § 2370(e)(2).  Although not

required by the language of the statute, some courts have held that a form of the expropriated

property must be located in the United States in order for the Second Hickenlooper Amendment

to apply.  *See, e.g., Rong*, 362 F. Supp. 2d at 99 (citing cases requiring that proceeds of

expropriated property or the property itself has made its way back to the United States at some

point in time); *Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322, 327 (5th

Cir. 1982) (requiring expropriated property or proceeds in the U.S.).

*First*, Plaintiffs have appropriate claimed title and rights in property. Plaintiffs have

alleged sufficiently – and Defendants have not contradicted in their motion to dismiss – that they

were the rightful owners of an interest in CCBU. Am. Compl. at ¶¶ 13, 16. Specifically,

Plaintiffs "are the true and rightful owners of the property and . . . Defendants have no right to

this interest" and request a decree setting forth this ownership. *Id.* at Count VI. Further, case

law provides that an investment, such as Plaintiffs' in CCBU, was meant to be protected by the

Second Hickenlooper Amendment. *See West*, 807 F.2d at 830 (noting that tangible/intangible

characterization of property interests is a distinction without a difference with regard to the

Second Hickenlooper Amendment); *see Rong*, 362 F. Supp. 2d at 100. By the clear language of

the Amended Complaint, then, Plaintiffs have claimed title to their property interest in CCBU at

issue, thus fulfilling the first requirement of the Second Hickenlooper Amendment.

*Second*, Plaintiffs have properly alleged that their claim to their property interest in

CCBU was the result of a confiscation and taking by Uzbekistan, with the assistance of Ms.

Karimova and Defendants. Am. Compl. at ¶¶ 28-31, 39-40, 44-45, 48, and Count VI.

Uzbekistan expropriated, through sham proceedings, ROZ's interest in CCBU. There simply is

no dispute that ROZ's interest in CCBU was confiscated and taken from Plaintiffs – therefore,

Plaintiffs have met the second requirement of the Second Hickenlooper Amendment.

*Third*, Uzbekistan's expropriation and taking of ROZ's property violated principles of

international law in that the expropriation involved alien property, taken without compensation

or legal basis. "International law prohibits expropriation of alien property without

27

compensation." *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1328 n.3 (11th Cir. 2003); *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 170 (2d Cir. 1967). Plaintiff ROZ Trading, Ltd. is a corporation with its principal place of business in New Jersey. ROZ is not a citizen of Uzbekistan.[22] ROZ has not received compensation for the value of its expropriated property interest. *See* Maqsudi Decl. at ¶ 23. Thus, Uzbekistan's taking violated the basic tenet of international law that requires compensation. Further, Uzbekistan's expropriation violated international law in that Plaintiffs' property was carried out by a bogus legal process and taken for retaliatory reasons, rather than public reasons. *See Farr*, 383 F.2d at 170 (finding Cuban expropriation of sugar motivated by a retaliatory purpose not a legitimate public purpose, thereby violating international law).

*Finally*, as discussed earlier, although the language of 22 U.S.C. § 2370(e)(2) does not require that the property or its proceeds return to the United States, some courts have interpreted the statute to include such a requirement. Whether or not it is a requirement is of no moment here. The majority interest in CCBU, prior to the expropriation, was held by two corporations located in the United States: ROZ, located in New Jersey, and TCCEC, located in Atlanta. After the expropriation, ROZ's interest was held by Defendants in Delaware, Maryland, or the District of Columbia before being held by the Swiss Zeromax GmbH.[23] Thus, ROZ's expropriated property returned to the United States and belongs in the United States.[24]

---

[22]    ROZ (Uzbekistan)'s separate property may stand on a different footing.

[23]    Plaintiffs' interest in CCBU was held by one of the U.S.-based Zeromax entities before it was fraudulently conveyed to Zeromax GmbH.

[24]    Furthermore, one of the express purposes of the Second Hickenlooper Amendment was to protect U.S. investors in foreign countries. ROZ was a U.S. investor in Uzbekistan, thus protection of ROZ furthers the goal of the Second Hickenlooper Amendment.

E.    **The Act of State Doctrine Does Not Apply Where the Alleged "Acts of State" Were Orchestrated by Defendants**

Defendants asserts that the act of state doctrine applies because this Court must pass judgment on the validity of Uzbekistan's sovereign acts of state in order to adjudicate ROZ's claims. Rev. Mot. at 27. As noted above, this reasoning fails here as a resolution of Plaintiffs' principal tort and contract claims in this case would not require this Court to invalidate any Uzbek official acts. To the contrary, applying the doctrine here would conveniently allow Defendants to insulate themselves from their own wrongful conduct. Accordingly, the act of state doctrine "does not bestow a blank-check immunity upon all conduct blessed with some imprimatur of a foreign government." *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 606 (9th Cir. 1976) (superseded by statute).

For example, in *Timberlane*, the defendants were charged with having conspired to deprive the plaintiff of the opportunity to mill lumber and export it to the United States. The defendants raised an act of state defense claiming that plaintiff's injuries resulted from acts of the government of Honduras, principally in connection with the enforcement of certain financial security interests. *Id.* at 605. The conspirators also caused an employee of the plaintiff to be falsely arrested and imprisoned and were responsible for the publication of defamatory articles about the plaintiff in the Honduran press. *Id.* The Ninth Circuit held that "[e]ven if the coup de grace to Timberlane's enterprise in Honduras was applied by official authorities, we do not agree that the doctrine necessarily shelters these defendants. . . . *[M]ere governmental approval or foreign governmental involvement which the defendants had arranged does not necessarily provide a defense.*" *Id.* at 605-06 (emphasis added); *see also United States v. Sisal Sales Corp.,* 274 U.S. 268 (1927) (Mexican legislation solicited by American banks was not act of state because foreign governmental activity was arranged by defendants rather than independently

29

conceived); *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 59 (D.D.C. 2004) (no act of state in inquiry casting doubt on integrity of acts of Saudi officials in detaining the plaintiff, but not requiring Court to declare invalid or illegal any such act); *Republic of Philippines v. Westinghouse Elec. Corp.*, 774 F. Supp. 1438 (D. N.J. 1991).

Thus, where the defendant is involved with procuring the government actions that it later asserts as "official acts" barring adjudication of claims against it, the act of state doctrine does not apply. That is exactly what took place in this case. The record before this Court demonstrates that Gulnora Karimova, a private citizen who controls Defendants, masterminded the Uzbek "proceedings" against Plaintiffs upon which Defendants now rely for their act of state defense. 2007 Inogambaev Decl. at ¶ 26 ("She was responsible for, among other things, the false charges and subsequent court proceedings that took away ROZ's interest in CCBU and the imprisonment of Mansur's relatives."), at ¶ 28 ("[S]he orchestrated every detail of the court proceedings against ROZ. . . . [S]he told the prosecutors precisely what charges to bring and how to prosecute the case. Ms. Karimova knew that there was no merit to these charges."). Ms. Karimova was even involved in reviewing and editing the draft court decisions relating to ROZ, CCBU and Mansur Maqsudi. 2007 Inogambaev Decl. at ¶ 29 ("Ms. Karimova often wrote substantial portions of the decisions herself to make sure that they contained the exact language and ordered the precise outcome she desired."). Karimova also established the Zeromax companies in order to take control of CCBU. 2006 Inogambaev Decl. at ¶¶ 11-16, 20-21 (discussing Ms. Karimova's control over Zeromax). As alleged in the Amended Complaint, Defendants furthered Plaintiffs' exclusion from CCBU by forming Muzimpex to hold the interest in CCBU that belongs to Plaintiffs and preventing Plaintiffs from exercising their rights under the JVA. *See* Am. Compl. at 39-42, 46-50. Given that responsibility for the "acts of state" and

Defendants' actions lies in the same person – Gulnora Karimova – Defendants cannot now raise the act of state defense where Ms. Karimova created the very "acts" upon which the Defendant companies she controls now rely for immunity.[25]

## IV.    PLAINTIFFS HAVE STATED VIABLE CLAIMS

A motion to dismiss under FED. R. CIV. P. 12(b)(6) tests the sufficiency of a complaint. *Wyatt v. Syrian Arab Republic,* 398 F. Supp. 2d 131, 135 (D.D.C. 2005).  Under the Federal Rules, the complaint "need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests." *Id.* (citing *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003)).  In ruling on a Rule 12(b)(6) motion, the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor.  *See Harris v. Ladner*, 127 F.3d 1121, 1123 (D.C. Cir. 1997).  A complaint should not be dismissed for failure to state a claim unless it is beyond doubt that plaintiffs can prove no set of facts that would entitle them to relief.  *See United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88-89 (D.D.C. 2004) (citing *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 325 (1991)); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  As detailed below, Plaintiffs in this case have alleged sufficient facts to support their clams against the Zeromax Defendants.

### A.    Choice Of Law

A federal court sitting in diversity will apply the choice of law rules for the state in which it sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496-497 (1941).  District of Columbia choice of law principles contemplate a "constructive blending" of the traditional

---

[25]    Notably, Professor Carter's Report does not address the issue of whether the act of state doctrine can be raised by a party who contributed to orchestrating the same acts that it then attempts to use as a shield.

"governmental interests" analysis and the "most significant relationship" test.  *Wyatt,* 398 F.

Supp. 2d at 138 (citing *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 n.18 (D.C.

1989).  Under the "governmental interests" analysis, the court determines which jurisdiction's

policy would be most advanced by having its law applied to the facts of the case.  *Id.* (citing

*Hercules*, 566 A.2d at 40).  Defendant argues that this case presents a false conflict where only

the policies of Uzbekistan would be advanced by application of its laws.  Rev. Mot. at 37.  This

could not be further from the truth.  There is a strong U.S. governmental interest in ensuring that

basic legal principles are applied, principles which may not be adhered to in the Uzbek judicial

system.[26]  *See* Horton Report at ¶¶ 11-17.  Moreover, Defendants note that claims for conspiracy,

tortious interference with business relations and quiet title claims (Counts II, III, V, and VI) are

not recognized under Uzbek law.  Rev. Mot. at 40.  They also note that Uzbek law does not

provide any basis for liability of shareholders for acts of the company itself.  Rev. Mot. at 39.

Issues such as whether Defendant has breached Counts II, III, V, and VI, and whether the

corporate veil of these U.S. companies can properly be pierced are issues in which the U.S. has a

dominant interest.

The other D.C. choice of law component involves assessment of which jurisdiction has

the most significant relationship to the dispute, looking to traditional factors such as the domicile

of the parties and the place where the injury was felt.  *District of Columbia v. Coleman*, 667 A.2d

811, 816 (D.C. 1995); *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2)(a-e) (1971);

---

[26]  This interest is demonstrated by law in the area of enforcement of foreign judgments, for instance.
U.S. courts cannot recognize or enforce foreign country judgments if they were obtained in a manner that
did not accord with the basics of due process.  *See Hilton v. Guyot,* 159 U.S. 113, 205-206 (1895);
*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) (refusing to enforce Liberian judgment because
courts in Liberia are not impartial tribunals); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW
OF THE UNITED STATES 482(1)(a) (1987).

*Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 194 (D.C. Cir. 1999). Analysis of these factors also point toward the application of D.C. law. Defendant Zeromax Group was operating in the District before it dissolved, shortly after learning that ROZ was going to exercise its right to terminate the JVA.[27]  Am. Compl. at ¶¶ 3, 51-52.  Defendants and Zeromax GmbH have also demonstrated their relationship to the District by hiring GlobalOptions, a D.C. company, to investigate members of the Maqsudi family in reaction to the filing of this case and the Vienna arbitration.  Thus, the District of Columbia has a significant relationship to the dispute.

Not surprisingly, Zeromax argues that Uzbek law should apply.  Zeromax suggests that Uzbek law would not allow any acts of Uzbekistan to be challenged since "Uzbekistan, acting alone through its courts, fully divested ROZ of ROZ's ownership in CCBU."  Rev. Mot. at 33. This is in stark contrast to Plaintiffs' allegations that Defendants, acted "alone or in concert with Karimova, Uzbekistan, TCCEC and The Coca-Cola Company."  Am. Compl. at 39.  Defendants also suggest – albeit vaguely – that the reason that Defendants must prevail is because Uzbekistan has papered over the record, for which they offer affidavit support of various decrees. Zeromax contends that this record of decrees, orders and other documents amounts to a defense that Defendants can assert in support of its own actions.  Rev. Mot. at 38-39.  Defendants ignore that such fabricated decrees and records were the result of corruption and fraud.  The one aspect of Uzbek "law" that would assuredly not be accepted for choice of law purposes in the United States is the choice of corrupt and corrupted *procedures* masquerading as law.

---

[27]  *See* hardcopy of Zeromax website (attached as Exhibit 24).

Defendants do not analyze whether Plaintiffs have stated a cause of action under D.C. law.  Because it is very likely that D.C. law would in fact govern at the merits stage, Plaintiffs demonstrate that they have pled valid claims against Defendants under D.C. law.

**B.      Plaintiffs' Allegations Against Defendants Support Valid Claims**

      **1.      Breach Of Contract**

A breach of contract claim requires a showing:  (1) that a contract existed; (2) that plaintiffs performed their contractual obligations; (3) that defendants breached the contract; and (4) that plaintiffs suffered damages from the breach.[28]  Plaintiffs pled a valid contract:  the JVA. Am. Compl. at ¶ 13.  Under the JVA, Defendants, as holders of Plaintiffs' interest in CCBU, were bound by the terms of the JVA.  *Id*. at ¶ 47.  Plaintiffs, pursuant to Section 12.2.3.6 of the JVA provided notices of termination once they were finally and completely barred from exercising their property and management rights in CCBU.  *Id.* at ¶ 48.  Defendants breached the JVA by failing to call a Parties' Assembly and conduct proceedings in accordance with the JVA. *Id.* at ¶¶ 47, 49.  Their breach caused damages to Plaintiffs by preventing them from receiving payment due upon termination and subsequent liquidation.  *Id.* at ¶ 50.  As alleged, Defendants control Muzimpex, and the actions of Muzimpex, are attributable to Zeromax.  *See generally Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 248-49 (D.C. 1993).  Defendants' suggestion that ROZ somehow lacks "standing" to pursue its breach of contract claim because the JVA was "null and void" must be rejected.  Rev. Mot. at 39.  The JVA specifically contemplates that ROZ (or TCCEC) may terminate the Joint Venture in the event of "expropriation."  Exhibit 9 at ¶ 12.2.3.6.  By definition then, the right to terminate continues *after* some event has compromised ROZ's right to participate in the Joint Venture.

2.      **Tortious Interference**

Tortious interference with business relations requires a showing of:  (1) the existence of a valid business relationship; (2) knowledge of the relationship; (3) intentional interference inducing a breach or termination of the relationship; and (4) resultant damage.  *See, e.g., Ellsworth Assocs., Inc. v. U.S.*, 917 F. Supp. 841 (D.D.C. 1996) (applying D.C. law).

ROZ had a valid business relationship in CCBU.  Am. Compl. at ¶¶ 13-14.  Defendants (with Ms. Karimova, or through her) knew of this relationship and intentionally interfered with it by causing the fabrication of false documents and causing the Uzbek government to interfere with the business and seize ROZ's interest.  *Id.* at ¶¶ 37, 39; 2006 Inogambaev Decl. at ¶¶ 10-11, 14-17, 20-21; 2007 Inogambaev Decl. at ¶¶26-30.  The resultant damage occurred when Plaintiffs' interest in CCBU was transferred to Defendants in 2004 – finally and completely barring Plaintiffs from exercising their rights in CCBU.  Am. Compl. at ¶¶ 45, 48.  Plaintiffs have plainly alleged that Defendants interfered with Plaintiffs' valid business relations.

3.      **Conversion**

A claim for conversion requires:  (1) wrongful exercise of ownership; (2) dominion or control over the personal property of another; (3) in denial of that person's right.  *See O'Callaghan v. District of Columbia*, 741 F. Supp. 273, 279-80 (D.D.C. 1990).

Plaintiffs owned an interest in CCBU.  Am. Compl. at ¶¶ 13-18.  Zeromax has wrongfully exercised ownership, dominion, and control over Plaintiffs' interest.  *Id.* at ¶¶ 41, 45-46.  Defendants' actions prevented Plaintiffs from exercising their rights under the JVA.  *Id.* at ¶¶ 46-50.  Defendants assert that Plaintiffs' conversion claim fails because the U.S. Zeromax

---

(…continued)

28      *See, e.g., In re Belmar*, 319 B.R. 748, 759-60 (Bankr. D.C. 2004) (applying D.C. law).

Defendants cannot be held liable for the acts of Muzimpex.  Rev. Mot. at 39.  With Zeromax

having stolen ROZ's interest, Zeromax's conversion cannot be avoided by the device of

depositing the converted interest into the hands of Muzimpex, which it controls.  Am. Compl. at

¶¶ 42, 47.  Defendants also contend that they could not have proximately caused Plaintiffs'

injury since they did not become associated with the shares until late 2004.  Rev. Mot. at 33.  But

in fact, Defendants were assuredly involved with Ms. Karimova long before then.  2006

Inogambaev Decl. at ¶¶ 12-13; Am. Compl. at ¶ 37.

### 4.    Conspiracy To Commit Conversion And Tortious Interference

To state a claim for conspiracy, Plaintiffs must show:  (1) agreement between two or

more persons to take part in unlawful action or lawful action in an unlawful manner, and (2) an

overt act in furtherance of the agreement. *See, e.g., Hall v. Clinton*, 285 F.3d 74, 82-83 (D.C. Cir.

2002) (applying D.C. law).  Here, Defendants, with Ms. Karimova and others, engaged in

concerted behavior to transfer control of Plaintiffs' interest in CCBU to Defendants.  Am.

Compl. at ¶¶ 31, 37-40.  As described in Mr. Inogambaev's declaration, it is alleged, and there is

assuredly reason to believe (given Ms. Karimova's statements and the ultimate result) that

Zeromax was directly involved in all or most of these efforts.  2006 Inogambaev Decl. at ¶¶ 10-

21.  Moreover, the precise timing of the conspiracy is largely irrelevant.  Once the conspiracy

was formed, Defendants became liable both for its own actions and for Ms. Karimova's

activities.  Under well-settled law, the joint and several liability of a conspirator applies to

damages accruing *prior* to joining the conspiracy as well as to damages resulting thereafter.  *See*

*Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002).

### 5.    Action To Quiet Title

An action to quiet title is available for personal property.  *See Martin & Earle v. Maxwell*, 67

S.E. 962, 964 (S.C. 1910) ("no doubt that a complaint to remove a cloud on the title to personal

property may be maintained . . . .  Any distinction between real estate and personal property in

this respect must be purely artificial. . . . ”); *Ellis v. Dixie Highway Special Road & Bridge Dist.*,

138 So. 374, 375-76 (Fla. 1931) (action to quiet title is appropriate to clarify ownership of

bonds).  Here, Plaintiffs assert a right to property; Defendants assert a right to the property.

Thus, a dispute exists as to the proper owner and a quiet title claim is one way to resolve the

dispute.

### 6.    Unjust Enrichment

To state a claim for unjust enrichment, Plaintiffs must show that a party retained a benefit

that in justice and equity belongs to another.  *Ellsworth Assoc.*, 917 F. Supp. at 848 (citing *4934,*

*Inc. v. District of Columbia Dep’t of Emp. Srvcs.*, 605 A.2d 50, 55 (D.C. 1992)).  It is not

necessary for a plaintiff to have directly conferred a benefit on a defendant.  *See In re Lorazepam*

*& Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50 (D.D.C. 2003) (applying D.C. law).  Here,

the ownership interest in a lucrative Coca-Cola franchise was the benefit retained by Defendants

Am. Compl. at ¶¶ 37-45.  Defendants possessed an appreciation or knowledge of the benefit, and

in fact, actively sought to take over Plaintiffs’ interest in CCBU.  *Id.*  Furthermore, Defendants

retained this benefit under inequitable circumstances.  *Id.*  Thus, Plaintiffs have a valid claim for

unjust enrichment.

### 7.    Fraudulent Conveyance

A claim of fraudulent conveyance requires that a debtor make a transfer:  (1) with actual

intent to hinder, delay, or defraud any creditor of the debtor, or (2) without receipt of reasonable

equivalent value in exchange for the transfer or obligation.  *See* D.C. Code § 28-3101 (2007).

ROZ is the creditor, and the Zeromax Defendants are the debtors, meaning the “person

who is liable on a claim.”  D.C. Code §§ 28-3101(4), 28-3101(6).  A transfer is defined as “every

mode, direct or indirect . . . of disposing of, or parting with, an asset or an interest in an asset.”

Here, Defendants made this transfer by taking a series of steps to avoid legal responsibility – specifically by forming Muzimpex in 2003 to hold the interest in CCBU and then by transferring the ownership interests to Zeromax GmbH in order to circumvent legal process.

The facts show that Defendants possessed the actual intent to defraud.[29]   The transfers here involved insiders given that Muzimpex is controlled by Defendants and all the Defendants are mere alter egos.  Defendants retained possession or control over the interest in CCBU all along.  Moreover, many of the transactions designed to defraud ROZ did not occur until *after* Zeromax had received its notice of termination, which provided notice of the existence of a likely claim.  Am. Compl. at ¶¶ 40, 42, 47, 51-53.

### C.    Plaintiffs' Claims Are Timely

Defendants' statute of limitations theories also lack merit.  Rev. Mot. at 40.  For statute of limitations purposes, a cause of action must be brought within a certain period "from the time the right to maintain the action accrues."  D.C. Code § 12-301 (2007); *Capitol Place I Assoc. L.P. v. George Hyman Constr. Co.*, 673 A.2d 194, 198 (D.C. 1996).  All of the claims raised by Plaintiffs in this case are timely either because they did not accrue until the past three years (or four years in the case of the fraudulent conveyance claim), rendering them within the applicable statute of limitations, or because the applicable statute of limitations was tolled.

### 1.    Breach Of Contract

Plaintiffs' breach of contract claim against Defendants did not arise until after Plaintiffs terminated the JVA, triggering Defendants' obligation to call a Parties' Assembly and to initiate

---

[29]   In determining actual intent, consideration is given to factors such as whether:  (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; and (3) the debtor had been sued or threatened with suit before the transfer was made.  D.C. Code § 28-3104(b)(1-2)(4) (2007).

liquidation proceedings. Am. Compl. at ¶¶ 46-50. Plaintiffs provided notice of termination to Uzbekistan and TCCEC on April 11, 2005, and notice to Defendants on August 5, 2005. *Id.* at ¶¶ 51-52. Accordingly, Plaintiffs were not injured by Defendants' failure to abide by the JVA's liquidation provisions until 2005. Given that Plaintiffs' complaint was filed in 2006, the breach claim is clearly within the limitations period.

### 2.    Fraudulent Conveyance

Plaintiffs' fraudulent conveyance claim is within the applicable four-year statute of limitations. D.C. Code § 28-3109(1) (2007). This claim is based on Defendants' transfer or sale of their property interest in CCBU in order to avoid paying ROZ for the value of the interest in CCBU. Thus, fraudulent conveyance has clearly been raised within the statute of limitations.

### 3.    Other Claims

Similarly, Plaintiffs' claims for tortious interference, conspiracy to commit tortious interference, conversion, conspiracy to commit conversion, action to quiet title, and unjust enrichment are also timely. Plaintiffs' interest in CCBU was transferred or sold to Defendants in or about late 2004. Am. Compl. at ¶ 45. Thus, the injury required for these claims to mature did not occur until late 2004, when Defendants took ownership over Plaintiffs' interest in CCBU. It was this final step that completed ROZ's exclusion from CCBU. Therefore, these claims are within the statute of limitations.

### 4.    Both Equitable Tolling And The Discovery Rule Would Extend The Limitations Period Here

Even assuming *arguendo* that the limitations periods might otherwise have presented some difficulty on the facts of this case, each and every claim is nonetheless timely under the doctrines of equitable tolling and the discovery rule.

The purpose of equitable tolling is to prevent unfairness to a diligent plaintiff.  *See Phillips v. Heine*, 984 F.2d 489 (D.C. Cir. 1993).  Statutes of limitation are tolled until the plaintiff, employing due diligence, could have discovered facts fraudulently concealed.  Equitable tolling applies where a plaintiff demonstrates "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 80-81 (2d Cir. 2003).  Extraordinary circumstances are circumstances beyond the control of the complainant which make it impossible to file a complaint within the statute of limitations.  *United States v. Cicero,* 214 F.3d 199, 203 (D.C. Cir. 2000).

In the present case, there were several extraordinary circumstances delaying Plaintiffs' filing.  Mr. Maqsudi, the Chairman and Chief Executive Officer of ROZ, was in the United States at the time that he sought to separate from Ms. Karimova – the occurrence which sparked the chain of events giving rise to these claims.  In short order, his children were kidnapped and his relatives in Uzbekistan were taken hostage and their lives put in grave danger.  Am. Compl. at ¶ ¶ 22-24.  It was nearly impossible for him to get information about what was happening in Uzbekistan with regard to CCBU, particularly in light of the very real dangers to his family members and colleagues.  Maqsudi Decl. at ¶¶ 17-22.  Furthermore, Defendants added to Plaintiffs' difficulties by taking steps to obscure the truth about their activities, such as re-registering several times, changing ownership, and creating false documents.  2006 Inogambaev Decl. at ¶¶ 10-11, 21; 2007 Inogambaev Decl. at ¶¶ 24-25.  It is impossible to see how this action could have been brought until the Uzbek government proceedings had run their course and Defendants had emerged as a culprit.

In addition, Plaintiffs' claims are timely under the discovery rule (sometimes termed the

"discovery exception"), which is a statute of limitations tolling device recognized by the District of Columbia (and other courts) in order to avoid the injustice that might occur from a mechanical application of a limitations period. *Capitol Place*, 673 A.2d at 199; *Farris v. Compton*, 652 A.2d 49, 55 (D.C. 1994) ("the determination as to when a claim accrued has been guided by considerations of basic fairness; the legislature should not be presumed to have intended to deny a plaintiff who did not know, and could not reasonably have known, of her injury at the time that it occurred, her day in court, provided that she filed suit in timely fashion after she learned or should have learned the facts"). More specifically, "accrual occurs pursuant to the discovery exception when a party knows or by the exercise of reasonable diligence should know: (1) of the injury; (2) the injury's cause in fact; and (3) of some evidence of wrongdoing." *Capitol Place*, 673 A.2d at 199 (citing *Bussineau v. President and Directors of Georgetown College*, 518 A.2d 423, 435 (D.C. 1986)). The "record must be construed 'in the light most favorable to the party opposing the motion.'" *Id.* at 198 (citing *Graff v. Malawer*, 592 A.2d 1038, 1040 (D.C. 1991)).

Without knowing about Defendants' involvement, Plaintiffs' causes of action could not have accrued. *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 946 (D.C. 2003) ("Even where a plaintiff might know, or be deemed to know, of wrongdoing on the part of one defendant, accrual of his action against another, unknown defendant responsible for the same harm is not automatic"). As explained above, Mr. Maqsudi had very limited information as to what was happening with CCBU in Uzbekistan. Maqsudi Decl. at ¶¶ 17-24. He could not go to Uzbekistan to investigate since he understandably feared for his life. Maqsudi Decl. at ¶ 21. Diligent inquiries were frustrated by actions prompted by secret falsification of documents. 2006 Inogambaev Decl. at ¶ 21; 2007 Inogambaev Decl. at ¶¶ 24-25. Plaintiffs did not even know that their interest in CCBU had been transferred or sold to Defendants until 2004. Maqsudi Decl. at ¶

24; Am. Compl. at ¶ 45.  Not only are Plaintiffs' claims timely under the applicable statutes of

limitations, as discussed above, but any lingering dispute about timeliness is resolved through

application of the equitable tolling and discovery rule doctrines.

**V.    DEFENDANTS' *FORUM NON CONVENIENS* ARGUMENT FAILS
        BECAUSE THERE IS NO ALTERNATIVE, LET ALONE MORE
        CONVENIENT, FORUM**

Asserting *forum non conveniens*, Defendants claim that this case must be litigated in

Uzbekistan.  Rev. Mot. at 41-44.  But any effort to invoke *forum non conveniens* in this case is

unavailing and frivolous.  There is good and sufficient reason why this case should be pursued

here – and why it *cannot* properly be pursued there.

As an initial matter, "plaintiff's choice of forum should rarely be disturbed."  *Gulf Oil*

*Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).  Even where a defendant demonstrates that an

adequate alternative forum exists and shows some added convenience to litigating there,

dismissal based on *forum non conveniens* is very much the exception, not the norm.  It is the

defendant's burden to establish (1) that an adequate alternative forum exists and, having done so,

(2) that the balance of public and private factors tips decidedly in favor of dismissal.  *BPA Int'l,*

*Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 85 (D.D.C. 2003).  The Zeromax Defendants

have not done so, nor can they.

**A.    There Is No Adequate Alternative Forum**

Defendants' *forum non conveniens* argument fails to overcome the first hurdle.  To

consider dismissal, the Court must first find an adequate alternative forum.  *Piper Aircraft Co. v.*

*Reyno*, 454 U.S. 235, 238 (1981).  On this point, Defendants refer us to the *Uzbek* courts.  But

Uzbekistan *cannot* provide an *adequate* forum.

*First*, the senior executives for Plaintiffs cannot travel to Uzbekistan without risking

imprisonment and death.  Maqsudi Decl. at ¶ 21.  Currently, they are wanted by authorities as a

result of faulty and bogus judicial proceedings. *See, e.g.,* November 6, 2002 Uzbek Office of

Public Prosecutor document regarding Mansur Maqsudi (attached as Exhibit 25). If they were to

travel to Uzbekistan for trial, Mr. Maqsudi and his colleagues undoubtedly would be arrested and

subjected to the internationally recognized brutal practices of the Karimov regime. Maqsudi

Decl. at ¶ 21; *see* Report of the United Nations Economic and Social Council (attached as

Exhibit 26) at ¶¶ 60-71.

Second, and equally important, the Uzbek judiciary system is corrupt and lacks any

coherence or consistency, thus preventing litigants from receiving fair trials – particularly where

the Karimov family is involved or has taken a personal interest. The lack of an adequate system

of justice and the subservience of the judicial system to the whim of the Karimov family is fully

detailed in the attached expert report. *See* Horton Report at ¶¶ 11-17, 20-27. Moreover, it is

well-known that the government of Uzbekistan frequently manipulates legal acts and records to

alter the basic dynamics of the law. *Id.* at ¶¶ 18-19.

## B.    The Private And Public Factors Favor This Forum

Even if Defendants could demonstrate that Uzbekistan was an adequate alternative

forum, the balance of public and private interest factors cuts against Zeromax. *See Pain v.*

*United Tech. Corp.*, 637 F.2d 775, 784-85 (D.C. Cir. 1980), *overruled on other grounds*; *Piper*

*Aircraft Co.*, 454 U.S. at 241. Private factors include:

> relative ease of access to sources of proof; availability of compulsory process for
> attendance of unwilling, and the cost of obtaining attendance of willing,
> witnesses; . . . and all other practical problems that make trial of a case easy,
> expeditious and inexpensive.

*Gilbert*, 330 U.S. at 508.

Defendants' assertion that all of the evidence and witnesses in this case are in Uzbekistan

is way off the mark. Rev. Mot. at 44. Given that the primary place of business of three of the

43

Zeromax entities was the United States, many relevant documents and witnesses are in the United States.[30]  The Coca-Cola Export Corporation (and its parent, The Coca-Cola Company), the key third party in this drama, is located in the United States and was directly involved in these events.[31]  Furthermore, Defendants' assertion that "all of the events are alleged to have occurred in Uzbekistan" is inaccurate.  Rev. Mot. at 44.  This case is based on the actions of the U.S. Zeromax Defendants, which had offices in the U.S., including Washington, D.C.  Am. Compl. at ¶¶ 3-5.  The key Coca-Cola witnesses are no longer in Uzbekistan, and the former employees of CCBU have likewise fled that country.  Maqsudi Decl. at ¶ 15.  Even if we assumed *arguendo* that Uzbek courts were capable of providing a fair trial, there is no suggestion that those courts are in a position to compel attendance of witnesses or issue process through the Hague Convention, or otherwise.

The U.S. Zeromax Defendants assert that an additional burden of litigating in the District of Columbia would be the expense of translating the Uzbek and Russian-language documentary evidence into English.  Rev. Mot. at  44.  The expense of translating is miniscule compared to the expense of transporting witnesses, representatives of Plaintiffs, representatives of Defendants, and counsel to Uzbekistan for trial.  And any documents would have to be translated into English nonetheless, because many individuals involved in this case are native English speakers, and do not read, speak, or understand Uzbek or Russian.

Public factors include "whether the community where the action leading to the suit actually took place has an interest in the litigation" and "whether the suit is 'unnecessarily

---

[30]    There also may be documents in Switzerland, where Zeromax GmbH is registered.  This further weakens Defendants' argument that Uzbekistan is the proper forum.

[31]    Plaintiffs note that they received discovery from The Coca-Cola Company in Atlanta, Georgia, pursuant to a proceeding under 28 U.S.C. § 1782.

burdensome' on the court." *BPA Int'l*, 281 F. Supp. 2d at 85-86 (internal citations omitted).

These factors also support this forum. ROZ Trading, Ltd. has its principal place of business in

the United States and its executives are American citizens. Maqsudi Decl. at ¶¶ 3, 6-7. At some

point, the U.S. Zeromax Defendants conducted business from and in the U.S. This country has a

vested interest in protecting its citizens.

## CONCLUSION

For the foregoing reasons, the U.S. Zeromax Defendants' Revised Motion to Dismiss

should be denied in its entirety.

Respectfully submitted,


 /s/ Stuart H. Newberger
Stuart H. Newberger, DC Bar #294793
Alan W.H. Gourley, DC Bar #358300
Katherine J. Nesbitt, DC Bar #474681
Sobia Haque, DC Bar #483440
Peter J. Eyre, DC Bar #500053
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

Attorneys for ROZ Trading, Ltd. and
ROZ Trading, Ltd. (Uzbekistan)

Dated:  December 21, 2007


Of Counsel:

Dr. Allan Gerson
2131 S Street, NW
Washington, DC 20008
Telephone:  (202) 966-8557
E-mail: gerson@gilgintl.org

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

_____
                                          )
ROZ TRADING, LTD., *et al.*               )
                                          )
                    Plaintiffs,           )        Case No. 1:06-cv-01040-CKK
                                          )
v.                                        )
                                          )
ZEROMAX GROUP, INC., *et al.*             )
                                          )
                    Defendants.           )
_____)

### PROPOSED ORDER

Upon consideration of the U.S. Zeromax Defendants' Revised Motion to Dismiss, dated

November 20, 2007, and Plaintiffs' response thereto, IT IS HEREBY ORDERED, that the U.S.

Zeromax Defendants' Revised Motion to Dismiss be denied;

IT IS SO ORDERED.

_____
Judge Colleen Kollar-Kotelly
United States District Court