# EXHIBIT 4

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| ROZ TRADING, LTD., et al. ) | |
| ) | |
| Plaintiffs, ) | Case No. 1:06-cv-01040-CKK |
| ) | |
| v. ) | |
| ) | |
| ZEROMAX GROUP, INC., et al. ) | |
| ) | |
| Defendants. ) | |

## Expert Report of Scott Horton

1.  I have been asked to offer my expert opinion in three primary areas: a) the general status of the Uzbekistani judicial system; b) the state of the rule of law in Uzbekistan; and c) whether or not Mansur Maqsudi has received fair treatment (or could expect to receive such treatment in the future) in the Uzbekistani judicial system.

2.  In sum, I agree with the general consensus in the international community that the Uzbekistani judiciary lacks independence. Uzbekistan has an elaborate and formal legal culture. However, one of the hallmarks of its legal culture is the subordination of legal formalism to the autocratic whim of its leader, Islam Karimov. If a matter arises in which the Uzbekistani autocrat takes a personal interest, he will dictate the outcome, whatever the nation's legal rules suggest. Mr. Maqsudi is a former member of the President's family who has already experienced the wrath of the Uzbekistani government. It is clear that any matter involving Mr. Maqsudi that is referred to the Uzbekistani courts would be resolved in a manner best calculated to damage or impair his interests, whatever the legal merits of his case.

**Qualifications**

3. I practice law in New York at Patterson Belknap Webb & Tyler LLP. I am a member of the Bar of the State of New York, having been admitted to practice in 1982. I am a foreign corresponding member of several foreign bar associations.

4. I studied law at the Universities of Munich and Mainz in Germany and then completed a J.D. degree at the University of Texas in Austin in 1981. I have been a practicing attorney since that time with a commercial practice which has since 1989 focused heavily on nations in transition, including Uzbekistan. Since 1997, I have been a member of the faculty at Columbia Law School in New York, where I conduct courses in comparative and international law. One of my courses deals with the legal environment of nations in transition of the former Soviet Union, including Uzbekistan. I serve as a faculty advisor for two scholarly publications and supervise independent study projects.

5. At Columbia, I am also associated with the Institute for Transition Economics and the Harriman Institute. I have frequently taught and written about the legal environment and legal issues in nations in transition, with a particular emphasis on the nations of Central Asia and their legal systems.

6. I travel regularly to Central Asia and spend a considerable part of my time there. In particular, I have studied the transformation of the legal profession in this region. I organized a program of interaction between the Association of the Bar of the City of New York and bar associations in Kazakhstan and Kyrgyzstan in 1993, and published a report on the status of the legal profession in Central Asia derived from this

mission. I have maintained close ties with lawyers, judges, law scholars, and prosecutors in the region.

7. I am a foreign corresponding member of the Bar of Kyrgyzstan and was appointed a judge-panelist of the Court of International Arbitration of Kyrgyzstan in 1997. I am also a founding director of the Legal Aid Society in Kyrgyzstan, which provides legal aid to the indigent in the region. I am a founding trustee of the American University of Central Asia, which was launched in 1995 with the support of the U.S. Government and the Open Society Institute. Within the board, I have oversight responsibility for the University's law department, which trains and prepares lawyers for practice throughout the Central Asian region, including Uzbekistan.

8. In 1997-99, I participated in the Council on Foreign Relation's study mission to Uzbekistan led by Senator Sam Nunn. This resulted in publication of the study *Calming the Ferghana Valley: Development and Dialogue in the Heart of Central Asia* (1999), to which I contributed. I served as rapporteur for legal issues at the World Economic Forum's Central Asian Summit in Almaty in 1999. In Uzbekistan, I served as outside counsel to the World Bank's International Finance Corporation ("IFC") on investments and structured financings in Uzbekistan and I represented the European Bank for Reconstruction and Development ("EBRD") in one of its major investment projects in Uzbekistan. My work for both IFC and EBRD terminated when these institutions decided to close financing in Uzbekistan, based on their view that Uzbekistan had failed to achieve minimal criteria assuring the existence of a market economy.

9. I worked with the Tashkent Bar Association to find funding and support for their legal aid project in 1997, and assisted the American Bar Association's Central and Eastern European Law Initiative in establishing a foreign-language law library in Tashkent. I have also participated in or supported a number of exchange programs which have brought Uzbekistani lawyers, prosecutors, and judges to Europe and the United States over the last five years, and I have met and spoken, often at length, with members of these delegations. At the request of the U.S. State and Justice Departments, I conduct a seminar entitled "An Introduction to Legal Systems of Central Asia" at the National Foreign Service Training Institute in Arlington, Virginia, each year.

10. I have previously qualified as a legal comparativist expert for purposes of reviewing and presenting the law of Uzbekistan. I was appointed in 2002 as Court's Expert in proceedings in the Superior Court of New Jersey – Chancery Division denominated *Mansur Maqsudi v. Gulnora Karimova-Maqsudi* and was requested to examine and resolve a number of procedural and substantive issues under Uzbekistani law. In the course of that engagement, I was required to review and form an opinion on some questions bearing on the present claims. My report was not challenged by the representative of the Government of Uzbekistan in the case, and was accepted by the Court and formed part of the basis for the Court's judgment in the case.

**Uzbekistani Judicial System**

11. I agree with the strong consensus among international experts and observers that the Uzbekistani judiciary is not independent, but rather that the President and Cabinet of

Ministers openly intervene in judicial matters using the Ministry of Justice and the Procuracy as effective tools to manipulate the judiciary.

12. For example, judges in Uzbekistan are subject to sanction at the discretion of the President if he concludes that they render decisions which are "incompetent." This authority to remove judges has not been wielded cautiously by President Karimov. Indeed, President Karimov recently removed fifteen members of the Uzbekistani Supreme Court – including the Chief Justice.

13. Uzbekistan is an impoverished nation, and the situation for most judges is no different. In my discussions with Uzbekistani judges, I have been informed that their salary is equivalent to $30 to $40 per month. A recent World Bank publication noted that "low salaries make it difficult for the judiciaries to hire and retain the best and brightest." The impoverishment of the judiciary renders judges in Uzbekistan susceptible to corruption and improper influence and leaves them particularly susceptible to influence by President Karimov and his Cabinet.

14. In 1995, Uzbekistan became a party to the International Covenant on Civil and Political Rights, which provides that individuals "shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law." In 2001, the Human Rights Committee, which is the expert body charged with assessing compliance with the Covenant, concluded that the system in Uzbekistan exposes judges to broad political pressures and endangers their independence and impartiality. This conclusion is fairly stunning, because the Human Rights Committee is generally cautious and diplomatic in the language it employs in evaluating parties to the

Covenant. The lack of equivocation in this language makes clear that the Committee considers the lack of judicial independence in Uzbekistan to be particularly egregious.

15. Other entities, including the United Nations and the U.S. State Department, have reached similar conclusions. For example, in its February 2005 report on Uzbekistan, the State Department concluded:

> Uzbekistan is an authoritarian state with limited civil rights. The Constitution provides for a presidential system with separation of powers between the executive, legislative, and judicial branches; however, in practice, President Islam Karimov and the centralized executive branch that serves him dominated political life and exercised nearly complete control over the other branches.

16. The report continued:

> State prosecutors play a decisive role in the criminal justice system . . . . If a judge's sentence does not agree with the prosecutor's recommendation, the prosecutor has a right to appeal the sentence to a higher court. There is no protection against double jeopardy. Judges whose decisions have been overturned on more than one occasion may be removed from office. Consequently, judges rarely defy the recommendations of prosecutors. As a result, defendants usually are found guilty.

17. The State Department's remarks concerning the absence of judicial independence in Uzbekistan are particularly striking because Uzbekistan was, at the time, a valued strategic ally of the United States in its military operations in Afghanistan. Uzbekistan had offered important assistance in the United States by making logistical facilities available at its Khanabad Air Base. Obviously, the short-term foreign policy interest of the United States would not have dictated such candid criticism, but this frank assessment only underscores the earnestness of the State Department's analysis.

6

### Dynamic Legal Framework in Uzbekistan

18. In the course of my work in Uzbekistan on commercial matters, and particularly in dealings with the Cabinet of Ministers, I became aware of manipulation of legal acts and records to change the basic dynamics of pending transactions. In particular, this included modification, frequently after the fact, of the ownership structure of corporatized Uzbekistani commercial structures which remained in the *de facto* control of the Government.

19. The most frequent procedure was that a decree of the Cabinet of Ministers simply changed the ownership structure of a corporation, usually increasing the ownership share of the Government and reducing the ownership share of private investors. These actions presented a grave challenge to the financings in which I was involved, and I know they were protested, but to no avail. In discussions with representatives of the Cabinet of Ministers, it was explained to me that these types of decisions had been made by a high-ranking official, usually the Prime Minister or President Karimov, and that the Cabinet of Ministers had no choice but to implement the decision. Based on these experiences, I formed the view that Uzbekistan presents a very high risk investment environment and that any investment is subject to an extraordinarily high level of risk based on the arbitrary decisions of political leaders.

### Uzbekistan's History of Prejudice Against Mr. Maqsudi

20. As discussed above, it is widely known that the Uzbekistani legal and judicial systems are susceptible to corruption and are unstable. These facts alone would make Uzbekistan an unsuitable place for trial. This is particularly true for Mr. Maqsudi in any matter involving his interests.

21. I believe that the prior involvement of the Uzbekistani courts in the divorce proceedings involving Mr. Maqsudi and his former wife offer a concrete basis upon which to conclude that the Uzbekistani judicial system is biased against Mr. Maqsudi and will continue to be biased against him.

22. In connection with the Maqsudi-Karimova divorce, the Mirabad District Court in Uzbekistan rendered a decision that purported to adjudicate a series of highly contentious issues. With respect to each issue, the court ruled in favor of Ms. Karimova.

23. On its face, the decision appeared to be rendered on October 5, 2001, and to have become final following the expiration of an appeal period, which ended on October 25, 2001. The decision contained a decree of divorce and an award of custody of the children to Ms. Karimova. The decision stated that Mr. Maqsudi failed to appear at the hearing on the divorce matter, notwithstanding two summonses. The summonses themselves listed different dates for the hearing.

24. Uzbekistani law accords the defendant in civil litigation multiple opportunities to learn about the claims that have been asserted. These rights include an opportunity to view the support for claims that have been filed against him. Mr. Maqsudi was not afforded any of these procedural rights. Nonetheless, the Uzbekistani court ruled against him on every issue.

25. The underlying papers from the Mirabad District Court proceedings left both me and the New Jersey Superior Court with extremely grave reservations about what had actually transpired. Indeed, serious irregularities in the documentation created doubt as to whether the proceedings reflected in the papers had actually occurred. In any

event, it was abundantly clear that Mr. Maqsudi was not treated fairly in this process, and accordingly, I recommended that the New Jersey court not recognize the Mirabad decision. The New Jersey Superior Court concurred in my recommendation.

**Conclusions**

26. I have formed the opinion that the Uzbekistani legal system is riddled with corruption and inconsistency.

27. I also believe that Mr. Maqsudi and any interest or person associated with him have no expectation of justice or fair treatment in Uzbekistani courts. I have reached this conclusion because of the prejudicial treatment to which Mr. Maqsudi has been subjected in the past and my detailed knowledge of Uzbekistan.

December 7, 2006

Respectfully submitted,

*[signature]*
Scott Horton
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036 USA
Telephone: (212) 336-2820
Facsimile: (212) 336-2457
E-mail: shorton@pbwt.com