# EXHIBIT 5

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

MANSUR MAQSUDI
6 Queens Court
Morristown, N.J. 07963,

FARID MAQSUDI
1 Meadow Ct
Montville, N.J. 07045,

and

ABDUL RAUF MAQSUDI
3 Manchester Drive
Denville, N.J. 07834,

                Plaintiffs,

v.

GLOBALOPTIONS, INC.
1615 L Street, NW, Suite 300
Washington, D.C. 20036

and

ZEROMAX GMBH
Poststrasse 30
6300 Zug ZG
Switzerland

                Defendants.

Case: 1:07-cv-01252
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 7/11/2007
Description: PI/Malpractice

## COMPLAINT FOR COMPENSATORY DAMAGES, PUNITIVE DAMAGES AND PERMANENT INJUNCTIVE RELIEF

## INTRODUCTION

Defendant, GlobalOptions, Inc., acting as an agent on behalf of Defendant Zeromax GmbH, posted a website containing false and defamatory statements about Plaintiffs Mansur Maqsudi, Farid Maqsudi, and Abdul Rauf Maqsudi. As a result, Plaintiffs, by and through their undersigned counsel, bring this action for defamation, libel *per se*, and false light invasion of privacy and seek compensatory and punitive damages, as well as permanent injunctive relief.

## PARTIES

1.     Plaintiff Mansur Maqsudi is an individual and at all times relevant to this complaint is a resident of New Jersey.  Mansur Maqsudi is an officer and director of ROZ Trading Ltd. ("ROZ").

2.     Plaintiff Farid Maqsudi is an individual and at all times relevant to this complaint is a resident of New Jersey.  Farid Maqsudi and Mansur Maqsudi are brothers.  Farid Maqsudi is an officer and director of ROZ.

3.     Plaintiff Abdul Rauf Maqsudi is an individual and at all times relevant to this complaint is a resident of New Jersey.  Abdul Rauf Maqsudi is Mansur Maqsudi's and Farid Maqsudi's father.

4.     Plaintiffs Mansur Maqsudi, Farid Maqsudi, and Abdul Rauf Maqsudi made all business decisions regarding the actions of ROZ and its affiliated business, Valuelink FZE. ROZ's interest in a lucrative soft-drink joint venture was stolen as a result of illegal activities undertaken by The Coca-Cola Export Corporation, the Republic of Uzbekistan, Gulnora Karimova, and Zeromax GmbH and its related entities, as detailed in *Roz Trading Ltd., et al. v. Zeromax Group Inc., et al.*, Case Number 1:06-cv-01040-CKK, a related case pending before this Court.

5.      Defendant GlobalOptions was initially formed in Delaware in 1998 as a limited

liability company (LLC).  On January 24, 2002, it converted from an LLC to a corporation under

Delaware law.  It remains incorporated in Delaware and has its principal place of business at

1615 L Street, NW, Suite 300, Washington, D.C. 20036.  According to its website,

GlobalOptions "was conceived as a private CIA, Defense Department, Justice Department, and

FBI, all rolled into one."  GlobalOptions describes itself as assisting "hundreds of corporations,

celebrities, and even governments deal with the complexities and tribulations of the modern

world." *See* http://www.globaloptionsinternational.com/company_profile.htm.  GlobalOptions

was hired by, and is an agent for, Defendant Zeromax GmbH ("Zeromax").

6.      Defendant Zeromax is a Swiss-registered company that was incorporated in July

2005.  Its partners are Miradil Djalalov and Fatima Makhmudovna Djalalova.  Defendant

Zeromax is one of four Zeromax entities named as defendants in the related case, *Roz Trading*

*Ltd., et al. v. Zeromax Group Inc., et al.*, Case Number 1:06-cv-01040-CKK, in which ROZ

asserts breach of contract and tort claims against Zeromax for willfully depriving ROZ of its

interest in CCBU.

7.      Upon information and belief, Gulnora Karimova exercises full control over

Defendant Zeromax.

## JURISDICTION AND VENUE

8.      Jurisdiction over the subject matter of this case arises from 28 U.S.C.

§ 1332(a)(1), as the parties are diverse in citizenship and the amount in controversy exceeds

$75,000, exclusive of interest and costs.

9.      Defendant GlobalOptions is subject to personal jurisdiction in this Court pursuant

to D.C. Code §§ 13-334, 13-422, and 13-423.  Defendant GlobalOptions is subject to personal

jurisdiction under § 13-334 based on service of process on the agent of the corporation doing business in the District. Defendant GlobalOptions is subject to personal jurisdiction of this Court pursuant to D.C. Code § 13-422 because it maintains its principal place of business in Washington, D.C. Defendant is also subject to personal jurisdiction of this Court pursuant to D.C. Code §§ 13-423(a)(1) and 13-423(a)(3), respectively, because it has transacted business in the District and the claims for relief arise from this transaction of business, and because GlobalOptions caused tortious injury in the District of Columbia by an act in the District of Columbia. The exercise of personal jurisdiction by this Court over Defendant GlobalOptions does not offend traditional notions of fair play and substantial justice.

10.    Upon information and belief, Defendant Zeromax is subject to personal jurisdiction in this Court pursuant to D.C. Code § 13-423(a)(1) and 13-423(a)(3) on the basis that it has transacted business, either directly or by its agent GlobalOptions, Inc., in the District of Columbia, and the claims for relief arise from this transaction of business, and because Zeromax caused tortious injury in the District of Columbia by an act in the District of Columbia. The exercise of personal jurisdiction by this Court over Defendant Zeromax does not offend traditional notions of fair play and substantial justice.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia.

## ALLEGATIONS OF FACT

12.    On June 6, 2006, ROZ filed a complaint in the United States District Court for the District of Columbia and simultaneously filed a Request for Arbitration with the International Arbitral Centre of the Austrian Federal Economic Chamber ("VIAC"), alleging damages arising from the events described below:

a.    On June 16, 1993, ROZ entered into a commercial Joint Venture Agreement ("JVA") with The Coca-Cola Export Corporation ("TCCEC"), a wholly-owned subsidiary of The Coca-Cola Company, and with the Republic of Uzbekistan.  The name of the joint venture was Coca-Cola Bottlers of Uzbekistan Ltd. ("CCBU").

b.    The joint venture was financially successful.  In the 2000 annual audit, assets of CCBU were valued at approximately $150 million.

c.    During the formation and early years of the joint venture, Plaintiff Mansur Maqsudi, the Managing Director of ROZ, was married to Gulnora Karimova ("Karimova"), the daughter of Islam Abduganievich Karimov, the President of the Republic of Uzbekistan.

d.    In July 2001, Mansur Maqsudi told Karimova that he was separating from her, citing irreconcilable differences.  This sparked a vicious and extreme reaction from Karimova which included kidnapping their two young children from their home in New Jersey and taking them to Uzbekistan, attacking members of the Maqsudi family in Uzbekistan and targeting the Maqsudi family's commercial business through office raids and sham judicial proceedings – all of which caused serious physical and emotional harm to the Maqsudi family and eliminated ROZ's ability to exercise its contractual rights to manage and control the joint venture.

e.    Through unlawful means and their partnership with Karimova, Zeromax illegally acquired ROZ's interest in the soft-drink joint venture.

13.    Karimova and Zeromax's illegal actions with respect to the Maqsudis and ROZ did not stop there.  Upon information and belief, in retaliation for ROZ's filing of a federal court complaint and a request for arbitration in Vienna and in furtherance of Karimova's campaign to terrorize the Maqsudis and ROZ, Zeromax, working with Karimova, turned to Defendant

GlobalOptions to further harm the business reputation and emotional well-being of the Maqsudis and their company, ROZ.

14.    On June 9, 2006, just three days after ROZ filed its complaint in this Court and the parallel request for arbitration in Vienna, the domain names "mansurmaqsudi.net" and "faridmaqsudi.net" were registered to an unidentified individual through Katz Global Domain Registration ("Katz"). Katz is a company that advertises complete privacy and anonymity for those who wish to register and manage websites but do not wish to be identified by Network Solutions, the company through which website domain registrations may be searched.

15.    The "faridmaqsudi.net" domain name automatically rerouted viewers to the "mansurmaqsudi.net" website, which published numerous false and defamatory assertions of fact concerning the Maqsudi family and ROZ, the company they own and manage. The false and defamatory statements published on the "mansurmaqsudi.net" website are described in further detail in paragraph 34.

16.    On July 6, 2006, the domain name "mansurmaqsudi.com" was registered to an unidentified individual through Domains by Proxy, Inc. ("Domains by Proxy"). Like Katz, Domains by Proxy guarantees its clients complete privacy from the Network Solutions database. "Mansurmaqsudi.com" also automatically directed viewers to the "mansurmaqsudi.net" website containing the defamatory statements.

17.    On August 25, 2006, the domain names "faridmaqsudi.com" and "abdulraufmaqsudi.com" were registered to an unidentified individual through Domains by Proxy. These domain names also automatically rerouted viewers to the "mansurmaqsudi.net" website containing the false and defamatory statements.

18.    The Maqsudis became aware of these websites in early October 2006.

19.     Zeromax Group, Inc., a related Zeromax entity named as a defendant in the VIAC arbitration proceeding, cited the content of "mansurmaqsudi.com" in its filing before the VIAC on October 25, 2006.

20.     Investigation into these websites led the Maqsudis to believe that GlobalOptions was the registrant of the domain names through Katz and Domains by Proxy.

21.     On December 1, 2006, through counsel, Plaintiffs sent a letter to Katz informing them of the false and defamatory statements published on the websites hosted by them, www.mansurmaqsudi.net and www.faridmaqsudi.net.  This letter was returned as "undeliverable," but was successfully resent on December 13, 2006.  Plaintiffs' letter called for each of these websites, and any related websites, to be taken down immediately.  In addition, Plaintiffs informed Katz that the allegations published on the sites were unfounded and without any truth.

22.     On December 1, 2006, through counsel, Plaintiffs sent a letter to Domains by Proxy informing them of the false and defamatory statements published on the websites hosted by them: www.mansurmaqsudi.com; www.faridmaqsudi.com; and www.abdulraufmaqsudi.com.  Plaintiffs' letter called for each of these websites, and any related websites, to be taken down immediately.  In addition, Plaintiffs informed Domains by Proxy that the allegations published on the sites were unfounded and without any truth.

23.     On December 1, 2006, through counsel, Plaintiffs also sent a letter to GlobalOptions regarding its registration of the following websites: www.mansurmaqsudi.com; www.faridmaqsudi.com; www.abdulraufmaqsudi.com.  Plaintiffs' letter called for each of these websites, and any related websites, to be taken down immediately.  In addition, Plaintiffs

informed GlobalOptions that the allegations published on the sites were unfounded and without

any truth.

24.     Upon information and belief, GlobalOptions, in posting the websites containing

the false and defamatory statements, was hired by and acted as an agent on behalf of Zeromax

and Gulnora Karimova.  On January 3, 2007, ROZ's co-counsel, Allan Gerson, met with Neil

Livingstone, then-Chairman and CEO of GlobalOptions, for the purpose of determining whether

or not Zeromax was responsible for the false website reports and, whether GlobalOptions had in

fact played a role in posting those websites.  Mr. Livingstone confirmed to Mr. Gerson that

GlobalOptions did indeed post those websites at the express direction of Zeromax.  However,

Mr. Livingstone threatened – implicitly, if not explicitly – the lives of both Farid and Mansur

Maqsudi unless they dropped their lawsuit against Zeromax pending in this Court.  At Mr.

Livingstone's January 11, 2007 meeting with Mr. Gerson, which was also attended by Mr.

Gerson's assistant, Ms. Shannon Hogan, Mr. Livingstone confirmed the earlier threat by urging

Mr. Gerson to advise ROZ to drop its case against Zeromax or face grave consequences.  Mr.

Livingstone indicated that Zeromax is run by dangerous persons and that its owners are furious

at the Maqsudis for suing them.  He told Mr. Gerson that Zeromax had informed the Department

of Justice about the Maqsudis' supposed "bad activities."  He also described Zeromax's

connections to mob leaders, including ex-KGB agents on errant missions.  He reiterated that

Zeromax could make life miserable for the Maqsudis, and added that his client could now be

expected to refrain from hostile actions not only if the Maqsudis drop the suit, but if an

additional condition were met: that the Maqsudis pay a defined sum of two million dollars to

Zeromax.

25.     Soon after the meetings with Mr. Livingstone, Plaintiffs' counsel notified the Federal Bureau of Investigation, and met with them regarding the threats to the Maqsudis' lives and personal safety in the context of concerted efforts in which the website defamation seemed as but one aspect of a larger campaign of intimidation.

26.     In a recent lawsuit arising out of Mr. Livingstone's departure from GlobalOptions, Mr. Livingstone confirmed that Zeromax is a client of Global Options.  In *GlobalOptions Inc. v. Neil Livingstone,* Civ. A. No. 1:07-cv-00608(PLF) (D.D.C.), Mr. Livingstone submitted an affidavit (attached as Exhibit A to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction (filed April 23, 2007)) in which Mr. Livingstone cites to and attaches correspondence from Tom Ondeck, an officer at GlobalOptions, stating that Zeromax is a client of GlobalOptions.

27.     On January 16, 2007, Plaintiffs received a response from Domains by Proxy indicating that it had asked "its customer" to contact Plaintiffs' counsel to resolve the situation. Domains by Proxy gave its customer until January 19, 2007 to do so.  The letter indicated that failure to make contact by the deadline would result in the lifting of the privacy service for the three websites registered to Domains by Proxy.  Neither Plaintiffs nor Plaintiffs' counsel were contacted by Domains by Proxy's customer.

28.     On January 26, 2007, Domains by Proxy informed Plaintiffs' counsel that it had been unsuccessful in attempting to contact its customer.  Because it did not respond to Domains by Proxy, the customer violated the terms of service.  As a result, Domains by Proxy canceled the privacy service for the three relevant websites: "mansurmaqsudi.com"; "abdulraufmaqsudi.com"; and "faridmaqsudi.com".

29.     Shortly thereafter, the Network Solutions database entries for these websites confirmed that the true registrant of the websites was in fact, GlobalOptions.

30.     To date, Plaintiffs have failed to receive any response from Katz regarding the websites registered through its privacy protection service.

31.     Upon information and belief, GlobalOptions is also the registrant of the websites operating under the privacy protection of Katz.

32.     Starting February 2, 2007, none of the websites were functional for a brief period of time.  Accessing any one of them resulted in redirection to a website stating:  "This Account Has Been Suspended.  Please contact the billing/support department as soon as possible."  The false and defamatory statements posted by GlobalOptions and Zeromax were still accessible during this time, however.  The first result of a "Google" search on Mansur Maqsudi was the website "www.mansurmaqsudi.net" and a click on the link to "Cached" information displayed the website's entire first page with the exception of the pictures.

33.     By March 2, 2007, all of the websites became functional again and remained functional until April 26, 2007.  Accessing the sites now results in a redirection to a website stating: "This Account Has Been Suspended.  Please contact the billing/support department as soon as possible."

34.     The false and defamatory statements posted on "mansurmaqsudi.net", and accessible through the four additional domain names:  "faridmaqsudi.net"; "mansurmaqsudi.com"; "faridmaqsudi.com"; and "abdulraufmaqsudi.com", falsely portray Plaintiffs as being involved in the following activities: criminal code violations, illegal registration of ROZ, charter fund fraud, fraudulent parallel trading, illegal profit-making, embezzlement, profit siphoning, tax evasion, smuggling cash out of Uzbekistan, oil embargo

violations, selling sugar on the black market, bribery, and money conversion violations. The
home page of the website lists and links to further details about each of these criminal and
disreputable activities.

35.    Many of the website's statements cite to highly unreliable documents issued by
the Uzbek government that are dated no earlier than late 2001 – after Mansur Maqsudi's
separation from Karimova. The Uzbek documents referenced on the "mansurmaqsudi.net"
website relate to or are part of the sham audits and investigations initiated by Uzbekistan to
intimidate and harass the Maqsudis and ROZ. It is well-documented that the courts and
governmental agencies of Uzbekistan lack independence and are wholly subservient to the
corrupt government headed by President Karimov and his family.

36.    The defamatory statements include, but are not limited to, the following:

        a.    That "[a]round April 2001, government auditors began to uncover
illegal schemes involving CCBU and Roz Trading."

        b.    That "during a 'routine regular audit' of Coca-Cola Bottlers
Uzbekistan Ltd. (CCBU) and Roz Trading, Ltd. 'serious violations of the law
[were] revealed by Uzbekistan's tax agencies.'"

        c.    That the Maqsudis "'committed lots of misdeeds, like violations of
tax law, violations in sales regulation, and violation of human rights in the plant
here.'"

        d.    That "[f]or failing to pay back taxes and other offences, the joint
venture was terminated in April 2005 and the remaining assets were liquidated."

        False and Defamatory Statements Regarding Criminal Code Violations

        e.    That "[t]he Maqsudis were convicted of the following criminal



violations of the Criminal Code of the Republic of Uzbekistan:" larceny by embezzlement, taxes or other payment evasion, legalization of revenue from criminal activities, forgery in office, acceptance of bribes, and extortion.

      f.      That Mansur Maqsudi also committed the following crimes: abuse of power or office, fraud, and illegal trading or intermediary activity.

<u>False and Defamatory Statements Regarding Illegal Registration of Roz Company</u>

      g.      That "[o]n 12 May 1993, the Maqsudis falsely registered Roz Trading, Ltd. as a foreign enterprise in Uzbekistan."

      h.      That "when registering the company, the Maqsudis 'presented forged documents to the authorities of Uzbekistan on the parent enterprise that had not yet been registered in the territory of Cayman Islands by that time. Thus, the listed persons registered the foreign enterprise in the Republic of Uzbekistan by false statement.'"

<u>False and Defamatory Statements Regarding a Charter Fund Fraud</u>

      i.      That the Maqsudis committed fraud with respect to a charter fund by listing the amount of the charter fund at $500,000, but "the fund was never created" and the "necessary resources and other property were not brought into the Republic."

      j.      That "ROZ Trading Ltd. thus fraudulently reneged on its legal obligations to invest $500,000 in its start-up ventures."

      k.      That "from 1995 to 2000, Roz Trading Ltd. failed to create a charter fund totaling $500,000. Thus the company did not qualify for the tax privilege."



<u>False and Defamatory Statements Regarding Fraudulent Parallel Trading</u>

l.    That "Roz Trading and its affiliated company Valuelink FZE in Dubai, UAE, defrauded their multinational partners, chiefly Proctor & Gamble and Alberto Culver, by contracting to sell personal-care products in Uzbekistan and then re-labelling the products and reselling them for larger profits in the U.S., United Kingdom, UAE, and African countries" and therefore engaged in "fraudulent parallel trading."

m.    That "Roz Trading received up to a 30-percent discount on goods from its multinational partners, according to Uzbekistan Attorney General Rashitjon Kadirov."

n.    That by "[u]sing false documents," the following goods "were supposed to be shipped to Tashkent for distribution in Uzbekistan and were instead shipped to the United States and sold in New Jersey, New York, and California: Alberto Carvel, Revlon, and Duracell, through distributors in Singapore and Russia; Crazy Glue in Ohio; Biore facial cream."

o.    That "[t]he shipment of Crazy Glue never left a U.S. port and was sold through Maqsudi's firms in New York and New Jersey."

p.    That "[w]ithout the knowledge of manufacturers, the goods were also distributed to other CIS countries and Russia."

q.    That "[w]hen representatives of American companies wanted to personally view how their products were being sold, they were taken to Tashkent where samples of their products were hurriedly scattered onto stalls in the central market . . . . The foreign visitors were pleased by what they saw and did not

know they were 'witnesses of a well-staged show.'"

r.      That "Procter & Gamble, its largest partner, and Gillette terminated their relationship with the Maqsudis and Roz Trading because of the fraudulent parallel trading activities."

<u>False and Defamatory Statements Regarding Illegal Profit-Making</u>

s.      That "ROZ Trading Ltd. (Uzbekistan) violated Article 243 – the 'legalization of profit received by criminal way.'"

t.      That ROZ Trading Ltd. (Uzbekistan) is guilty of 'illegal profit-making from state budget money that was converted in the Republic of Uzbekistan for importing consumer goods.'"

u.      That "[o]n 5 January 1994, an import contract was signed between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan) on the delivery of $200 million of consumer goods. Mansur Maqsudi signed the document on behalf of the Uzbekistan company and Farid Maqsudi signed the contract on behalf of the Cayman Islands company. The consumer goods included macaroni products, sugar, flour, chocolate products, children's nourishment, tea, cigarettes, chewing gum, among others. All payments related to the contract were made through Credit Swiss Bank in Switzerland. From 1995 to 1997, only '106,020,6 thousand U.S. dollars were delivered into Uzbekistan' [$106, 02060?]."

v.      That "[o]n 12 August 1999, Mansur Maqsudi concluded a credit trade contract (No. 2/99) for consumer goods for '6.000.000 USD' [$6 million] between Roz Trading Ltd. (Cayman Islands) and Roz Trading Ltd. (Uzbekistan).

The contract was registered (No. 21902294) with the Ministry of Foreign Economic Relations of the Republic of Uzbekistan on 13 September 1999."

<u>False and Defamatory Statements Regarding Embezzlement</u>

w.      That "[t]he Maqsudi family embezzled funds" and "'purposefully overestimated the cost of contracts for delivery of consumer goods in Uzbekistan by including the expenditures for marketing and teaching services which factually were not carried out. By those contracts, they illegally received hard currency in the amount of 33 million 992 thousand USD.'"

x.      That "[f]rom 1995 to 1997 the total amount of imported goods was '11.122.06 thousand USD [$11.1 million].'" "Of this amount, Maqsudi overestimated prices 'in the CCD' by 34 percent or '2,822.04 thousand USD [$2.8 million].' In other words, this amount was 'stolen' from the important goods. Maqsudi overstated the price of goods on customs declarations by 15 percent or '12.242, 31 thousand USD' [$12.2 million]. The total amount of imported goods was '93.857,76 thousand USD' [$93.8 million]." "In total . . . '15,064,35 thousand USD [$15 million] or 994,247.000 sum . . . was embezzled from the state resources.'"

<u>False and Defamatory Statements Regarding Profit Siphoning</u>

y.      That the Maqsudis "overcharged for imported goods and took straightforward trading commission to 'siphon off' much of the profits of the company and stashed the money in 'offshore accounts to avoid tens of millions of dollars in taxes.'"

z.      That the Maqsudis "funnelled money under the 'pretext of

investments' through dummy firms, 'as a strategy to limit profit payments to other founders of CCBU.'"

      aa.    That the Maqsudis "additionally smuggled a 'tremendous amount of undeclared dollars out of Uzbekistan.' During an inspection of Roz Trading Ltd., an 'undeclared cash amount of $199,900 was discovered.'"

<u>False and Defamatory Statements Regarding Tax Evasion</u>

      bb.    That "ROZ was involved in numerous schemes to avoid paying taxes to the governments of Uzbekistan and the United States."

      cc.    That "[f]rom 1995 to 2000, Roz Trading evaded paying taxes in the amount of 438,032,000 soms [$5.1 million] based on a 'commodity turnover in the amount of 24,519,190,000 soms [$287.6 million].'"

      dd.    That "[o]verall, the Maqsudis evaded taxes worth $17.6 million."

<u>False and Defamatory Statements Regarding Smuggling Cash Out of Uzbekistan</u>

      ee.    That the Maqsudis "'have smuggled a tremendous amount of undeclared cash dollars out of Uzbekistan.' During an inspection of Roz Trading's office in Uzbekistan, 'an undeclared cash amount of $199,000 was discovered.'"

<u>False and Defamatory Statements Regarding Oil Embargo Violations</u>

      ff.    That Valuelink, a company owned by the Maqsudi family, "purchased oil products 'from Middle Eastern countries, which are under economic sanctions by the World community.'"

      gg.    That "Valuelink falsified documents to conceal the true origin of the oil products by stating the country of origin for the oil was Uzbekistan."

hh.    That a "total of 150,920 tons of oil products was illegally sold

through Valuelink at a cost of $15,938,572.82."

<u>False and Defamatory Statements Regarding Selling Sugar on the Black Market</u>

ii.    That "[s]ince 1997, the Roz Trading company has sold sugar

through the 'black market' and not paid profit tax for 7 billion soms (local

currency), which is approximately $6 million."

jj.    That "[i]n the summer of 2000, Mansur 'developed a criminal

plan' to sell the sugar at 'overestimated prices' to clients . . ."

<u>False and Defamatory Statements Regarding Bribery</u>

kk.    That the Maqsudis engaged in bribery, misappropriation,

conversion, official forgery, and bribe taking.

## COUNT I

## DEFAMATION

37.    Paragraphs 1 through 36 are incorporated herein as if fully set forth.

38.    Defendants GlobalOptions and Zeromax made the false and defamatory

statements cited above regarding the Maqsudis and their business, ROZ.

39.    GlobalOptions and Zeromax published the false and defamatory statements to the

general public by posting them on the Internet, at "mansurmaqsudi.net", and by making them

further accessible through four additional domain names:  "faridmaqsudi.net";

"mansurmaqsudi.com"; "faridmaqsudi.com"; and "abdulraufmaqsudi.com".

40.    GlobalOptions and Zeromax published the false and defamatory statements with

negligent disregard for the truth because they failed to act with ordinary care with respect to

whether these statements were false.  GlobalOptions and Zeromax also published the false and

defamatory statements with actual malice because they knew or acted with reckless disregard as to whether the statements were false.

41.     To the extent that GlobalOptions and Zeromax published or republished defamatory statements attributed to others, they are not shielded from liability because the sources on which they relied are unreliable and a result of the sham judicial proceedings triggered by Karimova in response to Mansur Maqsudi's separation from her.

42.     The defamatory statements are not privileged.

43.     The defamatory statements have been and are available to a large audience of individuals who understand GlobalOptions' and Zeromax's false assertions of fact to be about Plaintiffs and to impugn Plaintiffs in their trade, profession, community standing, and business ethics.

44.     GlobalOptions and Zeromax have injured the Maqsudis in their trade, profession, community standing, and business ethics.

45.     The statements published by GlobalOptions and Zeromax are actionable as a matter of law based on their inherently defamatory nature.

46.     As a direct and proximate result of the broad publication of the defamatory statements by GlobalOptions and Zeromax, Plaintiffs Mansur Maqsudi, Farid Maqsudi and Abdul Rauf Maqsudi have suffered significant loss of their reputation, shame, mortification, and injury to their feelings and occupation.

## COUNT II

## LIBEL PER SE

47.     Paragraphs 1 through 46 are incorporated herein as if fully set forth.

48.     Defendant GlobalOptions and Zeromax made the false and defamatory statements cited above regarding the Maqsudis and ROZ.

49.     GlobalOptions and Zeromax published the false and defamatory statements to the general public by posting them on the Internet, at "mansurmaqsudi.net", and by making them further accessible through four additional domain names:  "faridmaqsudi.net"; "mansurmaqsudi.com"; "faridmaqsudi.com"; and "abdulraufmaqsudi.com".

50.     GlobalOptions and Zeromax published the false and defamatory statements with negligent disregard for the truth because they failed to act with ordinary care with respect to whether these statements were false.  GlobalOptions and Zeromax also published the false and defamatory statements with actual malice because they knew or acted with reckless disregard as to whether the statements were false.

51.     To the extent that GlobalOptions and Zeromax published or republished defamatory statements attributed to others, they are not shielded from liability because the sources on which it relied are erroneous, unreliable and a product of the sham judicial proceedings triggered by Karimova in response to Mansur Maqsudi's separation from her.

52.     The defamatory statements are not privileged.

53.     The defamatory statements have been and are available to a large audience of individuals who understand GlobalOptions' and Zeromax's false assertions of fact to be about Plaintiffs and to impugn Plaintiffs in their trade, profession, community standing, and business ethics.

54.     GlobalOptions and Zeromax have injured the Maqsudis in their trade, profession, and community standing.

55.     The statements published by GlobalOptions and Zeromax are actionable as a matter of law based on their inherently defamatory nature.

56.     The statements made by GlobalOptions and Zeromax are libelous *per se* because they accuse Plaintiffs of several crimes and because of their direct and unavoidable tendency to bring Plaintiffs into hatred, ridicule, and disgrace, and to injure the Maqsudis in their business, profession and reputation.

57.     As a direct and proximate result of the broad publication of the defamatory statements by GlobalOptions and Zeromax, Plaintiffs Mansur Maqsudi, Farid Maqsudi and Abdul Rauf Maqsudi have suffered significant loss of their reputation, shame, mortification, and injury to their feelings and occupation.

## COUNT III

## FALSE LIGHT INVASION OF PRIVACY

58.     Paragraphs 1 through 57 are incorporated herein as if fully set forth.

59.     Defendant GlobalOptions and Zeromax made the false and defamatory statements cited above regarding the Maqsudis and ROZ.

60.     GlobalOptions and Zeromax published the false and defamatory statements to the general public by posting them on the Internet, at "mansurmaqsudi.net", and by making them further accessible through four additional domain names: "faridmaqsudi.net"; "mansurmaqsudi.com"; "faridmaqsudi.com"; and "abdulraufmaqsudi.com".

61.     In so doing, GlobalOptions and Zeromax placed Plaintiffs in a false light that would be highly offensive to a reasonable person.

62.     GlobalOptions and Zeromax had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed.

63.    As a direct and proximate result of these acts, Plaintiffs have been injured.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant judgment in their favor and against Defendants GlobalOptions and Zeromax, and grant Plaintiffs:

a) Compensatory damages in an appropriate amount to be determined at trial;

b) Punitive damages against Defendants in an appropriate amount to be determined at trial;

c) Permanent injunctive relief barring Defendants from publishing the false and defamatory content in the future and causing great and irreparable harm to Plaintiffs for which there is no adequate remedy at law;

d) Reasonable costs and expenses;

e) Reasonable attorneys' fees; and

f) Such other relief which this Court may determine to be just and equitable under the circumstances.

## JURY DEMAND

64.    Plaintiffs demand a trial by jury on all issues properly triable thereby.

Respectfully submitted,

Stuart H. Newberger, DC BAR #294793
Alan W.H. Gourley, DC BAR #358300
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
E-mail: snewberger@crowell.com
        agourley@crowell.com


Attorneys for Plaintiffs

Dated:  July 11, 2007


Of Counsel:

Dr. Allan Gerson
2131 S Street, NW
Washington, DC 20008
Telephone:  (202) 966-8557
E-mail: gerson@gilgintl.org