# EXHIBIT 6

**In the**
**INTERNATIONAL ARBITRAL CENTRE OF THE**
**AUSTRIAN FEDERAL ECONOMIC CHAMBER**

| | |
|---|---|
| ROZ TRADING LTD., | ) |
| | ) |
| | ) |
| | ) |
| Claimant | ) |
| | ) |
| v. | ) |
| | ) |
| | ) Case No. _____ |
| THE COCA-COLA EXPORT CORPORATION, | ) |
| | ) |
| REPUBLIC OF UZBEKISTAN, | ) |
| | ) |
| OZIQOVQATSANOAT, | ) |
| | ) |
| and | ) |
| | ) |
| ZEROMAX GROUP, INC. | ) |
| | ) |
| Respondents | ) |

*HALBSCHRIFT*

SCHIEDSGERI
der Wirtschaftskammer (

EIN     - 6. Juni 2006

## STATEMENT OF CLAIMS

### 1.0     INTRODUCTION

1.1     Claimant ROZ Trading Ltd. (hereafter "ROZ" or "Claimant") hereby requests the
institution of arbitration proceedings against Respondents, The Coca-Cola Export
Corporation (hereafter "TCCEC"); the Republic of Uzbekistan (hereafter "Uzbekistan")
and its agency, instrumentality, and representative, OZIQOVQATSANOAT, also known as
the Uzpishcheprom Association (hereafter "Uzpishcheprom"); and Zeromax Group, Inc.
(hereafter "Zeromax").   This arbitration results from disputes between ROZ and its
former partners, and assigns, arising out of or in connection with the Joint Venture

Agreement (hereafter "JVA") executed by the parties and attached hereto as Exhibit 1. This Statement and the attached Exhibits set forth the parties, claims, amounts in dispute, number of arbitrators, and Claimant's nomination of an arbitrator.

1.2     The jurisdiction of the International Arbitral Centre of the Austrian Federal Economic Chamber is founded on each party's consent to the arbitration clause in the JVA which provides:

> [i]n the event that amicable settlement shall not obtain within 90 days following written notice by one Party to the other(s) of the existence of any such dispute, all such disputes shall be finally settled under the rules of arbitration and conciliation of the International Arbitral Centre of the Federal Economic Chamber in Vienna, Austria ("Vienna Rules"), by three arbitrators appointed in accordance with these rules.

JVA, Article 5.2. (Exhibit 1).

## 2.0     DESIGNATION OF THE PARTIES

2.1     Claimant ROZ is a limited liability company organized and existing under the laws of the Cayman Islands, British West Indies.  At times relevant to the acts at issue here, ROZ operated in Uzbekistan, in part, through a subsidiary, ROZ Trading Ltd. (Uzbekistan) (hereafter "ROZ(U)").  ROZ(U) was originally established in or about May 1993 as a limited liability society and registered with the Finance Ministry of Uzbekistan by order No. IP-28.  In September 1999, ROZ(U) was reregistered with the Ministry of Justice as a company with foreign investment.  (Exhibit 2).  Mansur Maqsudi, an American citizen living in New Jersey, is the Managing Director of ROZ, which is involved in the manufacture, trade, and distribution of consumer goods in numerous countries.  He signed the Joint Venture Agreement and the Addenda (described below) on behalf of ROZ, with full authority to bind ROZ to its terms, including the arbitration clause. ROZ's address is:

Elizabeth Square
P.O. Box 847
Grand Cayman, Grand Cayman Islands
British West Indies

Claimant is a subsidiary of ROZ Group, Inc., which is located at:

P.O. Box 9068
Morristown, New Jersey  07963
United States of America

Communications to Claimant ROZ regarding this matter should be directed as follows:

Stuart H. Newberger
Alan W.H. Gourley
Alyssa Gsell
Sobia Haque
Peter J. Eyre
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
United States of America
Telephone:    202-624-2500
Facsimile:     202-628-5116
E-mail:          snewberger@crowell.com
                     agourley@crowell.com
                     agsell@crowell.com
                     shaque@crowell.com
                     peyre@crowell.com

Dr. Rudolf K. Fiebinger
DDr. Karina Hellbert
Fiebinger, Polak, Leon & Partner
Am Getreidemarkt 1
A-1060 Vienna
Austria
Telephone:    43-1-58-2-58-0
Facsimile:     43-1-58-2-58-2
E-mail:          r.fiebinger@fplp.at
                     k.hellbert@fplp.at

2.2    Respondent The Coca-Cola Export Corporation (hereafter "TCCEC") is a corporation

organized and existing under the laws of the State of Delaware, United States of America.

It is a subsidiary of the worldwide corporation, The Coca-Cola Company (hereafter "Coca-Cola"), which is engaged in the manufacture and sale of certain concentrates, beverage bases, and syrups used in the production of certain non-alcoholic beverages.[1] Muhtar Kent, Senior Vice-President, Coca-Cola International, executed the JVA and the Addenda on behalf of TCCEC, with full authority to bind TCCEC to its terms, including the arbitration clause.    The Coca-Cola Export Corporation is co-located with Coca-Cola at:

> One Coca-Cola Plaza, NW
> P.O. Drawer 1734
> Atlanta, Georgia  30313
> United States of America

2.3    Respondent Uzbekistan is a country located in Central Asia which obtained independence from the former Union of Soviet Socialist Republics (hereafter "Soviet Union") in or about September 1991, but remains a Soviet-styled authoritarian government in the Stalinist tradition, where all state authority is concentrated in the President and exercised through his personally appointed and controlled Cabinet of Ministers.  The government owns and controls, to a significant degree, much of the economic enterprise in the country, including the production and sale of non-alcoholic beverages.  The address for the government of Uzbekistan is:

> The Republic of Uzbekistan Cabinet of Ministers
> Mustaqillik Maydoni
> House of Government
> Tashkent 700078
> Republic of Uzbekistan

---

[1]    Although TCCEC is the named party to the JVA, Coca-Cola was the party in interest and its employees made all of the principal decisions.  Claimant therefore reserves the right formally to add Coca-Cola as a Respondent in this action, should it establish that TCCEC is merely the alter ego or agent of Coca-Cola without independent substance.

Respondent Uzpishcheprom, acting in its own name and as the Republic of Uzbekistan's representative, is the agency responsible for regulation and operation of the food industry within Uzbekistan.  (Exhibits 3, 4).  Uzpishcheprom was established by Presidential decree (Exhibit 5),[2] and in carrying out its responsibilities, Uzpishcheprom has remained entirely subservient to the will of the President of Uzbekistan, Islam Karimov, who can direct its activities, including the acts that injured ROZ here.  (Exhibit 6).  Indeed, while Uzpishcheprom is officially an independent and separate entity from the Government of Uzbekistan, it operates as the state-created representative with control over matters relating to the food industry.  (Exhibit 6).  Throughout the events described below, then, Uzpishcheprom acted on behalf of the Republic of Uzbekistan.  The JVA was originally executed on behalf of Uzbekistan by Timor Karimov, the Director of the government-owned Tashkent Soft Drink Plant at Beshaghash ("Beshaghash"), a bottling facility operated and controlled by Uzpishcheprom.  In reviewing and approving the JVA on behalf of the President and the Cabinet of Ministers (described in more detail below), the Uzbekistan State Property and Privatization Management Committee, by decree dated August 25, 1993 (Exhibit 7), directed that Uzpishcheprom, as the government agency representing Uzbekistan, would sign the JVA on behalf of Uzbekistan.  On the next day, August 26, 1993, Husnidden Usmonov, Chief of Uzpishcheprom's soft drink department, executed, under seal, an Addenda and Clarification to the JVA, with full authority to bind

---

[2]     Claimant does not have a copy of the original Decree, but the attached 1994 decree establishes the President and Cabinet's full control over Uzpishcheprom.

formally Uzpishcheprom and Uzbekistan to the terms of the JVA, including the arbitration clause. (Exhibit 8).[3] Uzpishcheprom's address is:

> The Republic of Uzbekistan Uzpishcheprom Association
> 7 Navoi Street
> Tashkent 700038
> Republic of Uzbekistan

2.4     Respondent Zeromax Group, Inc. is a corporation organized and existing under the laws of the State of Delaware, United States of America. Zeromax is engaged, directly and through various affiliates which it controls and directs, including Muzimpex, in various oil and gas projects and other businesses in Uzbekistan and elsewhere in the former Soviet Republics of Central Asia. Zeromax became a party to the joint venture in or about 2004 or 2005 when it obtained from Uzbekistan shares in the joint venture, knowing that those shares had been stolen from ROZ, with TCCEC's assistance, through the actions described below. Under the terms of the JVA (Article 5.5), Zeromax, as a "Third Party transferee" had to "agree in writing to be bound by" the JVA. Zeromax therefore consented to the arbitration clause of the JVA for resolution of disputes arising from its actions in excluding ROZ from active participation in the joint venture and in failing to terminate the Joint Venture in accordance with the terms of the JVA. Zeromax operates its affiliates as a unitary entity and its address is:

---

[3]     Uzpishcheprom has been involved in a long series of reorganizations and restructurings, including a merger in 2003. (Exhibit 6). During this reorganization, Uzpishcheprom was merged with Maslojirtabakprom (the "Association of Edible Oil and Tobacco Industries"), pursuant to a Presidential decree. (Exhibit 9). The product of this merger was the Association of Edible Oil and Food Industry of the Republic of Uzbekistan, also known as OziqOvqatSanoat. This entity is responsible for all obligations of prior entities using the name Uzpishcheprom. (Exhibit 6). Therefore, Uzpishcheprom remains a viable entity and is a proper respondent to these Claims, as the representative of Uzbekistan during the events described herein. (Exhibit 6)

1725 I Street, NW
Suite 300
Washington, DC 20006
United States of America

### 3.0      **BACKGROUND OF CLAIMS**

#### A.    *The Formation of the Joint Venture*

3.1     In or about late 1992, representatives of ROZ and TCCEC approached Uzbekistan about investing in Uzbekistan by acquiring government-owned bottling facilities for use in the preparation, packaging, marketing, distribution, and sale of non-alcoholic beverages in Uzbekistan. On or about February 8, 1993, ROZ, TCCEC, and Uzbekistan jointly executed a Letter of Intent to establish within Uzbekistan a joint venture company for these purposes.[4]

3.2     On April 6, 1993, Muhtar Kent, Senior Vice President of Coca-Cola International, sent a letter on TCCEC letterhead to President Karimov and the Cabinet of Ministers explaining the parties' intention to form the joint venture and seeking certain assurances from the government which would help facilitate the success of the joint venture. (Exhibit 10). Specifically, Mr. Kent sought approval to deposit the initial joint venture cash contributions into a foreign bank and a guarantee that all disputes be resolved by international arbitration. Mr. Kent also sought the President's and Cabinet of Ministers' guarantee that all necessary government approvals would be forthcoming, including approval of the "competent governmental entity" to the transfer of land use rights for the bottling facility. Although ROZ does not currently have a copy of any response, it

---

[4]    As described more fully below, because of the acts of Respondents Uzbekistan, Uzpishcheprom, and TCCEC, ROZ and the Maqsudi family have been effectively banished from Uzbekistan and involuntarily barred from access to many ROZ and CCBU records related to the formation and operation of the joint venture.

understands that Uzbekistan responded favorably, including approval by the President and the Cabinet of Ministers for the joint venture between ROZ, TCCEC, and Uzbekistan to proceed.

3.3     On June 16, 1993, ROZ, TCCEC, and Uzbekistan, through Beshaghash, entered into the Joint Venture Agreement. (Exhibit 1). The purpose of the joint venture was to "engage in and maximize the profitable growth of the business of the preparation, packaging, distribution and sale of [Coca-Cola] Beverages in authorized containers" pursuant to a bottler's agreement between the joint venture and Coca-Cola. JVA, Article 1.1. The joint venture was originally called Coca-Cola Bottlers Tashkent Ltd., but in or around 1996, the name was changed to "Coca-Cola Bottlers Uzbekistan Ltd." after Coca-Cola expanded the joint venture's territory from only the Tashkent area to the entire country (hereafter "CCBU" refers to both entities).

3.4     In accordance with the JVA and the President's and the Cabinet of Ministers' commitment to ensure all necessary government approvals, the parties submitted the JVA to the Uzbekistan State Property and Privatization Management Committee, also known as Goskomimuschestov (hereafter "State Property Committee"), the "competent governmental entity" for disposition and use of Uzbekistan state-owned property. On August 25, 1993, the State Property Committee issued Directive No. 545k-PR formally permitting Uzpishcheprom to enter the joint venture as the representative of Uzbekistan and delegating to Uzpishcheprom the right to use government-owned property. (Exhibit 7). The State Property Committee further decreed that Uzpishcheprom, as the government agency representing Uzbekistan, not Beshaghash, the government-owned enterprise, was to be the signatory to the joint venture and responsible for managing the

government's direct ownership interest, subject to notification to the State Property Committee of any changes in the capital contributions by any of the parties. The State Property Committee retained ultimate control and authority over the Uzbekistan-owned property contributed to the joint venture and over any disposition of assets. The State Property Committee was given the authority, exercised independently or in tandem with the Cabinet of Ministers and the President, to oversee the reorganization of existing entities, and it has the right to invest state entities with the right of management or administration of state property. It also has the right to approve plans of privatization and to alienate state property to private entities. (Exhibit 6).

3.5     On the next day, August 26, 1993, the parties executed an Addenda and Clarification to both the JVA and CCBU's Articles of Association formally transferring Beshaghash's interest to Uzpishcheprom, and making Uzpishcheprom, in its own name and on behalf of Uzbekistan, the party to the JVA. (Exhibit 8). These documents were signed under seal and registered with the relevant government authorities, including the Ministry of Finance.

3.6     Upon formation of CCBU and in anticipation of obtaining all Uzbekistani approvals needed to commence operation, each party contributed $1,769,000 in cash or in-kind property deemed to be of equivalent value. As authorized by Uzbekistan in response to Mr. Kent's April 6, 1993 letter, TCCEC and ROZ opened an account at the Creditanstalt Bankverein in Vienna for deposit of their initial cash capital contributions. On July 30, 1993, TCCEC forwarded to ROZ Creditanstalt Bankverein's confirmation that capital contributions had been made and were available for use. (Exhibit 11). Each party – ROZ, TCCEC, and Uzbekistan – owned a 33.33% share of CCBU.

### B.    The Parties' Rights and Obligations under the Joint Venture

3.7    The JVA became effective in or about October 1993, after all Uzbekistani approvals for commencement of operation had been obtained, the CCBU Articles of Association and Charter had been filed with the Ministry of Finance, and Uzbekistan had signed with CCBU an unrestricted and irrevocable lease to the Beshaghash facility with a term of no less than 50 years.  JVA, Articles 3 and 7.  The JVA was purposefully of unlimited duration and could only be terminated in accordance with its express terms.  The long term lease reflected the mutual expectations of the parties that CCBU would operate the Coca-Cola franchise in Uzbekistan indefinitely.  In fact, based on its knowledge and Coca-Cola's history with other bottlers, ROZ reasonably expected that CCBU would retain the Coca-Cola bottling franchise for at least the 50 years of the lease (and likely longer), even though Bottler's agreements are typically negotiated for five year terms.

3.8    As sought by Mr. Kent's April 6, 1993 letter, the JVA specified that Uzbekistan, through its representative, Uzpishcheprom, retained the obligation to initiate and obtain all necessary government "approvals, permits, consents, authorizations and licenses" for effecting "all other transactions and activities" contemplated by the JVA.  JVA, Article 3.2.  In fact, from the formation through the first eight years of the joint venture's existence, CCBU obtained all necessary approvals and registrations without incident, including (as described in more detail below) for example, State Property Committee review and approval of increases in CCBU's charter capital and the corresponding changes in the parties' ownership stakes, and Ministry of Justice acceptance of corporate re-registrations that occurred over time.

3.9    The JVA recognized that additional capital might be needed in order to expand CCBU's production capacity or otherwise foster the success of the business. Such capital increases had to be approved by the Parties' Assembly (*see* JVA, Article 4.3.1) which, under the JVA, was vested with supreme authority over operation of the joint venture. JVA, Article 6.1. If the Parties' Assembly approved an increase in the joint venture's capital, each party had a right to contribute a percentage of the total new capital proportionate to its current ownership share, and thereby maintain its proportional interest in the joint venture. If a party chose not to contribute, the ownership shares of the contributing parties would correspondingly increase, whereas the non-contributing party's share would correspondingly decrease. JVA, Article 4.3.

3.10    The JVA also contemplated that the parties might wish to transfer their shares in the joint venture. Consistent with Uzbekistani law and the assurances received from the President and Cabinet of Ministers in response to Mr. Kent's April 6, 1993 letter, after the expiration of an initial two-year period, each party had the right to transfer its shares to third persons subject to notice and a right of first refusal by the other parties. JVA, Article 5. Also after that initial two-year period, ROZ and TCCEC could freely, and without further restriction, transfer shares to each other or to one of their own affiliates. The JVA designated Ernst & Young, London, as the final arbiter of the value of the shares should the transferee and the seller be unable to agree. The JVA required that any third party transferee of shares in CCBU agree, in writing, to be bound by the JVA (including the arbitration clause). JVA, Article 5.5.

3.11    The JVA mandated that the Managing Director of CCBU be responsible for the preparation and maintenance of monthly, quarterly, and annual books and records,

including financial performance, balance sheets, cash flow reports of receipts and

disbursements, and any other financial data reasonably requested by any of the parties.

JVA, Article 8.5.  Furthermore, the JVA required that the books and records of CCBU be

maintained in accordance with internationally recognized accounting methods and "be

audited annually by an internationally recognized auditing company."  JVA, Article 8.4.

Each party is entitled to "have access to the complete books of account and the records of

the Joint Venture and all supporting documentation at all reasonable times and shall be

entitled to make photocopies or extracts thereof."  JVA, Article 8.4.3.

3.12    The JVA established the circumstances under which a party – such as ROZ – may

terminate the joint venture including:

> the breach by any other Party of any material term of this Agreement if not
> cured within 60 days after receipt by the purported breaching Party of
> written notice of such breach from . . . ROZ, which notice shall set forth in
> reasonable detail the facts forming the basis of the breach.    JVA,
> Article 12.2.3.1.

ROZ is further entitled to terminate the agreement if it is:

> [e]ffectively impeded from exercising its rights of management in the
> Joint Venture due to causes beyond its control, . . . JVA, Article 12.2.3.6.

3.13    The JVA further explains that it "shall terminate 30 days after issuance of a Termination

Notice . . . ."  (JVA, Article 12.2.1), and that upon liquidation, each party is entitled to a

share of proceeds in proportion to their ownership share.  JVA, Article 12.4.5.  Upon

termination of the JVA, the parties must "call a Parties' Assembly and [agree] to adopt a

Parties' resolution by virtue of which the Joint Venture shall be liquidated . . . ."  JVA,

Article 12.1.  After liquidation, the debts of the joint venture are to be paid first and the

remaining proceeds are to be distributed to the parties, in proportion to their ownership

share.  JVA, Article 12.4.5.

3.14    As noted above, all disputes arising out of or in connection with the JVA that cannot be
settled amicably, "shall be finally settled under the rules of arbitration and conciliation of
the International Arbitral Centre of the Federal Economic Chamber in Vienna, Austria
("Vienna Rules"), by three arbitrators appointed in accordance with these rules." JVA,
Article 15.2. The language of the arbitration is to be English (JVA, Article 15.3) and "the
applicable law shall be the substantive law of Austria, excluding choice of law rules."
JVA, Article 15.5.

C.    *The Operation and Success of the Joint Venture*

3.15    Effective December 1, 1993, CCBU and Coca-Cola entered into a Bottler's Agreement
entitling CCBU to use Coca-Cola's Authorized Beverage Containers and to distribute and
sell the same using Coca-Cola's trademarks for five years. (Exhibit 12). In October
1997, Coca-Cola and CCBU entered into a new Bottler's Agreement valid through
November 30, 2003 and renewable for an additional five-year term. (Exhibit 13).

3.16    As contemplated in the JVA, during its first three years of operation, CCBU did in fact
require additional capital infusions in order to permit CCBU to expand and prosper by,
among other things, purchasing a better and more productive facility. JVA, Article 4.3.
As detailed in the paragraphs that follow, ROZ was the principal contributor, and in
accordance with the terms of the JVA set forth above, made additional capital
contributions totaling $6,383,000, such that, by December 23, 1996, ROZ had
contributed $8,152,000 of the total $14,807,000 capital contribution in CCBU.
Corresponding changes in the relative shares of CCBU reflected ROZ's additional
contributions, as well as some lesser additional contributions by TCCEC. Each of the

additional capital contributions and share transfers were unanimously approved by the Parties' Assembly with notice given to the State Property Committee.

3.17   By Parties' Assembly and Supervisory Board Resolution dated April 6, 1995 (Exhibit 14), the parties agreed to accept an additional ROZ contribution of $2,000,000 in cash for CCBU. After making this contribution, ROZ owned a 51.58% share interest in CCBU, TCCEC owned 24.21%, and Uzpishcheprom, Uzbekistan's representative, owned 24.21%. The Chairman of the Supervisory Board was authorized to implement the resolution based upon the opinion received from Deloitte & Touche CIS dated March 30, 1995.

3.18   By Parties' Assembly Resolution dated January 30, 1996 (Exhibit 15), the parties agreed to accept an additional capital contribution of $4,000,000 in order to purchase an additional bottling facility known as Kibrai PET. Of this amount, ROZ contributed $1,500,000 and TCCEC contributed $2,500,000. Uzbekistan, through its representative, Uzpishcheprom, elected not to make a contribution. Accordingly, the shares in the joint venture were again readjusted such that ROZ owned 46.60%, TCCEC owned 37.555%, and Uzpishcheprom owned 15.645% of CCBU.

3.19   By Parties' Resolution dated December 23, 1996 (Exhibit 16), the parties agreed to increase CCBU's capital by an additional $3,500,000. Again, Uzbekistan, represented by Uzpishcheprom, elected not to contribute. ROZ contributed $2,883,000 while TCCEC contributed $617,000. After these contributions, ROZ owned 55.055%, TCCEC owned 32.998%, and Uzpishcheprom, representing Uzbekistan, owned 11.947% of CCBU.

3.20   In mid-1997, Uzbekistan, represented by Uzpishcheprom, sought to reduce its stake in CCBU. ROZ agreed to invest further and purchase 9.947% of the Uzbekistan-owned

shares in CCBU for $7,658,830, reflecting a market value for CCBU of $76,996,381. ROZ and Uzpishcheprom, representing Uzbekistan, presented this proposed sale, as well as the three prior share adjustments resulting from the additional capital contributions, to the State Property Committee. By Directive No. 242k-PR, dated December 31, 1997 (Exhibit 17), the State Property Committee approved the prior share adjustments that had resulted in ROZ holding a 55.055% share, TCCEC holding a 32.998% share, and Uzpishcheprom, as Uzbekistan's representative, holding a 11.947% share.

3.21    It also approved Uzpishcheprom's proposed sale of 9.947% of the CCBU shares to ROZ, through ROZ's "branch establishment," ROZ(U). Significantly, for purposes of this approval, the State Property Committee treated this purchase as increasing ROZ's share in CCBU to 65.002% while correspondingly decreasing Uzpishcheprom's share to 2%. The State Property Committee, with copies to the Ministries of Justice and Finance, reaffirmed that it retained authority over disposition of Uzbekistan-owned property and noted that the Ministry of Finance controlled payment and use of any dividends on the Uzbekistani shares. Reflecting Uzbekistan's ownership of the shares in the joint venture, the Directive specified that the proceeds of the sale (authorized by the Directive to be paid in Soum) were to be paid into the Uzbekistani government's bank accounts controlled by the State Property Committee.

3.22    By Protocol dated March 12, 1998 (Exhibit 18), the parties to the joint venture agreed to ROZ's acquisition of the shares held by Uzbekistan (represented by Uzpishcheprom) and to various amendments to the JVA and the Charter to reflect the contributions by and the allocation of shares among the parties. The parties directed the Acting General Manager of CCBU to ensure registration of the changes with the Ministry of Justice and to prepare

new drafts of the JVA and Charter. On March 17, 1998, the Ministry of Justice accepted registration of the changes to the JVA, Charter, and Articles of Association. (Exhibit 19). The State Property Committee approved ROZ's actual purchase of these shares by Directive No. 49k-PR dated April 24, 1998. (Exhibit 20).

3.23    In acquiring the shares held by Uzpishcheprom, as the representative of Uzbekistan, ROZ acted through its Uzbekistani subsidiary, ROZ(U), which entered into the agreement with Uzpishcheprom, Uzbekistan's representative. ROZ(U)'s payment in Soum was accomplished by bank transfer to bank accounts of the Government of Uzbekistan.

3.24    There was no further adjustment in the ownership shares until early 2001. In late 2000, ROZ and TCCEC began negotiating over the sale of a portion of ROZ's interest in CCBU to TCCEC. These negotiations produced many preliminary documents that reflect how the parties intended to structure the deal. (Exhibit 21). A significant part of the negotiations revolved around accounts receivable owed to Coca-Cola by CCBU and CCBU's inability to pay those accounts receivable in dollars. CCBU owed Coca-Cola approximately $12 million in accounts receivable for concentrate. CCBU had the funds to pay Coca-Cola, but only in Uzbek soum and not in U.S. dollars. Like most companies in Uzbekistan, CCBU did not have the ability to convert soum into dollars and Coca-Cola required payment in dollars. In order to raise the dollars, ROZ, on behalf of CCBU, sought and received permission from the Uzbekistani government to purchase, in soum, raw materials, including oil and cotton, from the government. CCBU sold them to one of ROZ's subsidiaries, Valuelink, for dollars. Valuelink then sold these commodities on the international market. CCBU used the dollars it received to pay the Coca-Cola accounts receivable. Under this arrangement, Coca-Cola profited by having its outstanding

invoices paid and the Republic of Uzbekistan profited by receiving taxes on the sale of the goods.

3.25    On February 8, 2001, Uzpishcheprom, acting in its own name and on behalf of Uzbekistan, formally declined the opportunity to purchase a pro rata portion of these shares and approved TCCEC's purchase of the entire interest. (Exhibit 22). On February 16, 2001, by Decision R-05/5, the Uzbekistan Committee for Demonopolization and Development of Competition (hereafter "Anti-Monopoly Committee") approved ROZ's then contemplated sale of an 11.4% interest to TCCEC concluding:

> Considering that the proposed transfer involves only a redistribution of interests among the founders, without effect on the commodity market in question or change in the entity's production orientation, and guided by Article 15 of the Republic of Uzbekistan Law, "On Competition and Limitation of Monopolist Activity in Commodity Markets,"

> The Expert Council has *decided*:

>> 1. To give its consent . . .

(Exhibit 23).

3.26    On March 27, 2001, there was a general meeting of the participants in CCBU at which the parties to the JVA ratified two adjustments in the shares. First, the parties approved ROZ(U)'s formal participation in the JVA by virtue of the 9.947% stake it had purchased on ROZ's behalf from Uzbekistan's representative, Uzpishcheprom. Second, the parties approved TCCEC's purchase from ROZ of a 9.9884% interest in CCBU. (Exhibit 24). The interest purchased by TCCEC had declined from the level initially approved by the Anti-Monopoly Committee because, after further negotiations, ROZ and TCCEC had settled on a valuation of CCBU of $117,000,000. The purchase price remained approximately $11,564,280.

3.27   The parties also resolved to make corresponding changes in the JVA and the Charter to reflect the two transactions, and these changes were in fact made and attached to the meeting Protocol which was signed, under seal, by representatives of each of the parties. (Exhibit 24 at 4 and Annexes A and B).  The parties directed CCBU's General Manager "to conduct and complete all necessary registration formalities and procedures at the Ministry of Justice and other relevant local authorities in order to effect registration of the fourth participant; the two transfers of share; [and] the final structure of participatory shares and their percentages . . ." (Exhibit 24 at ¶ 5).  With these transfers, ROZ held 45.171% directly and 9.947% indirectly through ROZ(U); TCCEC held 42.882%; and Uzbekistan, through its representative, Uzpishcheprom, held 2%.

3.28   To ensure that there could be no question of appropriate approval, the parties presented these changes to all the relevant agencies.  On April 17, 2001, the State Property Committee approved this sale.  (Exhibit 25). The next day, April 18, 2001, the Anti-Monopoly Committee acknowledged receipt of the Protocol and consented to TCCEC's purchase.  (Exhibit 26).  The Ministry of Justice approved the amended JVA and Charter on April 19, 2001.  (Exhibit 27).

3.29   After the sale from ROZ to TCCEC was completed, ROZ used the dollars it received to purchase supplies and equipment for CCBU, including sugar, PET resin for plastic bottles, and carbon dioxide equipment.  Because of the events, described below, that excluded ROZ from further participating in the joint venture, CCBU never reimbursed ROZ for these purchases of supplies and equipment or credited ROZ with the resulting contribution made to the joint venture.

3.30    By all accounts, the joint venture was financially successful.  In the annual independent audit performed by Arthur Anderson, as of December 2000, the total shareholder equity (total assets minus current liabilities) in CCBU was approximately $109 million. (Exhibit 28).  Indeed, in terms of production volume, CCBU was among the Coca-Cola Company's top 35 bottlers from over 200 countries worldwide.  CCBU was the first bottler to receive the "Bottler of the Year" award from Coca-Cola for two years in a row. The Bottler of the Year award is based on the bottler's sales growth, quality of the product produced, and the continued improvement in its operations.  Coca-Cola recognized these significant accomplishments by inviting Mr. Maqsudi and his brother to an honorary dinner with its Chief Executive Officer, presenting them with an award, and flying the Uzbekistani flag over Coca-Cola headquarters in Atlanta.  (Exhibit 29).

**D.    *The Exclusion by Uzbekistan and TCCEC of ROZ from Management and Ownership of the Joint Venture***

**(1)    Background**

3.31    During the formation and early years of the joint venture, Mansur Maqsudi, Managing Director of ROZ, was married to Gulnora Karimova, the daughter of Islam Abduganievich Karimov, the President of Uzbekistan.  Mr. Karimov had ruled Uzbekistan while it was part of the Soviet Union and was "elected" President after its independence, a position he continues to hold to this day.

3.32    In July 2001, Mr. Maqsudi told Ms. Karimova that he was separating from her.  Ms. Karimova's response was extreme, and included absconding with their two young children from their home in the United States to Uzbekistan; attempting to extort money from Mr. Maqsudi; and threatening Mr. Maqsudi and his family.  To this day, Mr.

Maqsudi has not seen his children since Ms. Karimova left the United States with them nearly five years ago.

3.33    In September 2002, the Superior Court of New Jersey found that it had jurisdiction over the Maqsudi children to hear the custody dispute under the Uniform Child Custody Jurisdiction Act, which applies to jurisdictional custody issues between states in the United States and foreign countries.  After hearing the case, the court ordered Ms. Karimova to return the children to New Jersey and to arrange immediate telephone contact between the children and their father.  *See Maqsudi v. Maqsudi*, 830 A.2d 929 (N.J. Super. Ch. 2002) (Exhibit 30).  Ms. Karimova has defiantly refused to comply with these court orders and Mr. Maqsudi has had no contact with his children – by phone, in person, or otherwise – since the court's decision.

### (2)    Uzbekistan's Intentional Acts to Exclude ROZ from CCBU

3.34    As a direct result of the separation, Ms. Karimova and her father directed the full power of the Government of the Republic of Uzbekistan at destroying Mr. Maqsudi's investment in Uzbekistan, including ROZ's ownership, operation, and management of CCBU.   Beginning on August 13, 2001 and lasting several days, agents from Uzbekistan's feared National Security Service (the successor to the KGB in Uzbekistan) (hereafter "Secret Police"), under the guise of a "tax audit," raided both ROZ's and CCBU's offices in Tashkent and seized company documents and employees from each. CCBU's Managing Director and his Deputy were both taken away by the Secret Police and held in isolation for interrogation for more than 24 hours.

3.35    It is widely reported by such organizations as Human Rights Watch that the Uzbekistani police detain individuals and have held "them incommunicado and used torture, threats,

and other pressure to coerce confessions during the investigation." (Exhibit 31). Such "voluntary" appearances do not trigger any time restrictions on the detention or the right to counsel. Detained individuals are threatened and deprived of food, water, and sleep in order to obtain confessions to whichever "crimes" the police choose to assert. The United States Department of State has found that "the police force and the intelligence service use torture as a routine investigation technique." (Exhibit 32). Further, after an extensive investigation, the Special Rapporteur on Torture for the United Nations Commission on Human Rights found that "the pervasive and persistent nature of torture throughout the investigative process cannot be denied." (Exhibit 33 at ¶ 68).

3.36    The CCBU employees experienced these tactics first hand. The Secret Police, for example, held the CCBU Managing Director hostage for twenty-four hours and coerced him into executing a document in Russian – a language he neither speaks nor understands – to "authorize" further search of CCBU and seizure of its financial records. They separately held the Deputy Managing Director hostage for two or three days. The Deputy Managing Director was more familiar with the tactics of the Secret Police and may have been able to assist the Managing Director, had they been able to communicate. Ultimately, the Secret Police released them, but the threats and intimidation were such that, fearing a second indefinite detention, both fled the country.

3.37    Thus began Uzbekistan's campaign of terror and intimidation to exclude its joint venture partner, ROZ, from any further involvement in CCBU – a campaign that continues to this day. Another well-documented tactic of the Secret Police is to detain, threaten, and torture family members of those persons it seeks to intimidate. Relatives of Mr. Maqsudi have been, and continue to be, threatened and harassed by Uzbekistan in retaliation for

Mr. Maqsudi's separation from Ms. Karimova and subsequent initiation of divorce proceedings in the United States. For example, in December 2001, some of Mr. Maqsudi's family members were taken in the middle of a winter night from their homes in Uzbekistan to the border of Afghanistan and simply left there with no belongings. His elderly grandmother was forced to leave her home without her diabetes medication. Other family members were taken hostage and remain imprisoned. Indeed, their exact whereabouts are still unknown today. Further, Mr. Maqsudi's mother's home was demolished. Neither Mr. Maqsudi nor his immediate family can travel to Uzbekistan without risking their lives. Former employees of CCBU have been provided asylum in the United States and other western countries. Family members who remain in Uzbekistan remain subject to detention, intimidation, and torture.

3.38   President Karimov was not satisfied with mere intimidation and terror as a means to exclude ROZ from further participation in CCBU. He used his control of Uzpishcheprom and Uzbekistan to formalize the exclusion by initiating and manipulating sham proceedings in the Uzbekistani courts. In the first of these proceedings, initiated on September 28, 2001,[5] the Anti-Monopoly Committee brought an action in the Economic Court of Tashkent against CCBU, the Ministry of Justice, and the State Property Committee,[6] insisting that some or all of the post-1993 reallocations of shares in the joint venture were null and void because it had not approved these reallocations. (Exhibit 34). The Anti-Monopoly Committee argued that without the Anti-Monopoly Committee's

---

[5]   Significantly, this was the very date on which Gulnora Karimova purportedly initiated divorce proceedings against Mr. Maqsudi in Tashkent courts – proceedings which U.S. courts found, if they occurred at all, failed entirely to provide adequate notice and opportunity to be heard. (Exhibit 30 at Section II).
[6]   Due to translation differences, the State Property Committee is also referred to as "The State Committee for Assets of RU."

approval, the Ministry of Justice should not have approved the share reallocations, after which ROZ owned more than 35% of the shares of CCBU. (Exhibit 34). This assertion is demonstrably false and ridiculous for a number of reasons. First, less than six months earlier, the Anti-Monopoly had expressly approved the final adjustment in share allocation that it was now challenging. Second, at the time of the initial approval in February 2001 (*see* Exhibit 26 at ¶ 3), the Anti-Monopoly Committee had expressly acknowledged that the internal reallocations of shares among the joint venture partners could not have an effect on whether or not CCBU – as the entity engaged in bottling – had a monopolistic effect on the beverage industry. Finally, the relevant anti-monopoly law at issue only had come into existence on or about December 27, 1996, well after CCBU had been established and had been operating. It should not have been applied retroactively to companies that had been formed prior to this law's existence.

3.39   As numerous independent outside experts, including the United States Department of State and Human Rights Watch, have observed, the courts of Uzbekistan are wholly subservient to President Karimov, Gulnora Karimova's father. He has complete authority to appoint and to remove the judges, who have no guaranteed tenure or independence. (Exhibits 32, 33). In the divorce proceeding initiated by Ms. Karimova in Uzbekistan, "notice" was given to Mr. Maqsudi by mailing the notice, only two days before the hearing, to an incorrect and incomplete address in Uzbekistan, despite the fact that all parties knew Mr. Maqsudi was living in his home in the United States. This lack of opportunity to be present and heard was noted by the judge in Mr. Maqsudi's United States divorce proceeding in finding that the Uzbekistani divorce decree should not be recognized or enforced. (Exhibit 30). Furthermore, with respect to ROZ, the Economic

Court immediately accepted the Anti-Monopoly Committee's case and scheduled a hearing less than two weeks later, despite the fact that Mr. Maqsudi and other high-level ROZ personnel were not even in the country or able to travel there to participate. The Economic Court arbitrarily rejected CCBU's request for a continuance and ruled that the orders issued by the State Property Committee and the Protocols issued by the Ministry of Justice approving the share reallocations were invalid.

3.40    In its written decision, the Economic Court treated ROZ's and ROZ(U)'s shares as a unitary holding, which, together, owned 55.118% of CCBU.[7]   The Economic Court invalidated the various approvals of share reallocation, without guidance as to how the parties were to proceed to readjust the ownership interests in accordance with this decision or how to unwind the transaction. (Exhibit 35).

3.41    Both CCBU and TCCEC appealed this decision to the Tashkent Municipal Commercial Court.   ROZ was unable to participate directly because the Maqsudis were effectively banned from returning to Uzbekistan to defend their interests.   In fact, Uzbekistan denied their lawyers' visas, making it impossible for them to participate. (Exhibit 36).   The United States Department of State then requested visas on their behalf and this request was repeatedly denied.   On appeal, the Court set aside the lower court's invalidation of the directives and protocols solely with respect to TCCEC's interest and restored TCCEC to its 42.882% share in the joint venture based upon the Anti-Monopoly Committee's February and April 2001 approvals described above.   This Court refused to restore ROZ's shares, even though the very same approvals had acknowledged ROZ and ROZ(U)'s

---

[7]    The court refers to ROZ's percentage ownership share of CCBU as 55.055% and not 55.118%.   This difference, however, is immaterial.

combined interests.   (Exhibit 37).   Such an inconsistent court decision is hardly surprising, given that Uzbekistan and TCCEC were conspiring to exclude ROZ from further participation in CCBU.

3.42   Thus, after this court decision, ROZ's total interest was first reduced to 33.3%, its original investment.   Then, the sale of 9.884% of ROZ's shares to TCCEC was given effect, leaving ROZ with a 23.416% interest.   TCCEC then added the 9.884% interest to its previous 32.998% interest, totaling its 42.882% share.    Neither Uzbekistan nor TCCEC compensated ROZ for the diminution of its interest in the joint venture or took the required steps (*e.g.,* convening a Parties' Assembly) to implement this decision.

3.43   On February 5, 2002, the Supreme Economic Court of Uzbekistan summarily affirmed the Tashkent Municipal Commercial Court's judgment.   (Exhibit 38).   Thus, ROZ's total holdings in the joint venture were immediately reduced from 55.118% to 23.416%.   Like the previous court decisions, this order did not allow for compensation to ROZ for its loss of shares or for its investments and capital contributions in the joint venture.   No court specified whether it was ROZ's and/or ROZ(U)'s shares that had to be relinquished.

3.44   The second set of sham proceedings was deliberately initiated by Uzbekistan (at the direction of the Karimovs) to purge ROZ completely from any further participation in the joint venture.   To obtain the remainder of the ROZ holdings, the Ministry of Justice claimed that in forming ROZ(U), ROZ had failed to comply with its charter funding requirements.   (Exhibit 39).   The Ministry of Justice only notified ROZ of this alleged deficiency on November 26, 2001, a mere eight months after Uzbekistan's tax committee had acknowledged that the charter funds had, in fact, been properly paid.   (Exhibit 40). Nonetheless, on December 4, 2001, the Ministry of Justice ordered ROZ(U) to self-

liquidate or face liquidation proceedings unilaterally initiated and enforced by the Ministry of Justice. (Exhibit 41). Under the July 3, 1999 directive of the Cabinet of Ministers of Uzbekistan (Directive No. 327), ROZ(U) should have had two weeks to decide whether to liquidate voluntarily or to face liquidation proceedings. Prior to the expiration of the two-week period, however, the Ministry of Justice petitioned the Tashkent Economic Court to liquidate ROZ(U). Without further consultation with, or notification to, ROZ or ROZ(U), the Tashkent Economic Court approved the liquidation of ROZ(U) on December 26, 2001. In violation of Uzbekistani law, during the liquidation proceeding, the court denied counsel for ROZ or ROZ(U) an opportunity to participate in the proceedings. The timing of these proceedings – simultaneous with the expropriation proceedings described above and the divorce proceedings in the United States – and the speed at which they went forward, demonstrate that the proceedings were simply retribution against ROZ and Mr. Maqsudi for the dissolution of his marriage.

3.45    On June 3, 2002, the Economical Court of Tashkent formally ordered that ROZ's 23.416% share in CCBU be liquidated and used to pay the debts of ROZ(U). On September 11, 2002, the Supreme Economic Court of Uzbekistan formally approved both the liquidation of ROZ(U) and the seizure of ROZ's remaining interest in CCBU, allegedly in satisfaction of ROZ(U)'s "debts," including those arising from inadequate charter funding. (Exhibit 42). Apart from the fact that Uzbekistan's own tax committee had acknowledged that ROZ(U)'s charter funding had indeed been adequate, the sham nature of these proceedings is demonstrated by the court's reliance on false and inaccurate financial calculations to show a "debt", when, in fact, ROZ(U) had over $50 million in cash and unencumbered net assets on hand, including land, automobiles,

warehouses, offices, and rental property. (Exhibit 43). Through these proceedings, Uzbekistan not only stole the remainder of ROZ's interest in CCBU and other assets, but also eliminated CCBU debt owed to ROZ, thereby benefiting Uzbekistan and its partner in these unlawful acts, TCCEC.

> **(3)    TCCEC Joined With Uzbekistan in a Conspiracy to Exclude ROZ from CCBU**

3.46    At the beginning of Uzbekistan's reign of terror, TCCEC was content simply to stand by and allow Uzbekistan's retribution against ROZ, its joint venture partner. Quickly, however, TCCEC, with the active encouragement and participation of its parent company, Coca-Cola, undertook to conspire with Uzbekistan to exclude ROZ permanently from further participation in CCBU.

3.47    Initially, TCCEC and personnel from its parent, Coca-Cola, claimed to be merely concerned bystanders. In September 2001, shortly after the "tax audit," ROZ wrote to Douglas Daft, the Chairman and CEO of Coca-Cola, seeking specific assistance from Coca-Cola in asking it "to expressly condemn the abusive treatment of Coca-Cola joint venture employees." (Exhibit 44). In this same letter, ROZ requested a meeting with Daft to "formulate a joint plan of action" to deal with the upheaval at CCBU. Daft dismissively responded that the issue was "personal;" that Coca-Cola would not get involved in a private matter; and, with the self-interest of Coca-Cola in mind, counseled ROZ personnel against publicizing these issues any further. (Exhibit 45).

3.48    Daft's denial of involvement, however, is contradicted by a letter from the Uzbekistani Ambassador to the United States to a United States Senator. In that letter dated August 29, 2001 – prior to Daft's response to ROZ's letter – Ambassador Khamrakulov acknowledged TCCEC's and Coca-Cola's active participation in Uzbekistan's unlawful

acts by writing that "the representatives of the Coca-Cola Company's regional office have been closely collaborating with the government agencies of Uzbekistan, and share their position that the current audit of the joint venture's documentation is lawful . . . ." (Exhibit 46). Coca-Cola, however, was well aware from previous tax audits that this tax audit was unlike the others in its scope, duration, and treatment of CCBU employees. In the same letter, the Ambassador further wrote that the government of Uzbekistan keeps in "close contact with the headquarters of the Coca-Cola Company." (Exhibit 46).

3.49    Failing to obtain a truthful response from its joint venture partner, ROZ then wrote to Warren Buffet, a director of Coca-Cola, telling him in detail about the financial problems and general upheaval at CCBU and about the role that Coca-Cola was playing in helping Uzbekistan prosecute its reign of terror. ROZ requested a meeting to address these important issues. (Exhibit 47). Mr. Buffet declined ROZ's plea for assistance and deferred to the discretion of Coca-Cola's CEO, Douglas Daft, who had already refused to assist ROZ and had falsely denied working with Uzbekistan. (Exhibit 48).

3.50    In addition, ROZ requested from Coca-Cola a number of specific types of assistance including security; assistance with currency conversion; and funds to pay the salaries of CCBU employees, which ROZ had ensured were paid after the tax audit. (Exhibits 49-52). Although they had other employees in Uzbekistan (including country manager, Horst Dammann-Heublein) and in neighboring countries, TCCEC and Coca-Cola, deliberately and in complete disregard of the obligation under the JVA to act in good faith to preserve the assets of the joint venture, did nothing to assist CCBU and its employees during or immediately after the tax audit.

3.51  Consistent with the public statements of the Uzbekistani Ambassador, TCCEC and Coca-Cola actively undermined ROZ's efforts at obtaining protection and assistance from the United States government. While ROZ was seeking to convince the United States of the irregularities and unlawfulness of the tax audit, Coca-Cola representatives, including Ahmet Burak, Regional Manager of the Coca-Cola Eurasia Division, deliberately misled the U.S. Department of State by stating that the nature of the audit was not unusual. Approximately one year later – only after the Uzbekistani government threatened to liquidate TCCEC's shares – did Coca-Cola use its influence to convince the U.S. Department of State to intervene, and TCCEC was able to appeal its portion of the liquidation order. By this time, the damage to ROZ was irreversible.

3.52  Unaware of TCCEC's and Coca-Cola's treachery, shortly after the tax audit, Mr. Maqsudi and his brother traveled to London twice to meet with Ahmet Bozer, who, at the time was President of the Coca-Cola Eurasia Division, in order to encourage TCCEC to live up to its commitments to the joint venture. Shockingly, Bozer, acting on behalf of TCCEC, neither expressed concern for what had already occurred at CCBU nor committed to fulfilling TCCEC's duties to preserve assets and affirmatively avoid actions to hinder ROZ or the joint venture. Instead, Bozer denied that there was anything out of the ordinary with the tax audit. Rather than committing to use Coca-Cola's influence to communicate concerns over the human rights abuses and business calamities that had occurred at CCBU, Bozer instead suggested that TCCEC take over operation of the joint venture by installing one of his own employees as the Managing Director of CCBU. Mr. Maqsudi objected because he became suspicious of TCCEC's involvement with Uzbekistan in eliminating it from the joint venture. After unsuccessfully seeking

assistance from Coca-Cola to use its vast resources and influence to "stop the harassment and intimidation of our joint venture" ROZ justifiably could not trust that Coca-Cola would safeguard the interests of CCBU. (Exhibit 50).

3.53    In October 2001, Mr. Maqsudi met with Cem Kozlu, President, Coca-Cola Central Europe, Eurasia, and Middle East Group, to discuss CCBU's situation.  Mr. Kozlu commented that Coca-Cola might be in a position to purchase ROZ's shares in CCBU. Such an offer to purchase the shares, however, never materialized.

3.54    In fact, TCCEC and Uzpishcheprom, representing Uzbekistan, jointly pursued substituting ROZ management with new, more compliant management.  TCCEC proposed allowing the former Coca-Cola country manager of Uzbekistan, Horst Dammann-Heublein, to serve as CCBU's Acting Managing Director with full authority. ROZ countered by agreeing to have Mr. Dammann-Hueblein serve as Acting Managing Director, but with limited duties and authority.  (Exhibit 53).  Neither TCCEC nor Uzpishcheprom agreed to ROZ's proposal.  Then, in January 2002, TCCEC and Uzpishcheprom called for a general meeting of the participants of CCBU.  (Exhibit 54). They intentionally scheduled this meeting in Uzbekistan, knowing that no one from ROZ could safely travel there to participate.  TCCEC and Uzpishcheprom conspired to select Derek Willshee, a former Coca-Cola employee, as President of CCBU, without any input or approval from ROZ.  (Exhibit 55).  Mr. Willshee was appointed with the same duties and authority as Mr. Maqsudi, CCBU's previous President.  TCCEC and Uzpishcheprom knew that Mr. Willshee would follow their direction and continue to prevent ROZ from participating in CCBU.  Indeed, acknowledging the permanent exclusion of Mr. Maqsudi, one of Mr. Willshee's first actions as President was to write to Mr. Maqsudi, asking him

where to send the personal items that remained in Mr. Maqsudi's office.  (Exhibit 56).

Mr. Willshee sent Mr. Maqsudi all of the personal items in his office, except for the

photographs of his children.  TCCEC and Uzpishcheprom continued thereafter to exclude

ROZ by calling for and holding meetings in Uzbekistan, where no one from ROZ could

participate. (Exhibits 57, 58).

3.55    In practice, though, Mr. Willshee was only a figurehead with no independent authority to

manage CCBU.  The real authority resided with Irena Avtaiknia, a close ally of Gulnora

Karimova, President Karimov's daughter.  In fact, Ms. Avtaiknia formally succeeded Mr.

Willshee when he was forced to resign after approximately six months.  TCCEC was

fully aware that by appointing Mr. Willshee in name only, they were allowing Ms.

Karimova to control CCBU through her subordinate, Ms. Avtaiknia.  Knowing that they

were breaching the duty of good faith, TCCEC and Coca-Cola personnel repeatedly

denied to ROZ that they were working with Ms. Karimova and Ms. Avtaiknia (Exhibits

59, 60), even while planning and holding meetings with both of them in order to replace

ROZ permanently in the joint venture with a company under Karimova's control.  In or

about January 2002, at the Intercontinental Hotel in Tashkent, Ahmet Bozer secretly met

with both Ms. Avtaiknia and Ms. Karimova's then assistant, Farhod Inogambaev, to

discuss arrangements by which Ms. Karimova could formalize her control over and profit

from the joint venture.  By this time, Ms. Karimova had already formed companies

within Uzbekistan and a company in Dubai, United Arab Emirates, called Revi Holdings,

FZE, that were doing business with CCBU.  (Exhibit 61).

3.56    Following this discussion, as well as at a meeting in Switzerland in 2003, Coca-Cola, on

behalf of TCCEC, proposed a new charter between TCCEC and Uzpishcheprom,

representing Uzbekistan; this proposal would eliminate ROZ as a shareholder in CCBU. Coca-Cola also proposed a Management Contract between CCBU and a company owned and controlled by Ms. Karimova; this Management Contract would strip ROZ of any participation in the joint venture. (Exhibit 62). Uzbekistan's then First Deputy Foreign Minister, Sodiq Safaev, represented both Uzbekistan and Ms. Karimova in these negotiations with Coca-Cola. These negotiations ultimately culminated in an agreement, discussed more fully below, that allowed Respondent Zeromax, a company closely associated with and/or controlled by Ms. Karimova, to take ROZ's former shares in CCBU. Thus, Uzbekistan, TCCEC, and Coca-Cola successfully conspired to eliminate ROZ from CCBU, while maintaining their own stake in this successful and lucrative enterprise.

3.57    Throughout this period, Coca-Cola and TCCEC knew and approved of other CCBU transactions with Ms. Karimova's companies, including Revi Holdings and United International Group, that dissipated and looted CCBU's assets and allowed Ms. Karimova to siphon profits from these companies into her personal bank accounts in Dubai and elsewhere. Her status as daughter of the President gave her companies nearly unlimited access to hard currency – a rarity in Uzbekistan. Ms. Karimova, through her companies, sold sugar, plastic, and other raw materials to CCBU at inflated prices and required payment in advance, so there was no risk of non-payment. Soon after the transactions were complete, Ms. Karimova transferred money from her companies into her personal bank accounts. For example, on January 14, 2003, CCBU made two deposits into Revi Holdings' primary bank account, totaling $467,477.44. (Exhibit 63). One week later, on January 21, 2003, Ms. Karimova transferred $350,000 from the Revi

Holdings account into her personal bank account designated as a "payment to shareholder." (Exhibit 64). Similarly, on April 6, 2003, CCBU made a $399,958.19 payment to Revi Holdings. (Exhibit 63). On the same day, $350,000 was transferred from Revi Holdings to Ms. Karimova's United International Group. (Exhibit 65). Three days later, on April 9, 2003, Ms. Karimova transferred $362,000 from United International Group to her personal bank account as payment for a "management contract." (Exhibit 66). Between January 23, 2002 and April 9, 2003, Ms. Karimova transferred at least $8,042,000 from her companies to her personal accounts. These transactions, labeled as dividends, bonuses, consulting fees, management fees, return of capital, or corporate bonus repayments, gave her personal access to significant liquid assets in hard currency. (*See as examples,* Exhibit 67).

### E.   *Respondent Zeromax Joins the Conspiracy to Exclude ROZ from CCBU*

3.58   In or about late 2004, with TCCEC's full knowledge and approval, but without notice to ROZ as required by the JVA, Uzbekistan transferred ROZ's former shares in the joint venture to Respondent Zeromax Group, Inc., or one of its controlled affiliates. Nonetheless, ROZ learned through news reports in late 2004 of Uzbekistan's possible transfer to Zeromax of its own shares plus those illegally seized from ROZ. ROZ immediately formally protested the transfer or sale by writing to the State Property Committee. (Exhibit 68). Despite these protests, Uzbekistan proceeded with the sale to Zeromax, which purchased the ROZ shares in CCBU with full knowledge that they had been stolen from ROZ. As the successor in interest to ROZ's shares, Zeromax – reportedly through its subsidiary, Muzimpex – now runs CCBU, with Coca-Cola. (Exhibit 69). Under Article 5.5 of the JVA, Zeromax, as a third party purchasing shares

in CCBU, was required to agree to be bound by the JVA, including the agreement to arbitrate all disputes relating to the JVA. Thus, as the successor in interest and assignee of ROZ's shares in CCBU, each of the provisions of the JVA, including the arbitration clause, applies to Zeromax.

3.59    Once Zeromax took control of ROZ's shares in CCBU, ROZ was finally and completely barred from exercising its property and management rights in CCBU.

3.60    Furthermore, according to recent news reports, Ms. Karimova is part owner of Zeromax. (Exhibits 70, 71). Zeromax, for a number of years, has had close business and personal ties with Ms. Karimova, including paying her in or about the Spring of 2003 for assistance in securing a very large multi-million dollar contract with Uzbekistan for construction of the Shurtan-Sherabad natural gas pipeline. Shortly after the March 3, 2003 announcement of the Uzbekistani Cabinet of Ministers' approval of this deal, Zeromax deposited a $1 million installment in Ms. Karimova's account in the Rietumu Bank in Riga, Latvia.

3.61    These Coca-Cola and Zeromax transactions for the benefit of Ms. Karimova are particularly egregious insofar as during the Maqsudi New Jersey divorce proceedings in 2001-2002, Ms. Karimova had formally and publicly taken the position that she was an official of the Uzbekistani government entitled to diplomatic immunity. (Exhibits 72, 73).

### F.    *Notice of Termination*

3.62    In light of the deprivation of ROZ from its rights of management in CCBU and the sale of its shares to Zeromax, ROZ provided a notice of termination to Uzbekistan, through its representative Uzpishcheprom, and TCCEC on April 11, 2005. (Exhibit 74). ROZ

provided notice to Zeromax on August 5, 2005. (Exhibit 75). TCCEC responded by letter on May 10, 2005, denying that it was liable to ROZ for any amount or for an accounting of ROZ's shares. (Exhibit 76). Uzbekistan, represented by Uzpishcheprom, responded by letter also "dated" May 10, 2005, but not mailed until July 14, 2005. Uzpishcheprom professed "surprise" at ROZ's assertion that it had, in effect, been precluded from participation and management in CCBU; disagreed with ROZ's position on termination; and, for the first time, notified ROZ that it had, in fact, transferred ROZ's shares (but without naming the recipient). (Exhibit 77). Zeromax did not respond to the notice of termination. Nonetheless, by its express terms, the JVA was terminated on May 11, 2005, thirty days after the issuance of the notice of termination. JVA, Article 12.2.1.

3.63    Under the JVA, once a party terminates the agreement, "the Parties hereto agree to call a Parties' Assembly and to adopt a Parties' resolution by virtue of which the Joint Venture shall be liquidated . . . ." JVA, Article 12.1. The liquidation is to be conducted in accordance with Uzbekistani law and any proceeds are first to be used to pay any debts of the joint venture and expenses associated with the liquidation. JVA, Articles 12.4.1, 12.4.4. Then, "[t]he balance shall be distributed between the Parties in proportion to their share ownership, it being agreed that any Hard Currency left shall be used to satisfy the part of the liquidation proceeds due to TCCEC and ROZ." JVA, Article 12.4.5. TCCEC, Uzbekistan, and Zeromax have further breached the JVA by failing to call this mandated Parties' Assembly or to initiate liquidation proceedings as required under the JVA, or otherwise compensating ROZ for its share in CCBU. ROZ reserves the right to add Ms. Karimova as a party to this arbitration should it determine that Ms. Karimova is now, by virtue of her ownership or control of Zeromax or any other entity, a party to the JVA.

## 4.0     **EVIDENCE**

4.1     Claimant relies on the exhibits cited to above and attached to this Statement of Claims. ROZ will produce additional exhibits, as necessary, throughout this proceeding.

4.2     ROZ acknowledges that it has not supplied an exhaustive and complete set of exhibits. When the actions described above occurred, Mr. Maqsudi was in the United States. ROZ personnel were forced to flee Uzbekistan, in fear of their personal safety and lives. Mr. Maqsudi's family members who were living in Uzbekistan were forced out of the country or imprisoned. As a result, and due to circumstances well beyond Mr. Maqsudi's or ROZ's control, many documents were left in Uzbekistan and Mr. Maqsudi (or anyone else connected to ROZ) cannot safely travel there to collect them, if such documents still exist. Claimant believes that many important documents are in the possession of one or more of the Respondents or Coca-Cola.

4.3     The threats and retaliatory actions detailed above have prevented Mr. Maqsudi and ROZ from traveling to Uzbekistan, learning the full scope of the actions taken by Uzbekistan and TCCEC to deprive ROZ of its investment in CCBU, or obtaining access to the various documents that support its claims. ROZ was effectively unable to bring any claims against Uzbekistan and TCCEC until the Maqsudis had exhausted all available means to protect as many of the Maqsudi family members and former CCBU and ROZ employees as possible from the acts of intimidation and retribution. The following claims are all premised on the intentional and deliberate acts of Uzbekistan, TCCEC, and Zeromax to harm ROZ and deprive it of its share in CCBU without providing compensation.

4.4    ROZ intends to rely further on witness testimony, including from those individuals identified in the above paragraphs and additional witnesses identified as this proceeding moves forward.

## 5.0    STATEMENT OF CLAIMS

5.1    Uzbekistan, Uzpishcheprom, acting in its own name and on behalf of Uzbekistan, and Zeromax, intentionally and wrongfully excluded ROZ permanently from any further participation in CCBU. While doing so, Uzbekistan, Uzpishcheprom, and Zeromax unlawfully acquired ROZ's interest in CCBU. Moreover, Zeromax was completely aware that ROZ was intentionally excluded from CCBU; that ROZ was never compensated after the Economic Court declared the earlier share transfers invalid; and that Uzbekistan wrongfully obtained the remainder of the ROZ and ROZ(U) shares. Therefore, Zeromax obtained ROZ and ROZ(U)'s shares in bad faith. Accordingly, Uzbekistan, Uzpishcheprom, and Zeromax are liable to ROZ for the value of ROZ's 45.171% interest in CCBU, or $52.85 million, based upon the March 2001, $117 million valuation of CCBU, with Zeromax's maximum liability being $15 million, the price it paid for ROZ's shares. Because Uzbekistan, Uzpishcheprom, and Zeromax acted jointly, it is impossible to attribute to Uzbekistan, Uzpishcheprom, and Zeromax the individual shares of harm they each inflicted on ROZ. Consequently, because these individual shares cannot be attributed, Uzbekistan, Uzpishcheprom, and Zeromax shall be held jointly and severally liable, with Zeromax liable to ROZ for a maximum of $15 million. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by Uzbekistan,

Uzpishcheprom, and Zeromax on ROZ according to their individual contributions to the damages.

5.2    TCCEC is liable for the permanent exclusion of ROZ from any participation in CCBU because it took affirmative steps to conspire with Uzbekistan and Uzpishcheprom to eliminate ROZ from CCBU and substitute Gulnora Karimova for ROZ, either directly or indirectly through her shill, Zeromax. Accordingly, TCCEC is liable to ROZ for the value of ROZ's 45.171% interest in CCBU, or $52.85 million, based upon the March 2001, $117 million valuation of CCBU. TCCEC, Uzbekistan, and Uzpishcheprom deliberately and intentionally worked together to eliminate ROZ from CCBU. Because of this joint effort, it is impossible to attribute to TCCEC, Uzbekistan, and Uzpishcheprom their individual contributions to the harm they inflicted on ROZ. Claimant therefore asks that TCCEC, Uzbekistan, and Uzpishcheprom be held jointly and severally liable for the amount specified in Claim 5.1. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by TCCEC, Uzbekistan, and Uzpishcheprom on ROZ according to their individual contributions to the damages.

5.3    *In eventu*, if the Tribunal does not find for Claimant in Claims 5.1 or 5.2, Claimant seeks damages from Uzbekistan and Zeromax. Uzbekistan deliberately acted together with Zeromax in order to obtain ROZ and ROZ(U)'s shares and, as a result harmed ROZ. Zeromax knowingly obtained ROZ and ROZ(U)'s shares in bad faith. Thus, ROZ is entitled to the value of the shares at the time that Zeromax took them, totalling $15 million. Because Uzbekistan and Zeromax acted jointly, it is impossible to attribute to them the individual shares of harm they each inflicted on ROZ. Consequently, because

these individual shares cannot be attributed, Uzbekistan and Zeromax shall be held jointly and severally liable. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by Uzbekistan and Zeromax on ROZ according to their individual contributions to the damages.

5.4     By virtue of their malicious acts in excluding ROZ and ROZ(U) from participation in CCBU and in mismanaging CCBU through Gulnora Karimova and Coca-Cola personnel, Uzbekistan and TCCEC intentionally and wrongfully prevented CCBU from paying ROZ for the accounts receivable generated from ROZ's delivery of supplies and services to CCBU. Thus, Uzbekistan and TCCEC are liable for reimbursing ROZ in the amount of $9.9 million for supplies and services that were provided. Also, because of the joint efforts of Uzbekistan and TCCEC, the various harm contributed by each and inflicted on ROZ cannot be individually attributed to Uzbekistan and TCCEC. Therefore, Uzbekistan and TCCEC shall be held jointly and severally liable. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by TCCEC and Uzbekistan on ROZ according to their individual contributions to the damages.

5.5     Uzbekistan and Uzpishcheprom, acting in its own name and on behalf of Uzbekistan, in furtherance of the retribution against Mr. Maqsudi and ROZ, destroyed ROZ's subsidiary, ROZ(U), by illegally acquiring its shares, excluding it from CCBU, and dissolving it through bankruptcy proceedings that falsely valued ROZ(U)'s assets. These intentional acts damaged ROZ in the amount of ROZ(U)'s shares in CCBU and other assets of ROZ(U) that were taken through the sham bankruptcy proceedings. These

damages include $11.64 million for the value of the ROZ(U) interest in CCBU and $52 million for ROZ(U)'s assets that were seized. Uzbekistan and Uzpishcheprom were acting jointly in their efforts to harm ROZ. Because of these joint efforts, the shares of the damages cannot be attributed individually to Uzbekistan and Uzpishcheprom. Consequently, Uzbekistan and Uzpishcheprom shall be held jointly and severally liable. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by Uzbekistan and Uzpishcheprom on ROZ according to their individual contributions to the damages.

5.6    *In eventu*, if the Tribunal does not find for Claimant in one or more of the claims cited above, Claimant seeks damages for Uzbekistan's, Uzpishcheprom's (acting in its own name and on behalf of Uzbekistan), TCCEC's, and Zeromax's failure to terminate the joint venture, as outlined in the JVA. Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax have breached the JVA and are liable for the damages to ROZ resulting from their failure to distribute to ROZ its share of the CCBU assets upon the termination of the joint venture under Article 12, including any waste and diminution in the value of the shares resulting from the wrongful acts of Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC in excluding ROZ from further participation in the management and operation of the joint venture and in permitting Ms. Karimova to siphon off profits and assets after August 2001. These damages are $52.85 million, representing the market value of ROZ's shares as measured by the joint venture's earning capacity over its life as reasonably expected by the parties. Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC acted jointly to harm intentionally ROZ by not initiating the contractually required liquidation procedure. In addition, the various contributions to the damages cannot be

attributed individually to Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC. Claimant therefore asks that Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC be held jointly and severally liable. *In eventu*, if the Arbitral Tribunal concludes that joint and several liability is inappropriate, the Arbitral Tribunal shall apportion the damages inflicted by Uzbekistan, Uzpishcheprom, Zeromax, and TCCEC on ROZ according to their individual contributions to the damages.

5.7     Claimant seeks to recover the damages cited above plus statutory interest, as well as attorneys' fees and costs incurred in the prosecution of this arbitration.

## 6.0     RELIEF SOUGHT

The Arbitral Tribunal shall render the following Award:

1.     Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax (with Zeromax up to an amount of $15 million) shall be liable to ROZ for $52.85 million and statutory interest from August 13, 2001 until July 31, 2002, in the amount of 5% p.a., and as of August 1, 2002 and onwards statutory interest according to Article 1333 para. 2 of the Austrian Civil Code (ABGB), or such other amount as the Arbitral Tribunal may find appropriate, for all losses and damages suffered as a consequence of Uzbekistan's, Uzpishcheprom's, TCCEC's, and Zeromax's breaches of the JVA and/or for all other unlawful acts. Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax shall be held jointly and severally liable, with Zeromax's liability capped at $15 million; *in eventu*, the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax in accordance with their individual contributions. Should the above claim be dismissed, the Arbitral Tribunal shall hold Uzbekistan and Zeromax liable to ROZ for $15 million and statutory interest from November 4, 2004 onwards

according to Article 1333 para. 2 of the ABGB; or such other amount as the Arbitral Tribunal may find appropriate, for damages suffered as a consequence of Uzbekistan's and Zeromax's illegal sale and purchase of ROZ's share in CCBU. Uzbekistan and Zeromax shall be held jointly and severally liable; *in eventu* the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan and Zeromax in accordance with their individual contributions;

2. Uzbekistan and TCCEC shall be liable to ROZ for $9.9 million and statutory interest from August 13, 2001 until July 31, 2002, in the amount of 5% p.a., and as of August 1, 2002 and onwards statutory interest according to Article 1333 para. 2 of the ABGB or such other amount as the Arbitral Tribunal may find appropriate, for damages suffered as a consequence of Uzbekistan's and TCCEC's efforts to prevent CCBU from reimbursing ROZ for services and supplies provided. Uzbekistan and TCCEC shall be held jointly and severally liable; *in eventu* the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan and TCCEC in accordance with their individual contributions; and

3. Uzbekistan and Uzpishcheprom shall be liable to ROZ for $63.64 million and statutory interest from September 11, 2002 onwards according to Article 1333 para. 2 of the ABGB or such other amount as the Arbitral Tribunal may find appropriate, for damages suffered as a consequence of Uzbekistan's and Uzpishcheprom's illegal acquisition of ROZ(U)'s shares. Uzbekistan and Uzpishcheprom shall be held jointly and severally liable; *in eventu* the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan and Uzpishcheprom in accordance with their individual contributions.

4.  *In eventu*, if the Arbitral Tribunal rejects one or more of the Reliefs Sought mentioned above, Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax shall be liable to pay ROZ $52.85 million and statutory interest from May 30, 2005 onwards according to Article 1333 para. 2 of the ABGB or such other amount as the Arbitral Tribunal may find appropriate, for damages suffered as a consequence of Uzbekistan's, Uzpishcheprom's, TCCEC's, and Zeromax's refusal to initiate the liquidation procedure as required by the JVA. Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax shall be held jointly and severally liable; *in eventu*, the Arbitral Tribunal shall apportion the damages inflicted on ROZ between Uzbekistan, Uzpishcheprom, TCCEC, and Zeromax in accordance with their individual contributions.

In addition, the Arbitral Tribunal shall award Claimant the following compensation:

1.  AWARDING Claimant its legal, expert, executive, and other costs incurred in connection with this arbitration.

2.  AWARDING that Respondents are ordered to make all these payments within 14 days.

3.  AWARDING Claimant such other and further relief as the Arbitral Tribunal may deem appropriate under Austrian law.

## 7.0    **NUMBER OF ARBITRATORS**

7.1  According to Article 15.2 of the JVA, three arbitrators are to be appointed in accordance with the Vienna Rules.

## 8.0    NOMINATION OF ARBITRATOR

8.1    Claimant nominates The Honorable (Retired) Thomas Penfield Jackson as an arbitrator.

His contact information is as follows:

> The Honorable Thomas Penfield Jackson (Retired)
> Jackson & Campbell, PC
> One Lafayette Center, South Tower
> 1120  20th Street, NW
> Washington, DC  20036-3437
> Phone:  (202) 457-1600
> Facsimile:  (202) 457-1678

Respectfully submitted,

Stuart H. Newberger
Alan W.H. Gourley
Alyssa Gsell
Sobia Haque
Peter J. Eyre
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
United States of America
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
E-mail:  snewberger@crowell.com
          agourley@crowell.com
          agsell@crowell.com
          shaque@crowell.com
          peyre@crowell.com

Attorneys for ROZ Trading, Ltd.

Date:   June 1, 2006

Dr. Rudolf K. Fiebinger
DDr. Karina Hellbert
Fiebinger, Polak, Leon & Partner GmbH
Am Getreidemarkt 1
A-1060 Vienna
Austria
Telephone:  43-1-58-2-58-0
Facsimile:  43-1-58-2-58-2
E-mail:  r.fiebinger@fplp.at
          k.hellbert@fplp.at

Attorneys for ROZ Trading, Ltd.

Of Counsel:
Dr. Allan Gerson
2131 S Street, NW
Washington, DC  20008
United States of America
Telephone:  (202) 966-8557
E-mail:  gerson@gilgintl.org