# EXHIBIT 9

# JOINT VENTURE AGREEMENT

This JOINT VENTURE AGREEMENT, dated the day of *June 16*, 1993, by and among THE COCA-COLA EXPORT CORPORATION, a corporation organized and existing under the laws of the State of Delaware, United States of America, with principal offices at One Coca-Cola Plaza, N.W., Atlanta, Georgia 30313, United States of America ("TCCEC"), ROZ TRADING LTD., a limited liability company organized and existing under the laws of the Cayman Islands, United Kingdom, with offices at Elizabethan Square, P.O. BOX 847 Grand Cayman, Cayman Islands, BWI, United Kingdom ("ROZ") and THE TASHKENT SOFT DRINK ~~EXPERIMENTAL~~ PLANT at BESHAGHASH, a state-owned enterprise organized and existing under the laws of The Republic of Uzbekistan with offices at Almazar 1, Tashkent, Republic of Uzbekistan ("Beshaghash") (TCCEC, ROZ and Beshaghash are hereinafter referred to as the "Parties")

## WITNESSETH:

*Whereas* The Coca-Cola Company ("TCCC") is engaged in the manufacture and sale of certain concentrates and beverage bases ( the "Beverage Bases"), the formulae for which are industrial secrets of TCCC, from which non-alcoholic beverage syrups (the "Syrups") are prepared, and is also engaged in the manufacture and sale of the Syrups, which are used in the preparation of certain non-alcoholic beverages (the "Beverages") and which are offered for sale in bottles and other containers and in other forms or manners; and

*Whereas* TCCEC is a subsidiary of TCCC, and possesses extensive knowledge and expertise in investing in the preparation, marketing, distribution, merchandising and sale of the Beverages; and

*Whereas* ROZ is an affiliate of The Maqsudi group of companies which has outstanding expertise and decade-long experience in the manufacture, trade with and distribution of consumer goods in numerous countries, including the U.S.A., Africa, Japan and, notably, Afghanistan and The Republic of Uzbekistan; and

*Whereas* Beshaghash is a state-owned enterprise responsible for, among others, the production of soft drinks having demonstrated capabilities in the preparation, packaging, distribution and sale of non-alcoholic beverages and possesses extensive knowledge and expertise in the local market in The Republic of Uzbekistan, particularly in Tashkent state, and has full and unconditional <u>authorization to use and dispose of</u> the fixed and movable assets associated with the soft drink part of the production facility at Beshaghash which the Parties have earmarked as site for this project; and

*Whereas* the Parties and The Concern Uzpishprom, the government agency having responsibility for the food and beverages industry in The Republic of Uzbekistan, entered into a Letter of Intent dated February 8, 1993 with respect to the establishment in The Republic of Uzbekistan of a joint venture company which would combine the expertise of all Parties hereto with the objective of preparing, packaging, marketing, distributing and selling the Beverages in Tashkent and Tashkent state; and

*Whereas* the Parties desire, upon the terms and subject to the conditions set forth below, to form a limited liability company with foreign capital under the laws of The Republic of Uzbekistan (hereinafter referred to as the "Joint Venture") to (1) engage in and maximize the profitable growth of the business of the preparation, packaging, distribution and sale of the Beverages in authorized containers pursuant to a Bottler's Agreement (as hereinafter defined) or other authorizations from TCCC; (2) engage in the purchase and importation of ingredients, Beverage Bases, equipment, components and other materials necessary for the foregoing; and (3) engage in such other lawful activities and for such purposes as shall be contemplated by this Agreement, the Articles of Association (as hereinafter defined) of the Joint Venture or by a Parties' Assembly resolution of the Joint Venture;

*Now, therefore,* in consideration of the mutual covenants contained in this Agreement, the Parties hereby agree as follows:

# ARTICLE 1

## BUSINESS OF THE JOINT VENTURE

1. 1   Tha principal objective of the Joint Venture shall be to engage in and maximize the profitable growth of the business of the preparation, packaging, distribution and sale of the Beverages in authorized containers pursuant to a bottler's agreement for the preparation, packaging, distribution and sale of the Beverages in authorized containers to be concluded between the Joint Venture and TCCC in substantially the form set forth in Exhibit 1 (the "Bottler's Agreement") or other authorization from TCCC covering the territory or territories specified in the Bottler's Agreement, which will include the city and the state of Tashkent, Republic of Uzbekistan (the "Territory"); –

1. 2   To this end the Joint Venture shall purchase and import ingredients, Beverage Bases, equipment, components and other materials necessary for the foregoing. This will include, without limitation, in particular the direct importation from TCCC or its authorized suppliers, of Beverage Bases against freely convertible currency defined as United States Dollars or any currency freely traded in international currency markets and convertible into United States Dollars ("Hard Currency");

1. 3   The Joint Venture shall further engage in any such other lawful activities as may support the main business objective, including, without limitation, advertising and marketing services and promotional support of the main objective and every activity which aims at obtaining Hard Currency, such as countertrade and barter.

# ARTICLE 2

## NAME; LOCATION AND LEGAL STATUS

2.1   Name

2.1.1  The corporate name of the Joint Venture shall be "Coca-Cola Bottlers Tashkent
Limited Liability Company" in English and "Koka-Kola Ichimligi Tashkent
Cheklangan Masuliyat"" in Uzbek. Both the English and Uzbek corporate name
shall be incorporated. The trade name of the Joint Venture shall be "Coca-Cola
Bottlers Tashkent Ltd." in English and "Koka-Kola Ichimligi Tashkent C.M." in
Uzbek.

2.1.2  The Joint Venture may use the trademark and trade name COCA-COLA as part of
the corporate name of the Joint Venture only upon written consent and
authorization for this purpose from TCCC and pursuant to the terms of the Bottler's
Agreement and the Deed of Covenant in substantially the form set forth in Exhibit 2
hereto. None of the Parties shall obtain any rights with respect to such trademark or
trade name by reason of this Agreement or their status as shareholders of the Joint
Venture. Any breach of such specific authorization shall entitle TCCC to terminate
all rights to the use of such trademark and trade name and to any injunctive and
other relief available in the courts of The Republic of Uzbekistan and in other
jurisdictions. If the Joint Venture ceases to be authorized to use the name
COCA-COLA or if the Bottler's Agreement or the Deed of Covenant should be
terminated for any reason, the Parties agree to take all actions necessary to cause
the name of the Joint Venture to be changed.

2.2   Location

The registered office and legal address of the Joint Venture shall be at Almazar 1,
Tashkent, Republic of Uzbekistan, and the Joint Venture shall conduct its business
enterprise in the Territory.

JM

**2 3    Legal Status**

2. 3. 1   The Joint Venture shall be an entrepreneurial association in the form of a limited
liability company as is generally envisaged and allowed in the *Uzbek Law on
Enterprises* and the *Regulation on the Procedure for Establishment and Activities of
Enterprises with Foreign Investments Investment approved by the Resolution 290 of the
Cabinet of Ministers to the President of The Republic of Uzbekistan on November 12, 1991.*

2. 3. 2   For purposes of this Agreement "limited liability" shall mean that, while the Joint
Venture is fully liable for its obligations up to an amount corresponding to its
registered share capital, the *Parties* have no liability for the obligations of the Joint
Venture over and above paying in in full their contributions to the registered share
capital of the Joint Venture.

2. 3. 3   The Joint Venture shall be an independent, autonomous legal entity having its own
rights and obligations which includes, without limitation, the ability to enter into
contracts, to acquire rights, to enter into and perform obligations, to sue and to be
sued in court and arbitral tribunals and to establish branches and subsidiaries. The
Joint Venture shall be separate and distinct from the Parties and its property and
assets shall not be jointly owned by any of the Parties.

2. 3. 4   The duration of the Joint Venture shall be unlimited, unless it is liquidated pursuant
to this Agreement or the Articles of Association of the Joint Venture in substantially
the form of the Exhibit 3 hereto (the "Articles of Association").

2. 3. 5   The Joint Venture shall exercise its activities in conformity with the mandatory
provisions of Uzbek law, this Agreement, its Articles of Association, the Bottler's
Agreement and all other agreements and documents ancillary to this Agreement.

## ARTICLE 3

## ESTABLISHMENT OF THE JOINT VENTURE

3. 1   Simultaneously with the execution of this Agreement the Parties, as founders of the
Joint Venture, shall execute the Articles of Association;

6

3. 2    Thereafter, Beshaghash shall promptly initiate the process for obtaining all approvals, permits, consents, authorizations and licenses from all governmental or governmentally empowered entities, central bank or similar authority or any other executive, legislative or judicial entity necessary for (a) the registration, establishment and operation of the Joint Venture, (b) the contribution and transfer of the in-kind contributions of Beshaghash and TCCEC to the Joint Venture as defined in Section 4.2.1, *infra*, and (c) the effecting of all other transactions and activities contemplated by this Agreement (including, but not limited to, the approval to establish the Joint Venture pursuant to the *Uzbek Foreign Investment Law*; the approval for Beshaghash to invest in the Joint Venture; the agreement of the City of Tashkent to transfer the land use rights to the land associated with the soft drink production facility at Beshaghash to the Joint Venture in the form of a fifty-year lease; the government approval to transfer the title to the buildings and movable and immovable equipment associated with Beshaghash to the Joint Venture and the opinion by the Tashkent Expert Commission on the feasibility study) (the "Official Approvals");

3. 3    Immediately after confirmation of the Official Approvals has been received, Beshaghash shall submit the Joint Venture for registration with the registry of The Republic of Uzbekistan in accordance with the provisions of the *Regulation on the Procedure of State Registration of Enterprises with Foreign Investment approved by the Resolution 290 of the Cabinet of Ministers to the President of The Republic of Uzbekistan on November 12, 1991.*

3. 4    No later than on the day of submission of the Joint Venture for registration the Parties shall effect their initial contributions to the share capital of the Joint Venture as provided for in Section 4.4.1.;

3. 5    Immediately after confirmation of the registration of the Joint Venture has been received, the Managing Director shall cause the Joint Venture to accede to this Agreement by setting his signature under this Agreement whereby the Joint Venture shall be bound by all terms and conditions of this Agreement;

3. 6    Immediately following the registration of the Joint Venture the Lease Agreement in substantially the form of the Exhibit 4 between The City of Tashkent and the Joint Venture by virtue of which the unrestricted and irrevocable rights to use the land associated with Beshaghash for a term of at least 50 years is conferred to the Joint Venture (the "Lease Agreement"), shall be executed;

3. 7    Within a week from the entry into effect of this Agreement Beshaghash shall deliver to the Joint Venture all books relating to the in-kind contributions of Beshaghash which it has agreed to contribute to the Joint Venture in return for a share in the capital of the Joint Venture pursuant to Section 4.2.1 ,infra, (the "Contributed Assets"). TCCEC and ROZ shall have the right to copy and use the books and records to respond to inquiries or to defend claims directly concerning the business of the Joint Venture.

## ARTICLE 4
## SHARE CAPITAL

4. 1    Share Capital

The initial registered share capital of the Joint Venture shall be Roubles 5, 031, 036, 000 (Roubles five billion thirty-one million thirty-six thousand), equalling US$ 5, 307, 000 (United States Dollars five million three hundred seven thousand) at the exchange rate applicable on May 31, 1993.

4. 2    Investment by the Parties

4. 2.1  The registered share capital shall be comprised of the following contributions of the Parties:

TCCEC                   *cash contribution* in the amount of 1, 601, 172, 000Roubles (= US$ 1, 689, 000 (United States Dollars one million six hundred eighty-nine thousand))

                        *in-kind contribution* in the form of Beverages Bases valued collectively at 75, 840, 000 Roubles (=US$ 80, 000 (United States Dollars eighty-thousand)).

*total contribution*: 1, 677, 012, 000 Roubles (=US$ 1, 769, 000 (United States Dollars one million seven hundred sixty-nine thousand))

ROZ

*cash contribution* in the amount of 1, 677, 012, 000 Roubles (=US$ 1, 769, 000 (United States Dollars one million seven hundred sixty-nine thousand))

*total contribution*: 1, 677, 012, 000 Roubles (=US$ 1, 769, 000 (United States Dollars one million seven hundred sixty-nine thousand)).

Beshaghash

*in-kind contribution* in the form of (1) the irrevocable, unconditional and full right, title (or equivalent right) and interest to (a) the buildings constituting the soft drink production facility Beshaghash and (b) to all existing machinery and movable and immovable plant equipment at the soft drink production facility Beshaghash and (2) the use and maintenance rights to all utilities available at Beshaghash, including, without limitation, power, gas and water supply; all in-kind contributions being valued collectively at 1, 677, 012, 000 Roubles (=US$ 1, 769, 000 (United States Dollars one million seven hundred sixty-nine thousand));

*total contribution*: 1, 677, 012, 000 Roubles (=US$ 1, 769, 000 (United States Dollars one million seven hundred sixty-nine thousand). The in-kind contributions of Beshaghash are described in more detail in Annex 1 hereto.

The exchange rate for the Rouble contribution to the initial share capital shall be the rate applicable on May 31, 1993 *i.e.* 948 Roubles to one United States Dollar. Any subsequent change in the exchange rate between the United States Dollar and the Rouble shall have no impact on the share ownership of the Parties with respect to the initial contributions to the share capital.

4. 2. 2    Based on the above contributions, the share ownership of the Parties in the Joint Venture shall be as follows:

TCCEC:                              share ownership 33.33%

ROZ:                               share ownership 33.33%

Beshaghash:                        share ownership 33.33%

### 4. 3    Capital Increase

4. 3. 1   In the event that the Joint Venture requires additional capital resources with the
purpose to extend its production needs, by building a new plant, the Parties will
make contributions in the form of buildings, equipment, concentrate and any other
necessary capital. In the event that such increase in capital is required, which shall
be established by the Supervisory Board, the Parties hereto agree to cause their
representatives to vote for the capital increase in the Parties' Assembly, which vote
shall, notwithstanding the local requirement of unanimity, require the absolute
majority.

The share of the Parties in the authorized capital will accordingly increase pro rata
to the contributions made.

4. 3. 2   If a Party decides not to subscribe to its pro rata share in the capital increase the
other Party or Parties, as the case may be, shall have the right to subscribe on a pro
rata basis to the share of the Party (ies) electing not to participate in the capital
increase.

### 4. 4    Payment modalities

4. 4. 1   *cash contributions*: 50% of the cash capital contributions of the Parties shall be
deposited in United States Dollars in an account with *Creditanstalt-Bankverein*,
Vienna, Austria in the name of "*Coca-Cola Bottlers Tashkent Ltd. in formation*" no later
than on the date the Joint Venture is submitted for registration pursuant to Section
3.3. *Creditanstalt-Bankverein* shall issue a written confirmation that the initial cash
contributions have been duly paid in and can, as soon as *Creditanstalt-Bankverein*
has received the documents evidencing that the Joint Venture has been registered,
be freely disposed of by the Managing Director of the Joint Venture. The remaining
50% of the cash capital contributions of the Parties shall be deposited in said bank
account with *Creditanstalt-Bankverein* in United States Dollars on a date to be stated
in a Parties' resolution but no later than one year after the date of registration of the
Joint Venture. Following the registration of the Joint Venture, the Managing

Director shall open a Rouble account and a Hard Currency account in the name of "*Coca-Cola Bottlers Tashkent Ltd.*" with a commercial bank in The Republic of Uzbekistan in which the revenues generated by the Joint Venture shall be deposited.

The initial cash contributions shall be utilized to invest in building renovation and refurbishing, equipment and general overhaul, vehicles and forklifts, furniture and fittings, Beverage Bases, bottles, cases, pallets as and when necessary. The amount of cash remaining after these investments have been made shall be deposited in the Hard Currency account in the name of "*Coca-Cola Bottlers Tashkent Ltd.*" with a commercial bank in the Republic of Uzbekistan mentioned in the preceding paragraph.

4. 4. 2   *in-kind contributions:* The in-kind contribution of TCCEC shall be made available to the Joint Venture no later than thirty days from the date of registration of the Joint Venture. The in-kind contributions of Beshaghash shall be made available to the Joint Venture no later than on the date of registration of the Joint Venture.

# ARTICLE 5
## TRANSFER OF SHARES

5. 1   The shares of the Parties shall not be represented in share certificates, *i.e.* they are not transferrable by negotiable instruments. The shares or any part thereof shall be transferrable, however, provided the following requirements are fulfilled:

5. 2   In the event that TCCEC wishes to transfer its share

5. 2. 1   TCCEC shall have the unconditional right to freely transfer the whole or any part of its share to one of TCCEC's affiliates or subsidiaries, including without limitation, TCCC, and, after the expiration of a two-year period following the registration of the Joint Venture, to ROZ, to one of its fully-owned subsidiaries or to one of its affiliates having the same ownership structure as ROZ. The price of the share offered shall correspond to its fair market value as determined by agreement of TCCEC and the transferee. If such agreement cannot be reached, the fair market value shall be determined by Ernst & Young, London, which determination shall be binding.

5. 2. 2  If TCCEC receives a bona fide offer from any individual , corporation, partnership, unincorporated organization or any government or political subdivision thereof (a "Person") other than the Parties to the Joint Venture ("Third Party") to purchase the whole or any part of its share ("Third Party Offer"), then TCCEC shall first offer to sell such share to ROZ and Beshaghash, who shall have the right for 20 days to purchase such share at the same price and upon the same terms and conditions of the Third Party Offer pro rata to their share.

Should Beshaghash or ROZ elect not to purchase the share offered, then Beshaghash or ROZ, as the case may be, shall have the right to purchase the share which has not been purchased by the other Party for 10 days. If neither Beshaghash nor ROZ elect to purchase the share offered, then TCCEC shall have the right to sell the share to a Third Party only at the same price and upon the same terms and conditions of the Third Party Offer for a period of 120 days following Beshaghash's and ROZ's decline to purchase .

5. 3   in the event that ROZ wishes to transfer its share

5. 3. 1  ROZ shall, after the expiration of a two-year period following the registration of the Joint Venture, have the unconditional right to freely transfer the whole or any part of its share to (a) TCCEC or to one of its affiliates or subsidiaries or (b) to one of ROZ's fully-owned subsidiaries or to one of ROZ's affiliates having the same ownership structure as ROZ. The price of the share offered shall correspond to its fair market value as determined by agreement of ROZ and the transferee. If such agreement cannot be reached, the fair market value shall be determined by Ernst & Young, London, which determination shall be binding.

5. 3. 2  If ROZ receives a Third Party Offer, then ROZ shall first offer to sell such share to Beshaghash and TCCEC who shall have the right for 20 days to purchase such share at the same price and upon the same terms and conditions of the Third Party Offer pro rata to their share.

Should Beshaghash or TCCEC elect not to purchase the share offered, then Beshaghash or TCCEC, as the case may be, shall have the right to purchase the share which has not been purchased by the other Party for 10 days. If neither Beshaghash nor TCCEC elect to purchase the share offered, then ROZ shall have the right to sell the share to a Third Party only at the same price and upon the same terms and conditions of the Third Party Offer for a period of 120 days following Beshaghash's and TCCEC's decline to purchase.

5. 4    *in the event that Beshaghash wishes to transfer its share*

If Beshaghash receives a bona fide offer from one of the Parties or from a Third Party to purchase the whole or any part of its share, then Beshaghash shall first offer to sell such share to TCCEC and ROZ, who shall have the right for 20 days to purchase such share at the same price and upon the same terms and conditions of the bona fide offer from one of the Parties or from the Third Party pro rata to their share.

Should TCCEC or ROZ elect not to purchase the share offered, then TCCEC or ROZ, as the case may be, shall have the right to purchase the share which has not been purchased by the other Party for 10 days. If neither TCCEC nor ROZ elect to purchase the share offered, then Beshaghash shall have the right to sell the share to a Third Party only at the same price and upon the same terms and conditions of the Third Party Offer for a period of 120 days following TCCEC's and ROZ's decline to purchase.

5. 5    Any Third Party transferee must agree in writing to be bound by this Agreement.

# ARTICLE 6
# GOVERNING BODIES

6. 1    The Parties' Assembly

6. 1. 1    The Parties' Assembly is the supreme governing body of the Joint Venture. Each of
the Parties shall be represented in the Parties' Assembly by one delegate who shall
have the right to vote the share of the Party he is representing. Each of the Parties
shall appoint an alternate delegate who shall represent the Party appointing him at
any meeting in which the main-delegate is unable to participate. Each Party shall
have the right at any time to substitute another person for the delegate or the
alternate delegate, which person shall produce a power of attorney conferring the
right to represent one of the Parties at the Parties' Assembly.

6. 1. 2    The following decisions shall be subject to a Parties' Assembly resolution:

6.1.2.1      approval of the annual financial statement (balance sheet and profit
& loss account)

6.1.2.2      establishment and distribution of dividends

6.1.2.3      approval of the purchase, sale, transfer, pledge of real estate or other
financial transaction the value of which exceeds 1/5 of the registered
share capital

6.1.2.4      dissolution, liquidation, merger or other business combination of the
Joint Venture

6.1.2.5      appointment and removal of the Managing Director

6.1.2.6      amendment of the Articles of Association including, without
limitation, a capital increase and the change, modification or
expansion of the business objectives of the Joint Venture.

6.1.3  The meetings of the Parties' Assembly shall be held at the Beshaghash plant or at such other place as agreed unanimously between the Parties and they shall be called by a member of the Supervisory Board or the Managing Director at least once a year within six months upon closure of the fiscal year for the purpose of approving the annual financial statement. A Parties' Assembly meeting must also be called if considerable interests of the Joint Venture so demand or if it has been ascertained that the accumulated net losses add up to more than one half of the share capital of the Joint Venture.

6.1.4  The Managing Director or member of the Supervisory Board calling the Parties' Assembly shall notify each Party at their legal addresses indicated *infra* Section 16.8 by telefax (to be confirmed by registered mail) at least 10 days before the day of the meeting indicating the purpose of the meeting (the agenda). In the event that all Parties are present or represented and have no objections, decisions of the Parties' Assembly can be reached without the requirements stated in this Section 6.1.4. having to be met. Any decision taken without the above procedures having been observed is null and void.

6.1.5  The presence of the Parties' delegates representing 100% of the share capital shall constitute a quorum for the transaction of business by the Parties' Assembly; if a quorum cannot be constituted at a meeting, a second meeting shall be called in accordance with the procedure of Section 6.1.4 and a quorum shall be considered attained if more than 50% of the share capital is present.

6.1.6  The Parties' Assembly shall pass its resolutions by the absolute majority *i.e.* with the approval of the Parties' delegates representing more than 50% of the total registered share capital regardless of the quorum.

6.1.7  A Parties' resolution requiring the absolute majority may validly be taken by written consent in the form of a circular letter in lieu of a Parties' meeting provided that each Party gives its written consent to this procedure.

6.1.8  The following decisions shall require the presence and the approval of Parties' delegates representing 100% of the total registered share capital (unanimity):

6.1.8.1  the amendment of the Articles of Association, excepting the increase of the share capital, which shall be decided by absolute majority;

6.1.8.2  the merger or other business combination of the Joint Venture;

6.1.8.3  the sale of all or substantially all the assets of the Joint Venture.

6.1.8.4  the material change or modification, but not the expansion, of the main objectives of the Joint Venture.

6. 1. 9   Minutes of the Parties' meetings shall be established in English and Russian and shall be signed by all participating delegates, whereupon they shall be regarded as valid and authentic rendering of the Parties' meetings. Both versions shall be equal, provided that, in the event of a difference in the interpretation of the English and Russian versions, the English version of the minutes will prevail.

6. 2   The Supervisory Board

6. 2. 1   The Supervisory Board shall consist of three members. The Parties shall have the right to delegate the following number of members, which shall have the right to vote the share of the Party they represent, to the Supervisory Board :

TCCEC                        one member

ROZ                          one member

Beshaghash                   one member

6. 2. 2   The Managing Director may not serve as member to the Supervisory Board. The members of the Supervisory Board shall serve for an initial two year period.

6. 2. 3   Each of the Parties may, at any time, substitute another person for the member of the Supervisory Board delegated, which substitute shall produce a power of attorney conferring the right to substitute for a member of the Supervisory Board.

6. 2. 4   The Supervisory Board shall have the right to appoint one of its members as Chairman of the Supervisory Board. The Chairman of the Board shall be responsible for calling the meetings of the Supervisory Board upon request of anyone of its members or the Managing Director and shall conduct the meetings of the Supervisory Board. Excepting these responsibilities, the position of the Chairman of the Board shall be equal to that of the other members of the Supervisory Board.

JM

6. 2 5  The Supervisory Board shall meet when necessary, but shall hold at least two
sessions a year. The decisions of the Supervisory Board may be adopted in writing
in form of a circular letter if all members of the Supervisory Board agree in writing
to this procedure.

6. 2 6  The Supervisory Board shall constitute a quorum only by way of presence of
members representing 100% of the share capital; if a quorum is not present at a
meeting, the Chairman shall call a second meeting by notifying each member of the
Supervisory Board at their legal addresses indicated infra Section 16.8 by telefax (to
be confirmed by registered mail) at least 10 days before the day of the meeting. The
second meeting shall constitute a quorum by way of presence of members
representing more than 50% of the total registered share capital.

6. 2 7  The Supervisory Board shall reach its decisions by the vote of its members
representing more than 50 % of the total registered share capital, regardless of the
quorum.

6. 2 8  The Supervisory Board shall supervise the management of the Joint Venture.

6. 2 9  The Supervisory Board shall have the right to request reports from the management
on all matters pertaining to the business of the Joint Venture and shall have the
right to inspect and audit the Joint Venture's books and documents as well as all of
its assets.

6. 2. 10  The following (trans) actions shall require the approval of the Supervisory Board:

6.2.10.1  all activities not within the regular course of business of the Joint
Venture, including, but not limited to, the execution, modification or
cancellation of any contract the value of which exceeds one tenth of the
registered share capital of the Joint Venture

6.2.10.2  the annual programs as required under the Bottler's Agreement, the
three year operational business plans ("OBPs") and the annual budget
plans ("ABPs")

6.2.10.3  the institution, termination, or settlement of any litigation with third
parties where the amount in controversy exceeds US$ 25, 000.

6.2.10.4  the determination of the total number of employees of the Joint Venture

6.2.10.5  bonus and compensation of key staff

6.2.10.6  collective bargaining agreement

6.2.10.7    hiring and termination of executive staff (including the First Deputy to the Managing Director, technical, finance, marketing and sales managers)

6.2.10.8    the adoption and periodic revision of a chart setting forth the precise limits of the authority of the Managing Director and the executive staff of the Joint Venture (the "Chart of Authority")

6.2.10.9    hiring of any salaried employee with a total annual gross compensation in excess of US$ 25,000 or the retention of any person on a commission or the termination of employment of any salaried employee with a total annual gross compensation in excess of US$ 25,000

6.2.10.10    public announcements as described in Section 11.4.

6.2.10.11    reorganization or adoption of or change in any major policy of the Joint Venture relating to operations, manufacture, sale of products, or product lines

6.2.10.12    capital expenditures in excess of US$ 25,000 at any one time

6.2.10.13    indebtedness in excess of US$ 25,000 at any one time

6.2.10.14    guarantees of payment by or of performance of obligations of third parties

6.2.10.15    creation of liens, mortgages, encumbrances, or other charges of any kind on any asset of the Joint Venture

6.2.10.16    reinvestment of earnings

6.2.10.17    employee pension and other benefit programs

6.2.10.18    purchase and sale of real estate

6.2.11    The Supervisory Board shall represent the Joint Venture with regard to all agreements or transactions between the Joint Venture and the Managing Director of the Joint Venture.

6.2.12    Minutes of the meetings of the Supervisory Board shall be established in English and Russian and shall be signed by all participating Board members, whereupon they shall be regarded as valid and authentic rendering of the Board meetings. Both versions shall be equal, provided that, in the event of a difference in the interpretation of the English and Russian versions, the English version of the minutes will prevail.

**6. 3    The Managing Director**

6. 3. 1   The Joint Venture shall have one Managing Director who shall manage, decide and take dispositions with regard to all of the day-to-day operations and the regular and ordinary business of the Joint Venture. The Managing Director shall be appointed by the Parties' Assembly.

6. 3. 2   The Managing Director shall be assisted in the exercise of his duties by a specialist executive to be hired with the approval of the Supervisory Board and who shall have the title "First Deputy to the Managing Director". The Parties agree that this position will be filled by the existing director of Beshaghash and shall cause the Supervisory Board to give its approval to his recruitment.

The Supervisory Board may hire such additional number of executive staff responsible for certain areas (e.g. finance manager, technical manager, marketing manager) to assist the Managing Director in fulfilling his obligations as it deems necessary.

6. 3. 3   The Managing Director shall at all times act in accordance with and within the limitations of the laws of The Republic of Uzbekistan, this Agreement, the Articles of Association and the guidelines and resolutions of the Parties' Assembly and the Supervisory Board, including the Chart of Authority to be adopted by the Supervisory Board at its first meeting.

6. 3. 4   The Managing Director shall have the right to sign in behalf of the Joint Venture by his sole signature. He shall represent the Joint Venture in and outside of court. The Managing Director shall be responsible and liable to the Joint Venture for keeping within the limitations of his powers of representation. Third parties, however, may rely on the comprehensive representation power of the Managing Director.

6. 3. 5   If the Managing Director breaches his duties he shall be liable to the Joint Venture for all resulting damages. In particular, without limitation, the Managing Director shall be liable to the Joint Venture for damages resulting from transactions (a) requiring the approval of the Supervisory Board concluded without having obtained such prior approval and (b) violating the Chart of Authority.

19

6. 3. 6  The Managing Director shall receive a monthly remuneration from the Joint Venture in an amount determined by the Supervisory Board and stated in an employment contract to be concluded between the Managing Director and the Joint Venture, represented by its Supervisory Board.

6. 3. 7  The Managing Director may be removed by a Parties' resolution. The removal of the Manging Director shall not affect any rights under his employment contract surviving the termination thereof in accordance with its terms.

6. 3. 8  The Managing Director may neither transact business within the Joint Venture's lines of business for his own account or the account of others unless the Supervisory Board has given its consent. The Managing Director may not enter into a participation into a business pertaining to the same line of business as the Joint Venture.

# ARTICLE 7
# CONDITIONS PRECEDENT TO THE OPERATION OF THE JOINT VENTURE

7. 1  The following conditions shall be satisfied before the Joint Venture starts its operations:

7. 1. 1  All Official Approvals are obtained to the satisfaction of all Parties.

7. 1. 2  A satisfactory number, in the opinion of all Parties, of the government guarantees and incentives requested in the letter presented by the Parties to the Cabinet of Ministers to the President of The Republic of Uzbekistan attached hereto as Annex 2 have been issued.

7. 1. 3  The Parties have received the appropriate documentation evidencing the truth of the representations and warranties of the Parties (see *infra* Article 9).

7. 1. 4  The in-kind and initial cash contributions of the Parties as provided in Section 4.2.1 have been transferred or paid in.

20

7.1.5 The agreements ancillary to this Agreement (which include without limitation the Bottler's Agreement, the Deed of Covenant and the Articles of Association) have been executed.

7.1.6 The Lease Agreement between The City of Tashkent and the Joint Venture has been executed.

7.1.7 Beshaghash has ceased all dealing in the Territory in non-alcoholic beverages or syrups other than the Beverages, as soon as the Joint Venture is ready for production.

7.1.8 An initial business plan, to be later superseded by the OBP and ABP, has been established and approved by the Parties concurrently with this Agreement.

7.2 If, after the best good faith efforts of the Parties, all of the foregoing conditions are not met within 180 days after the date of execution of this Agreement by all Parties, any Party hereto may terminate this Agreement with immediate effect by issuing a written notice of termination (a "Termination Notice") to the others, and the Joint Venture shall thereupon be liquidated in accordance with Section 12.4. The Parties agree that such termination shall not result in any liability, except insofar as the failure to satisfy the foregoing conditions resulted from a breach of this Agreement.

# ARTICLE 8

## OPERATIONS

8.1 Labor Relations

8.1.1 The Joint Venture shall be properly and professionally staffed with an adequate number of competent employees. On the day the Joint Venture is to start its operations, as determined by the Managing Director, Beshaghash shall make available to the Joint Venture any of the current employees of its business as may be necessary in the judgment of the Supervisory Board for the operations of the Joint Venture. Beshaghash shall indemnify and defend the Joint Venture from and against all obligations of Beshaghash to any such employee resulting from his or her period of employment prior to joining the Joint Venture.

8. 1. 2  The Managing Director shall, within the limits of his authority, determine the terms and conditions of individual employment agreements, which shall at all times be in accordance with Uzbek law. The Managing Director shall, with the guidance and subject to the approval of the Supervisory Board, negotiate a collective bargaining agreement with the competent local trade union, if Uzbek law so requires.

8. 1. 3  Beshaghash shall use its reasonable efforts to assist the Joint Venture in obtaining visas, work permits and other necessary approvals from The Republic of Uzbekistan for all expatriate personnel of the Joint Venture or of TCCEC or ROZ, it being agreed that expatriate personnel shall be employed only if this is required to fill management and/or specialist positions. If and to the extent set forth in the respective employment agreements, expatriate personnel shall receive salaries in Hard Currency in The Republic of Uzbekistan and/or abroad.

8. 1. 4  TCCEC shall provide assistance to the Joint Venture in the development of the Joint Venture's human resources and particularly the retraining of the staff formerly employed by Beshaghash according to the standards and guidelines of TCCC.

8. 2  <u>Dividend Policy and Hard Currency</u>

8. 2. 1  The Parties agree that the first priority for the use and application of net income generated by the Joint Venture will be to reinvest in the Joint Venture's business so as to maximize its growth. To the extent any funds remain after such reinvestment and the appropriate servicing of indebtedness and other liabilities of the Joint Venture, then such funds may be made available for distribution to the Parties in proportion to their share in the Joint Venture by decision of the Parties' Assembly.

8. 2. 2  Beshaghash and ROZ agree to make best efforts to supply the Joint Venture with Hard Currency throughout its period of operation.

8. 2. 3  The Parties agree that the first priority for the use of Hard Currency shall be to pay for the imported Beverage Bases, the second priority shall be to pay expatriate personnel and the third priority shall be to remit the dividends of TCCEC and ROZ abroad.

8. 2. 4  Beshaghash agrees to exercise its reasonable efforts to assist the Joint Venture in making remittances abroad to TCCEC and ROZ in Hard Currency and in making payment to expatriate personnel in such currency.

**8. 3    Fiscal Year.**

The fiscal year of the Joint Venture shall be the calendar year, provided that the first fiscal year of the Joint Venture shall commence on the date of registration of the Joint Venture and end on the 31st December of the following year.

**8. 4    Accounting and Auditing**

8. 4. 1    The Joint Venture shall maintain books of account in United States Dollars and in Roubles, using an internationally recognized accrual method of accounting understandable for all Parties for the entry of all transactions relating to its business and operations. In addition to this all such records shall be maintained as are required under Uzbek law.

8. 4. 2    The books of account of the Joint Venture shall be audited annually by an internationally recognized auditing company. The fees and expenses of the auditor(s) shall be borne by the Joint Venture.

8. 4. 3    The books of account of the Joint Venture shall be kept at its registered address in Tashkent. Each Party or its duly authorized representative(s) shall have access to the complete books of account and records of the Joint Venture and all supporting documentation at all reasonable times and shall be entitled to make photocopies or extracts thereof.

8. 4. 4    In the absence of provisions of local law on the rates of depreciation for fixed assets, equipment and premises, the Joint Venture shall have the right to determine its own rates of depreciation.

**8. 5    Preparation of Financial Statements**

8. 5. 1    The Managing Director shall be responsible for the preparation of monthly, quarterly and annual financial reports stated in United States Dollars in conformity with the accounting method specified in Section 8. 4. 1., *supra*, to be presented to the Parties no later than 20 days following the close of any monthly reporting period and five months following the close of the fiscal year.

8. 5. 2  The financial statements shall consist of (a) the financial results for the reporting period (b) a balance sheet of assets and liabilities (c) a cash flow report showing all receipts and disbursements for the reporting period and (d) any other financial data analyses as reasonably requested by the Parties.

8. 5. 3  The Managing Director shall additionally submit all necessary and required financial statements in proper form to the appropriate government authorities as required by and within the time period(s) specified by the laws and regulations of The Republic of Uzbekistan.

8. 5. 4  At any time as may be reasonably required by the Parties, the Managing Director shall cause the Joint Venture to provide the Parties with financial and/or accounting information as they may require.

8. 6    Operational Business Plans and Annual Budget Plans.

The Joint Venture shall, annually and by the date requested by TCCEC, cause to be submitted to and discussed with TCCEC and the Parties OBPs and ABPs . The OBP shall include strategic business plans, volume projections, market share, per capita consumption, financial estimates and other information as the management or Parties may consider necessary or appropriate. The ABP shall include specific operational plans for the coming year, volume projections, market share, per capita consumption, financial estimates and other information as the management or Parties may consider necessary or appropriate.

8. 7    Taxes .

8. 7. 1  The tax returns of the Joint Venture shall be prepared by the Managing Director in accordance with the laws and regulations of The Republic of Uzbekistan taking into consideration the tax status granted to the Joint Venture.

8. 7. 2  The Joint Venture shall supply the Parties with copies of its annual income tax returns for review before such returns are filed with the appropriate government authorities and with certified and/or stamped copies of all of its tax returns as filed.

8. 7. 3   Neither the Joint Venture nor TCCEC or ROZ shall be liable for any taxes associated with activities or operations conducted by Beshaghash, either before or after the formation of the Joint Venture, or with respect to the contribution or transfer of any assets by Beshaghash to the Joint Venture. In the event that any governmental authorities impose any tax, penalty or liability on TCCEC, ROZ or the Joint Venture attributable to such activities or operations, then Beshaghash agrees to indemnify and hold harmless TCCEC, ROZ and the Joint Venture from and against any and all liability for taxes.

8. 8   <u>Expenses</u>

8. 8. 1   Each Party shall bear its own expenses incurred in conjunction with the establishment of the Joint Venture prior to its registration.

8. 8. 2   Reasonable expenses, such as attorneys' and court fees, incurred by the Parties in conjunction with the registration of the Joint Venture shall be reimbursable by the Joint Venture up to an amount of US$ 5, 000.

8. 9   <u>Environmental Compliance</u>

The Parties agree that the business of the Joint Venture at all times shall be conducted in strict and full compliance with the environmental laws in effect in The Republic of Uzbekistan.


# ARTICLE 9

# REPRESENTATIONS AND WARRANTIES

9. 1   · *Representation and Warranties of Beshaghash.*

Beshaghash hereby represents and warrants to TCCEC and ROZ as follows (for purposes of this Article 9, "represent and warrant" means to make statements of fact relating to the matters specified below, which statements of fact are being relied upon by the other Parties)

JM

9. 1. 1  <u>Legal Status</u>. Beshaghash is a state-owned enterprise being duly organized and validly existing under Uzbek law and having full legal right, power and authority to enter into this Agreement and to perform its obligations hereunder.

9. 1. 2  <u>Authority</u>. This Agreement has been duly authorized by all necessary corporate action of Beshaghash, has been executed by duly authorized representatives of Beshaghash and constitutes a legal, valid and binding obligation of Beshaghash enforceable in accordance with its terms.

9. 1. 3  <u>No Conflict</u>. The execution, delivery and performance of this Agreement by <u>Beshaghash is not *ultra vires*</u>, that is beyond Beshaghash's powers, and does not violate any provisions of

9.1.3.1    any of Beshaghash's organizational or foundation documents,

9.1.3.2    any contract, agreement or instrument to which Beshaghash or its affiliates are a party or by which it or any of its assets is bound, including but not limited to any contract, agreement or license with respect to any non-alcoholic beverage, or

9.1.3.3    any law, decree, regulation or order of The Republic of Uzbekistan, any other governmental body having authority over Beshaghash's activities, or any instrumentality of any of the foregoing.

9. 1. 4  <u>Title to Contributed Assets</u>

Beshaghash has all right, title (or equivalent right) and interest in and to the Contributed Assets. The Contributed Assets are in good operating condition and fit for the purpose for which they are being used.  The Contributed Assets are not subject to any liens, security interests, taxes, charges or other encumbrances or rights of a Person.

9. 1. 5  <u>Compliance with Law</u>. In connection with its use of the Contributed Assets and the conduct of business operations and other activities utilizing the Contributed Assets, Beshaghash has complied with all applicable laws, decrees, orders, regulations and governmental requirements and possesses and will cause to be transferred to the Joint Venture all public and private authorizations necessary to conduct such business operations.

JM

9. 1. 6  Books and Records. The books and records of Beshaghash relating to its current business are correct and complete and have been maintained in accordance with the accounting method required by Uzbek law.

9. 1. 7  Litigation. Neither Beshaghash nor the Contributed Assets are affected by or the subject of any pending or threatened litigation, arbitration, administrative proceeding or investigation. There are no outstanding judgments, orders, writs, injunctions or decrees, whether of a judicial body or a governmental entity, affecting Beshaghash or the Contributed Assets.

9. 1. 8  Employee Matters. All contributions required to be made by Beshaghash under all present and former benefit plans (e.g., bonuses, payments-in-kind, saving plans, company pension plans) to the employees who are to become employees of the Joint Venture together with retirees or terminated employees have been paid in full on a timely basis, and no liability will accrue to the Joint Venture with respect to any such plan. There are no pending or threatened disputes regarding Beshaghash's relationship with its current or former employees.

9. 1. 9  Environmental Matters. Beshaghash has conducted its current business and utilized the Contributed Assets in full compliance with all applicable environmental, pollution, planning and waste disposal laws, regulations, orders and directives, and Beshaghash has, and the Joint Venture will have, no liability in connection with Beshaghash's current business or the utilization of the Contributed Assets from the use, storage, transportation, disposal or release into the environment of any polluting or hazardous material, and there exist no events or circumstances relating to any such acts that could give rise to liability or damages on the part of Beshaghash or the Joint Venture or affect the Contributed Assets or otherwise interfere with the Joint Venture's operations.

9. 1. 10 Disclosure. All information provided by Beshaghash to TCCEC and/or ROZ and their respective representatives (including by means of the foregoing representations and undertakings made under this Article 9) has been completely and accurately disclosed and does not misrepresent or omit any information which is of material importance in determining the status of Beshaghash's existing business and the Contributed Assets. ·

9. 2    *Representations and Warranties of TCCEC and ROZ*

TCCEC represents and warrants to ROZ and Beshaghash and ROZ represents and warrants to TCCEC and Beshaghash as follows:

9. 2. 1    Authority. This Agreement has been duly authorized by all necessary corporate action of TCCEC/ROZ, has been executed by a duly authorized representative of TCCEC/ROZ and constitutes the legal, valid and binding obligation of TCCEC/ROZ, enforceable in accordance with its terms.

9. 2. 2    No Conflict. The execution, delivery and performance of this Agreement by TCCEC/ROZ do not violate any provisions of

9.2.2.1    TCCEC's/ROZ's organizational or foundation documents,

9.2.2.2    any contract or instrument to which TCCEC/ROZ is a party or by which it or any of its assets is bound, or

9.2.2.3    any law, decree, regulation or order applicable to TCCEC's/ROz's business.

9. 2. 3    Approvals and Consents. Except for the Official Approvals, no approvals, consents or licenses are required to be obtained in order to enable TCCEC/ROZ to enter into this Agreement and perform its obligations hereunder.

9. 3    *Representations and Warranties of ROZ.*

ROZ represents and warrants to TCCEC and Beshaghash as follows:

9. 3. 1    Legal Status. ROZ is a limited liability company duly organized and validly existing under the laws of the Cayman Islands, United Kingdom, and has full legal right, power and authority to enter into this Agreement and to perform its obligations hereunder.

9. 4    *Representations and Warranties of TCCEC.*

TCCEC represents and warrants to ROZ and Beshaghash as follows:

9. 4. 1    Legal Status. TCCEC is a corporation duly organized and validly existing under the laws of the State of Delaware, United States of America, and has full legal right, power and authority to enter into this Agreement and to perform its obligations hereunder.

# ARTICLE 10

## INDEMNIFICATION

10.1 <u>Indemnities</u>   Each of the Parties (the "Indemnifying Party") agrees to reimburse, indemnify and hold harmless the other Parties and their respective employees, directors, agents and affiliates and the Joint Venture (the "Indemnified Parties") at all times hereafter from and against any and all claims, charges, demands, and all damages (including, without limitation, fines, penalties and criminal or civil judgments), losses, liabilities, deficiencies, expenses (including attorneys' and accountants' fees) and/or any payments required to be made by any Indemnified Party arising out of or resulting from, or with respect to, without limitation:

10.1.1 any breach by the Indemnifying Party of any representation, warranty, assurance or covenant contained in this Agreement; and

10.1.2 any failure of the Indemnifying Party to perform in all respects its obligations under this Agreement.

10.2 <u>Statements as Representations</u>

All statements contained herein or in any certificate, schedule, list, exhibit, document or other writing delivered pursuant hereto or in connection with the transactions contemplated hereby shall be deemed representations and warranties within the meaning of Sections 9.1 and 10.1 hereof.

10.3 <u>Procedure</u>

In the event of any claim by a Party under Section 10.1, the Party asserting the claim shall notify the Indemnifying Party in writing of said claim, which notice shall set forth the basis of the claim and, if then determinable by the Party asserting the claim, an estimate of the amount thereof.

10.4 <u>Remedies Cumulative</u>

The right to indemnification as set forth in this Article 10 shall be cumulative and shall not preclude a Party from asserting any other rights or seeking any other remedies against another Party or its successors or assignees. The provisions of

Sections 10.1 through 10.3 are in addition to and do not amend or supersede any indemnification provision of the Bottler's Agreement.

## ARTICLE 11

## CONFIDENTIALITY

11. 1    _Confidentiality Obligations_

11. 1 .1 The Parties recognize that (a) in the course of forming and operating the Joint Venture each of them may disclose to the others information about the disclosing Party's business or activities which such Party considers proprietary and confidential and (b) that the Joint Venture itself may develop or acquire proprietary and confidential information which it will disclose to the Parties (all of such proprietary and confidential information is hereinafter referred to as the "Confidential Information"). The Party who receives any Confidential Information (the "Receiving Party") agrees to maintain confidential status for such Confidential Information for a period of not less than 10 years from the date of disclosure, not to use any such Confidential Information for any purpose other than the purpose for which it was originally disclosed to the Receiving Party and not to disclose any of such Confidential Information to any Person, unless such information:

    11.1.1.1    is or has become part of the public domain from a source other than the Joint Venture or the Receiving Party;

    11.1.1.2    was already known to the Receiving Party at the time it was disclosed to the Receiving Party;

    11.1.1.3    is disclosed to the Receiving Party by a Person who is not under any legal obligation prohibiting such disclosure; or

    11.1.1.4    is required to be disclosed by law (subject to paragraph 11.1.2 below).

11. 1. 2 The Parties acknowledge that each of them may be required by law to disclose Confidential Information to government authorities, upon the advice of counsel, or in connection with the obtaining of Official Approvals or the registration of the Joint venture, and each shall endeavor to limit disclosure to that purpose. Each Party will give the others prior written notice of any disclosure pursuant to this paragraph, which notice shall specify the substance of any such disclosure.

11. 2    _No Amendment_

JH

30

The Parties acknowledge and agree that the confidentiality obligations contained in this Agreement are in addition to and do not supersede or amend those contained in the Bottler's Agreement. The confidentiality obligations set forth herein shall survive and continue to apply after the termination of this Agreement.

### 11.3   Proprietary Information of TCCC

Notwithstanding anything to the contrary contained herein, in no case shall any information proprietary to TCCC be disclosed in any manner without its prior written approval. The prohibition set forth in this Section 11.3 shall not be subject to any time limitation.

### 11.4   Public Announcements

The Parties agree not to make any public announcement about the Joint Venture unless and until the Supervisory Board agrees to the content and manner of dissemination of such public announcement; provided, however, that if counsel for TCCEC advises TCCEC that disclosure is required under the securities laws or stock exchange rules applicable to TCCEC or any of its affiliates, then TCCEC is not obligated to seek the other Parties' prior approval but will provide a copy of such disclosure to the other Parties.

## ARTICLE 12

## TERM, TERMINATION AND LIQUIDATION

### 12.1   Term

This Agreement shall be effective from the date of signature of the last Party to sign, and shall have an unlimited duration unless it is earlier terminated pursuant to this Article 12 or Section 7.2.

Upon termination of this Agreement the Parties hereto agree to call a Parties' Assembly and to adopt a Parties' resolution by virtue of which the Joint Venture shall be liquidated in accordance with Section 12.4.

The provisions of this Agreement on indemnification, confidentiality, liquidation and arbitration shall survive termination of this Agreement.

## 12 2   Termination and Liquidation

12. 2. 1 This Agreement shall terminate 30 days after issuance of a Termination Notice provided that such Termination Notice has not been revoked by the Party that issued it prior to the expiration of such 30 day period.

12. 2. 2 *Beshaghash* shall be entitled to terminate this Agreement by issuing a Termination Notice to TCCEC and ROZ, with a copy to the Joint Venture, following the occurrence of any of the following events:

12.2.2.1   the breach by TCCEC or ROZ of any material term of this Agreement if not cured within 60 days after receipt by the purported breaching party of written notice of such breach from Beshaghash which notice shall set forth in reasonable detail the facts forming the basis of the breach; or

12.2.2.2   a material change, in the opinion of Beshaghash, in the present ownership, or control, or management of any of the other Parties; or

12.2.2.3   an event of Force Majeure entitling Beshaghash to terminate pursuant to Section 12.3; or

12.2.2.4   any of the other Parties or its assets becomes the subject of bankruptcy, insolvency, liquidation or similar proceedings with respect to the rights of creditors, which proceedings are not dismissed or otherwise terminated within 60 days after their commencement; or

12.2.2.5   the termination for any reason of the Bottler's Agreement.

12. 2. 3 *TCCEC and ROZ* shall be entitled to terminate this Agreement by issuing a Termination Notice to the other Parties, with a copy to the Joint Venture, following the occurrence of any of the following events:

12.2.3.1   the breach by any other Party of any material term of this Agreement if not cured within 60 days after receipt by the purported breaching Party of written notice of such breach from TCCEC/ROZ, which notice shall set forth in reasonable detail the facts forming the basis of the breach; or

12.2.3.2   an event of Force Majeure entitling TCCEC/ROZ to terminate pursuant to Section 12.3; or

12.2.3.3   in the event of any adverse change in Uzbek law as it relates to the Joint Venture or if it becomes impossible in the judgment of TCCEC/ROZ for the Joint Venture to carry on its business in a manner consistent with its objectives and, at the same time, the Parties cannot agree that there is any reasonable possibility for future business activities; or

*JM*

12.2.3.4    any termination of the Lease Agreement concerning the land associated with the soft drink production facility Beshaghash; or

12.2.3.5    any of the other Parties or its assets becomes the subject of bankruptcy, insolvency, liquidation or similar proceedings with respect to the rights of creditors, which proceedings are not dismissed or otherwise terminated within 60 days after their commencement; or

12.2.3.6    TCCEC/ROZ is effectively impeded from exercising its rights of management in the Joint Venture due to causes beyond its control, including without limitation

12.2.3.6.1    the imposition of or compliance with any law, act, decree, regulation or order issued by a governmental agency or body;

12.2.3.6.2    the denial of requisite visas, work permits or residence permits for TCCEC/ROZ personnel or non-Uzbek personnel of the Joint Venture to enter, reside and work in and exit The Republic of Uzbekistan; or

12.2.3.6.3    the expropriation, nationalization or seizure of any property of the Joint Venture, or any direct or indirect ownership interest therein; or

12.2.3.7    a material change, in the opinion of TCCEC/ROZ, in the present ownership, or control, or management of any of the other Parties ; or

12.2.3.8    the termination for any reason of the Bottler's Agreement.

## 12 3 Force Majeure

12. 3. 1    For purposes of this Agreement "Force Majeure" shall mean any order, regulation, decree, law, statute or directive, whether promulgated in the form of law or otherwise of any governmental entity which asserts jurisdiction over the assets or activities of the Joint Venture and/or the parties, any insurrection, riot, war, state of emergency, boycott, embargo, strike, other labor disturbance, fire, flood or other Act of God, or any other cause beyond the reasonable control of the Joint Venture.

12. 3. 2    No Party shall be liable for non-performance or delay in performance of any obligation stipulated in the Agreement if such non-performance or delay is caused by Force Majeure.

12. 3. 3    When an event of Force Majeure is of such nature that (a) the objectives of this Agreement and of the Joint Venture are substantially impaired, and (b) the Joint Venture is impaired for more than 180 consecutive days, any of the Parties shall

33

have the right to terminate this Agreement by issuing a Termination Notice pursuant to Section 12.2.1.

12. 4   <u>Liquidation Procedure</u>

12. 4. 1 Any liquidation shall be conducted pursuant to the provisions of the Uzbek Law on Enterprises and any other Uzbek laws and regulation concerning the liquidation of limited liability companies;

12. 4. 2 The Managing Director shall serve as liquidator unless the Parties' Assembly appoints other persons to such position or the Uzbek law otherwise provides.

12. 4. 3 The liquidator shall act pursuant to and in compliance with the resolutions of the Parties' Assembly and the provisions of this Agreement concerning the Managing Director.

12. 4. 4 The liquidator shall wind up pending transactions, collect claims, and realize the remaining assets of the Joint Venture, it being agreed, however, that ROZ and TCCEC shall have the option to claim the movable assets associated with the production and packaging of the Beverages, in which case the value of such assets shall be deducted from the part of the liquidation proceeds due to ROZ or TCCEC pursuant to Section 12.4.5.

12. 4. 5 The proceeds from the liquidation activities shall serve in the first instance to satisfy the debts of the Joint Venture (including, but not limited to, debts owed to the Parties) and any expenses incurred in connection with the liquidation of the Joint Venture. The balance shall be distributed between the Parties in proportion to their share ownership, it being agreed that any Hard Currency left shall be used to satisfy the part of the liquidation proceeds due to TCCEC and ROZ.

## ARTICLE 13

## NON-COMPETITION

13. 1   *Beshaghash* covenants and agrees, during the validity of this Agreement and for a period of two years thereafter, not to enter (a) into any joint venture or similar agreement involving any international soft-drink company or affiliate thereof in connection with the establishment in The Republic of Uzbekistan of a business enterprise whose activities would involve the manufacture, marketing, distribution

JM

34

and sale of non-alcoholic beverages or (b) into any agreement involving any
international soft-drink company or affiliate thereof for the importation,
manufacture, packaging, distribution or promotion of soft-drinks or any products
competing with the Beverages, without the prior written approval of the other
Parties. Beshaghash specifically agrees that it shall not manufacture, package,
distribute or sell non-alcoholic beverages other than the Beverages without the prior
written consent of TCCC.

13. 2   ROZ covenants and agrees, during the validity of this Agreement not to engage in
activities that compete with the business of the Joint Venture in the Territory and
not to enter into any co-operation that would engage in such competitive activities.


## ARTICLE 14

## GOVERNING LAW

The Joint Venture shall be conducted in conformity with the mandatory provisions of
Uzbek law. All matters not governed by mandatory Uzbek law concerning the relationship
between the Parties shall be governed by this Agreement and the Articles of Association.


## ARTICLE 15

## DISPUTE RESOLUTION

15. 1   All disputes arising out of or in connection with this Agreement or related to its
violation or termination shall be amicably settled.

15. 2   In the event that amicable settlement shall not obtain within 90 days following
written notice by one Party to the other(s) of the existence of any such dispute, all
such disputes shall be finally settled under the rules of arbitration and conciliation
of the International Arbitral Centre of the Federal Economic Chamber in Vienna,
Austria ("Vienna Rules"), by three arbitrators appointed in accordance with these
rules.

15. 3   The language of this arbitration shall be English.

15. 4   The seat of the arbitration shall be Vienna.

15. 5    The applicable law shall be the substantive law of Austria, excluding its choice of law rules. The Parties expressly waive the application of paragraph 595 (1) fig. 7 of the Austrian Code of Civil Procedure (ZPO).

# ARTICLE 16

## MISCELLANEOUS

16. 1    <u>No waiver.</u> No failure or delay on the part of any Party in the exercise of any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or of any other right. All rights and remedies under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

16. 2    <u>Independent Contractor Status/No Agency</u>

Unless otherwise provided in this Agreement, no Party shall, without the prior written consent of the other Parties, in any manner use the name of, or commit or act or purport to act for or as a representative of, or assume any obligations or responsibilities on behalf of, the other Parties or the Joint Venture, whether before or after its registration. The Parties agree that nothing in this Agreement will create or be deemed to create any partnership or any other relation between them except as expressly stated herein.

16. 3    <u>Severability</u>

If any one or more provisions of this Agreement shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired; provided, however, that in such case the Parties agree to use their reasonable efforts to achieve the purpose of the invalid provision by a new legally valid provision.

JM

16.4    Trademarks

Nothing herein shall give the Parties or the Joint Venture any interest in the trade marks of TCCC or the goodwill attaching thereto or in any label, design, container or other visual representation thereof or used in connection therewith.

16.5    Assignment

Except as provided in Article 5, no Party shall assign or transfer any right or obligation hereunder whether by operation of law or otherwise without the prior written consent of the other Parties. Any such attempted assignment or transfer in violation of this Section 16.5 shall be void and without legal effect. Notwithstanding the foregoing, TCCEC shall have the right to assign all or any of its rights and obligations hereunder to any of its affiliates, including, without limitation, TCCC. This Agreement shall be binding upon the Parties and their successors and permitted assignees. Nothing herein shall be construed to confer upon any Person other than the Parties any benefit or legal right.

16.6    Amendments

Amendments to this Agreement shall have validity only if made in writing and signed by persons authorized by the Parties to sign on their behalf.

16.7    Agreement Constitutes Entire Understanding

This Agreement, together with its Annexes which form an integral part of it, constitutes the entire understanding between the Parties with respect to the subject matter hereof and supersedes all prior written and oral understandings or agreements between the Parties with respect thereto.

16.8    Notices

All notices, requests, demands or other communications hereunder shall be in writing in English and shall be given by personal service, prepaid airmail, international express courier service, telex, or by telefax to the appropriate Party as follows:

If to Beshaghash:

Tashkent Soft Drink Experimental Plant
Alamazar Street, Impasse Alleya 162
700003 Tashkent
Republic of Uzbekistan
tel: (3712) 45 37 67 or 51 or 68

If to ROZ:

ROZ Trading Ltd.
Gatartol Street 60
700113 Tashkent
Republic of Uzbekistan
tel: (3712) 78 97 07 or 78 95 73

If to TCCEC:

The Coca-Cola Export Corporation
One Coca-Cola Plaza
P.O. Drawer 1734, Atlanta, Georgia
United States of America
tel:   (1-404) 676-2121
fax:   (1-404) 676-6792

with copy to:

Coca-Cola Ges.m.b.H.
att. Division Legal Counsel
Triester Strasse 217, 1232 Vienna
Austria
tel:   (43-1) 66-171
fax:   (43-1) 66-171-25

If to the Joint Venture to:

Coca-Cola Bottlers Tashkent Ltd.
att. Managing Director
Almazar Street, Impasse Alleya 162
700003 Tashkent
Republic of Uzbekistan

All notices shall be effective when received and all notices by telefax shall be confirmed by a notice sent by personal service, prepaid airmail or international express courier service. Any Party designated to receive notice hereunder may by notice to the others designate a new address for notices and shall provide the address for notices of any new or substituted parties.

### 16.9 Favorable Changes in Law

In the event The Republic of Uzbekistan shall adopt any law, decree, regulation or order more favorable than the laws, decrees, regulations or orders previously applicable to the Joint Venture or to the Parties, then the Joint Venture and the Parties shall be entitled to apply (if application is necessary) to the appropriate governmental entity to receive the benefit of such law, decree, regulation or policy.

### 16.10 Adverse Changes in Law

In the event The Republic of Uzbekistan adopts any new, or repeals or makes changes in any existing, law, decree, regulation or order which materially adversely affects TCCEC's or ROZ's economic interests in the Joint Venture or under this Agreement, the Parties shall consult together and adjust the economic benefits to them under this Agreement. In the event the Parties are unable to agree upon an adjustment to these economic benefits acceptable to TCCEC or/and ROZ, as the case may be, then TCCEC or/and ROZ shall be entitled to exercise its/their rights under Section 12.2.3.

### 16.11 Headings

The article and section headings contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

### 16.12 Legal Version

This Agreement shall be prepared in Russian and English, both versions being equal. The Parties acknowledge that, in the event of a difference in the interpretation of the English and Russian versions, the English version of this Agreement will prevail.

16. 13   Necessary Measures

The Parties shall in a timely manner and as required from time to time take all such actions as may be necessary or appropriate to cause the Joint Venture to implement the transactions contemplated by this Agreement and to ensure that the Joint Venture takes all such actions as may be necessary to give full effect to the provisions of this Agreement, to cause the Joint Venture to comply with applicable law, and to abstain from taking any actions which would contravene the intent of the provisions of this Agreement.

*IN WITNESS WHEREOF*, the Parties have caused this Joint Venture Agreement to be executed in four original Russian copies and in four original English copies and delivered by their duly authorized representatives on the date set forth after their respective signatures.

THE COCA-COLA EXPORT CORPORATION

By: _____

Date: ___16-6-93___

ROZ TRADING LTD.

By: _____

Date: ___16-6-93___

TASHKENT SOFT DRINK EXPERIMENTAL PLANT

By: _____

Date: ___16.06.1993___

Acknowledged and Accepted this_____day of _____ 1993:

COCA-COLA BOTTLERS TASHKENT LTD.

By: _____

        Managing Director

Annex 1:      List of Assets Contributed by Beshaghash
Annex 2:      Letter to the Cabinet of Ministers
Exhibit 1:    Bottler's Agreement
Exhibit 2:    Deed of Covenant
Exhibit 3:    Articles of Association
Exhibit 4:    Lease Agreement