# EXHIBIT 26

**UNITED
NATIONS**

**E**

 **Economic and Social
Council**

Distr.
GENERAL

E/CN.4/2003/68/Add.2
3 February 2003

Original:  ENGLISH*

COMMISSION ON HUMAN RIGHTS
Fifty-ninth session
Item 11 (a) of the provisional agenda

### CIVIL AND POLITICAL RIGHTS, INCLUDING THE QUESTIONS
### OF TORTURE AND DETENTION

**Torture and other cruel, inhuman or degrading treatment**

**Report of the Special Rapporteur on the question of torture, Theo van Boven,
submitted in accordance with Commission resolution 2002/38**

**Addendum**

**MISSION TO UZBEKISTAN\*\***

_____

  \*  The executive summary is being circulated in all official languages.  The report itself is
contained in the annex to the executive summary and is being circulated in the language of
submission and in Russian only.  The appendices are circulated in the language of submission
only.

\*\*  In accordance with General Assembly resolution 53/208 B, paragraph 8, this document is
submitted late owing to the late date of the mission.

GE.03-10766  (E)    270203

E/CN.4/2003/68/Add.2
page 2

**Executive summary**

At the invitation of the Government, the Special Rapporteur undertook a visit to the Republic of Uzbekistan from 24 November to 6 December 2002 during which he met various high officials and representatives of civil society organizations, as well as alleged torture victims and their relatives, and visited detention facilities.  The Special Rapporteur appreciates that the Government enabled him to carry out this important mission and he regards his visit as a clear indication of increased cooperation between the Government and the United Nations in the field of human rights.  The Special Rapporteur believes, on the basis of the numerous testimonies he received during the mission, that torture or similar ill-treatment is systematic.  Accordingly, he recommends a number of measures to be adopted with a view to putting an end to torture and ill-treatment in Uzbekistan.  He notes with great interest and keen expectation the intention and willingness expressed by high government officials to follow up on the recommendations included in the report.

E/CN.4/2003/68/Add.2
page 3

**Annex**

**REPORT BY THE SPECIAL RAPPORTEUR ON THE QUESTION OF
TORTURE, THEO VAN BOVEN, ON HIS VISIT TO UZBEKISTAN
(24 NOVEMBER-6 DECEMBER 2002)**

CONTENTS

|  |  | Paragraphs | Page |
|---|---|---|---|
| Introduction ..................................................................... | | 1 - 6 | 4 |
| I. | PROTECTION OF DETAINEES AGAINST TORTURE .......... | 7 - 33 | 5 |
| A. | Prohibition of torture ......................................... | 7 - 8 | 5 |
| B. | Initial arrest and detention ................................. | 9 - 17 | 5 |
| C. | Pre-trial detention .............................................. | 18 - 27 | 7 |
| D. | Complaints procedures ....................................... | 28 - 33 | 10 |
| II. | THE PRACTISE OF TORTURE:  SCOPE AND CONTEXT .... | 34 - 59 | 11 |
| A. | General issues .................................................... | 34 - 42 | 11 |
| B. | Lack of respect for existing legal safeguards ................... | 43 - 48 | 14 |
| C. | Aborted visit to Jaslyk colony ........................... | 49 - 52 | 15 |
| D. | Denial of access to the lock-up of the National Security Service Office in Tashkent ................................. | 53 - 54 | 17 |
| E. | Impunity ........................................................... | 55 - 59 | 17 |
| III. | CONCLUSIONS AND RECOMMENDATIONS ...................... | 60 - 71 | 19 |

Appendices

| I. | Excerpts from the report of the Republic of Uzbekistan to the Counter-Terrorism Committee (S/2002/974, annex, pp. 13-15) ......................... | 26 |
|---|---|---|
| II. | Individual cases ................................................................................. | 27 |

E/CN.4/2003/68/Add.2
page 4

**Introduction**

1.      Following a joint request by the Special Rapporteur and the Chairman-Rapporteur of the Working Group on Arbitrary Detention in June 2000, the Government of Uzbekistan in June 2002 invited the Special Rapporteur to undertake a fact-finding mission to the country within the framework of his mandate.  The mission was also discussed by the President of Uzbekistan and the Secretary-General of the United Nations on the occasion of the latter's visit to the country on 18 October.  The objective of the visit, which took place from 24 November to 6 December 2002, was to enable the Special Rapporteur to collect first-hand information from a wide range of contacts in order better to assess the situation regarding torture and other forms of ill-treatment in Uzbekistan and thus be in a position to recommend to the Government a number of measures to be adopted with a view to putting an end to those practices.

2.      During his visit, the Special Rapporteur met the Prime Minister of Uzbekistan, Mr. Sultanov, the Minister for Foreign Affairs, Mr. Kamilov, the Minister of Internal Affairs (MVD), Mr. Almatov, the Minister of Defence, Mr. Gulyamov, the Minister of Justice, Mr. Polvon-Zoda, the Procurator General, Mr. Kodirov, the Acting Chairman of the Supreme Court, Mr. Ishmetov, the Deputy Chairman of the National Security Service (SNB), Mr. Mustafaev, the State Secretary on law enforcement agencies at the Presidential Office, Mr. Azizov, the Deputy Minister of Internal Affairs in charge of the execution of sentences (GUIN), General Kadirov, the Ombudsman, Mrs. Rashidova, and the Director of the National Centre for Human Rights, Mr. Saidov.

3.      The Special Rapporteur visited the following places where persons deprived of their liberty are held:  the IVS/SIZO of the Ministry of Internal Affairs in Tashkent, the prison of Andijan, the district IVS/SIZO of the SNB of Ferghana Oblast in Ferghana, the Jaslyk colony, the main psychiatric hospital in Tashkent and the Zangiata colony.  Due to adverse weather conditions, the Special Rapporteur was unable to carry out visits to Navoi and Karshi regions, in particular the colony of Navoi 64/36, as originally planned.

4.      The Special Rapporteur notes with regret his inability to carry out the visit to Jaslyk colony in a satisfactory and comprehensive manner.  He also notes with serious concern that he was denied access to the SNB lock-up in Tashkent (see below for further details).

5.      The Special Rapporteur met persons who themselves or whose relatives had allegedly been victims of torture and other forms of ill-treatment and he received verbal and/or written information from non-governmental organizations (NGOs) and members of civil society, including the following:  Human Rights Watch Office in Tashkent, Mothers against Death Penalty and Torture, Legal Aid Society, the Human Rights Society for Uzbekistan (OPCHU), the Independent Human Rights Society for Uzbekistan (NOPCHU), Freedom House, Mazlum, Ezgulik Human Rights Society, the Committee for Legal Assistance to Prisoners, the Initiative Group for Human Rights, the Centre for Democratic Initiatives and the Tashkent Group for the Defence of Human Rights.  Finally, he also met with representatives of the Office for Democratic Institutions and Human Rights of the Organization for Security and Cooperation in Europe.

E/CN.4/2003/68/Add.2
page 5

6.      The Special Rapporteur wishes to thank the Government of Uzbekistan for having invited him and for having extended its support during his mission through the Ministry for Foreign Affairs and other government agencies.  He also wishes to express his gratitude to the United Nations Resident Coordinator in Uzbekistan and his staff for their logistical and other support.

## I.  PROTECTION OF DETAINEES AGAINST TORTURE

### A.  Prohibition of torture

7.      Article 26 of the 1992 Constitution provides that "[n]o one may be subjected to torture, violence or any other cruel or humiliating treatment".  The 1994 Criminal Code (CC), which was later amended in October 2001, does not contain any specific definition of torture.  However, a number of provisions in the CC were said by the authorities, in particular the General Procurator, to cover the crime of torture, from article 104 ("premeditated grievous bodily harm") to article 110 ("ill-treatment/tormenting" - *istyazanie*).  Article 17 of the 1999 Criminal Procedure Code (CPC) states that "[j]udges, procurators, and persons carrying out initial inquiries or pre-trial investigations are under the obligation to respect the honour and dignity of persons involved in a case.  No one shall be subjected to torture (*pytki*), violence or other cruel, humiliating or degrading treatment.  It is prohibited to perform acts or hand down judgements which humiliate or demean a person, … or will cause unjustified physical or mental suffering."

8.      According to the Director of the National Human Rights Centre, the question whether the actual provisions of the CC were sufficient or whether a more precise definition of torture was needed had been referred for consideration to the Parliamentary Committee on Legislation.  In that respect, the Special Rapporteur shares the views of the Committee against Torture which recommended in May 2002 - after consideration of the second periodic report on implementation of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment submitted by Uzbekistan (CAT/C/53/Add.1)[1] - that Uzbekistan "(a) proceed promptly with plans to review the proposals to amend its domestic penal law to include the crime of torture fully consistent with the definition contained in article 1 of the Convention and supported by an adequate penalty" (CAT/C/CR/28/7, para. 6).  Furthermore, the Special Rapporteur notes that the offence contained in article 104 CC,[2] the most serious of the relevant offences in the CC, provides for only up to five years' deprivation of liberty.  He would like to recall that article 4, paragraph 2, of the Convention states that "[e]ach State Party shall make these offences punishable by appropriate penalties which take into account their grave nature".

### B.  Initial arrest and detention

#### 1.  Arrest

9.      Any person apprehended and deprived of liberty must be formally charged within 72 hours.  Article 226 CPC states that the detention without charge "cannot exceed more than 72 hours from the moment the detainee (arrested person) is brought to the police station or to another organ of law-enforcement".  Upon the sanction of a procurator, this

E/CN.4/2003/68/Add.2
page 6

detention without charge can be extended up to 10 days for the purpose of preliminary investigation. Once charges are brought against a suspect, the latter is placed in an "isolator of temporary detention", known by its Russian acronym IVS.

10.    Upon arrival at the police station, an arrest protocol has to be drafted by the arresting officer and the arrested person is required to write an "explanation letter" in which s/he explains the reasons for and circumstances of the arrest. It is believed that this "explanation letter" may later be used as evidence in court. According to non-governmental sources, during this period detained persons must also sign a document stating that they have been informed of their rights. It is alleged that this document does not state what those rights are. Similarly, if a suspect decides to renounce his right to a lawyer, a document to that effect has to be signed in the presence of a lawyer.

11.    Article 44 of the Constitution provides that each person enjoys the right to appeal to the court for redress of any illegal action by State agents. According to non-governmental sources, however, the Supreme Court stated in 1997 that this guarantee would not apply to the issue of the deprivation of liberty as the CPC already provides for sufficient procedural guarantees in that respect. While the Acting Chairman of the Supreme Court did not confirm or deny this information, he regretted that it was not the current practice to appeal to courts for redress in case of alleged arbitrary detention. The Special Rapporteur notes with regret that the right to habeas corpus - a fundamental guarantee against arbitrary detention - is thus not a part of Uzbek criminal proceedings, even if article 18 CPC provides that "[n]o one can be arrested or detained in custody if not on the grounds of a court decision or with the sanction of a procurator. The judge and the procurator have the duty to immediately release anyone illegally deprived of liberty …". This provision may indeed be interpreted as guaranteeing the possible involvement of a court at the initial stage of deprivation of liberty, although it does not provide for a right to appeal to a court. It must however be noted that it was recognized by all interlocutors, including official ones, that in practice, all decisions regarding pre-trial detention are the sole purview of a procurator. Courts are said not to be involved at all at this preliminary stage of criminal proceedings.

## 2. Access to legal counsel

12.    Article 48 CPC provides for the right to a legal counsel ("defender") from the time the detainee is informed that s/he is suspected of a crime or from the moment he is "detained" (*zadershanie*). The meaning of this last word was subject to various interpretations by officials, interlocutors and legal practitioners; it is not clear whether it refers to the moment of arrest/apprehension, or to the moment charges are formally brought against a suspect.

13.    Accordingly, article 49 CPC, which enumerates a list of persons who may act as a defender in a case, including close relatives with the approval of the investigator or the court, provides that "[t]he defender can act in the case when the citizen is informed of the charges or from the point when he is considered a suspect or from the moment of his detention". It seems here that the word "detention" refers to the moment the charges are formally brought. This would then mean that a suspect has the right to a defender only after having been formally charged, i.e. after 3 or up to 10 days.

14.     However, it must be noted that in accordance with article 48 CPC, "[a] suspect/accused has the right … to demand an interrogation not later than 24 hours after her/his detention". Similarly, article 110 CPC provides that "… the suspect has to be interrogated immediately or not later than 24 hours after the detention".  Again, in these two provisions, the word "detention" can be interpreted in two different ways.  It was, however, widely believed that it would here mean apprehension.  This is supported by the following explanation given by the General Procurator to the Special Rapporteur:  a suspect must be first interrogated within 24 hours after her/his apprehension in order to leave 48 hours to procurators to decide, upon first evidence gathered by the investigator, whether to formally bring charges in the case concerned.  In accordance with article 111 CPC, after this first interrogation session, which must therefore occur within 24 hours of deprivation of liberty, the investigator must "ensure the participation of a legal counsel in the interrogation".  This would then mean that a suspect has the right to a defender after this first interrogation session during which s/he "is informed that s/he is suspected of a crime" (art. 48), i.e. within 24 hours after deprivation of liberty.

15.     The Special Rapporteur believes that the crucial question of the timing of access to a defender/legal counsel/lawyer in the early stage of the criminal process is widely unknown or ignored as various interpretations may be given to the relevant CPC provisions.  From discussions with officials and legal practitioners, it was unclear whether a person deprived of liberty has the right of access to a lawyer immediately after deprivation of liberty (apprehension), within 24 hours, or only from the moment s/he is formally charged, i.e. 3 or up to 10 days after apprehension.  While the Minister of Justice stressed that lawyers can visit their clients from the moment of apprehension and fully participate in all phases of the investigation, legal practitioners were divided between the two other alternatives, i.e. within 24 hours, or from the formal bringing of charges.

16.     Furthermore, it must be stressed, the head of the IVS of the MVD in Tashkent confirmed that the investigator in a case is responsible for informing the family and lawyers of the detainees of their detention.  He acknowledged that meetings with lawyers or family members require in any case the prior explicit consent of the investigator, who was said to have complete discretionary powers in that matter.

17.     Finally, the Special Rapporteur notes with concern that during the first interrogation session provided for by article 48 CPC (within the initial 24 hours), the suspect may be asked to write at least an "explanation letter", if not a confession - possibly self-incriminating - that may then be used as evidence in court.  In accordance with the provisions referred to above, at this stage, the law does not provide for the mandatory presence of a lawyer.  The Special Rapporteur was informed of the practice according to which witnesses, who according to the law do not have access to legal counsel, were reportedly initially brought to the police, made to confess, and were subsequently turned into "suspects".

## C.  Pre-trial detention

### 1.  Pre-trial investigation

18.     After the initial detention in temporary isolation of 3 or up to 10 days, a person must be either released, or charged and then "placed in custody" (*zakluchen pod straju*) pending trial,

E/CN.4/2003/68/Add.2
page 8

normally in a remand centre, commonly known by its Russian acronym SIZO (*sledstvenniz izolator*). Pursuant to article 245 CPC, the "detention in custody during the investigation of the crime may not exceed two months". This time limit can be extended to three months by a district procurator in case of necessity to conclude the investigation and if there are no grounds warranting a change in the measure of restraint. A further extension of up to six months can be made only on the grounds of an especially complex case and only by a regional procurator. An extension beyond six months is permitted in exceptional cases and only with regard to persons who are accused of having committed especially serious crimes. Finally, the pre-trial detention may be extended up to one and a half years by the General Procurator of the Republic of Uzbekistan. No further extension of the time limit is permissible. According to the General Procurator, most cases are resolved within three months. As illustrated by numerous cases presented in appendix II, extensive periods of pre-trial detention seem to be common.

19.     The attention of the Special Rapporteur was drawn by the Acting Chairperson of the Supreme Court to article 88 CPC according to which "during the preliminary investigation, it is forbidden: (1) to carry out actions harmful to the life and health of persons or offending their honour and dignity, (2) to force confessions, explanations, conclusions … by way of force, threats, deceit and other illegal measures".

20.     According to article 33 CPC, the supervision of the respect for and precise implementation of the law during the pre-trial investigation is entrusted to the General Procurator of the Republic and to subordinate procurators. They must supervise the whole pre-trial criminal process conducted by investigators from the MVD, the SNB or their own investigators. Investigators are said to be assisted by operatives. Officers from the MVD investigate minor crimes, those from the SNB, so-called security crimes or crimes against State interests, while those from the General Procurator's Office, serious crimes.

21.     According to the Procurator General, release on bail pending trial is only resorted to if there is a formal request and if a sufficient sum of money can be paid as a guarantee. He reported that during the first 10 months of 2002, some 700 persons had been released on bail. The Special Rapporteur deems that release on bail or similar arrangements should be resorted to much more frequently.

22.     A number of non-governmental interlocutors of the Special Rapporteur alleged that the criminal investigation process, including at the time of apprehension, is mainly governed by administrative internal rules that are not made public. This is said to be a major obstacle to an active and effective participation of legal counsels and lawyers, especially in the early stage of arrest and detention, as well as to access by independent medical doctors and relatives of persons deprived of their liberty. This is also believed to explain the wide discretionary powers of investigators in that respect. The Minister of Justice nevertheless denied the existence of administrative instructions. All legislation regarding arrest, detention and pre-trial investigation process are contained in the CPC. It must be stressed that low-ranking law enforcement officials met during the visit to places of detention appeared to be uncertain about the legal provisions that they had to observe when dealing with pre-trial detainees.

## 2.  Assistance by a lawyer

23.    Article 53 CPC provides that "… when the accused or defendant is kept in custody the defender has the right to meet with him one to one without limitation of the frequency and the length of the meetings".  According to the law, meetings with lawyers must thus be confidential and unlimited.  In practice, this provision is said to be widely ignored and officials in charge of places of detention acknowledged that any meeting with a lawyer must be formally approved by the investigator or the procurator in the case.

24.    Article 50 CPC further provides that "… the participation of the defender in the case is guaranteed by the interrogator, investigator, procurator or court.  In those cases where it is not possible for the chosen defender to take up the case within 24 hours, the interrogator, investigator, procurator or court has to offer the suspect, accused or defendant or his/her relatives another defender or to contact a lawyers' bureau, association or firm [which would] appoint a defender.  The defender chosen by the suspect, accused or defendant has the right to join the case at any time."  Similarly, article 111 CPC specifies that if the suspect/accused cannot hire a legal counsel of her/his choice, the investigator has the obligation to provide her/him with a State-appointed lawyer.

## 3.  Confession

25.    Article 235 CC states that "forcing a confession, i.e. the use of psychological or physical pressure on a suspect, defendant, a witness or a victim or an expert by way of threats, blows, beatings, ill-treatment/tormenting (*istyazaniya*), the infliction of physical suffering, light or medium-level bodily harm or injury or other illegal actions carried out by the interrogator, investigator, or procurator, with the aim of forcing confessions, is punished by detention of up to six months or the deprivation of liberty of up to five years.  The same action, when resulting in grievous consequences, is punished by deprivation of liberty from five to eight years."  Article 22 CPC also provides that "obtaining testimony of a suspect, accused person, defendant, victim, witness or any other party to a case by the use of force, threats, violation of their rights or other illegal means is prohibited".  According to legal practitioners, article 95 is furthermore said to provide that no evidence received by inadmissible means may be considered as evidence in court.  Unlike statements renouncing legal assistance, confessions do not have to be made in the presence of a lawyer to be admissible in court.

26.    The Special Rapporteur notes with satisfaction that in May 1997, the Supreme Court issued a plenary court decision stating that "any evidence obtained unlawfully shall be devoid of evidential value and cannot form the basis of a judgement".  According to the Minister of Justice, the Supreme Court had also issued a directive stating that confessions do not necessarily establish guilt, in the absence of other objective proof or evidence.  Without providing the Special Rapporteur with any specific examples, he stated that there were quite a few examples of courts rejecting evidence obtained as a result of torture.  The Acting Chairman of the Supreme Court drew the attention of the Special Rapporteur to article 463 CPC which provides that admission of guilt during investigation or in court can be part of the verdict, only if objectively confirmed by other corroborative evidence.

E/CN.4/2003/68/Add.2
page 10

27.     According to the information received from non-governmental sources and as illustrated by a large number of cases referred to in appendix II, contrary to the Supreme Court's decision, allegations that confessions have been extracted under torture are, in practice, systematically ignored in the courts, and often serve as the sole basis for conviction, especially in cases concerning CC articles 156, 159 or 244 (see below and appendix I).  Requests by lawyers to establish and examine evidence that torture has taken place are said to be completely ignored.  The Special Rapporteur has received information that even in cases where a defendant could name alleged perpetrators or medical certificates attested that torture had been carried out, the courts did not order any investigation into the allegations.  The sole action sometimes taken by magistrates is to ask the alleged perpetrators to testify in court that they have not used illegal means during the pre-trial investigation.

### D.  Complaints procedures

28.     As indicated above, article 44 of the Constitution provides that "everyone shall be entitled to legally defend his rights and freedoms, and shall have the right to appeal any unlawful action of State bodies, officials and public associations".  However, it has been noted above that the right to habeas corpus does not exist in the Uzbek legal system.  Besides, it must be underlined that article 53 CPC provides that lawyers have the right to "bring complaints with regard to actions and decisions of the interrogator, investigator, procurator or court".

### 1.  General Procurator's Office

29.     During the pre-trial detention, complaints must be addressed by alleged victims or persons acting on their behalf to a senior investigator, the head of the relevant MVD or SNB internal investigations department, a civil procurator in the case of MVD officers or a military one in the case of SNB officers.  It should be underlined that senior/head investigators have discretionary powers in deciding whether to forward a complaint, with a recommendation or not, to the General Procurator's Office.  The latter has the overall prerogative of supervising the criminal investigation.  If the complaint is made during the pre-trial detention, there is no recourse possible to a court.  As confirmed by the Acting Chairman of the Supreme Court, the court monitoring of a criminal case starts solely when the procurator transfers the criminal file to the court system.  It is only at that point that the pre-trial investigation period is reviewed ex post facto by a magistrate.  Non-governmental sources alleged that, in practice, this is often a pure formality.

30.     The General Procurator stated that it was highly unfortunate that law enforcement officials had committed violations during investigation and pre-trial detention.  Once a complaint is received in an official manner from the alleged victim or her/his relatives, an investigation is immediately launched which would lead to a legal decision.  Later, the General Procurator confirmed that his Office can actually act *proprio motu*.  If the facts are confirmed, administrative measures, and possibly criminal prosecution, are initiated.  Since January 2002, 40 cases have reportedly been lodged against MVD officers for illegal actions.  No statistics were, however, provided regarding the number of cases that would fall within the Special Rapporteur's mandate.  But the General Procurator noted that in numerous cases the complaints are not confirmed.  Appeals against the decision of the procurator may be lodged by the alleged victim or on her/his behalf to a procurator of a higher rank, up to the General Procurator.  The

E/CN.4/2003/68/Add.2
page 11

General Procurator informed the Special Rapporteur that his Office not only was undertaking preventive visits to places of detention, but was also working closely with the International Committee of the Red Cross (ICRC) and human rights organizations, including international ones. He said that organizations were visiting places of detention and thus monitoring the treatment of persons deprived of liberty and their conditions of detention, but he failed to name them. He expressed the hope that this work would lead to positive results in due course.

## 2. The Ombudsman's Office

31.     Pursuant to the 1997 "Law on the Republic of Uzbekistan on the Authorized Person of the Oliy Majlis (Parliament) for Human Rights Ombudsman", the Ombudsman[3] is charged with the monitoring of human rights law. Her work encompasses four areas of activity: the improvement of legislation in the field of human rights; the investigation of human rights complaints and restitution; the provision of (public) information relating to human rights; and cooperation at the international level. She indicated to the Special Rapporteur that she was paying particular attention to vulnerable persons, including detainees, and had carried out visits to detention centres on the basis of complaints received. In 2002, visits had been carried out to a women's and a children's colony.

32.     During the meeting with the Ombudsman, the overall responsibility of the General Procurator's Office regarding the investigation of alleged illegal actions by law enforcement officials was reiterated. In 2001, an agreement on the collaboration between the Ombudsman's and the General Procurator's Offices was reached with a view to enhancing their cooperation in dealing with complaints and restoring citizens' rights. According to the 2001 Ombudsman's report, 54 per cent of the total number of complaints, i.e. 4,472, were connected with the functioning of the court and law enforcement bodies. They included cases concerning unjustified prolonged investigation of cases, procrastination, unlawful actions by law enforcement officials, contradictory court verdicts or failure to execute them, illegal methods of investigation, violations of the right to counsel for persons under investigation.[4] For the first 11 months of 2002, the Ombudsman had received only six complaints regarding unlawful acts of law enforcement agencies. She stated that as a result of the review of these complaints, criminal cases had been suspended, public officials had been dismissed and investigations had taken place.

33.     The Ombudsman stressed that her work needed to be more effective, and she expressed the hope that a new draft law under consideration would give her the right to protest unlawful actions of law enforcement officials and to draw conclusions in cases she would submit to the relevant public authorities, including the General Procurator's Office. She regretted her Office's lack of financial and personnel resources and noted that other State authorities did not always cooperate fully and did not share all relevant information.

## II. THE PRACTICE OF TORTURE: SCOPE AND CONTEXT

### A. General issues

34.     In recent years, the Special Rapporteur had received information according to which torture is widespread and targets persons suspected of having committed ordinary crimes as well

E/CN.4/2003/68/Add.2
page 12

as persons accused of membership in banned political or religious organizations or of having committed crimes related to their alleged religious beliefs or activities.[5]  It was alleged that law enforcement agents seek to coerce self-incriminating confessions or testimonies against third parties, to extort bribes, or to punish, humiliate or break the will of those suspected of or convicted on political or religious grounds as well as of human rights activists.  Prolonged beatings, sometimes with clubs or other implements, suffocation through the use of gas masks or plastic bags, electric shocks, sexual violence, and denial of food or water were said to be common practices.  It was also alleged that the criminal justice system appeared to lack procedural safeguards against abuse by members of law enforcement agencies, as it reportedly grants procurators wide powers concerning pre-trial custody and access to lawyers/relatives and to forensic evidence.  Thus, over the years, a large number of individual cases have been referred for clarification to the Uzbek authorities under the mandate of the Special Rapporteur.

35.     The Minister for Foreign Affairs indicated that the Government had studied and responded to all allegations submitted under the mandate.  If the replies had not reached the Special Rapporteur, it was said to be due to a "technical problem".  The State Secretary on law enforcement agencies confirmed that all communications received from the Office of the High Commissioner for Human Rights had been studied by the relevant authorities of the country and not a single allegation had been confirmed.  Despite repeated requests by the Special Rapporteur for copies of the responses, at the time of writing they had not been received.

36.     The Special Rapporteur also notes with concern that from his discussion with the Acting Chairperson of the Supreme Court, it became clear that requests for interim measures issued by the Human Rights Committee, a large number of which concern death sentences based on confessions allegedly extracted under torture, had not been brought to the attention of this organ of the judiciary, which reviews all death penalty cases.  The Special Rapporteur is seriously concerned at what appears to be a lack of appropriate consideration of, and action in relation to requests on behalf of individuals at risk of torture or even of execution, or who have been victims of acts of torture.

37.     In this connection, on 6 December 2002, the Special Rapporteur handed over to the Minister for Foreign Affairs an urgent appeal on behalf of Iskander Khudoberganov and his co-defendants (see details regarding this case in appendix II).  The Special Rapporteur indicated that he would appreciate receiving any information that the Government could provide about the situation of the persons concerned before the completion of the present report.  At the time of writing, no information had been received.

38.     The request by the Special Rapporteur to visit the country also echoed the concerns expressed by the Committee against Torture, which included "(a) the particularly numerous, ongoing and consistent allegations of particularly brutal acts of torture and other cruel, inhuman or degrading treatment or punishment committed by law enforcement personnel; (b) the lack of adequate access for persons deprived of liberty, immediately after they are apprehended, to independent counsel, a doctor or medical examiner and family members, an important safeguard against torture; (c) the insufficient level of independence and effectiveness of the procuracy, in particular as the Procurator has the competence to exercise oversight on the appropriateness of the duration of pre-trial detention, which can be extended up to 12 months; (e) the insufficient independence of the judiciary" (CAT/C/CR/28/7, para. 6).  Similarly, the Human Rights

Committee had indicated that it was "gravely concerned about consistent allegations of widespread torture, inhuman treatment and abuse of power by law enforcement officials. The Committee is also concerned about the limited number of investigations into allegations of torture" (CCPR/CO/71/U2B, para. 7).

## 1. Treatment of criminal suspects

39.     During the mission, the Special Rapporteur gathered numerous detailed and consistent testimonies from alleged victims and their relatives, only a limited number of which are reproduced in appendix II, as most individuals concerned refused to have their names and stories made public for fear of reprisals. The testimonies mostly refer to confessions extracted under torture and other forms of ill-treatment, almost invariably coupled with a denial of access to lawyers and relatives. These testimonies, as well as the lack of definitive, consistent and precise interpretations of existing legal safeguards, which appear to be rarely respected in practice, to a great extent substantiate the allegations and concerns referred to above.

40.     According to the information received from non-governmental sources, torture is being used in virtually all cases in which articles 156, 159 and 244 CC (see appendix I) are invoked, in order to extract self-incriminating confessions and to punish those who are perceived by public authorities to be involved in either religious, or political, activities contrary to State interests (so-called security crimes). These provisions, which are rather vaguely worded and whose scope of application may be subject to various interpretations, are said to have been used in numerous allegedly fabricated cases and to have led to harsh prison sentences. The four crimes that, following recent amendments, are now the only capital offences are said to lead to a death sentence only if they are combined with aggravated murder charges. Evidence gathering in such cases is said to rely exclusively on confessions extracted by illegal means. It is reported that religious leaflets as well as weapons or bullets have been planted as evidence that a person belongs to banned groups such as Hizb-ut-Tahrir, a transnational Islamic movement which calls for the peaceful establishment of the Caliphate in Central Asia. It is also reported that torture and ill-treatment continue to be used against inmates convicted on such charges, inter alia to force them to write repentance letters to the President of the Republic or to punish them further.

41.     As illustrated by numerous cases presented in appendix II, the Special Rapporteur believes that illegal methods of investigations are not restricted to the categories of suspect mentioned above. Suspected ordinary criminals are likewise subjected to torture and other forms of ill-treatment, mainly with a view to extracting self-incriminating confessions, obtaining bribes and punishing them.

42.     Furthermore, the Special Rapporteur has received information according to which persons belonging to sexual minorities have been subjected to various forms of torture, including of a sexual nature, and harassment, and to have been arbitrarily detained with a view to threatening or punishing them and to obtaining bribes. Temporary/casual workers who offer their services on a day-by-day basis in marketplaces are also believed to have been targeted. Casual workers, including female sex workers, have allegedly been beaten or raped if they could not pay bribes. Asylum-seekers are also believed to be at risk of being forcibly returned to countries where they may be at risk of torture (refoulement) and concern was expressed over the fact that Uzbekistan has not ratified the 1951 Convention relating to the Status of Refugees.

E/CN.4/2003/68/Add.2
page 14

## B.  Lack of respect for existing legal safeguards

43.     The Special Rapporteur has received information according to which lawyers have frequently been barred from taking part in the criminal investigation process or from court trials. Investigators are said to have discretionary powers in deciding if and when a suspect will have access to a lawyer.  Very few cases have been reported to the Special Rapporteur in which access to a lawyer was granted within 10 days after deprivation of liberty.  It is also reported that privately hired lawyers are sometimes replaced by State-appointed defence lawyers, even against the wishes of their clients.  A large number of these lawyers, who are commonly referred to as "pocket lawyers", are said to work hand in hand with investigators.  It is alleged that some have witnessed or participated in the illegal use of force during interrogation and did not intervene, or, later in court, denied allegations of torture made by defendants.

44.     Relatives are allegedly told by heads of places of pre-trial detention that they will be granted access to detainees only upon formal approval by the investigator in the case.  It is not clear whether the law provides for access by relatives to pre-trial detainees or whether it is left entirely to the discretion of the investigator.  The Special Rapporteur believes that prompt and confidential access to any person deprived of liberty is an important guarantee against treatment falling within his mandate.

45.     With respect to access to medical doctors, it is alleged that private doctors are systematically refused access to detainees in pre-trial detention.  Only doctors called on the emergency line are believed not to have been denied access by investigators to a detainee in urgent need.  It is also reported that detainees are only medically checked upon transfer to a SIZO by doctors who are under the jurisdiction of the Deputy Minister of Internal Affairs in charge of the execution of sentences (GUIN).  They are said not to have received any forensic training.  It must also be noted that only medical reports requested by investigators and procurators are said to have legal standing in court.  Forensic experts from the Ministry of Health are only called upon in cases of death in custody.  In that respect, the Special Rapporteur regrets not to have met any representatives from the Forensic Institute, as requested.

46.     With respect to the trial process, the lack of statutory powers and lack of independence of judges are alleged to make any defence and any torture complaint meaningless.  Independent lawyers are said to be subjected to various forms of pressure and harassment with a view to making them renounce active participation in the defence of their clients.  Lawyers have reportedly been threatened by judges, including in the courtroom, and visited and assaulted by law enforcement personnel, in particular after their involvement in so-called security cases. Thus, it is widely believed by defendants and the population at large that lawyers are extremely reluctant to bring torture allegations to the attention of a magistrate during trial.  Procurators are believed to be all-powerful in the criminal process and to rely almost exclusively on confessions. They control MVD and SNB investigators or carry out investigations themselves, bring charges and authorize detention, monitor respect for the CPC and the conditions of detention, and prosecute in court.  During trial, their indictment is said to be the - often only - basis of the conviction.  The Minister of Justice stressed that the principle of equality of arms between the

prosecution and the defence was enshrined in the Constitution and the CPC.  However, he acknowledged that in practice, procurators had much greater weight than defence lawyers.  He was fully aware that much more needed to be done in order to overcome the deficiencies of the present practice.

47.     Amongst the existing legal safeguards against torture, the Acting Chairperson of the Supreme Court noted that within seven days of having received a criminal file, the judge must at the first hearing verify whether the deprivation of liberty was lawful, whether there are sufficient grounds for the case to be heard in court and whether the legal guarantees of the CPC were fully respected during the pre-trial investigation (CPC, art. 396).  If not, the judge must acquit the suspect (art. 469).  The Special Rapporteur notes that these provisions, if fully implemented by an independent judiciary, would actually be important safeguards.

48.     Finally, it must be stressed that according to the Minister of Internal Affairs, independent journalists, civil society organizations, as well as international organizations such as the OSCE and ICRC, have access to detention facilities, including pre-trial detention facilities under his responsibility, and thus play an important role in monitoring the treatment of persons deprived of their liberty.  The Special Rapporteur concurs that such monitoring is indeed essential.  He notes, however, that non-official interlocutors were not entirely satisfied with the level of cooperation by law enforcement agencies.

## C.  Aborted visit to Jaslyk colony

49.     On 1 December 2002, the Special Rapporteur visited the Jaslyk colony located in the Karakalpakstan region, in the far north-west of the country.  Because of the importance and size of that colony, often cited for its hardship conditions and inhuman practices, the Special Rapporteur had clearly indicated his wish to spend there at least six hours in the facility.  The matter was agreed upon with the Deputy Minister of Internal Affairs in charge of the execution of sentences (GUIN), who accompanied the Special Rapporteur during the mission.  The itinerary and schedule of his visit was modified in accordance with the recommendations of the Deputy Minister, who kindly provided the Special Rapporteur's delegation with a plane. Because of the itinerary thus chosen and the timing of the flight - the plane only flys during the daytime - the Special Rapporteur was in fact unable to spend more than two hours at Jaslyk colony.  As a result, the Special Rapporteur refused to inspect the colony and concentrated on a discussion with its director, in particular on the two deaths that had occurred in August 2002, and interviews with a few inmates.  The Special Rapporteur noted with concern that these confidential interviews were abruptly disrupted on several occasions by the official accompanying the Special Rapporteur's delegation.  The Special Rapporteur thus regrets that he was unable to carry out the visit to Jaslyk colony in a satisfactory and comprehensive manner. Jaslyk colony, which was said by its director to hold 381 prisoners at the time of the visit, is located in the Karakalpakstan desert where temperatures can reportedly reach 60° C in summer and -30° C in winter.  It is extremely remote from the main inhabited centres and there is no road between the colony and the closest urban centre, Nukus.  Thus, the only public transport is the train.  According to the information received, there are daily trains from Tashkent to Jaslyk colony.  The journey reportedly lasts over three days and costs a sum of money that a large number of relatives cannot afford.

E/CN.4/2003/68/Add.2
page 16

50.     According to consistent information received from relatives of detainees in Jaslyk colony, upon arrival, relatives have to spend a night in a nearby hotel.  The conditions there are said to be very poor.  The director assured the Special Rapporteur that detainees can receive visits whenever they wish.  He explained, however, that detainees under "strict regime" may receive only four visits per year, two of them of a longer duration (up to three days).  According to the director, upon arrival relatives would contact him and be granted permission to visit their relatives.  Furbished rooms are said to be put at their disposal.  According to relatives, the director insults and harasses them and threatens to kill detainees if their families do not encourage them to write repentance letters.

51.     The director informed the Special Rapporteur that the Jaslyk colony no longer has a punishment cell for inmates who infringe prison rules; he explained that inmates who breach prison rules or misbehave are reprimanded.  He stressed that allegations of detainees being held in the basement or in secret places at the colony are only rumours, and that the colony is open to visits from not only relatives, but also religious leaders (muftis), civil society organizations and others, such as the Ombudsman's Office and the ICRC.  Furthermore, each month, representatives from the Office of the General Procurator, at either the regional or national level, visit the colony.  The director stressed that muftis come to teach to prisoners "real" Islam, because of the proselytism by religious terrorists detained in Jaslyk colony.  The director proudly mentioned that 70-80 per cent of the detainees write letters of repentance, and that he personally exhorts them to do so.

52.     The Special Rapporteur enquired more specifically about the two recent deaths in Jaslyk colony.  The bodies of Khusnuddin Alimov, aged 24, and Muzafar Avazov, aged 35, who were serving 16- and 18-year sentences respectively for their involvement in Hizb-ut-Tahrir, were returned home to Tahskent for burial on 8 August 2002.  Pictures were taken of Mr. Avazov's body which was visibly covered with extensive bruises and burns, the latter possibly caused by immersion in boiling water; Mr. Alimov's body was reportedly also covered with the same types of marks and injuries.  The director explained that the policy of the colony is to place religious terrorists, often said to be connected with Afghanistan or Chechnya, with common criminals.  Hence, when terrorists engage in proselytism and make offensive remarks against Uzbekistan's administrative system and political leadership, fights often break out.  According to the director, this is what had happened in August 2002 in the case of Khusnuddin Alimov and Muzafar Avazov.  Teapots containing boiling water were said to have been thrown during the fight, which, according to the director, explained the burns.  He further indicated that, like all cases of death in custody, the case had been referred to the Office of the General Procurator which had carried out an investigation, including an autopsy, and that a decision not to open criminal proceedings had been reached.  The Special Rapporteur recalled that an expert forensic examination based on the photographs of Mr. Avazov's body had been carried out by a professor of forensic medicine and science at the University of Glasgow (United Kingdom) which had concluded, inter alia, that "[t]he pattern of scalding shows a well-demarcated line on the lower chest/abdomen, which could well indicate the forceful application of hot water whilst the person is within some kind of bath or similar vessel.  Such scalding does not have the splash pattern that is associated with random application as one would expect with accidental scalding".  The director answered by saying that the detainees in question had a yellow/dark complexion which burns faster.  Regarding the more general question of how many persons had died in custody in Jaslyk colony in recent years, the director said he could not answer the question.

### D.  Denial of access to the lock-up of the National Security Service Office in Tashkent

53.     On 4 December, after having to wait for more than half an hour outside in bad weather, the Special Rapporteur was denied access by the Deputy Head of the SNB to the SNB lock-up in Tashkent.  He said that the visit should have been announced and that pre-trial detainees under investigation can only meet with persons external to the criminal process with the formal approval of the investigator in the case.  The Special Rapporteur notes that in his initial meeting with the same official the terms of reference of the mission had been clearly spelt out.  In particular, reference had been made to the requirement to have immediate access to any place of detention and to any persons deprived of their liberty, including on an unannounced basis.  The Special Rapporteur furthermore observes that during a prior meeting with the Deputy Head of the SNB, the latter had indicated that his Office had broad experience with the work of the ICRC and that the principle of confidential interviews with detainees had been adhered to.  It is the understanding of the Special Rapporteur that the methods of work of the ICRC as far as visits of places of detention and interviews with detainees are concerned are very similar to his own methods.  He considers this incident to be a serious breach of the terms of reference that had been agreed upon by the Uzbek authorities.  The matter was immediately raised with the Ministry for Foreign Affairs.  It must be noted that a large number of torture allegations received by the Special Rapporteur relate to the SNB lock-up in Tashkent (see appendix II).

54.     In relation to the respect for the terms of reference of the mission, the Special Rapporteur notes that in a number of instances during the visit in the Ferghana Valley, contacts between the Special Rapporteur and representatives of civil society appeared to have been closely monitored by the authorities.  Officials introducing themselves as SNB officers were reported to have questioned private individuals whom the Special Rapporteur was to meet.  Phone lines were also cut after contacts were established between representatives of civil society organizations and the Special Rapporteur's delegation.  The matter was raised at the time with the official accompanying him.  During interviews with detainees at the prison of Andijan, it also became clear that the latter had been warned by the prison authorities not to complain to the Special Rapporteur.  Similarly, alleged tuberculosis patients currently held at the prison infirmary could not describe either their symptoms, or the treatment they were receiving.  They praised the prison administration for the conditions of detention.

### E.  Impunity

55.     Very few torture complaints seem to be investigated, whether they are made during the pre-trial investigation period or at trial.  Various officials referred to two recent cases in which law enforcement officers were sentenced to prison terms after having been convicted of torture (see the case of Ali Muhammad Mamadaliev and Ravshan Haitov in appendix II).  The Deputy Head of the SNB stressed that incidents of torture were rare as great attention had traditionally been paid to the training of investigators, including in respecting human rights at all stages of the process.  He referred to the Mamadaliev case as being the only one.  The General Procurator told the Special Rapporteur that in the 10 first months of 2002, 40 members of the MVD had had criminal charges brought against them, including for offences such as abuse of authority and hiding of information.  In particular, he referred to the Haitov case in which his Office had sent an investigation team to the police station concerned and had launched a criminal case resulting in long prison terms.  The Minister of Internal Affairs stated that his Ministry was dealing very

seriously with its personnel suspected of having or found to have violated human rights, and that this had led to some prosecutions. Despite requests to these three interlocutors, no statistics regarding the type of violations committed by law enforcement personnel were provided to the Special Rapporteur.

56.     At the pre-trial detention phase, there is no independent body capable of investigating torture complaints as the General Procurator's Office would ultimately be in charge of the investigations. In particular, the Special Rapporteur notes with serious concern that in the very high profile case of Iskander Khudoberganov et al. (see appendix II), the General Procurator denied having received any complaints regarding alleged torture and other forms of ill-treatment. The Special Rapporteur notes that, according to the information he has received, not only were complaints made during the actual trial, but they were also formally forwarded by relatives of the defendants to the General Procurator's Office. Finally, they were widely reported by human rights organizations, including through press releases.

57.     It must also be noted that there is no legal obligation for a judge to order an investigation into complaints made during a trial. It is reported that a judge would at most call upon the officer allegedly responsible and ask her/him to testify in court that s/he did not torture the suspect. Other evidence, such as medical reports or registry records, is disregarded. Even when the defendant bears visible marks of torture or ill-treatment, judges would usually conclude that torture allegations were made in an attempt to avoid being sentenced and will admit confessions as decisive evidence.

58.     Widespread allegations according to which confessions are extracted by illegal means and form the basis of evidence would also seem to be substantiated by the extremely small number of acquittals. According to non-governmental sources, the acquittal of a person is seen as evidence of negligent work on the part of the investigator, the procurator and the judge in the case, which in turn would have a negative impact on their professional career, with the possibility of the institution of disciplinary proceedings. Therefore, once a person is charged, investigators are willing to resort to illegal means to obtain a confession, without which a procurator would allegedly refuse to bring a case to court. The lack of (scientific) equipment and training and an overload of cases due to the reported 100 per cent success rate demanded by the authorities ("solved cases" criterion for promotion) is also believed to contribute to a disproportionate reliance of investigators on confessions as evidence. Furthermore, in cases of acquittal, complaints are alleged to be lodged by the procurator against the judge (see examples in appendix II) who may be dismissed after three complaints. The legal provision allowing for the dismissal of judges against whom complaints had been lodged by three procurators was reportedly removed at the September 2001 session of Parliament. Therefore, it is believed that judges rely extensively on procurators' indictments, even if torture complaints have been raised during trial. It is said that persons charged will inevitably be convicted as it is always considered possible that law enforcement officials will resort to illegal means to obtain a confession which will then become the basis for the conviction.

59.     The Minister of Justice indicated that in his opinion, the acquittal rate was insufficient, and that this problem would be solved once the judiciary was truly independent. On the other hand, the General Procurator stated that there were very few cases of acquittal because investigations, under the supervision of his Office, were properly conducted and would

invariably lead to the obtaining of evidence in support of the prosecution. He confirmed, however, that in accordance with the law, convictions cannot be based solely on confessions. Finally, the State Secretary on law enforcement agencies denied that public officials are being promoted on the basis of anything except their professionalism and honesty; only those who treat citizens respectfully could be promoted. He added that he had no reason to believe that the use of torture or ill-treatment had led to the promotion of staff.

## III.  CONCLUSIONS AND RECOMMENDATIONS

60.     **The Special Rapporteur acknowledges with appreciation the invitation extended to him as well as the support rendered to him by the authorities, in particular the Ministry for Foreign Affairs.  He nevertheless regrets that the mission's terms of reference were not fully respected.  The failure to grant him access to the SNB lock-up in Tashkent and the unsatisfactory visit to Jaslyk colony remain matters of serious concern.  However, the Special Rapporteur does not believe that these incidents prevented him from gathering sufficient information to allow him to form his opinion on the situation in the country with respect to issues falling within his mandate.**

61.     **The Special Rapporteur notes with satisfaction that the Prime Minister, as well as other senior government officials, expressed their intention and willingness to follow up on the recommendations that are included in the present report.  He hopes that these recommendations, read in conjunction with those made in May 2002 by the Committee against Torture, will find a positive echo in the country and that all efforts will be made to implement them.  He also welcomes the information from the Acting Chairman of the Supreme Court according to which the President of the Republic initiated a "stage by stage" reform of the judiciary which would take into account other countries' experiences in relation to judicial redress regarding detention and the overall criminal process.  In particular, he encourages policy makers who are said to be currently discussing this issue to enshrine the rights to habeas corpus into relevant legislation.  He welcomes the information received from the Government on 6 January 2003 according to which the Parliamentary Commission had adopted on 8 November 2002 the "Concept of further deepening the judicial and legal reform" which emphasizes the importance of the judicial supervision of investigations at the pre-trial stage**.

62.     **Uzbekistan, formerly a republic of the Soviet Union, has only been independent since 1 September 1991.  Important efforts have been made by the authorities to liberalize the economy and the President of the Republic is reported to have presented during the ninth session of Parliament a bill on the liberalization of the judiciary.  The Special Rapporteur notes with satisfaction that alternative measures to deprivation of liberty, such as the payment of fines and compensation to the victim, are being considered.  According to the Acting Chairman of the Supreme Court, only 38.2 per cent of criminal cases now lead to a deprivation of liberty compared with more than 50 per cent several years ago.  Coupled with presidential amnesties, this is believed to have addressed the problem of overcrowding in detention facilities**.

E/CN.4/2003/68/Add.2
page 20

63.     Despite the fact that a multiparty democratic system still needs to be established with a view to legitimizing the political authorities, the Special Rapporteur was impressed by vibrant sectors of civil society concerned with human rights issues.  He regrets that, for the time being, only one independent human rights non-governmental organization has been officially registered by the authorities, and that a number of civil society activists are said to have been harassed, detained and ill-treated allegedly because of their human rights activities.  In particular, he is particularly concerned about the current situation of Elena Urlaeva and Larissa Alexandrova Vdovina (see appendix II).

64.     Due to recent legal reforms, four crimes, namely premeditated murder with aggravating circumstances, genocide, terrorism and aggression, are now capital offences. According to a statement attributed to the President of the Republic, on average, 100 persons per year are executed.  Despite his requests, the Special Rapporteur was not provided with any specific statistics regarding death penalty cases.  As noted above, he regrets that the Supreme Court, which is to review all cases of death sentence, even in the absence of a formal complaint according to its Acting Chairperson, seems not to have received information from United Nations human rights monitoring bodies regarding alleged irregularities in the criminal process leading to a death sentence, in particular requests for interim measures from the Human Rights Committee.  The Special Rapporteur further questions the statement by the Acting Chairperson according to which no one has ever been wrongly executed.

65.     The Special Rapporteur also notes with serious concern the situation of relatives of persons sentenced to death.  The complete secrecy surrounding the date of execution, the absence of any formal notification prior to and after the execution and the refusal to hand over the body for burial are believed to be intentional acts, fully mindful of causing family members turmoil, fear and anguish over the fate of their loved one(s).  The practice of maintaining families in a state of uncertainty with a view to punishing or intimidating them and others must be considered malicious and amounting to cruel and inhuman treatment. Furthermore, the Special Rapporteur considers that the abolition of the death penalty would be a positive step towards respect for the prohibition of torture and other forms of ill-treatment.

66.     The combination of a lack of respect for the principle of presumption of innocence despite being guaranteed by the Constitution (art. 25) and the CPC (art. 23), the discretionary powers of the investigators and procurators with respect to access to detainees by legal counsel and relatives, as well as the lack of independence of the judiciary and allegedly rampant corruption in the judiciary and law enforcement agencies, are believed to be conducive to the use of illegal methods of investigation.  The excessive powers in the overall criminal proceedings of procurators, who are supposed at the same time to conduct and supervise preliminary criminal investigations, to bring charges and to monitor respect for existing legal safeguards against torture during criminal investigations and in places of detention, make investigations into complaints overly dependent on their goodwill.

67.     **The Special Rapporteur regrets the absence of legal guarantees such as the right to habeas corpus and the right to prompt and confidential access to a lawyer and relatives. He further observes that pre-trial detainees are held in facilities which are under the same jurisdiction as investigators in the case. According to the Director of the National Centre for Human Rights, the question of placing SIZO and colonies/prisons under a different jurisdiction is currently being debated.  The Special Rapporteur believes that only IVS should ultimately remain under the jurisdiction of the MVD or SNB and that suspects should be kept there for a short period of time.**

68.     **The Special Rapporteur believes, on the basis of the numerous testimonies (including on a number of deaths in custody) he received during the mission, not least from those whose evident fear led them to request anonymity and who thus had nothing to gain personally from making their allegations, that torture or similar ill-treatment is systematic as defined by the Committee against Torture (see endnote).[6]  Even though only a small number of torture cases can be proved with absolute certainty, the copious testimonies gathered, only a limited number of which appear in appendix II to the present report, are so consistent in their description of torture techniques and the places and circumstances in which torture is perpetrated that the pervasive and persistent nature of torture throughout the investigative process cannot be denied.  The Special Rapporteur also observes that torture and other forms of ill-treatment appear to be used indiscriminately against persons charged for activities qualified as serious crimes such as acts against State interests, as well as petty criminals and others.**

69.     **There remains the question of the level at which political responsibility arises. While the Special Rapporteur notes that some official authorities acknowledged the existence of incidental practices of torture, the Special Rapporteur has no doubt that the system of torture is condoned, if not encouraged, at the level of the heads of the places of detention where it takes place or of the chief investigators.  If the top leadership of these forces and those politically responsible above them do not know of the existence of a system which the Special Rapporteur's delegation was able to discover in a few days, it can only be because of a lack of a desire to know.  Moreover, in the light of information repeatedly conveyed to the authorities by the Special Rapporteur himself, United Nations human rights monitoring bodies such as the Human Rights Committee and international and local NGOs, the lack of such awareness may well reflect an unwillingness to look too closely at the problem.  The very hierarchical nature of the law enforcement bodies also makes it difficult to believe that the top leadership of these forces is not aware of the situation.  The result is that impunity largely prevails among those charged with investigating suspected criminal activities**.

70.     **Accordingly, the Special Rapporteur makes the following recommendations:**

        (a)     **First and foremost, the highest authorities need to publicly condemn torture in all its forms.  The highest authorities, in particular those responsible for law enforcement activities, should declare unambiguously that they will not tolerate torture**

E/CN.4/2003/68/Add.2
page 22

and similar ill-treatment by public officials and that those in command at the time abuses
are perpetrated will be held personally responsible for the abuses.  The authorities need to
take vigorous measures to make such declarations credible and make clear that the culture
of impunity must end;

(b)     The Government should amend its domestic penal law to include the crime of
torture the definition of which should be fully consistent with article 1 of the Convention
against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and
supported by an adequate penalty;

(c)     The Government should also amend its domestic penal law to include the
right to habeas corpus, thus providing anyone who is deprived of his or her liberty by
arrest or detention the right to take proceedings before an independent judicial body which
may decide promptly on the lawfulness of the deprivation of liberty and order the release
of the person if the deprivation of liberty is not lawful;

(d)     The Government should take the necessary measures to establish and ensure
the independence of the judiciary in the performance of their duties in conformity with
international standards, notably the United Nations Basic Principles on the Independence
of the Judiciary.  Measures should also be taken to ensure respect for the principle of the
equality of arms between the prosecution and the defence in criminal proceedings;

(e)     The Government should ensure that all allegations of torture and similar
ill-treatment are promptly, independently and thoroughly investigated by a body, outside
the procuracy, capable of prosecuting perpetrators;

(f)     Any public official indicted for abuse or torture should be immediately
suspended from duty pending trial;

(g)     The Ministry of Internal Affairs and the National Security Service should
establish effective procedures for internal monitoring of the behaviour and discipline of
their agents, in particular with a view to eliminating practices of torture and similar
ill-treatment.  The activities of such procedures should not be dependent on the existence of
a formal complaint;

(h)     In addition, independent non-governmental investigators should be
authorized to have full and prompt access to all places of detention, including police
lock-ups, pre-trial detention centres, Security Services premises, administrative detention
areas, detention units of medical and psychiatric institutions and prisons, with a view to
monitoring the treatment of persons and their conditions of detention.  They should be
allowed to have confidential interviews with all persons deprived of their liberty;

(i)     Magistrates and judges, as well as procurators, should always ask persons
brought from MVD or SNB custody how they have been treated and be particularly
attentive to their condition, and, where indicated, even in the absence of a formal complaint
from the defendant, order a medical examination;

(j)    All measures should be taken to ensure in practice absolute respect for the principle of inadmissibility of evidence obtained by torture in accordance with international standards and the May 1997 Supreme Court resolution;

(k)    Confessions made by persons in MVD or SNB custody without the presence of a lawyer/legal counsel and that are not confirmed before a judge should not be admissible as evidence against persons who made the confession.  Serious consideration should be given to video and audio taping of proceedings in MVD and SNB interrogation rooms;

(l)    Legislation should be amended to allow for the unmonitored presence of legal counsel and relatives of persons deprived of their liberty within 24 hours.  Moreover, law enforcement agencies need to receive guidelines on informing criminal suspects of their right to defence counsel;

(m)    Given the numerous reports of inadequate legal counsel provided by State-appointed lawyers, measures should be taken to improve legal aid service, in compliance with the United Nations Basic Principles on the Role of Lawyers;

(n)    Medical doctors attached to an independent forensic institute, possibly under the jurisdiction of the Ministry of Health, and specifically trained in identifying sequelae of physical torture or prohibited ill-treatment should have access to detainees upon arrest and upon transfer to each new detention facility.  Furthermore, medical reports drawn up by private doctors should be admissible as evidence in court;

(o)    Priority should be given to enhancing and strengthening the training of law enforcement agents regarding the treatment of persons deprived of liberty.  The Government should continue to request relevant international organizations to provide it with assistance in that matter;

(p)    Serious consideration should be given to amending existing legislation to place correctional facilities (prisons and colonies) and remand centres (SIZOs) under the authority of the Ministry of Justice;

(q)    Where there is credible evidence that a person has been subjected to torture or similar ill-treatment, adequate reparation should be promptly given to that person; for this purpose a system of compensation and rehabilitation should be put in place;

(r)    The Ombudsman's Office should be provided with the necessary financial and human resources to carry out its functions effectively.  It should be granted the authority to inspect at will, as necessary and without notice, any place of deprivation of liberty, to publicize its findings regularly and to submit evidence of criminal behaviour to the relevant prosecutorial body and the administrative superiors of the public authority whose acts are in question;

E/CN.4/2003/68/Add.2
page 24

(s)    Relatives of persons sentenced to death should be treated in a humane manner with a view to avoiding their unnecessary suffering due to the secrecy and uncertainty surrounding capital cases.  It is further recommended that a moratorium be introduced on the execution of the death penalty and that urgent and serious consideration be given to the abolition of capital punishment;

(t)    The Government should give urgent consideration to closing Jaslyk colony which by its very location creates conditions of detention amounting to cruel, inhuman and degrading treatment or punishment for both its inmates and their relatives;

(u)    All competent government authorities should give immediate attention and respond to interim measures ordered by the Human Rights Committee and urgent appeals dispatched by United Nations monitoring mechanisms regarding persons whose life and physical integrity may be at risk of imminent and irreparable harm;

(v)    The Government is invited to make the declaration provided for in article 22 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment recognizing the competence of the Committee against Torture to receive and consider communications from individuals who claim to be victims of a violation of the provisions of the Convention, as well as to ratifying the Optional Protocol to the Convention, whereby a body shall be set up to undertake regular visits to all places of detention in the country in order to prevent torture.  It should also invite the Working Group on Arbitrary Detention and the Special Representative of the Secretary-General on human rights defenders as well as the Special Rapporteur on the independence of judges and lawyers to carry out visits to the country.

71.    For purposes of follow-up assessment, the Special Rapporteur would appreciate it if the Government would make its views known on the implementation of the above-mentioned recommendations, possible at the next session of the Commission on Human Rights, and otherwise not later than 1 July 2003.

### Notes

[1]  Uzbekistan acceded to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment on 31 August 1995.

[2]  Article 104 ("premeditated grievous bodily harm"):  "Premeditated infliction of bodily injury which is life-threatening at the moment of infliction, or which results in the loss of sight, speech, hearing or any organ or the complete loss of the function of an organ, psychological illness, or other damage to health combined with a permanent incapacity to work exceeding 33 per cent or leading to a premature pregnancy or an irreparable maiming of the body is punished by deprivation of liberty of three to five years."

[3]  According to the Law on the Ombudsman, the Ombudsman is elected by the Oliy Majlis (Parliament) from amongst its deputies.  She is independent from other State agencies and officials (art. 2), and has the right to initiate legislation.

[4] Summary Report (in English) of the Authorized Person of the Oliy Majlis for Human Rights (Ombudsman), 2001, p. 5.

[5] In particular, see E/CN.4/2001/66, paras. 1224-1266 and E/CN.4/2002/76/Add.1, paras. 1725-1752.

[6] As far as the term "systematic" is concerned, the Special Rapporteur is guided by the following definition used by the Committee against Torture: "The Committee considers that torture is practised systematically when it is apparent that torture cases reported have not occurred fortuitously in a particular place or at a particular time, but are seen to be habitual, widespread and deliberate in at least a considerable part of the territory of the country in question. Torture may in fact be of a systematic character without resulting from the direct intention of a Government. It may be the consequence of factors which the Government has difficulty in controlling, and its existence may indicate a discrepancy between policy as determined by the central Government and its implementation by the local administration. Inadequate legislation which in practice allows room for the use of torture may also add to the systematic nature of this practice" (A/48/44/Add.1, para. 39).

E/CN.4/2003/68/Add.2
page 26

## Appendix I

## EXCERPTS FROM THE REPORT OF THE REPUBLIC OF UZBEKISTAN TO THE COUNTER-TERRORISM COMMITTEE (S/2002/974, annex, pp. 13-15)

"Article 156 of the Criminal Code, entitled 'Instigation of national racial or religious hatred', refers to deliberate actions which are offensive to national honour and dignity and insulting to the feelings of citizens because of their religious or atheistic convictions, carried out with the aim of eliciting hatred, intolerance or discord towards groups of the population on national, racial, ethnic or religious grounds, as well as the direct or indirect restriction of rights, or the establishment of direct or indirect privileges on the basis of national, racial or ethnic affiliation or attitude to religion.

"This offence poses a direct threat to the social relationships underpinning national, racial and religious equality."

"Article 159 of the Criminal Code, entitled 'Attacks against the constitutional order of the Republic of Uzbekistan', refers to public calls for unconstitutional change of the existing State structure, for the seizure of power or removal from power of legally elected or designated authorities or for the unconstitutional violation of the unity of the territory of the Republic of Uzbekistan, as well as the dissemination of materials having such a content.

"Such attacks on the constitutional structure pose a threat to the social relationships underpinning the security of State power."

"Article 244 of the Criminal Code, entitled 'Mass disturbances' refers to the organization of mass disturbances accompanied by violence directed at persons, rioting, arson, damage to or destruction of property, the use or threat of use of weapons or other objects used as weapons to resist a representative of authority or any active participation in mass disturbances.

"Mass disturbances pose a threat to the social relationships underpinning public security.

"…

"Article 244-1 of the Criminal Code, entitled 'Preparation or dissemination of materials constituting a threat to public safety and public order', refers to the preparation or dissemination of materials expressing the ideology of religious extremism, separatism or fundamentalism, incitement to riot or the forced eviction of citizens or materials intended to cause public panic, after an official warning.

"Article 244-2 of the Criminal Code, entitled 'Establishing, leading or participating in religious extremist, separatist, fundamentalist or other prohibited organizations', refers to the offence of establishing, leading or participating in religious extremist, separatist, fundamentalist or other prohibited organizations."

## Appendix II

## INDIVIDUAL CASES*

**Sadik Khamidov** was reportedly visited by an investigator at 11 p.m. on 27 May 1992, who asked his mother to wake him up and asked him questions about one of his friends, who had drowned in the canal. After a couple of minutes, he left and reportedly came back with four or five people, stating he had forgotten something. At that point, it is reported that Sadik Khamidov was arrested. The next morning, his mother went to see the investigator at the Namangan city department of the Ministry of Internal Affairs (MVD), who reportedly told her that everything was fine. His mother reportedly found out later, that he had been severely beaten and that his clothes were soaked in blood. In August, she was reportedly allowed to see her son in the Tashbulak SIZO in Namangan. He was said to have been covered in bruises. In the detention centre, he had reportedly been given electric shocks and had been kept in cold water for eight days. He reportedly told his mother that the case against him had been fabricated. When his mother complained about the treatment her son had allegedly been subjected to to the prison authorities, they reportedly stopped her from seeing him. During the trial in December, Sadik Khamidov reportedly told the judge that he had been tortured; however the judge allegedly accused him of lying. A lawyer also raised the allegations of torture and stated that the confessions had been extracted under torture, but was reportedly ignored. After the hearing, Sadik Khamidov was said to have been threatened not to talk about the torture, and again placed in cold water for having raised the torture allegations in court. At the trial, he was subsequently sentenced to death, and the two other accused to 20 years' imprisonment, for the murder of a police officer and a guard at a canal. About three years later, the corpses of the co-defendants were returned to their families, having died of tuberculosis at a medical facility in Touluk. In 1992, Sadik Khamidov's mother appealed the verdict and met with the head of the Supreme Court, informing him that she had had no further information from her son after his transfer from Namangan. She furthermore raised allegations of torture, but these were reportedly ignored by the judge. When she wrote to Namangan city court, she was reportedly told that they had sent her the letter that her son had already been executed. In 1996, she had received a verbal message from someone who had visited Karshi, that her son was still alive. She is said to have visited Karshi several times, but the authorities reportedly told her that they had no one there of this name and they could not give out information. His mother is said to have visited all detention centres, and had sent letters to the Supreme Court and other courts, and four letters to the President of the Republic to find out whether her son had been executed. She reportedly received a letter from the Supreme Court stating that the verdict remained in force.

**Abdurahim Turgunov** was reportedly arrested on 12 April 1995 at his home in Namangan. Twelve police officers are said to have burst into the house, two of which held his wife at the door and the others woke up her husband and led him away. The other officers are said to have searched the house. Fifteen days later, the 15 officers are said to have come back and to have searched the three-room house for six hours. One police officer is said to have placed something into a container in the basement. According to the information received, the authorities subsequently claimed that they had found five pieces of a gun in the basement, and a video of the house was made. For seven months, his wife did not know about her husband's

---

* For ease of reference, the following summaries are presented in chronological order.

E/CN.4/2003/68/Add.2
page 28

whereabouts. After seven months, she reportedly received a phone call in the evening from a lawyer in Tashkent who told her to go to Tashkent and informed her of her husband's trial. When she arrived in Tashkent on the next morning, the trials had been concluded and he had been sentenced to five years' imprisonment. He was reportedly detained in Karshi colony until 1997, and in spring 1997, he was reportedly transferred to Sangorod prison clinic in Tashkent, due to his bad state of health. In autumn, after five to six months of medical treatment, he was returned to Karshi. In May 1998, he was reportedly taken to Tashkent, where he was said to have been sentenced by the Supreme Court to 10 years' imprisonment on fabricated charges. Until 1999, he was reportedly detained in a humid cell in Tashkent prison, also commonly known as Tashturma, where he was said to have been beaten and placed in a plastic shirt which contracted when he moved. He was reportedly transferred to Karshi 51/64. In April 1999, he was said to have been left unconscious for three days. The prison authorities reportedly took him out, thinking he was dead. He was allegedly given no medical help. He is said to be suffering from kidney ache, and he is said to be covered in sores on his hips, legs and side of the body. He was reportedly refused a transfer to Sangorod prison clinic.

**Ilhom Zainabitdinov,** born in 1979, was reportedly arrested on 30 June 1997 in the green market in Andijan by local people when, in a drunken state, he attempted to snatch a gold chain from a lady. He was reportedly taken to police station No. 2 in Andijan, where groups of three or four police officers allegedly beat him for two days. They reportedly denied him food and drink (in very hot summer temperatures), lifted him up and threw him on the ground (the so-called "helicopter method") as well as kicked and beat him. The police are said to have wanted to make him confess to having robbed another woman a week earlier. At the end of the second day, he reportedly signed a confession as a result, which was countersigned by a State-appointed lawyer. On the second day, the police are said to have searched his father's home. When his father attempted to see his son, he was reportedly denied access. On the third day, he was said to have been transferred to Andijan prison where he stayed until the court hearing in October 1997. When he told the judge that he was forced to take responsibility for a second crime which he did not commit, the judge reportedly responded that, "So many people lie and you are the only one telling the truth?" His lawyer also raised the question of ill-treatment, which the judge is said to have ignored. He was reportedly sentenced to 12 years by the local court. According to the information received, on appeal, the sentence was said to have been repealed and another hearing reportedly took place in the summer of 1998 in the city court, resulting in a sentence of nine years. Upon appeal at the regional court, the sentence was reduced to seven years. He was reportedly released on 5 July 2000 after serving three years. During the three years, he had been moved to five or six different prisons.

**Mumin Zainabitdinov**, Ilhom Zainabitdinov's younger brother (see above), aged 15 at the time, was reportedly arrested on 24 April 1999 in Andijan when his brother's case was being reviewed at the regional court, and brought to the main city police station. He had reportedly been pressured to steal by some men, who are believed to have been ordered to put such pressure on him. At the police station, the police officers are said to have given him electric shocks, and to have beaten him. As a result, he is said to have suffered from a burst appendix. Without notifying his father, Mumin Zainabitdniov was reportedly transferred to Andijan state clinic on 3 May 1999 and operated on. The police are said to have accused him of stealing, allegedly to put pressure on his family not to pursue the appeals in his brother's case. The criminal procedure was said to have been closed and he was released 18 days later. On 24 June 1999, he

was reportedly rearrested on the same accusation, and the investigation was prolonged for three months. During his detention in Andijan prison, he reportedly swallowed a metal cross on 13 October 1999. He was reportedly operated on again without his father's notification. The operation is said to have coincided with his brother's appeal. On the same day, his father had written an appeal to the head of the Centre for Human Rights of Uzbekistan. It is believed that psychological pressure was brought on his younger son on orders from the procurator's office. The prison authorities are said to have told Mumin Zainabitdinov that he would never leave the prison. On 4 November 1999, he was reportedly sentenced to five years' imprisonment for theft. When he raised the torture allegations in court, the judge is said to have stated, "You were not beaten enough - you should have your hands cut off." When the sentence was published, it reportedly was dated 29 October 1999, i.e., before the court hearing took place. When it was raised with the authorities, the judgement was still pre-dated for 3 November. Mumin Zainabitdinov was reportedly detained at the children's colony in Zangiata, and transferred to hospital colony No. 18 in Tashkent at the end of February 2000. He was reportedly released on amnesty in October 2001.

    **Javlon Azimov**, born in 1982, and **Davron Azimov**, born in 1983, were reportedly abducted from their sport college in Tashkent on 5 May 1998. They were reportedly held during 11 days in a flat where they were beaten up, tied to a radiator and had scotch applied on their eyes. As a result of the beatings he was subjected to, Davron had later to undergo an operation in the lower abdominal part (left side). Before being released on 16 May 1998, they were allegedly threatened with death if they were to tell anyone what had happened. It is believed they were abducted upon the order of a colonel from the MVD who had accused their eldest brother of theft. The eldest was reportedly accused of having stolen some money when he was working for the colonel as a private trainer for the latter's sons. During the abduction period of Javlon and Davron Azimov, their mother is said to have been visited on several occasions at night-time by a lieutenant-colonel of the MVD who is believed to have asked her to pay a bribe of US$ 150,000 in order for her sons to be released. On 12 May, she and her lawyer are said to have filed a complaint with the SNB. It is believed that SNB officers later denied that any complaint had been filed and refused to open any investigation into the abduction and ill-treatment, despite repeated requests, including through a lawyer. The eldest son is said to have been arrested in Ulianosk city in the Russian Federation in May 2002. He was released after one month of detention because of lack of evidence. In July 2002, he was reportedly rearrested and deported to Tashkent on 19 October 2002. He is now said to be facing charges of theft and to be held in the Tashkent city prison, also commonly called Tashturma.

    **Akhmatkhon Atakhanov**, a 54-year-old man who had worked in a mosque, was reportedly taken on 5 May 1998 to a Namangan police station where he was allegedly forced to sign a document. There, his hands were reportedly tied behind his back, and he was hit with a baton. Drugs were said to have been placed on him. He is said to have been interrogated over a period of four months in the SIZO of Namangan with a view to making him confess. He is said to have been asked whether he belonged to an extremist group. He was reportedly hit with a bat, including on the chest, lifted up and dropped on the floor (the so-called "helicopter method"). In September 1998, he was reportedly sentenced for the second time (he had already been sentenced in 1994 in similar circumstances) to three and a half years in prison for illegal

E/CN.4/2003/68/Add.2
page 30

possession of drugs.  He was said to have been transferred to Zarafshan colony on
20 December 1998.  In mid-January 2002, he was reportedly transferred to Karshi colony 64/33.
**Muhammad Atakhanov**, his 30-year-old son, is said to have moved to Tashkent and later, in
February 1999 to Kazakhstan after several arrests in the community.  On 6 September 1999, an
amnesty was reportedly declared by the President of the Republic, so Muhammad Atakhanov
wrote a letter asking for forgiveness for having left the country, which he handed over at the
border.  He was reportedly handed over to the Uzbek border guards and detained in Tashkent.
On 6 October, four police officers from Namangan are said to have come and stated that they
would bring him home.  According to the information received, they however brought him to the
Namangan SIZO.  At his trial, he was reportedly sentenced to 15 years in prison for leaving
Uzbekistan and using a false passport to enter Uzbekistan.  He is now said to be detained in
Chirchik city colony.  **Abass Atakhanov**, his 23-year-old brother, was reportedly arrested on
6 August 2000 upon return from his military service.  He was reportedly accused of crossing the
border illegally and was questioned about his brother's whereabouts.  The same day, four police
officers are said to have come to his house, to have asked where the basement was and to have
re-emerged several minutes later, claiming that they had found 48 bullets.  He was reportedly
charged under article 248 and later amnestied.  He is said to have been detained again in the
Namangan City MVD office, where he is said to have been ill-treated.  When his mother tried to
see him in October 2000, she was reportedly told that she could not and that she was free to
complain to the United Nations.  He was reportedly sentenced again to four years' imprisonment
in November 2000, on the basis of a violation of article 159 and detained in Almalik colony.  In
spring 2001, he was said to have been transferred to Karshi colony.  **Abdulkhamid Kayumov**,
the nephew of Akhmatkhon Atakhanov, was reportedly arrested in Namangan in the summer of
the year 2000.  He was reportedly charged with propagating Hizb-ut-Tahrir literature.  As he did
not plead guilty, police officers are said to have beaten him on the head with sticks and clubs.
As a result, he was reportedly forced to give false testimony against two other persons accused of
activities within Hizb-ut-Tahrir.  After 17 days in the Namangan SIZO, he was reportedly set
free.  He was reportedly rearrested in the summer of 2002 in Namangan town, and accused of
having received a grenade from someone.  He reportedly never signed a confession and was
again said to have been beaten on the head.  As a result, he is said to be suffering from hearing
problems.  In June 2002, his trial was said to have commenced.  On the day of the verdict in
August, his wife is said to have been told another date for the commencement, and reportedly
only arrived in time for the verdict.  The prosecutor is said to have told his family that he would
only be charged with article 159 (i) - which would have meant a lighter sentence - but then asked
for article 159 (iv) at the trial.  He had reportedly asked the family to pay him a bribe, however,
since they could not pay it, the procurator is said to have relied on subsection (iv).  His
State-appointed lawyer is said to have been paid no attention in the proceedings.
Abdulkhamid Kayumov was reportedly sentenced to 16 years.  He was reportedly held in Jaslyk
colony at the time of writing.

    **Akhmat Turakhanov**, a member of the political opposition from Namangan city, who
had advocated the laying of gas pipes around the city, an initiative which was apparently not
popular with the local authorities, was reportedly arrested and taken to Namangan MVD office
on 29 December 1998.  It is also reported that he was a member of an independent human rights
organization and petitioned the authorities to open mosques.  He was reportedly later sentenced
to five years in prison for "Wahhabism" pursuant to article 159 in March 1999, on allegedly
fabricated charges.  During the trial, 21 out of the 23 witnesses reportedly told the judge that they

had been forced to write the accusations, and that Akhmat Turakhanov had never taken part in religious activities.  The only two witnesses who gave testimony against him reportedly stated that they had heard about illegal activities but could not specify them further when questioned by the judge.  His lawyer stated that the defendant had previously lodged a complaint against the two witnesses and that their testimony was not reliable.  The judge reportedly sentenced him to five years.  Akhmat Turakhanov reportedly hit his head against the cage in which he was kept during the trial and protested that he was tried unfairly.  He is said to have bled heavily and was taken away on a stretcher.  He is said to have been denied regular doses of insulin as a diabetic, and reportedly was unable to walk.  At the Tashturma, his sons were reportedly barred from handing him insulin.  As a result of the refusal of medical treatment, he reportedly died in the prison.

    **Rusmetov Saber** and two of his sons, **Uigun** and **Ozbek**, were reportedly arrested on 1 January 1999, while a third son is believed to have escaped police arrest.  On the four previous days, his house had been searched on several occasions by police officers without any search warrant during which a number of items, such as passports, diplomas, etc., were confiscated.  It is alleged that bullets were planted in his disabled daughter's room and that an old religious book on Islam was found.  Police officers were said to have stayed at his place watching his wife until 6 February 1999.  During that period, Rusmetov Saber's wife, **Sultanova Rustamovna Dharman** was even accompanied to the toilet at gunpoint and was threatened with death if she did not cooperate.  According to the information, the family was targeted because they were suspected of being Wahhabists.  Rusmetov Saber and his two sons were reportedly taken to the Urgench City police station on the day of their arrest and Sultanova Dharman was asked to come to bring them food and new clothes.  There, she is alleged to have been stripped to her underwear, to have been humiliated in front of other detainees, to have been insulted and to have been held in a dark room for 24 hours.  As a result, she is said to have been seriously distressed.  It is believed that, in the meantime, Rusmetov Saber and his sons were forced to sign confessions.  It is in particular reported that they were told that, if they did not sign confessions, their wife/mother would be raped.  Despite her repeated requests to investigators, Sultanova Dharman was not authorized to provide her relatives with a lawyer.  On 25 May 1999, Rusmetov Saber was reportedly taken on a stretcher to the Khozorap district court which sentenced him to five years' imprisonment on charges of illegal possession of drugs and bullets.  It is believed that he had never seen a lawyer during the whole judicial process and was seriously beaten up at the Urgench City police station with a view to making him confess.  He was reportedly amnestied after having spent three years in detention in various facilities, including Navoi 29, Karshi 64 and a prison in the Tashkent region.  It is said that his wife was never informed of any of these transfers and that she could only keep track of his whereabouts thanks to the information provided by relatives of co-inmates of her husband.  According to the information received, as a result of the treatment he was subjected to, Rusmetov Saber is now mentally disturbed.  At some point, it is reported that the two sons, Uigun and Ozbek, were transferred to the National Security Service (SNB) headquarters in Tashkent.  The family was reportedly not informed of their transfer.  The trial is said to have been held at the Tashkent Regional Court in camera as of 1 July 1999.  During the trial, thanks to a bribe paid to one of the guards, a paper was smuggled out in which the defendants requested their mother to provide them with a lawyer as they had not seen any during either the pre-trial investigation, or the trial.  Sultanova Dharman is said to have been denied access to the court room by the judge, who is believed to have stated that Wahhabists are not authorized to attend trials.  It is believed that the

E/CN.4/2003/68/Add.2
page 32

court proceedings record the presence of a lawyer during the trial.  On 29 July 1999, Uigun and Ozbek were said to have been sentenced to death.  It is believed that they had been charged with several articles, in particular article 159.  An appeal is said to have been launched to no avail.  On 23 September 1999, the Supreme Court is said to have confirmed in camera the death sentence.  Their mother is also said to have written a complaint letter to the General Procurator.  She reportedly saw them on 2 August in Tashkent City prison, also called Tashturma.  It is reported that their faces were covered with bruises, in particular around the eyes and mouth.  They are said to have claimed that they had been electrocuted while being held at the SNB lock-up in Tashkent and one of her sons complained of bleeding from his mouth for several consecutive days while being held at the SNB.  Their mother is reported as having to pay bribes to prison guards in order to be able to provide them with food which, she later learnt, never reached them at all.  According to the information received, she was prevented from giving them any medicine.  At the time of writing, the mother did not know whether her sons had been executed.  It is also alleged that the family is constantly harassed by police officers coming to their house to ask questions and insult family members.  Sultanova Dharman is also believed to have been arrested on several occasions at road checkpoints.  In particular, on 18 August 2002, she was arrested at a checkpoint near Bukhara because she had been recognized by a police officer.  She was allegedly insulted, accused of being a Wahhabist, and threatened with death in prison.  It is reported that she was held there for three days before being accompanied to Tashkent by two police officers.  As a result of this incident, her health is said to have seriously deteriorated.  In particular, she reportedly had high blood pressure for six consecutive days.  Complaints were reportedly lodged with the Procurator's office of Khorzem and with the General Procurator's Office, to no avail.

**Shechnasar Mataripovich Yakubov** was reportedly arrested on 13 January 1999 in Hibinsk by SNB officers.  He was allegedly given electroshocks and was beaten with a baton on his head.  As a result, it is believed that he had a bruise on his face, swollen eyes, burst lips, headache, kidney problems and leg injuries.  He is also said to have lost weight.  The SNB officers are said to have wanted to make him confess to committing crimes related to his religious beliefs.  His trial was held on 29 July 1999 allegedly without the presence of a lawyer.  According to the information received, he was sentenced to death.  Since Yakubov's parents were threatened by the SNB officers, they have not taken any domestic actions.  At the time of writing, it was not known whether Shechnasar Mataripovich Yakubov had been executed.

**Uitkir Bahodirovich Yusupov**, aged 25, and **Savdor Sobirovich Allayarov**, aged 27, were neighbours living in the same house in Urganchek.  They were reportedly arrested on 29 January 1999 by officers of the SNB and later taken to Tashturma.  It is believed that the charges were related to their religious beliefs.  They were allegedly beaten at the SNB office of Tashkent and also by police officers from Tashkent.  When Savdor Sobirovich Allayarov's mother was allowed to visit her son in Tashturma, she reportedly saw his eyes swollen and bruises around his eyes.  He had reportedly lost weight.  His head, legs and the kidney area were said to be hurting.  The mother of Uitkir Bahodirovich Yusupov visited her son on 31 January in Tashturma and reported her son bearing the same marks.  The Regional Court of Tashkent sentenced both to death on 29 July 1999.  Their relatives were not allowed to attend the trial.

Savdor Sobirovich Allayarov's mother reportedly complained to the Procurator's office of Khorzem, to the General Procurator and to the Supreme Court, to no avail.  At the time of writing, it was not known whether Uitkir Bahodirovich Yusupov and Savdor Sobirovich Allayarov had been executed.

**Polvanasar Chutaev**, aged 23, was reportedly arrested on 5 February 1999 in Samary, Russia, and was transferred to Tashkent.  He was allegedly beaten at the SNB office and later also by officers from the GUVD.  It is believed that he was given electroshocks and was beaten on his head and legs.  As a result, it is reported that his lips were burst and his face swollen.  He was allegedly hardly able to walk.  The Regional Court of Tashkent reportedly sentenced him to death, without the presence of a lawyer.  At the time of writing, it was not known whether Polvanasar Chutaev had been executed.

**Vassiev Jamshid Jabborovich** was said to have been arrested by officers of the SNB from Bukhara right after the February 1999 bombings in Tashkent.  He was reportedly accused of having participated in these bombings and was also charged with religious extremism.  His mother is said to have complained to senior SNB officers about the fact that her son had not been provided with a lawyer and had not been formally charged three days after his arrest.  She was reportedly told that in his case, it would not be necessary to hire a lawyer.  His lawyer is said not to have been later given access to his client.  His mother was told by SNB officers that Vassiev Jamshid Jabborovich would be released shortly as there was no evidence against him.  It is reported that, until August 1999, he was held at the SNB Bukhara headquarters where his mother was able to see him, under the supervision of an investigator, two months after his arrest.  According to the information received, he was covered with bruises and looked very pale.  According to the information received, he had been beaten, in particular on the neck with clubs, and strangled with a wire, with a view to making him sign a confession which he refused to do.  It is also believed that cold water was poured on him for 45 consecutive days.  He was reportedly formally charged by the Tashkent City Procurator with articles 159 and 244 of the Criminal Code and the case is said to have been transferred to Tashkent jurisdiction.  In August, it is said that he was transferred to Tashturma.  On 24 September 1999, his family was reportedly informed that the trial had started the previous day.  During the trial at the Bostanlyk District Court in the city of Gazalkent, Tashkent Province, it is alleged that his lawyer was treated so badly by the judge that he could not defend his client properly.  During the trial, the three other co-defendants are said to have claimed that their confessions had been extracted under torture, to no avail.  On 30 September, Vassiev Jamshid Jabborovich was reportedly sentenced to 11 years' imprisonment.  The sentence is also said to have included the confiscation of his property.  According to the information received, no evidence against him was mentioned in the verdict.  The three other co-defendants were sentenced to 10, 12 and 13 years of imprisonment.  From November 1999 to April 2000, Vassiev Jamshid Jabborovich was reportedly held in Karshi colony.  Appeals were lodged with the Procurator General's Office and the Supreme Court.  The former is said to have responded that he had been convicted in accordance with the law and that his guilt had been proven during the investigation.  According to the information received, an independent expert nominated by the Ombudsman concluded that he was not guilty of the charges brought against him.  In April 2000, he was said to have been transferred to Jaslyk colony, but his family was reportedly informed of this transfer only in May.  His mother, a medical doctor, is said to have seen him at Jaslyk colony in June.  He reportedly had a large bruise on his shoulders, apparently due to beatings with an iron bar.  It is also reported that he

E/CN.4/2003/68/Add.2
page 34

had several sores on his body, haemorrhoids, an enlarged liver and a sore hole in the stomach.  It is believed that he was punished and subjected to various forms of ill-treatment because of his mother's public complaints about the treatment he had been subjected to.  It is believed that, at the time of the visit of the Special Rapporteur, he had been transferred to another detention facility, possibly Zangiota colony near Tashkent.

**Sabir Saiibbaev** was reportedly arrested at home in Namangan on 23 March 1999 by some 20 MVD officers, some of them wearing uniforms.  It is alleged that he was taken to the basement of his house where he was beaten for some 30 minutes with a view to making him confess that he had a gun.  It is believed that officers had come with a gun that they claimed was his.  According to the information received, when he came out from the basement, he could not speak to his relatives, who were threatened not to say a word about what had just happened.  His wife was then said to have been taken to the basement where she was asked to recognize arms that are believed to have been planted there by officers.  Sabir Saiibbaev was reportedly taken to the Namangan City police station.  His children are said to have been able to see him there some 10 days after his arrest.  Thereafter, his whereabouts were not known until his wife was informed in September by relatives of co-defendants in her husband's case that he was being tried in Tashkent.  It is reported that the trial had started in camera in Tashkent at the end of August.  It is not known whether a lawyer had been appointed.  According to the information received, he was sentenced to death and his property was confiscated.  His wife is said to have been evicted with her children from their house.  She is believed to have been able to meet with her husband in Tashturma for some 15 minutes in the presence of a prison guard at the end of September.  According to the information received, several appeals were lodged with the Ombudsman, the Procurator General and the Supreme Court, to no avail.  The Supreme Court is said to have confirmed the death sentence on 1 October.  It is reported that his death certificate was received by his family on 26 December 1999.  On 28 November 2000, the Namangan City Court reportedly ruled that his family should regain half of the property that had been confiscated.  It is reported that this decision was never implemented.

**Dmitry Chikunov**, a businessman born in 1971, was reportedly arrested in his mother's home in Tashkent on 17 April 1999 on the accusation of having killed two people on the same day.  After her son's arrest, his mother, **Tamara Chikunova**, was said to have been held in her apartment with four police officers.  The investigators reportedly insulted Dmitry Chikunov and asked his mother how she could have given birth to "a faggot".  She was allegedly told that her son would be returned shortly, and was detained in her room by the police.  Her office and apartment were searched and a microphone was said to have been installed.  She was then allegedly beaten and humiliated.  She is said to have asked where her son was, but was given no response.  Dmitry Chikunov was reportedly transferred to the Tashkent City main police station (GUVD).  On the way to the GUVD, one of the arresting investigators is said to have caught his head in the car door and kicked him several times in the abdomen.  Throughout the trip, he is said to have beaten him with his fists and elbows.  Upon arrival at the GUVD, Dmitry Chikunov was led into an office where there were seven or eight officials.  They are said to have torn off his tie and to have pressed him up against the wall and to have severely beaten him.  One is said to have hit him with an empty Coca-Cola bottle.  After a couple of minutes Dmitry Chikunov is said to have started losing consciousness and a blow reportedly knocked his head against the wall.  Two of the investigators, including the arresting officer and another investigator, were reportedly shouting at him that he was faking it, and that they should give

him "some more". He reportedly regained consciousness, when the investigators tied his hands behind his back, placed a gas mask on his head and closed off the breathing tube. One of the investigators reportedly shouted at him to confess to the murder and insulted him. Dmitry Chikunov is said to have started to suffocate immediately, and reportedly kept on repeating that he was not guilty, that he had seen the killing happen, but had taken no part. One of the investigators is said to have replied that since Dmitry Chikunov was "such a stubborn [*skotina*]", they would drag in his mother and gang-rape her in front of him; if that "didn't help", they could make him fall out of the window "accidentally", and they would write that he had committed suicide. He was allegedly made to listen to his mother being ill-treated via microphone. Dmitry Chikunov is said to have begged them not to touch his mother, and pleaded with them to let him out. He reportedly told them that he was not guilty, and that they should do whatever they wanted with him instead. Then another investigator and other GUVD staff walked in, and the investigator reportedly yelled at everyone: "Beat him, the pederast!" They are said to have begun to beat and kick him with their feet, fists, and truncheons. The same investigator is said to have shouted that, since Dmitry Chikunov was not married, he must be a pederast. According to the information received, he said that they were going to finish the "press conference" and threatened him with rape, stating that they would "give him what he wanted, since he was a homosexual". He reportedly beat him on the back of the head with a stick in the form of a male sex organ, carved out of stone. They reportedly called in a photographer and, while beating him all the while, are said to have tried to pull off his trousers. When Dmitry Chikunov tried to resist as best as he could, they reportedly threw him on the floor, one person sat on his neck, another on his arms and a third person on his back, shouting: "Now we'll shove this prick up your ass and take a picture, and send it with you to prison. They love guys like you in there!" Then the one who was sitting on his back is said to have jumped up and landed with both feet on his spine. The officers are then said to have dragged off his trousers, and started beating his legs and feet with their truncheons. The whole time they were alleged to have been screaming, "We know that you're the murderer, admit it and we'll stop!" Dmitry Chikunov is said to have told them that he was not guilty. They then reportedly picked him up, let him put on his trousers, and then reportedly tied him to the radiator, and started to kick and beat him with their truncheons on his back and ribs. One of the investigators is alleged to have said that they were going to kill him and nothing would happen to them. It is reported that they indicated that if there were any marks from the blows, they would just say that he got into a fight. Dmitry Chikunov reportedly fell over, but the investigators are said to have kept pulling him up and beating him. They reportedly said that for stubborn types they had a method called "swallow [*lastochka*]". They are said to have untied him from the radiator, handcuffed him again, took him by his shoulders and legs and threw him four times towards the ceiling and stepped back. He reportedly fell on his back on the floor, leading to temporary paralysis. When Dmitry Chikunov regained consciousness, an investigator reportedly asked him whether he was now going to confess, to which Dmitry Chikunov nodded his head. They then reportedly let him wash and gave him a cigarette. Then two investigators reportedly started to argue among themselves that they should make him the organizer of the crime. They reportedly questioned him about where he went to school, in what city. Then they reportedly wrote down his statement and warned him "not to pull any tricks". They reportedly told him that someone would arrive, would ask him questions while they taped him on video, so he should answer, and if he did not know the answer he should just read the paper. When he gave his answers, the interviewing person reportedly did not believe him. He is said to have told the investigators to turn off the camera, and to bring him out into the hallway. When he was alone with them, he is said to have

E/CN.4/2003/68/Add.2
page 36

started to yell at them that he needed the facts, and that this was not a confession but just a bunch of chatter. He allegedly stated that he could "investigate" the case like that himself, with his fists, if he wanted to, and that he did not believe for a minute that Dmitry Chikunov was guilty. After that, he reportedly left. They allegedly brought Dmitry Chikunov back into the office, beat him again, and yelled that he had "screwed everything up", and that they would kill him. After conferring amongst themselves, they reportedly told him that they had no other choice than to kill him in a supposed escape attempt. They reportedly led him out into the street to a car. Four investigators took him to the scene of the crime, threatened and abusing him in the car and telling him that they would only need to make one phone call in order to realize all their threats against Dmitry Chikunov's mother. When they arrived at the place, they reportedly led Dmitry Chikunov in front of the headlights and turned his back to them. One of them is said to have walked up to him, cocking the trigger on a pistol, and then putting the barrel of the gun to the back of his head. One of the investigators reportedly made a telephone call and commanded that Tamara Chikunova be found. Dmitry Chikunov is said to have begged them not to touch his mother. They then reportedly told him that he had to act completely in accordance with their commands, and say only what he was told to say, to which he agreed. Then investigators reportedly congratulated each other, and kissed each other after the Uzbek custom. They reportedly drove back to the GUVD. Three days after his arrest, his mother was reportedly called to bring new clothes to her son. She stated that she would only do so in exchange for his other clothes. The investigators are said to have given her her son's clothes, after an effort had been made to clean them. Traces of blood were clearly discernible on the clothes, on his underpants, in the waist area of his trousers and on the shirt. The investigators allegedly asked her to return her son's clothes which she refused. Dmitry Chikunov was reportedly held at the GUVD for about 20 days, and interrogated every day. They reportedly deprived him of sleep, constantly beat him with truncheons, kicked him, spit on him and told him that he was their slave. They reportedly told him that they would make him pay for not having shot him. During the night, they reportedly took him out of the cell several times to beat him. The two main investigators, including the arresting investigator, are believed to have been in charge of the others. They reportedly did not return him to the prison until 4 May, and again returned him to the GUVD on 6 May, where he was reportedly beaten again, and humiliated. He was reportedly told that the investigators had "helped" his mother to hang herself. When Dmitry Chikunov threw himself at them, they are said to have tortured him again for two days, using the gas mask and the "swallow" method. They reportedly held him there for more than 10 days, and sent him back to prison at the end of the twelfth day. In May 1999, an arrest warrant was issued for Tamara Chikunova. She was reportedly allowed to see her son only if she provided the investigators with information. She reportedly hired a lawyer who was not allowed to see Dmitry Chikunov for five months whilst the investigation was ongoing. During the investigation, he was reportedly held in the basement of the district IVS/SIZO in Tashkent. She was reportedly told that her son would be killed in the basement if he did not confess. After the investigation, her son is said to have written a statement stating that he was guilty on the condition that he would be transferred to prison and that his mother's life would be spared. Tamara Chikunova was said to have only been allowed to see her son after five months who had reportedly lost half his weight. The witnesses at the trial were the police officers who had reportedly beaten him. When Dmitry Chikunov told the court that he was not guilty and that he had confessed under torture, the judge is said to have stated, "No, you are the killer and now you see the independence of the judiciary." Dmitry Chikunov's lawyer was not allowed to participate in the trial. Instead, his State-appointed lawyer gave testimony in court against him,

stating that she had talked to him, that he had confessed and that he had not been beaten.  When Dmitry Chikunov asked her when she had seen him, she stated that she could not remember as she had too many cases.  According to the information received, he replied that this was the first time he saw her.  Tamara Chikunova reportedly filed a complaint against the lawyer who subsequently lost her right to practice.  Dmitry Chikunov was eventually sentenced to death.  On 30 June 1999, the United Nations Human Rights Committee is reported to have requested a moratorium on the execution to consider the case (interim measures).  However Dmitry Chikunov was executed on 10 July 1999.  The news was reportedly given to his mother as she went to visit him in Tashturma on that same day.  On a visit on 9 July, she had allegedly been told by the prison guards that she could not see him and should come back the next day.  The two main investigators in the case, who had reportedly led the torture of Dmitry Chikunov and who had harassed Dmitry Chikunov's family, have reportedly been promoted.  One of them, who is now said to be the head of the operative department of internal affairs of the Tashkent oblast, has reportedly been promoted to lieutenant-colonel, and the other is now said to be working for the General Procurator's office.

Mamadjanov Rahmatillo Hamidovich, a former member of Hizb ut-Tahrir, reportedly came to the Margilan City SNB Office on 9 May 1999 to ask for pardon following a speech by the President of the Republic according to which all members of non-traditional religious groups who repent would be forgiven.  It is believed that he was immediately seriously beaten and transferred to the SIZO cell.  Later that year, he was reportedly sentenced to seven years' imprisonment despite the fact that he raised torture allegations during his trial and that he had asked for pardon.  It is reported that he was detained at colony 64/29.  As a result of the treatment he was allegedly subjected to, his liver could not function properly anymore.  According to the information received, he died in Margilan City Hospital on 26 November due to a liver failure.

Vasgen Vladimirovich Arutunjanz was reportedly arrested in July 1999 by criminal investigators of the RUVD of the Iakkasarai region on suspicion of murdering two people.  After being taken to a detention facility in Tashkent, Vasgen Vladimirovich Arutunjanz was allegedly severely beaten in order to make him confess committing the crimes, which he refused to do.  It is alleged that he was beaten on his heels and in the kidney area.  It is also alleged that he was kicked and beaten with a baton on his head.  At the medical unit of Tashturma, he was reportedly given medical aid.  As a result of the continuing beatings, he had to undertake an abdominal surgery in September 2002.  Other results of the beatings were allegedly breathing problems and head injury.  After being convicted with murder and sentenced to death, Vasgen Vladimirovich Arunjanz spent 1 year and 10 months on the death row.  Because of the situation, his father is said to have committed suicide.  At the time of writing, it was not known whether Vasgen Vladimirovich Arutunjanz had been executed.

Bekzod Kasymbekov, born in 1975, was reportedly arrested by armed officers on 5 August 1999 at his family country house in Tashkent.  It is believed that he was arrested along with his father as his younger brother, Kanditdinov Kasymbekov, who was suspected of having killed two police officers, was not at home.  It is reported that his mother was watched constantly at home by six armed officers.  On 8 August, she is said to have been taken to the Tashkent City Department of Internal Affairs (GUVD) where she was allegedly insulted and cursed while being asked to present the gun that had been allegedly used by her son to kill the

E/CN.4/2003/68/Add.2
page 38

police officers.  At some point, she reportedly referred to God by saying: "O God, what's going on."  As a result, it is believed that she was accused of being a Wahhabist.  She was released later that day.  She is said to have then returned to her city flat where six armed officers refused to let her use the phone or open the windows despite the summer heat.  In the meantime, her eldest son, Bekzod Kasymbekov, and her husband were allegedly interrogated in two separate rooms at the GUVD where they were held for 20 days.  It is believed that they could hear each other's screams and cries due to the treatment they were allegedly subjected to.  As a result, it is reported that Bekzod Kasymbekov was forced to sign a confession.  His mother was asked to provide him with a lawyer after 35 days of detention.  The lawyer is said to have later testified that her son's body was covered with bruises.  At that time, he was transferred to Tashkent city prison, also called Tashturma, in the basement of which he was allegedly tortured.  He was held there for six months before his trial at the Chirchik City Court, where he is said to have faced five different charges which could not be proved during the pre-trial investigation.  Ultimately, he was reportedly charged with article 159.  It is alleged that the procurator was not happy with the sentence of 12 months' imprisonment and wrote a protest letter to the court.  As a result, it is believed that he was retried for the same offence by the Tashkent regional court which increased his sentence to eight years.  He was reportedly transferred to Navoi Colony 29 where he is believed to have had to pay bribes to prison guards to stop the beatings he was subjected to.  It is also alleged that he was left under the sun for hours.  After 10 months, he was reportedly secretly transferred to the National Security Service (SNB) Headquarters in Tashkent to face a new trial.  There, he was asked to sign new confessions upon the threat of being subjected to the same treatment he had been subjected to at the local police station.  He was convicted again by the Tashkent City Court on 28 November (see below, case of Iskander Khudoberganov).  Police officers are also said to have tried to plant a gun at her husband's shop, but were prevented from doing so by neighbours.  He was however later forced to sign a confession admitting that he had improperly used cash money in his shop (articles 188 and 189 of the Criminal Code).  Based on this confession, he was then sentenced by the Mirabad district court to one year and a half of imprisonment.  An appeal was later launched with the Tashkent city court, which decided to give him a conditional sentence.  Finally, it is reported that Kanditdinov Kasymbekov's car was found in the countryside outside Tashkent stained with blood.  Members of the Kasymbekov family are said to be regularly called to report to local police stations.

        **Nosyr Abdumalikovich Khakimov** was reportedly arrested in early August 1999 and taken to the Sobir-Rakhimov district police station.  It is reported that he was released on 9 August, but rearrested the same day.  He was allegedly forced to sign a confession admitting that he had robbed his uncle's house, after having been taken to a dark room where his hand tied in the back, he was beaten by four police officers.  As a result, he is said to have lost consciousness.  On the following day, he is believed to have been charged with the beating of a cigarette seller and was taken to the Tashkent City Department of Interior (GUVD).  According to the information received, he was threatened with being subjected to the same treatment as his classmate Bekzod Kazymbekov, who was shown to him covered with blood and wearing a gas mask.  It is alleged that officers threatened to torture his wife, who at that time was pregnant.  After 20 days, he was reportedly allowed to call his family to ask them to hire a lawyer.  The lawyer was said to have been authorized to be present solely on the day the investigators completed the investigation and forwarded the case to a judge.  In April 2000, he was sentenced by the Chirchik City Court under article 159 to five years' imprisonment.  Other charges that he was facing were said not to have been proven during the investigation.  The procurator is

believed not to have been satisfied with the verdict and to have written a protest letter. A new
verdict was issued and he was sentenced to another eight years in September 2000. This
sentence was upheld on appeal. He is said to have been detained at Navoi Colony 29 where he
was held in an isolation cell for 25 days, beaten with police clubs and left under the sun for
hours. During one of her visits, his mother is reported to have seen blood stains behind his ears.
On 6 May 2002, he is said to have been taken to the National Security Service (SNB)
Headquarter in Tashkent where he was reportedly interrogated by the initial investigator of the
GUVD. He is believed to have been forced to sign a new confession. On 21 November, his
mother was reportedly informed that he had been forced to sign new confessions. He was
eventually charged with article 159. He was convicted again by the Tashkent City Court
on 28 November (see below, case of Iskander Khudoberganov). His lawyer is believed to have
been prevented from participating in the trial and to have been denied access to his criminal file
which is said to be classified as "secret". He is said to be in a poor health condition, having
breathing and heart problems.

   **Marat Rakhmanov**, a Russian national, reportedly went to visit his sister in Samarkand
in August 1999. One evening a friend of his sister's came over, who was a prostitute, and who
had drank too much, and he accompanied her home. The next morning, on 17 August 1999, she
and her child were reportedly found dead. Marat Rakhmanov, as well as his sister and her child,
aged 15 months, were reportedly arrested and held in the Samarkand IVS. Marat Rakhmanov
was said to have been molested and severely beaten for seven days. When he refused to sign a
confession admitting to have committed the murder of his sister's friend, his sister and her child
were reportedly brought to him and he was told that they would be raped in front of him.
According to the information received, he told the police that he would sign anything they
wanted, if they let his sister go and she called him from home. He was reportedly further beaten
so that he would not renounce his intention. He was said to have had a gas mask placed over his
head, cigarette butts extinguished on his body and severe burns inflicted by an electric device
used for boiling water. He was threatened that he would be put in a bottle. In the court hearing
in March 2000, he reportedly told the judge about the treatment he had allegedly been subjected
to while in custody. He was reportedly told by the judge that he was lying. A friend of his,
who was present in the courtroom and who had worked with judicial medical expertise, told him
to take off his shirt. The judge reportedly asked him what he was doing. He replied that he had
been undressed so often, he was not ashamed. His body reportedly bore small burns caused by
cigarette butts and severe larger burns, as well as uneven cuts as if caused with a bottle. A
court official is said to have made an attempt to chase the friend from the room, and the judge
reportedly asked, "Who had allowed the presence of a medical expert in the room?"
Marat Rakhmanov is also said to have been suffering from kidney and heart problems, but no
medical examination was carried out, despite his requests. The judge is said to have told
Marat Rakhmanov that he wanted to avoid his responsibility, that he was a criminal. He
furthermore reportedly told him that, as he is a man, he should take that suffering. On
30 March 2000, he was sentenced to death, and transferred to death row in Kattakurgan prison.
On 20 April 2001, the death sentence was reportedly commuted to 20 years' imprisonment by
the Board of the Supreme Court. The prison guards reportedly did not inform Marat Rakhmanov
that his death sentence had been commuted. They are said to have taken him out of prison,
leading him to think that he was being taken to be shot. It was only upon arrival in the colony in
Namangan, that he was told by other prisoners where he was, and he understood that his
sentence had been commuted.

**Shukhrat Sotboldievich Abdullaev** was reportedly serving a prison term in the Karakul Bazar colony 64/25 when, on 31 October 1999, he was reportedly transferred to the SIZO of Bukhara for investigation concerning a murder that had taken place at the Karakul Bazar colony. On 1 November 1999, he allegedly died, while in custody at the Bukhara SIZO. It is said that on 2 November 1999, his father, who intended to visit his son in Karakul Bazar, was told that his son had died of a heart failure, that he had been buried in a "guarded" cemetery, and that relatives would only be able to visit the gravesite after three months. According to the information received, more than a year later, his father received a death certificate, stating that the cause of death was heart failure, and official information as to the place where he had been buried. It is reported that he requested that an exhumation and examination of the body of his son be carried out. On 17 July 2001, he is said to have received the results of the forensic examination conducted by the Bukhara Forensic Medical and Legal Department. This document allegedly stated that the body showed over 60 signs of battering and beatings, that there were numerous cuts on the arms, that the person had been handcuffed, that there were signs of strangling, and that there where numerous contusions on the body's chest, back and abdomen. He is reported to have then addressed the Office of the General Procurator of the Republic requesting that his son's death be investigated, and that those responsible for his death be brought to justice. His claims were reportedly dismissed. He also addressed the Tashkent District Court, the Tashkent City Court, and the Supreme Court. Each of them is said to have replied that they had no competence to deal with the case.

**Shukur Sotboldievich Abdullaev**, the brother of the above-named, was reportedly serving a 10-year prison term in Karakul Bazar Colony 64/25 when, on 31 October 1999, he was reportedly taken to the SIZO of Bukhara City together with his brother and several other inmates from the Kharakul Bazar Colony for investigation into the death of a prisoner detained in that prison. It is reported that he was charged with murder. The trial is said to have taken place from 24 April to 23 May 2000. The verdict was delivered on 23 June 2000, and he was sentenced to death. It is alleged that during the pre-trial investigation period, while under interrogation in Bukhara, Sukur Sotboldievich Abdullaev was severely ill-treated and beaten. In particular, he allegedly suffered injuries on the spine and skull, and his jaw was broken. During the trial sessions, he was reportedly unable to walk or stand. According to the information received, his lawyer asked the judge that his client be provided with medical assistance, but reportedly this request was turned down. On 19 July 2000, he was allegedly transferred to Tashturma. It is said that his father last received permission to visit him on 27 July 2001. Since then, subsequent requests to visit Sukur Sotboldievich Abduallaev have reportedly been denied to his relatives. Fears have been expressed that he may have been executed. His relatives are nevertheless said not to have received any death certificate.

**Ulugbek Eshov** was reportedly serving a prison term at the Andijan Prison, when in 1999 he was transferred to the Karakul Bazar Colony to serve the final months of his term in the strict regime section of that colony. In May 1999, his mother is believed to have requested that her son be released under the presidential amnesty which had been announced that month. On 4 October 1999, he was reportedly amnestied. However, he was not allowed to leave that colony. It is alleged that, on 31 October 1999, Ulugbek Eshov was transferred to the SIZO of Bukhara City together with the two persons named above as well as other inmates for the purposes of investigation into the death of another detainee in that colony. His mother was informed that her son would be tried in April 2000. It is reported that, during the pre-trial

investigation period, Ulugbek Eshov was severely beaten and ill-treated by three investigators.
In particular, his clothes were allegedly ripped off and he was kicked and beaten on the head and
abdomen, chlorine was allegedly used to make his breathing difficult, and he was eventually
forced to sign a confession.  According to the information received, during the trial he could not
stand or walk.  He reportedly pleaded innocent and informed the judge that he had been forced to
sign the confession because of the treatment he had been subjected to.  It is reported that he was
eventually sentenced to death and transferred to the Tashturma.  His mother last saw him in
August 2001.  Since then, subsequent requests to visit Ulugbek Eshov have reportedly been
denied to his relatives.  Fears have been expressed that he may have been executed.  His relatives
are nevertheless said not to have received any death certificate.

   **Shukrat Erdanov**, born in 1972, was reportedly arrested by SNB officers in the
Samarkant region in the Urgut district on the way to a wedding party on 5 December 1999.  He
was reportedly taken to the SNB regional office in Samarkand where he was allegedly given
electric shocks to his genitals in the basement, whilst his hands and legs had been tied together.
His mouth is said to have foamed as a result.  The officers torturing him allegedly stated that as
he was "a tough guy", he would not accept guilt.  He was also allegedly beaten, in particular on
the head and waist.  He was reportedly asked to give out the names of his friends.  He and five
other persons arrested at the wedding party were reportedly tried for Islamic extremism (pursuant
to articles 159 and 244 of the Criminal Code) by a judge in the Samarkand region and he was
reportedly sentenced to 18 years in prison in the summer of 2000.  His family was reportedly
only informed about his arrest in June 2002 by a representative of the court.  The court is alleged
to have claimed that they had informed the family by sending a letter to the MVD of the district
where his family was living.  After his trial, he was transferred to Katakurgan prison in the
Samarkant region.  In autumn 2000, he was allegedly taken to Karshi jail.  In September 2002,
he was reportedly severely beaten by wardens in Karshi prison and was sexually assaulted by
other detainees.  One of the wardens there is said to have insulted his mother, asking her whether
she had prepared the death clothing for her son.  On 20 October 2002, he was reportedly
transferred to Jaslyk prison.  According to the information received, upon arrival at the Jaslyk
colony, Shukrat Erdanov was placed in a punishment cell and was deprived of food for a lengthy
period of time.  His brothers, **Botir** and **Davron Erdanov**, were reportedly arrested at their
workplace on 3 September 2001.  Davron Erdanov is said to be detained under a strict regime in
Karshi prison and Botir Erdanov in Zarafshan prison, where they are said not to be receiving
sufficient food.

   **Abdulkhim Ganiev** was reportedly arrested by SNB officers at home
on 18 January 2000 at around 4.30 a.m.  It is believed that the officers claimed that they had
an arrest warrant for somebody called Abdulkaham.  The officers are said to have broken into his
place as his mother was refusing to open the door in the absence of any arrest warrant for
Abdulkhim.  According to the information received, Abdulkhim Ganiev's hands were cuffed
behind him and a rifle was put against his back.  No explanation was given, except that he was
accused under article 159 of the Criminal Code.  It is reported that the officers, some of whom
were masked, searched the house.  Nothing is said to have initially been found.  A SNB officer
was seen planting some Hizb-ut-Tahrir leaflets.  According to the information received,
Abdulkhim Ganiev was allegedly denied access to his own toilets.  It is alleged that his mother
was threatened with death if she did not allow the SNB officers to use her son's car.  The latter
was reportedly pushed into a SNB minivan where he was covered with a blanket.  He was

E/CN.4/2003/68/Add.2
page 42

reportedly taken to the SNB headquarters in Tashkent where he was visited by his mother some
three months after his arrest. His lawyer was reportedly allowed to meet with him one month
after the arrest. According to the lawyer herself, she could not represent him properly as she had
difficulties obtaining access to the criminal file. According to the information received, he was
deprived of sleep for several consecutive days, and severely beaten and threatened. As a result,
it is reported that he signed a confession. It is also reported that his confession was videotaped.
According to the information received, on that tape, he appeared very weak and as if he was
crying. During his trial at the Akmal Ikramov district court, one of the co-defendants is said to
have claimed that his toenails had been torn out and showed to the judge his feet as evidence.
The judge is said to have then asked the investigators why the co-defendants had not been
"educated" and why they were not silenced. The judge is also reported to have stated that he
should put a hose in their nose and push until it comes out from the other end. At that point,
the defendants are believed to have asked for the judge to be removed immediately from the
case. The trial was thus reportedly adjourned for three months. The trial in camera then took
place in Tashkent City Court. It is reported that the verdict was handed over on 9 October at
the Akmal Ikramov district court. Abdulkhim Ganiev was eventually sentenced to 19 years'
imprisonment. On 5 February 2001, the Supreme Court is said to have reduced the prison
sentence by one year. He is said to have been held in Tashturma until April 2001. It is reported
that he was then transferred to the strict regime section of the Kazil Tiepe colony 47, where he
was currently detained at the time of writing. From 1 September to 27 October 2002, it is
alleged that he was held in the isolation cell because he had refused to greet the director of the
colony. It is reported that he was asked to sign a repentance letter. On 2 November, he was
reportedly sent back to the isolation cell.

**Surat Mirvaleev,** a 29-year-old man, was reportedly arrested on 26 January 2000, and
kept in the basement of the SNB in Tashkent. On 27 January, he is said to have gotten a lawyer.
According to the information received, in court documents, it is stated that he was only arrested
on 28 January. He was reportedly kept in the basement for three months, where he was said to
have been tortured for 17 days. One hand and foot were reportedly cuffed together. It is also
reported that he was severely beaten and asphyxiated with a gas mask. During the trial, which
took place from 4 to 25 July 2000, he reportedly showed the injuries sustained, such as the traces
of his handcuffs and his T-shirt with traces of blood to the judge, who reportedly ignored them.
He is furthermore said to have been in a very bad state of health. The procurator allegedly told
Surat Mirvaleejev's mother that, since she was wearing the Islamic scarf, her son deserved this
punishment. He was reportedly charged with offences pursuant to articles 156, 159, 244 (b)
and 216 of the Criminal Code, and sentenced to 10 years' in prison. His family reportedly
lodged an appeal on 5 September 2000, subsequent to which Surat Mirvaleev was transferred
from general to strict regime. His mother would like to appeal, but the judge is said to be
keeping the court documents. The chairwoman of the district court of Sabor Rakhimov is said to
have stated that she did not like women wearing Islamic scarf. Surat Mirvaleev is said to be
currently detained in Nawai prison in an isolation cell. According to the information received,
he is suffering from tuberculosis and breathing problems. His mother reportedly bought
medicine for him which he is said not to have received. She reportedly complained to the head
of GUIN, about her son's health problems. It is alleged that she asked the MVD for her son's
transfer to Tashkent which was rejected in October 2002.

**Abdullayev Bozithan** was reportedly arrested at home in Narabad on 7 February 2000. According to the information received, he and his family were taken to the Namangan City police station where he was interrogated about the fact that the family had been praying at a Gombad mosque. It is believed that, 11 months before their arrest, the family had already written a repentance letter about this. Abdullayev Bozithan's wife is said to have tried to use this letter to gain access to her husband while he was being interrogated. Later that night, they were all released, but Abdullayev Bozithan was asked to report to the police station the following morning. Less than half an hour after having returned home, he was reportedly taken back to the police station to sign some papers. According to the arresting officers, he was supposed to be back home after one hour. As he did not return that night, his wife reportedly went to the police station the following morning where she was told by Abdullayev Bozithan that investigators were trying to make him confess to illegal possession of firearms. His wife is said to have stayed in the police station for five consecutive days. On the fifth day, she is reported to have been interrogated and shown confessions allegedly written by her husband, in which the latter confessed of drug trafficking and religious extremism. She briefly saw him half-conscious. A month later, she is said to have been able to visit her husband at the police station where he told her that he had been beaten on the head, back and legs. As a result of the treatment he had allegedly been subjected to, he had reportedly signed a number of papers whose contents he knew nothing about. He was eventually charged under article 159. On 2 May 2000, the Namangan District Court is said to have sentenced him to 14 years' imprisonment. It is alleged that no evidence was produced in court against him, except the confessions that he had been forced to sign. It is reported that he raised torture allegations during the trial. The investigator in the case is said to have denied these allegations and the judge to have accepted the latter's version of the facts without further investigation. During a hearing at the Supreme Court on 15 August, his lawyer is believed to have proved that evidence against Abdullayev Bozithan had been fabricated. As a result, the sentence is said to have been reduced to eight years. It is believed that he was transferred to colony 64/3 near Tashkent after having spent some time in Tashturma.

**Jodjorbek Hadjimatov** was reportedly arrested in Andijan in March 2000 as a suspected member of Hizb-ut-Tahrir. He was reportedly severely beaten in the main city police department by three or four officers. As a result, he is said to have signed a confession admitting that he had disseminated Hizb-ut-Tahrir leaflets. After 10 days, he was transferred to the SIZO located at the Andijan prison. During the pre-trial investigation, he was reportedly taken to the psychiatric clinic to see whether he was criminally responsible. There, he is said to have managed to hand his mother his bloodstained jacket. During his trial in November 2000, he reportedly told the judge that he had been beaten like a punching bag and that the guards had told him that they had taken pleasure in beating him. The judge is said to have asked him why he did not complain to the procurator. The procurator is said to have been absent practically during the whole trial. On the last day, he is said to have turned up, to have stated his opinion and to have left. Jodjorbek Hadjimatov was reportedly sentenced to 16 years' imprisonment pursuant to article 159 of the Criminal Code. He is presently said to be detained in Chirchik colony 6. The allegations of torture, including the bloodstained jacket, have reportedly been raised with the procurator's office and the Ombudsman. However, according to the information received, no investigation has ever been ordered in the allegations of torture and no medical examination was said to have been carried out. In spring 2001, his sentence is said to have been reduced to 12 years on appeal.

E/CN.4/2003/68/Add.2
page 44

**Alisher Khalikov,** a 32-year-old father of three children, and his father were reportedly requested to come to the anti-terrorism department of the Namangan regional MVD office on 30 March 2000 by three officers who came to their home.  As Alisher Khalikov was working in Tashkent, his father sent him a message to return to Namangan.  On 31 March, Alisher Khalikov and his father went to the MVD office and spoke to a sub-colonel. Alisher Khalikov, who is a believer and prayed five times a day, was reportedly retained there. When his father asked why, he was told by an investigator to go home.  Alisher Khalikov was allegedly accused of having given religious courses on Islam to two people in the neighbourhood.  When his father returned the next day, he was reportedly told by the sub-colonel that they had the right to keep his son three days.  His father is said to have returned three days later.  In the meantime, Alisher Khalikov was allegedly beaten on the head with a handgun.  As a result, it is reported that he had collapsed and had blood in his eyes and sores on his head.  The investigators reportedly wanted to make him confess to having distributed 40-50 banned religious leaflets.  As a result of the treatment he was subjected to, he reportedly signed a statement.  After three days, he was said to have been released and summoned to the MVD office every day for 35 days and occasionally beaten there.  After 35 days, a police officer reportedly came to their house and asked Alisher Khalikov to go to the regional MVD office to sign documents.  His father accompanied him.  At the city court, they were reportedly handed an accusation statement.  The trial reportedly commenced the next day, on 5 May 2000.  On the way back, his father saw the head of the neighbourhood council and a local policeman and asked them why they had done this to his son.  The two reportedly stated that he had done something illegal.  The trial solely lasted two days.  Two witnesses were reportedly produced who stated that they had been taught Islam by Alisher Khalikov.  During his court hearing, a State-appointed lawyer raised the allegations of torture, but was reportedly told by the judge to be quiet.  The judge reportedly sentenced him to three and a half years.  He was then said to have been led away in handcuffs, and his family reportedly did not know where he was for four months.  They reportedly wrote to several MVD offices, who told them that they did not know where their son was.  After writing to the procurator, his family found out that their son was in Karshi 64/49.  It is believed that the parcels that they are sending him are not delivered to Alisher Khalikov.  In prison, the latter was said to have been beaten, kicked and made to do push-ups by the guards, each time he attempted to pray.  He is said not to be able to benefit from an amnesty as the prison authorities are said to note every day that he is violating internal prison rules (inter alia, by praying).  The family is said to have appealed to the Supreme Court, stating that Alishek Khalikov was not a member of Hizb-ut-Tahrir.

**Khodir Sobirov** was reportedly arrested by three or four people in Tashkent on 16 April 2000, and taken to the MVD office in the Kirov district.  There, he was allegedly severely beaten on his head by several officers.  After a month, he was said to have been taken to Tashturma.  When his wife visited him there with her children on 24 May 2000, he did not recognize her.  During his trial from 16 to 26 August 2000, he told the judge that he had been severely beaten and named the alleged perpetrators.  The judge reportedly ordered the court to bring the officers allegedly responsible.  Only one is said to have come to court, who was then asked by the judge whether he knew Khodir Sobirov and whether he had beaten him.  The

officer reportedly replied that he did not know him, and was released by the court.
Khodir Sobirov's allegations were ignored and he was reportedly sentenced to 13 years in prison
for religious extremism, pursuant to articles 159, 244 and 217. At the time of writing, he was
said to be detained at Karshi colony 64/61 under general regime. The nutrition is said to be
insufficient and of bad quality and Khodir Sobirov has reportedly lost a lot of weight, leading to
underweight and weakness. In 2001, he was reportedly made to sweep the floor only dressed in
his underpants. In November 2002, he was reportedly covered in bruises and sores as a result of
ill-treatment subjected at Karshi colony. He is furthermore said to be suffering from pains in his
calf muscles for which he is reportedly being denied medication. His family has reportedly been
barred from handing medication over to him.

    **Kasanboi Khambarov**, born in 1968, was reportedly arrested in May 2000 in Andijan
by SNB officers and was allegedly told that he would be released after a couple of hours.
Following the arrest, it is reported that some 10 other SNB officers searched his house. He was
reportedly detained in the Andijan SNB headquarters for approximately two months. It is
alleged that no material evidence was found, and that he was forced to sign a confession under
threats of torture. According to the information received, he was brought to trial in July 2000,
and on 9 August 2000 the Andijan Regional Court sentenced him to eight years' imprisonment.
According to the information received, the verdict stated that he was guilty under article 156 (2)
"and other articles" of the Criminal Code. Kasanboi Khambarov is reported to have served the
first six months of his term in the Andijan prison and was then transferred to Tashturma, and
subsequently to the Kazan 64/51 colony, in Karshi region. His family was reportedly not
informed officially about either transfer. In late 2001, he was reportedly transferred to the
Zangiata infirmary in Tashkent, as his health had been seriously deteriorating. On
20 April 2002, he is said to have died. On 22 April 2002, a forensic examination was carried
out which determined that the cause of death was tuberculosis. According to the information
received, when his body was returned to his family for burial, the corpse revealed a number of
bruises and signs of possible beatings, and part of the skull was missing.

    **Timerivich Yarach Dauronov** was reportedly arrested on 26 June 2000 outside a bar on
the street in Samarkand on suspicion of having murdered a person with whom he had been seen
having a drink. He was reportedly taken to the IVS of the main police station in Samarkand
where he was interrogated two or three times a day over 15 days in the presence of a
State-appointed lawyer. He is said to have signed a document in which he denied the
accusations of murder. It is reported that he was then transferred to Kattakurgan SIZO. Later,
he was reportedly taken back to the IVS in Samarkand where he was forced to sign a confession.
It is alleged that he was beaten with a club and asphyxiated with a gas mask. According to the
information received, the lawyer was not present during all interrogation sessions. During the
whole pre-trial investigation period, his relatives were allegedly denied access to him. A judge is
said to have asked for further investigations because of the lack of evidence presented by the
investigators when the criminal file was presented to the magistrate. In particular, it is believed
that the knife which had been used to commit the murder was absent from the evidence. The
procurator is believed to have tried to prevent the re-opening of investigations. Timerivich
Yarach Dauronov is then said to have spent two months in Katakurgan prison without being
further interrogated. He was eventually sentenced to 20 years' imprisonment. During his trial,
he allegedly complained about the treatment he had been subjected to, to no avail.

**Maxim Yurevich Strahov**, a former military officer who had suffered a serious head injury while serving in Chechnya, was reportedly arrested in a shop in Tashkent on 30 September 2000 by GUVD officers on suspicion of having murdered four people.  He is said to have been taken to the Mirzo-Ulugbek district police station where he was allegedly seen by his mother, while he was being dragged to an interrogation room on 2 October.  He is said to have been held there for one week before being transferred to the lock-up of the Tashkent City Department of Internal Affairs (GUVD).  There, he was allegedly beaten by up to 12 officers and a gas mask was put on his face with a view to asphyxiating him.  According to the information received, he was also subjected to the technique referred to as "the helicopter", by which someone is lifted in the air before being dropped on the floor.  One month after his arrest, he was reportedly brought before a procurator.  Before being taken to the procurator's office by car, his mother is said to have briefly seen him with his face covered with bruises and bloodstains behind the ears.  According to the information received, he was provided with a State-appointed lawyer to whom his mother gave a bribe to make sure that he would take an active part in the pre-trial investigation.  This lawyer later reportedly refused to defend Maxim Yurevich Strarhov as the latter was facing death sentence charges.  Three different lawyers were later hired, but none had access to the criminal file.  A medical consultation to check the mental health of the defendant is said to have been refused by the judge, but to have been later authorized by the procurator in the case.  The medical opinion is said to have only stated that, as a former serviceman in Chechnya, Maxim Yurevich Strarhov may well have murdered four people.  On 18 March 2001, he was reportedly sentenced to death.  According to the information received, he was not executed within the usual three-month period because of a moratorium in force at that time.  It is believed that he was eventually executed on 20 May 2002.  His mother is said to have received a death certificate issued by the Yunusabad district registration office a month after the execution.  It is also reported that she was subjected to various pressures, including at her workplace, to make her stop complaining about her son's case.  Despite her several requests, she does not know whether the case of her son was reviewed by the Supreme Court.  **Fayzullaev Nigmat**, a friend of Maxhim Yurevich Strarhov, who was arrested at the same time and who was facing the same charges, is believed to have been executed around the same date.

**Tohir Mahmudovich Hudoybergshov**, born in 1975, is said to have been arrested on 6 December 2000 in Hadaras and sentenced to 16 years' imprisonment.  Reportedly, no lawyer was appointed to him and no witnesses were heard during the trial.  It is believed that Tohir Mahmudovich Hudoybergshov was beaten by SNB and GUVD officers from the Hasaras region on his back and head with a baton and that he was given electroshocks while in custody.  As a result, it is reported that he had pain in his arms and legs and high blood pressure.  Tohir Mahmudovich Hudoybergshov's mother reportedly complained to the responsible forces ever since her son was arrested, to no avail.

**Aleksander Sergeevich Kornetov**, born in 1977, was reportedly arrested on 11 January 2001 and taken to the Chilanzar Regional Department of the MVD.  His mother and wife were reportedly not officially informed about his detention, and were only allowed to visit him one week after his arrest.  Murder charges were reportedly brought against him on 16 January 2001, after he was allegedly beaten and kicked, particularly on the head, by the investigator in the case and three persons in plain clothes.  As a result, he was allegedly left unconscious for an undetermined period of time, and was subsequently forced to sign a confession admitting his guilt.  According to the information received, he was then transferred to

the Office of the Procurator of the Zanghiota District, and from there to Tashturma.  It is reported that his relatives were not officially informed about either of these transfers.  According to the information received, despite the fact that his mother had addressed numerous public officials, including the procurator in Zangiata, to know the whereabouts and state of health of her son, who is said to be suffering from tuberculosis, it was only on 16 March 2001 that Aleksander Sergeevich Kornetov's relatives were informed that he had been transferred to the Tashturma.  It is alleged that in the meantime, his case had been transferred to the Office of the General Procurator of the Republic.  An exhumation of the corpse of the person he had allegedly murdered was reportedly ordered.  The exhumation is said to have revealed that the body that was exhumed was not the one of the person that Aleksander Sergeevich Kornetov was accused of having murdered.  It is, however, believed that the procurator sent the case with murder charges to the court.  During the whole pre-trial investigation, Aleksander Sergeevich Kornetov is reported not to have had access to a lawyer.  According to the information received, he appeared in court with a large mark on his forehead and cuts on his wrists.  During the trial, he reportedly refused to acknowledge his confession, and stated that he had been tortured and forced to sign it.  According to the information received, the court did not take into account any material evidence in its deliberations.  On 7 August 2001, Aleksander Sergeevich Kornetov was sentenced to death.  On appeal, the sentence was reportedly upheld.  The Supreme Court eventually commuted the sentence to 20 years' imprisonment.  At the time of writing, Aleksander Sergeevich Kornetov was serving his term at the Andijan prison.

**Valerij Sergheevich Agabekov**, aged 27, was reportedly arrested, together with his brother-in-law, on 28 January 2001 at 7 a.m., following a fight between the brother-in-law and another two people.  He reportedly only witnessed the fight.  Upon arrest, Valerij Sergheevich Agabekov and his brother-in-law were said to have been taken to the Akhangaran District Police Station, in Tashkent Province.  It is said that, seven days later, his mother was allowed to see him for a few minutes after having allegedly bribed the officer on duty.  Valerij Sergheevich Agabekov was reportedly taken for investigations to Tashkent City Department of the MVD for two months, and was reportedly severely beaten and ill-treated during pre-trial investigation in order to make him confess to murder.  According to the information received, as a result of the treatment he was allegedly subjected to, he lost consciousness several times, his jaw was broken, he had blood in his urine, and he lost two teeth.  It is also reported that he was handcuffed and tied to a radiator and his head was hit repeatedly against it.  A plastic bag was allegedly placed over his head and an investigator is reported to have shouted the following:  "either you confess or you will be dead before your trial".  It is alleged that his brother-in-law was also ill-treated during investigation.  It is believed that they never received any kind of medical care or assistance.  Valeri Serghei Agabekov was reportedly accused of murder on the basis of his brother-in-law's confession.  On 18 September 2001, both were sentenced to death on charges of murder by the Tashkent Regional Court.  During the trial, they are said to have pleaded innocent and requested further investigation.  The death sentences were reportedly upheld by the Board of the court on 12 November 2001.  On 23 April 2002, their death sentences were commuted to 12 years' imprisonment by the Collegium of the Supreme Court.  Their families were reportedly not informed about this.  It is believed that it was only on 10 May, when Valeri Serghei Agabekov's mother saw her son at Tashkent train station - where she had gone following rumours that he would be transported to the Andijan prison on that day - that she learnt that their sentences had been commuted.

**Allanazar Yusupovich Kurbanov** was reportedly detained at the beginning of March 2001 at Hazarapsky police station in the region of Khorzem. It is alleged that he was beaten, in particular on the neck, that a bag was placed over his head, that he was kicked while handcuffed and that he had his fingertips burnt. It is also reported that his wife and four-month-old baby were summoned at the police station. His wife was allegedly beaten in an office next door to where he was kept so that he could hear her crying. The baby was reportedly held upside down and cold water was poured over his face. Allanazar Yusupovich Kurbanov was reportedly sentenced to death by Khorzem Regional Court on 22 August 2001. According to the information received, appeals against the death sentences were turned down by the Supreme Court on 13 December 2001. Both his relatives and his lawyer claimed that he and another detainee, **Yusufbay Rustamovich Sultanov**, had been forced to confess to a murder by unlawful methods. It is reported that since they were transferred to Tashkent prison in February 2002, their families have not been able to receive any news from them. Yusufbay Rustamovich Sultanov was allegedly beaten by SNB officers. He was reportedly given electroshocks and was beaten with a baton on his head. His wife saw him during the trial, which took place on 23 August 2001 at the District Court of Khorzem. He was reportedly sentenced to death. His body was allegedly covered with bruises, teeth were missing and he complained about his ribs being hurt. His parents reportedly complained to the Procurator's office of Khorzem, to the General Procurator, to the Ombudsman, and to the President of the Republic. The authorities reportedly gave contradictory information each time the families enquired about the fate of the two prisoners. It is alleged that, while the chairman of the Khorzem Regional Court informed Allanazar Yusupovich Kurbanov's parents that their son had already been executed, the registration office claimed that there was no confirmation about his death.

**Refat Tulyaganov** was reportedly sentenced to death by the Taskhent City Court for premeditated murder under article 97 of the Criminal Code on 5 July 2001. There was said to be evidence that he had acted in self-defence and that the court neglected this fact. His mother is said to have seen the procurator and reportedly offered him US$ 200, as she knew that a conviction pursuant to article 97 could lead to the imposition of the death penalty. His mother reportedly turned to the ombudsman for help, who stated that she would be monitoring the case. Refat Tulyaganov was said to have been severely beaten and coerced to confess while in pre-trial detention. The Taskhent City Court Appeals Committee and the Supreme Court upheld the initial death sentence on 21 August and 4 October 2001, respectively. On 18 January 2002, he was reportedly executed in secret, despite a request by the United Nations Human Rights Committee made on 24 December 2001 to suspend the execution until it had pronounced on the merits of the case. His family was said not to have been informed about the date of the execution, and when his mother asked to see him on 24 January 2002, prison personnel reportedly sent her back and told her that she should return the next day. On 12 February the family received an official certificate informing them of the execution date. When his mother went to see the Ombudsman with the official certificate, the latter reportedly told her that it was not possible that her son had been executed as she had been monitoring the case. She reportedly stated that she did not know what to do in the case.

**Enver Tulyaganov,** Refat Tulyaganov's 27-year-old brother (see above) was reportedly arrested on 17 March 2002. The police stopped him, allegedly to check his papers and took him to the UVD police station in the Iakkasarai district where it became clear that they knew his name. They reportedly told him that there had been a recent murder in the neighbourhood and that he had to confess. Enver Tulyaganov replied that there was no way that he was signing his own death warrant. He was reportedly beaten for three days. After three days, he was allowed to use the bathroom and was told to take off his coat, which he was subsequently asked to check. He stated that there was no need to check it, as he knew his coat very well. The officers then reportedly told him to check his right pocket. In the pocket he is said to have found bullets. When he protested that he did not have them in his pocket before, the investigator is said to have opened a safe, to have taken out a grenade and to have told him that if he did not stop protesting, the grenade would be his, too. He was reportedly kept in the basement of the MVD regional office until 4 May 2002 in incommunicado detention. He was reportedly subsequently transferred to another detention centre where he managed to call a friend who reportedly visited him in detention. Enver Tulyaganov was reportedly handcuffed and bore signs of beating, such as bruises in his face and blood on his head. He reportedly told his friend that he either had to accept the bullets or sign a confession. A human rights defender and a lawyer reportedly visited him subsequently and submitted statements to the court that he had been ill-treated. During the court hearing, Enver Tulyaganov reportedly told the judge about the beatings and gave names of those who had reportedly beaten him, but the judge ignored the allegations of torture. He furthermore rejected the statements submitted by Enver Tulyaganov's friend and the human rights defender, stating that they were biased. The submissions to court reportedly contained statements by Enver Tulyaganov that were reportedly not signed. He is said to have been kept in the MVD basement during the six months that the investigation lasted. In September 2002, he was reportedly sentenced to nine years' imprisonment and was sent to Tashturma. His mother reportedly wrote to many officials in Uzbekistan, including the President of the Republic, but is said to have received no response.

**Ravshan Haitov,** a 32-year-old man, and his 27-year-old brother **Rasul Haitov** were reportedly arrested on 16 October 2001 by MVD officers of Sabir-Rakhimov district on accusations of membership in the banned Islamic party Hizb-ut-Tahrir (pursuant to article 244 of the Criminal Code). Their families were allegedly not informed of their arrest and had searched for them in different police stations in Tashkent during the night. In April 2002, a criminal case of "religious extremism" against Rasul Haitov was formally closed due to a "lack of evidence". In January 2002, Rasul Haitov reportedly testified in court that he had been beaten and kicked, had been lifted up by his arms and legs and thrown on the floor (the so-called "helicopter method") by policemen of Sabir-Rakhimov District Police. His head was allegedly covered with a plastic bag until he fainted, and needles had been stuck under his fingernails. Whilst he was being subjected to these treatments, officers are said to have brought into the room his brother, who was naked and covered in blood and could not hold his head up. The police reportedly threatened the two brothers with anal rape with a truncheon. Later, he is said to have been shown the dead body of his brother Ravshan. The corpse was returned to his family on the following days. Although police reports allegedly state that the official cause of death was a heart attack, it is reported that the body was bruised and had several bones broken. In their testimonies, the allegedly involved police officers claimed that the two brothers beat themselves and that they resorted to force to prevent them from self-immolation and an escape attempt. It is reported that the Deputy Chief of the Sabir-Rakhimov District MVD testified that there was

E/CN.4/2003/68/Add.2
page 50

nothing criminal in the officers' actions and that the latter were justified in the context of the international efforts against terrorism. During the trial, Rasul Haitov was said to have been extremely weak, hardly able to walk or sit and nearly lying on the bench in the courtroom. He was reportedly never granted any medical help by the authorities after he had been discharged from hospital in the middle of November 2001. He is said to be seriously traumatized and suffering from constant headaches. His internal injuries, sustained through the treatment he was allegedly subjected to while in custody, reportedly still cause him a lot of pain as of the time of writing. On 21 January 2002, the procurator reportedly called for two of the involved police officers to be found guilty of murder. However, on 30 January 2002, two police majors, a captain and a lieutenant, all assigned to the Tashkent's Sabir Rakhimov District Department of Internal Affairs were sentenced to 20 years' imprisonment each by Tashkent City Court for "premeditated infliction of bodily harm that caused death" (pursuant to article 104 of the Criminal Code). Fears have been expressed that the conviction on a lesser charge could enable them to qualify for release under the presidential amnesty declared on 8 December 2002. The police officers are said to be serving their sentences in the prison colony in the town of Bekabad. On the day of the announcement of the hearing, relatives of the convicted officers reportedly threatened the family that they would take revenge.

   **Kamiljan Sadikhov** was reportedly selling mineral water in the centre of Margilan at the beginning of October 2001, when he was approached by a man asking him whether he would like to meet to pray and study Islam in a teahouse. The next day, he reportedly met the man with three other unknown men in the teahouse, where they prayed. The following day, the same man came to his workplace and asked whether he could leave a bag with him, which he would pick up two hours later. He is said not to have turned up, and Kamiljan Sadikhov reportedly discovered 15 leaflets and 4 or 5 books of banned literature. He reportedly burnt the leaflets and hid the books behind the central heater in his flat. The same evening, he reportedly went to a wedding where SNB officers asked for him and then took him to the SNB office of Margilan at around 11 p.m. His father was said to have been told about the arrest by some of the guests. When he went there with his wife an hour later, he was reportedly told that his son had been sent to the MVD office in Margilan. There, he was allegedly told that since his son had been arrested by the SNB, he should be kept there. His parents went back to the SNB office where they were reportedly told that their son would be kept for another day and that they should go home. His parents reportedly found out that the man who had left his books with their son, had given their son's name to SNB officers. The next morning, his parents are said to have returned to the SNB office. When they arrived there, the gates were reportedly wide open, and their son was placed into a car and driven away. They were told that their son was being driven to Fergana. When they asked about their son's guilt, they were told that they would find out in Fergana. When they asked to see their son at the Fergana SNB office, they were reportedly told that they would need a lawyer, and were given the name of a State lawyer, who requested 10,000 sum for each attempted visit. Two or three days later, they were able to see their son. During the investigation, which continued for one and a half months, the investigator had reportedly brought Kamiljan Sadikhov to Margilan city and ordered him to show how he had distributed leaflets whilst SNB personnel took photos. After his arrest, Kamiljan Sadikhov was reportedly severely beaten in order to force him to sign a confession. He was said to have been kicked in the ribs and stomach with police boots, and had a plastic bag placed over his head. A mask was reportedly also placed over his head, so that he could not identify who was beating him.

According to the information received, he was threatened that if he wanted to live, he should follow the investigators' instructions and sign a confession letter.  He was furthermore reportedly told that he would be released if he signed, but would otherwise die or leave the police station as a disabled person.  As a result, he is believed to have signed the documents on the day of arrest, and was subsequently transferred to the Fergana SNB office.  The three men who had prayed with him and another friend were reportedly also brought to the Fergana SNB office.  Another man who had received leaflets from the same man was reportedly brought in.  It was believed that the man distributing Hizb-ut-Tahrir leaflets had been forced to do so by the law enforcement agents.  His trial reportedly took place in February 2002.  Out of four invited witnesses, only two are said to have taken part and it is reported that they could not corroborate his guilt.  Kamiljan Sadikhov's family was not listened to.  When his father told the judge to treat his son's case in accordance with the law, the judge is believed to have stated that he believed the prosecution.  When Kamiljan Sadikhov showed the sores he had sustained as a result of having been beaten, the judge reportedly told him not to show them, and asked him who had tortured him.  When Kamiljan Sadikhov responded that he could not see, as a mask had been placed over his head, the judge did not pay any attention to his statement.  He was reportedly sentenced to six years in prison on the basis of article 159, and transferred to Navoi colony 64/46.

**Alamidin Khamidov**, a 28-year-old man, was reportedly arrested by the area police officer who came to his house in the morning of 1 November 2001 and took him to the SNB office in Margilan.  As soon as he entered the room in the SNB office, he reportedly saw four uniformed and masked men from a Special Operations Unit who started beating him.  They then reportedly asked him to strip and searched his clothes.  They ordered him to put them back on and to check his pockets.  Alamidi Khamidov is said to have responded that he knew that he only had 600 sum in his pockets.  They reportedly asked him to check his breast pocket, where he found a banned leaflet.  According to the information received, he was subsequently taken to another room where he was asked whether he was involved with Hizb-ut-Tahrir, which he denied.  For three days, he was reportedly beaten all over his body with sticks.  False witnesses were said to have been brought in who were threatened to give false evidence against him, and to state that they had received religious leaflets from him.  His hands were reportedly cuffed, and he was beaten all over leading to vomiting and severe bleeding.  It is alleged that he was not allowed to speak or to ask for a lawyer.  Four needles were reportedly placed in his hand, and plastic bags were placed over his head.  He reportedly lost consciousness several times.  He was then allegedly made to clean his vomit and blood.  The police reportedly put a pointed metal pole in his arm for two days.  On the third day, the police brought a bigger metal pole and raped him with it, as a result of which he lost blood.  At night, he was handcuffed against a metal battery.  They reportedly handed him a questionnaire which included the following question:  "Are you a member of Hizb-ut-Tahrir?"  When he wrote that he was not a member of Hizb-ut-Tahrir, he was allegedly beaten on the neck by an officer whilst two others held him.  His body and especially his throat was reportedly so swollen that he could not eat nor drink.  After the third day, he decided to sign a confession in order to stop the treatment he was allegedly being subjected to.  He was reportedly unable to hold a pen as a result of the injuries.  A doctor was said to have been called, who applied some bandages and he was allegedly beaten again.  It is believed that the doctor was aware of what was going on, but was unable to ask questions.  He gave Alimidin Khamidov two pills for the night and the morning and told the SNB officers that he should be eating rice.  The doctor was reportedly sent away.  Alimidin Khamidov was then ordered by the head of the Margilan SNB to sign a confession, which he did the following day.

E/CN.4/2003/68/Add.2
page 52

Five further persons were brought into his room and were reportedly told to sign a confession. Later that day, he saw 19 other persons in the SNB office, who were charged with the same charges. On the same day, he was said to have been moved to the SNB office in Fergana where an investigation started. He told them the truth about the allegations and the treatment he had allegedly been subjected to at the SNB office in Margilan.

On 5 and 6 November, he was reportedly unable to move. Two doctors at the SNB are said to have given him injections, which were reportedly without effect. On 7 and 8 November, doctors were reportedly examining him every hour. On 8 November, another investigator came to his room, who he told that he was innocent. The investigator reportedly stated that if he was not guilty, he would be released. In the evening, a SNB officer from Margilan reportedly came to his cell and asked him to sign a letter stating that he had not been tortured, and that he would not write any complaint letter. Alamidin Khamidov told him that he would say the truth and would not sign. The SNB officer stated that his fate was in his hands and that he would be released if he signed. He is believed to have eventually seen a lawyer and was released. When he returned home, he was said to have been extremely sick and his parents took him to the hospital. There, his parents insisted that the medical certificate contained the correct reason for his injuries. On 10 November, the investigator reportedly complained why he had written that he had been beaten at the SNB office, and told him that there was insufficient evidence against him. Subsequently, representatives from the military procurator's office and forensic office reportedly examined him. He is said to have received an official letter according to which none was found guilty in the SNB office in Margilan. Doctors reportedly changed the medical certificate to state that he had suffered from a heart failure and rheumatism in detention. Another forensic medical examination was reportedly carried out in Margilan. In December 2001, he was reportedly summoned again to the SNB office in Fergana. He reportedly wrote a complaint letter, to no avail.

**Ali Muhammad Mamadaliev**, a cotton farmer, was reportedly arrested on 4 November 2001 while he was sleeping in a shack on the field and was taken by a policeman of the area to the Margilan SNB office at 4 a.m. At 9 a.m., his father went to the SNB office to find out about his son. He brought some bread which was taken from him, and he was reportedly told that his son would be released in the afternoon. Three other farmers were reportedly released in the afternoon, but his son was not amongst them. His father returned at 9 p.m. On the way to the SNB office, he reportedly saw his son's friend lying on the street who had allegedly been severely beaten by the police. At the SNB office, he was reportedly told that his son was not there. He then went to the SNB office in Fergana and looked through the files of those detained, however, his son was not on the list. He then reportedly returned to the SNB office of Margilan and was told that his son had run away as he had committed a crime. His father told the officers that his son would not disappear for any reason. The head of the SNB office in Margilan reportedly told him that he would not find his son. On 5 December 2001, his body was found in a canal near Tarkant town. The medical expert is said to have stated that his neck had been broken about a month earlier. It is believed that he was killed as he would not accept to be labelled as a Hizb-ut-Tahrir activist. A man is said to have claimed that he

witnessed security officers beating the alleged victim to death and then throwing his body into a canal. The witness was reportedly beaten and sodomized with a steel stick because of what he had seen. It is also reported that the family of the deceased was threatened by security officers in order to prevent them from lodging complaints. Three SNB officers reportedly admitted later that they had killed him and were subsequently sentenced for murder by the Military Court in Tashkent. Two of them were given 15 years in prison and the third one, 5 years in prison. They are said to be detained in Behabat prison. His father, who is looking after his son's two children, has reportedly received no compensation and lodged a complaint about six months ago.

**Eduard Galustian** is said to have been arrested by five officers of the Minister of Internal Affairs on 26 November 2001 at the flat of a business woman in Tashkent. There, he was reportedly knocked to the floor and beaten, before being tied to a radiator. The business woman is then said to have accused him of having sold her some 500 counterfeited United States dollars. It is reported that he was asked some US$ 10,000 to be released. Around 8 p.m., Eduard Galustian reportedly called his wife to ask her to find the money before 10 a.m. the following morning. It is reported that he was then taken to the Tashkent City Department of Internal Affairs (GUVD) where he was held in an office with a telephone in order to allow him to be in contact with his wife. As his wife could not get the money on time and as investigators had discovered that he had already been convicted twice in the past, he was allegedly threatened with a harsher prison sentence. It is alleged that he was beaten and asphyxiated with a gas mask in order to make him sign a confession admitting to counterfeiting money. According to the information received, at the time of signing the confession, he was promised that the latter would be destroyed as soon as the money had been received. Around 5 December, he is said to have been transferred to the Tashturma. On several occasions, it is believed that the authorities wanted to take him back to the GUVD. As a result, he is said to have started a hunger strike not to be returned to the GUVD. According to the information received, he sewed a button on his lips and attempted to commit suicide. At the end of December, it is reported that he was convinced by a State-appointed lawyer to be interned in a psychiatric institution in order to have the charges brought against him reduced. It is reported that this was the first time since his arrest that he could see his wife. It is alleged that his face was covered with bruises, that he was constantly coughing and that he complained about a painful kidney. He is reported to have stayed there for a month before being taken back to Tashturma. The court proceedings are said to have started on 27 February 2002 and to have lasted until April. No evidence is said to have been produced in court. It is reported that he was sentenced to 10 years' imprisonment in a severe regime institution. According to the information received, he complained about the treatment he had allegedly been subjected to while being investigated at the GUVD to the judge, but to no avail. An appeal was reportedly lodged with the Tashkent City Court, which is said to have confirmed the sentence. According to the information received, he is currently detained at the Chirchik colony, where his family can visit him for one hour every three months and for 24 hours twice a year. It is reported that he was transferred at the end of December 2002 to Tashturma with a view of being transferred to Karshi colony. He allegedly refused to be transferred to Karshi because he was afraid that he would be ill-treated there. According to the information recently received, although he is a Russian national, he has been forced to sing the Uzbek national anthem. It is alleged that when he refuses, he is beaten.

**Odir Khashimov** was reportedly arrested by plainclothes officers at home on 10 January 2002 in Zangiata district, in Tashkent region. No reason was given. He was later

E/CN.4/2003/68/Add.2
page 54

accused of robbery. It is reported that his wife went the following day to the Sergeli district police station to search for her husband. Officers are said to have denied that he was detained there. According to the information received, on that day, he was however detained there before being transferred to the Tashkent City Department of the MVD (GUVD). His family is believed to have been informed of this transfer on 14 January. Both his wife and mother were then reportedly asked to bring him new clothes. They are said to have arrived at the GUVD at 9 a.m. but that they were made to wait until 5 p.m. It is alleged that they saw bruises on his body when he changed clothes. He is believed to have told them that he had been severely beaten and threatened with rape at the GUVD, as a result of which he signed a confession. According to the information received, his wife was asked to sign a blank paper. She is said to have refused to do so. The trial at Serguieli district court is said to have started on 25 March even if at that time, evidence had been found against others who had been arrested some two months after Odir Khashimov's arrest. No evidence is said to have been produced during the trial and witnesses are said not to have recognized him. On 3 May, he was reportedly sentenced to 15 years and 6 months' imprisonment. On 8 August, the sentence was confirmed by the Tashkent City Court even if it is reported he was acquitted on one of the charges. He is said to have been held in the Zangiota colony. The family is said to have sent complaint letters regarding the treatment he had been subjected to at the GUVD to the Ombudsman and the Head of the GUVD, to no avail.

**Saidullo Murodov** was reportedly arrested on 16 February 2002 and was initially accused of murder. On 24 February, it is alleged that, while in custody at the MVD office of Termez, a towel soaked in petrol was placed on his stomach and that fire was set to it. According to the information received, he was given electroshocks and a gas mask was applied to his face with a view to asphyxiating him by closing the oxygen flow and forcing him to breathe smoke through the mask. As a result, he is said to have lost consciousness. He was also reportedly beaten on the sole of the feet. According to the information received, picture of burning marks on his stomach were taken. It is however believed that Saidullo Murodov refused to sign a confession. On 13 November, he was reportedly sentenced by the Surchi District Court in the province of Surkhandaria to six years in prison for illegal possession of drugs and ammunition which are believed to have been planted on him after his arrest. His lawyer is said to have been denied access to his client on several occasions prior to the trial. In particular, it is reported that he was unable to lodge an appeal against the verdict as he was denied access to his client and thus could not get a signature authorizing to do so. At the time of writing, the whereabouts of Saidullo Murodov were not known, as he has not been seen since the sentencing.

**Oleg Zarapulov**, a 19-year-old member of the Union of Independent Journalists of Uzbekistan and responsible for the press centre of the Human Rights Society of Uzbekistan, on whose behalf a joint urgent appeal was sent by the Special Rapporteur on the question of torture, the Special Rapporteur of the right to freedom of opinion and expression and the Chairman-Rapporteur of the Working Group on arbitrary detention on 15 March 2002. He was reportedly arrested by two police officers in civilian clothes at his home on 6 March 2002. When he did not open the door, one of the officers reportedly entered his flat through the window on the second floor. He was then reportedly taken to the MVD Department of the Iakkasarai district in Tashkent. In the car, he was said to have been insulted, abused and threatened. There, officers allegedly told him that he will see how to write articles, and that he will be spending years in prison. Two officers reportedly hit him on the head and stepped on his

foot.  They handcuffed him to a pole.  They are then said to have taken him to another room, where they threatened him that if he did not sign a paper stating that he was homeless and begging in the street, they would detain and hide him in the basement and show him "real treatment".  Around noon, they then drove him to a person who countersigned the paper, allegedly a judge who looked at him through the car window but did not speak to him.  They then returned him to the MVD office.  At 10 p.m., the officers brought him to a special reception centre in the Kuiluk district in Tashkent, which is reportedly used to detain persons who do not have identification documents and where militiamen are said to be employed as investigators.  He told the director that he was not homeless.  According to the information received, blood was taken from him against his will.  On 9 March, he was reportedly visited by a number of human rights defenders who asked the director to release him.  The latter reportedly replied that he had an order to keep Oleg Zarapulov for two months.  He was kept in a small cell for five days.  In the special reception facility, one-person cells were said to have contained between 8 and 10 people.  As other detainees, he was reportedly given food only twice a day (one loaf of bread during the day) and only allowed to use the toilet facilities at 1 a.m. and 5 a.m.

**Bakhtior Kinjaev**, an 18-year-old man, was reportedly arrested on 14 April 2002 in Fergana, allegedly to check his military papers.  He was said to have been taken to a padded room without windows in the Altaryk district police station in Fergana.  Four men reportedly started beating him, accusing him of the killing of a young girl who had been found dead in the vicinity.  He was reportedly kept for seven days without being charged.  He was said to have been given electric shocks to his handcuffs, as a result of which he is believed to have experienced heart problems.  Every day he was allegedly beaten with clubs, had needles put under his nails, head and feet.  On the sixth day, he was reportedly given a blank piece of paper, and told to sign it to verify his signature.  Subsequently, the investigators are said to have written a confession for murder on that paper, and he was brought to the prosecutor with a freshly typed confession.  When Bakhtior Kinjaev realized this, he was so upset that he reportedly destroyed the computer in the police station.  The officers reportedly hit him in the kidneys so that he was allegedly unable to urinate as a result of the pain.  One investigator is said to have punched him in the nose.  As the pain was very strong, he reportedly punched him back.  He was reportedly hit on the head and became unconscious.  He reportedly woke up in hospital with two scars on his throat (of three and two centimetres in length).  A week later, he was again transferred to the police station where he was asked to sign a new confession, which he refused.  He was reportedly transferred to the SIZO in Fergana where he stayed for one month.  There, he was no longer interrogated.  He was then brought to the psychiatric hospital in Tashkent for five hours.  The court proceedings reportedly started on 1 June in the Fergana District Court.  At the trial, 33 witnesses spoke against him.  He was reportedly given a State-appointed lawyer who told him to admit to the crime, so that he would get out of the colony quicker.  His lawyer reportedly did not raise the torture allegations in court, as he had allegedly been paid off by the police.  When Bakhtior Kinjaev told the judge about the allegations of torture, the magistrate reportedly ignored them.  On 8 June, Bakhtior Kinjaev was sent to the psychiatric hospital for a month.

The prosecutor, investigator and psychiatric doctor reportedly told his father, that if he paid them US$ 10,000 each, his son would be released. His father allegedly stated that he did not have money, but if the judge was good and honest, he would find that his son was not guilty. On 15 August, Bakhtior Kinjaev was reportedly sentenced to 20 years, 3 in prison and 17 in a strict regime in a colony.

**Dshamurad Rakhimovich Makhmudov**, who was said to have been sentenced to prison for reading Hizb-ut-Tahrir literature, was reportedly brought to Jaslyk colony on 13 June 2002. Previously, he had been held at Navoi 29/3 colony and Andijan prison. In Zangiata colony near Tashkent, the prison authorities reportedly told him that if he wrote a repentance letter to the President, he would not be sent to Jaslyk. His wife, mother and children were said to have been brought to see him and he was told that if he did not write a repentance letter, he would see them for the last time. He is said to have refused to sign the repentance letter. As a result, it is believed that he was transferred to Jaslyk colony. When refusing to negate his beliefs, Dshamurad Rakhimovich Makhmudov was reportedly taken to the medical unit early August 2002, as if to examine him, and was reportedly beaten there with bats. Four of his teeth were pulled out, and it is reported that he is bearing scars on the left side of his mouth. He was told by colony authorities that he was sent to Jaslyk colony in order for the authorities to get rid of him.

**Shukurov Bakhiiar Shakarovich**, who has been held in prison No. 36 since 27 November 1997 after having been convicted to 18 years' imprisonment, reportedly left his barrack during the night (at around 4 a.m.) of 22 June 2002, to go to the toilet. As he was sick, he is said to have worn long underwear. He was reportedly detained by a prison guard and brought to the supervisor's office, where he explained that he was feeling sick. A senior lieutenant is believed to have warned him against breaking the rules and to have sent him to a punishment cell. On the following morning, he was again taken to the supervisor's room on suspicion that he was praying. There, being asked, he reportedly indicated that he was praying five times a day. At that point, a captain is believed to have hit him on the ear with his fist. When hit a second time, he is said to have fallen on the floor where he was allegedly kicked on the side and insulted. According to the information received, he was then transferred to the solitary confinement cell where he was allegedly beaten with rubber batons, and kicked with leather boots. Despite his requests, he was not allowed to meet with the prison director. As his health condition was rapidly deteriorating, he was reportedly taken to another cell. On 23 June, he is said to have written a new complaint that he wanted to send to the General Procurator. He was reportedly brought to the supervisor's office, where he was allegedly kicked and beaten again as well as insulted. According to the information received, he was eventually able to send a complaint to the General Procurator.

**Mutabar Tozhibaeva**, an independent journalist, was reportedly arrested at around 10 p.m. on 1 July 2002 in Kirghilinski district, in the Ferghana region. It is alleged that she was taken to the Regional MVD office (ROVD) where the deputy head twisted her arms behind the back and hit her on the head and on the neck. She was allegedly also kicked on the legs and was eventually thrown violently into a cell. She is said to have been denied access to water and food as well as to the toilets. It is believed that her identity documents as well as her tape recorder were confiscated. She was allegedly accused of "giving free rights to people". At around 2 a.m., she was allegedly threatened with rape and insulted by the deputy head of the ROVD. She was

released on the following morning thanks to the pressure of other journalists. She was reportedly accused of non-compliance with a police officer and petty hooliganism. According to the information received, on 31 July 2002, the Kirghilinski court convicted her of disturbance of the public order under the Administrative Code. The court is reported to have issued a warning. But the appeal (regional) court is said to have ruled that she was not guilty. During her trial, she asked for a medical examination. After three days, the judge is said to have authorized such an examination, which is said to have revealed light bruises consistent with her allegations. It is believed that the officers who were implicated in the fabrication of false evidence in her case were under investigation at the time of writing. It is believed that she was arrested because on that day she had shown to other journalists in the city of Durma where a young boy had allegedly been killed by SNB officers.

**Humiedin Tursunov** was reportedly arrested on 8 July 2002 by MVD officers from Altaruk regional MVD office (ROVD). It is believed that he was accused of having caused a scandal on the street. He was reportedly taken to the Altaruk ROVD where he was questioned the following day. He was allegedly beaten at the back of the neck and on the wrists while being seated on a chair with his hands tied in the back with a view to making him confess a rape. It is also alleged that he was beaten on the heels. According to the information received, he was subjected to this treatment over three or four consecutive days, for three or four hours every day. As a result, on the fourth day, he is said to have signed a confession admitting that together with his brother, **Shamsudin Tursunov**, he had raped a girl in 2000. It is believed that he signed this confession in front of a woman who he later learnt was a State-appointed lawyer. On 22 July the investigation is said to have been completed and the criminal file to have been forwarded to a magistrate. It is reported that the trial only started on 16 October. During the trial, the alleged rape victim stated that she had been forced to make a false accusation because of the beatings she had allegedly been subjected to. Despite the absence of any accusation, he is said to have been convicted and sentenced to six years in prison. His brother, who was a co-defendant in the case, but who was also later accused of murder, was sentenced to 20 years in prison. It is alleged that the latter was convicted on a confession extracted under torture. At some point during the pre-trial investigation, Humiedin Tursunov is believed to have seen his brother being dragged from an interrogation room, covered with bruises all over his body and unable to walk. The family is said to have sent several complaints to the Ombudsman, to no avail. Humiedin Tursunov was eventually amnestied and released on 20 November.

**Elena Urlaeva**, on whose behalf the Special Rapporteur intervened previously by joint communication with the Special Representative on human rights defenders on 1 October 2001, and by joint urgent appeal with the Working Group on Arbitrary Detention and the Special Representative on human rights defenders on 17 September 2002, was reportedly detained on 28 August 2002 after having taken part in a peaceful protest outside the Ministry of Justice. She had reportedly been active on behalf of victims of torture, by attending court proceedings and urging families to present the issue of torture before the judiciary. She had furthermore contributed to a shadow report to the Committee against Torture. The decision to intern her for involuntary treatment was reportedly taken by the Mirabad inter-district court. The judgement is said to have contained information of complaints she had submitted which were said to have been fabricated. In the psychiatric hospital, Elena Urlaeva is said to be receiving medication and injections against her will, namely a daily injection of triftazin, and an injection of modaten depot every 10 days. She is reportedly being given azleptol and triflooperazin on a daily basis.

E/CN.4/2003/68/Add.2
page 58

When she refused to take medication during her first internment in the hospital in April and May 2001, she was reportedly tied to the bed and forced to take the medication. As a result of the medication, she was suffering from loose teeth, pain in her hands and in the heart area, and oppressive feelings. Her hands were shaking. She could only receive visits by her mother and son. When asked for the reasons for sectioning Elena Urlaeva, the deputy director of the institution replied that she had been showing signs of strange behaviour since 1996. Neighbours and doctors had recommended that she be checked. According to the director of the psychiatric institution, she has a general conflictual nature, was having arguments with people and problems with doctors; she made unsubstantiated complaints that she was being followed by law enforcement officials and that her phone was tapped; and she wrongly complained that her brother had been ill-treated in detention. It is believed that she had been checked by a board of doctors who concluded that she is suffering from schizophrenia. The director of the institution did not know when she would be released. As a result of the medical treatment that she is receiving, her behaviour had become more manageable, and according to the director, she had said that she felt better. He also claimed that as with many other patients, she had not realized that she was sick. The director stated that he was not aware that she had taken part in a demonstration. She was sectioned on the basis of article 27 of the applicable law, on the grounds that her stay outside the hospital without treatment would represent a serious threat to her health, as there would be a negative dynamic in the evolution of her disease. According to the information received, she was released on 31 December 2002. It is however reported that she is now facing civil charges with a view to assessing that she is permanently insane. She would thus lose her legal responsibility and would be prevented from intervening on behalf of human rights victims. At the time of writing, the hearing was scheduled on 16 January 2003.

**Larissa Alexandrova Vdovina** was reportedly arrested on 27 August 2002 while participating in a picket line outside the building of the Ministry of Justice in Tashkent, protesting against human rights abuses. She was arrested at the same time as Elena Urlaeva (see above) and it is believed that she was eventually subjected to the same kind of medical treatment. She is also said to have been diagnosed with schizophrenia. According to the information received, the picket was disrupted and halted by the police, and Larissa Alexandrova Vdovina was taken to the Regional Department of the MVD, together with others participating in the protest. She was not interrogated and was not allowed to make a telephone call. On 28 August 2002 she was taken to the main psychiatric hospital in Tashkent, where since then, she has been held in a room with two other patients. She is being forcibly administered medication and injections which make her tired and sleepy. She is said to have undergone several psychiatric examinations by physicians of that institution and by various commissions of the Ministry of Health, which concluded that she is suffering from schizophrenia. It is reported that she has not, however, been informed about the reason for her internment. According to the information received, she was not allowed to attend the two court hearings, at the local and city courts, which presumably decided upon her internment. According to the information received, she has been interned in this psychiatric institution five times in the past. During previous periods of internment, she was allegedly ill-treated and tied to her bed on several occasions. At the time of writing, she was reportedly still being held at the main psychiatric hospital in Tashkent. According to information recently received, since the first week of December 2002, she has been given a new type of injection, which is believed to be affecting her health badly, in particular causing pain to her kidney. She has been trying to stop the hospital staff from giving her these new injections, and in response hospital staff have allegedly been beating her.

**Alexandra Yurievna Shigaeva**, born in 1987, was reportedly arrested with her parents and her 4-year-old brother, **Alexandrovich Vjacheslev Toropovski**, on 18 September 2002 in Tashkent by officers from the ROVD of Sereliysk. They are all Russian citizens. They were reportedly taken to the Sergueli district police station in Tashkent, where the parents were accused of intentional murder. Both children were allegedly beaten with a view to making their mother confess the murder. A gas mask was allegedly placed on the children. The boy is said to have been released after 24 hours. On the second day of detention, it is believed that the mother decided to sign a confession because of the beatings she was allegedly subjected to, the worrying health condition of her daughter and threats that the latter would otherwise be raped. The two children were reportedly segregated from their parents during the whole detention. Alexandra Yurievna Shigaeva was allegedly forced to sign, under the threat that her mother would otherwise be killed, a statement according to which she had witnessed her parents committing a murder. She was reportedly held for six days. Both children were reportedly taken back to the Russian Federation by their eldest brother. According to a medical report issued on 23 October 2002 by the Orenburg (Russian Federation) Children's Trauma hospital, she was diagnosed with a serious brain concussion/trauma, bruises on the chest and a trauma in the lower abdomen, and is said to be still experiencing memory problems with respect to her period of detention. The parents were reported to be still under investigation and are believed to have denied all accusations and to have retracted their confessions as soon as their children had been released. It is reported that their lawyer had access to them for the first time on 21 October during a meeting at the Sergeli District Procurator's office in the presence of the investigator in the case and representative of the Consulate of the Russian Federation. According to the information received, the lawyer had to appeal to the Tashkent city procurator to have access to her clients as the investigator in the case was refusing to allow such access. She is said to have requested a medical examination by an independent doctor. The lawyer is reported to have had access to the criminal file on 23 October. It is not known when the parents were transferred to Tashturma, but it is believed that they were currently detained there during the visit of the Special Rapporteur.

**Alexander Yanovich Stopnisky**, a Russian citizen, was reportedly arrested on 26 September 2002 in Tashkent on suspicion of theft. It is alleged that in order to break him psychologically, his two boys, aged 4 and 12 respectively, were summoned on two occasions to the Regional IVS of the Ministry of Internal Affairs where they were handcuffed and interrogated. The children are believed to have been threatened with the death of their father. He is said to have been made to witness these interrogation sessions, and to have been beaten on his heels, head and in the area of his kidneys in order to force him to sign a confession. It is also believed that he was tortured with a gas mask. At the time of the visit of the Special Rapporteur, he reportedly continued to be held at the Regional IVS of the Ministry of Internal Affairs despite the fact that, according to the Procurator, he was transferred on 7 October to Tashturma. He is believed to have had access to his lawyer for the first time 10 days after his arrest. According to the information received, the first confidential meeting he had with his lawyer occurred on 19 November. As he is said to have experienced heart problems, a doctor is believed to have been called on five occasions by the investigators in the case and diagnosed a heart attack. It is reported that he was given injections, but that he is not receiving any other medication. He is said to have refused to sign a confession and a document according to which he would state that

E/CN.4/2003/68/Add.2
page 60

he has been well treated while in custody. His relatives were reportedly asked to pay a bribe of 200,000 sums in order for him to be released on bail. From the time of arrest, it is reported that his daughter and lawyer have been writing complaints to the General Procurator, but their complaints were sent back to the criminal investigator, who was allegedly responsible for the beatings.

**Izat Muminov** was reportedly working as a private taxi driver when, on 7 October 2002, two armed clients threatened him and refused to pay. It is reported that he went to the Shaikhantaur district police station to complain about this incident. There he was told that he should go to the Sobir Rakhimov police station (ROVD), under which jurisdiction this incident had occurred. There, he was asked to stay at the station in order to recognize his two assailants, who were reportedly arrested the following day. At 1.30 a.m. on 8 October, he is said to have called his wife to inform her that he would come home later that day. On 9 October, his wife, sister and other relatives came to the police station to enquire about his whereabouts. They were reportedly told to wait for five minutes as the case in which Izat Muminov was involved was still under investigation. At that point, an investigator is said to have informed the investigator in the case of Izat Muminov that "his guy was finished". The latter is said to have become very pale and to have asked the family to leave the police station, which was closed shortly afterwards. Izat Muminov's relatives are said to have waited for three hours outside the police station waiting for information about his whereabouts. An officer is said to have eventually asked for the relatives of Izat Muminov. The latter's wife and sister were allegedly asked in a derogatory manner who had made them wear a scarf on their head and to which religious organization they belonged. They were reportedly invited in to give further details. There, Izat Muminov's wife was reportedly told that her husband was accused of serious crimes. His sister was thrown out of the police station and was insulted. At that time, it is believed that Izat Muminov's body had been transferred to the morgue where MVD officers are said to have told the forensic expert that the body had been found on the street. According to the information received, two marks (7 centimetres each) were visible on each side of the neck and his Adam's apple was crushed. The head of the ROVD is believed to have claimed that Izat Muminov had hung himself in the basement of the ROVD. This explanation is said to have been denied by the forensic expert as the marks were not consistent with hanging. In the meantime, at 4 p.m., Izat Muminov's family was called into the police station to be informed that there would be a house search at their place in view of the serious crimes Izat Muminov was accused of. One of their neighbours is said to have received an anonymous phone call informing him that Izat Muminov had been killed and that his body was at the morgue. The family was said to have been denied access to the morgue by ROVD officers. The following night, officers from the ROVD and from the Tashkent City Department of the MVD are said to have come to their home to ask them to take the body and to bury it within eight hours. The family is reported to have refused to do so. Their telephone line was cut for the next 10 days and their house was under constant surveillance. It is reported that the funeral took place on 10 October. The family is said to have witnessed marks on his ankles as if he had been lifted in the air with handcuffs, a large haematoma on the back of his left leg. All his fingers were said to be dark blue. It is believed that the body was frozen allegedly in an attempt to prevent the bruises from appearing. The rope with which he allegedly hung himself was never produced. The official medical expertise is said to only record the marks on the neck. It is noted that even old injuries suffered at the time he was a serviceman during the Afghan war were not recorded in this forensic report. The family's lawyer is said to have lodged a complaint with the Procurator-General's Office regarding the way the forensic examination had been

carried out. The conclusion of this expert opinion is death from suffocation. His sister is said to have asked the forensic expert whether the conclusion meant that he had hung himself or that somebody else had strangled him. It is believed that the expert responded that it was impossible to determine the real cause. The same expert is alleged to have insulted the family when they asked for the body to be exhumed with a view to making a new examination. It is reported that an inquiry into this death in custody has been opened.

**Azamat Mamankulov**, an 18-year-old journalist gathering information on human rights violations in Tashkent and **Ruslan Sharipov**, another journalist, were reportedly sitting in an Internet café in Aleishi Market in Tashkent on the evening of 21 October 2002 when Azamat Mamankulov was called by someone. Two people reportedly grabbed him (one of whom reportedly lived in his house), twisted his arms to his back and hit him on the head. Ruslan Sharipov was said to have been stopped from leaving the café and told that "his time would come and that he would be spitting blood". During the arrest, they reportedly told onlookers that they were from the 7th District SNB office in Uzbekistan. In the car, Azamat Mamankulov was elbowed in the chest and hit on the head. According to the information received, he was told that if he continued to work with Ruslan Sharipov, he would be placed in prison or disappear. He was then brought to a marketplace where his mother worked. His mother was then told that her son should not work with Ruslan Sharipov and that they could detain him at the SNB. His mother allegedly told the officers that she would kill herself if they took her son. The officials reportedly pretended that they would take him to the SNB, but subsequently brought him home, warning that Ruslan Sharipov would be arrested in a number of days. The car used by the men is said to belong to the driver of the Minister of Justice. The Minister of Justice was reportedly requested to investigate this incident but no response was reportedly given.

**Kulmuradov Musurmon** was driving his mother to Tashkent city hospital in his own car in order for her to have her eyes examined there on 10 November 2002 when he was arrested at Darband checkpoint by traffic police officers. It is believed that he was suspected of having stolen the car. In order to check his identity card, he was reportedly requested to follow an officer into an office nearby. A while later, the passengers of the car were asked to follow three officers wearing military uniforms. All were reportedly taken to the Sherabad District National Security Service (SNB) office, where Kulmuradov Musurmon had his hands and feet allegedly tied by two military officers wearing masks before being made to sit on a table. There, he was reportedly accused of drug trafficking. It was alleged that he had swallowed bags containing heroin. According to the information, officers started to beat him severely in front of his mother and other family members who were travelling with him. When his mother complained about the treatment her son was allegedly subjected to, she was reportedly cursed and called "an old fox" as well as threatened that she would be put on the same table if she did not shut up. It is said that the volume of the television set and a radio in that room was raised and that Kulmuradov Musurmon continued to be beaten up. At that point, it is reported that his wife and daughters were taken into an office next door. He is said to have refused to sign a confession as he was not guilty. An officer is reported to have brought three bottles of vodka and lots of samsa (baked meat pie) into the room. After having some vodka and samsa, officers allegedly started beating Kulmuradov Musurmon again. It is alleged that he was hit on the head and body with a wire rope and a metal pipe for several times in front of his mother. As he continued to refuse signing a confession, his legs were allegedly pierced with a screwdriver and various parts of his

E/CN.4/2003/68/Add.2
page 62

body were pinched with pliers.  It is alleged that his fingernails were pulled out and hit with a hammer.  He was also allegedly hit on the head with a metal pipe three times.  At that point, he is said to have lost consciousness and to have had his head bleeding.  He was reportedly taken out of the room.  SNB officers reportedly took his wife, his two daughters and his mother to a hospital, where they were all X-rayed with a view to find out whether they had swallowed any drug pouches.  Nothing was found.  SNB officers are said to have twisted his mother's arms and to have tried to force her to swallow a medical probe.  She was then allegedly hit on the head four or five times in order to force her to swallow the probe, to no avail.  On that night, the family of Kulmuradov Musurmon was kept by SNB officers at the hospital.  They were eventually released on the following day around noon.  On that day, the family was reportedly informed around 9 p.m. that Kulmuradov Musurmon had died in the SNB office.  His body had reportedly been transferred to the Surkhandarya Regional SNB office.  His father and brothers were not allowed to go in the building.  They reportedly spent the night right in the car in front of the building.  The following day, his father was able to meet the head of the regional SNB office at around 2 p.m.  This SNB official is said to have suggested that they should not write any complaint letters.  According to the information received, he also promised his father that he would help with everything as long as no complaint was lodged.  He reportedly added that Kulmuradov Musurmon's body was examined, that heroin bags were found hidden in his stomach and that the reason of the death was that some bags had burst.  It is believed that a criminal file against Kulmuradov Musurmon was opened and that he was charged with article 273 of the Criminal Code.  According to the forensic expert who conducted the examination, Kulmuradov Musurmon had three ribs broken.  It is believed that heroin wrapped in plastic was put into his mouth and then moved into his body under high pressure of water.  However, according to the information received, heroin bags got stuck in his larynx.  The forensic expert is also said to have indicated that a lot of water was found in his body.  The head and officers of the regional SNB office are said to have threatened his father and brothers that they would spend the rest of their lives in prison if they tried to ask for a re-examination of the corpse.  The corpse was reportedly taken back home at around 6 p.m. on that day.  Upon pressure from SNB officers, the family was forced to bury the body without being allowed to have an independent forensic examination carried out.  A number of photos (that were made available to the Special Rapporteur) were taken.  His mother is reported to have asked the regional prosecutor's office to order a re-examination of the body, to no avail.  She was reportedly told to go to the regional SNB office and that it was not the duty of the procurator's office to review SNB officers' activities.  Then, the family is reported to have appealed to the regional military procurator's office, where the deputy procurator refused to register their complaint.  When his mother went to Denov and Termez city postal/telegraph service in order to send appeals to various public administrations regarding her son's death, the employees are said to have refused to accept her communications because they had been briefed to do so.  On 17 November, two officers in military uniforms, who introduced themselves as officers of the military procurator's office, are said to have come to Kulmuradov Musurmon's house to ask about the person who had taken the pictures of the body and the reason for taking those pictures.  It is reported that they asked for the original film.  They are also said to have threatened the mother that they would put one of her sons in prison on fabricated charges if she continued to complain about the death of Kulmuradov Musurmon in custody.  A medical report based on the photographs was reportedly drawn up by a professor of forensic medicine and science at the University of Glasgow.  According to this report, "[t]he pattern of the injuries is typical of systematic and violent beating over a period of time, possibly over a few days".  It adds that

"[t]his man has suffered extensive systematic blunt impact trauma, caused by substantial force. The blunt impact trauma could be due to multiple causes including, kicking and striking with an object such as wood, e.g. a chair leg, a cylindrical long object such as a type of baton. The parallel bruises noted are typical of just such an appearance. Multiple blows with an open hand or a fist are also possibilities".

**Iskander Khudoberganov** (Rasul and Ravshan Haitov's stepbrother - see case above), **Bekzod Kazymbekov, Nosirkhon Khakimov, Orifzhon Vasykovich Kadyrov, Asatulla Boltaevich Abdullaev** and **Abdunabi Khikmatovich Sharipov** were sentenced to death or to prison sentences on 28 November 2002 in the Tashkent City Court. According to the information received, Iskander Khudoberganov was sentenced to death, inter alia, for "anticonstitutional activity" (art. 159 (4)), the organization of a criminal group (art. 242 (1) and (2)), terrorism (art. 155 (2)), murder (art. 97 (2)), aggression (art. 151), robbery (art. 164) and the instigation of national, racial or religious hatred (art. 156 (2)). Bekzod Kasymbekov and Nosirkhon Khakimov were reportedly sentenced to 16 years in prison, under strict regime, for attempted robbery (art. 28-164, 4 (a), (b)). Orifzhon Kaedyrov and Asatulla Abdullaev were said to have been sentenced to six years' imprisonment in the general regime for anticonstitutional activity (art. 159 (3) (a) and (b)) and Abdunabi Shapirov to 10 years in strict regime for the organization of a criminal group (art. 242 (1) and (2)) and anticonstitutional activity (art. 159 (4)). In the sentencing the judge is said to have stated that his verdict relied exclusively on the statements and confessions of the defendants and witnesses. Throughout the trial, three of the defendants, namely Iskander Khudoberganov, Nosirkhon Khakimov and Bekzod Kasymbekov had insisted several times that they had been forced to make self-incriminating statements as a result of torture and other forms of ill-treatment they had been subjected to while in custody, as well as threats and actual ill-treatment against family members. Furthermore, two witnesses reportedly stated in court that they had been ill-treated, and that they too retracted their statements. On 19 November 2002, one of the witnesses, Farkhod Kadirkulov, is said to have stated in court that he had been beaten in order to incriminate himself and the defendants. The judge in the case reportedly dismissed all allegations of torture, telling Iskander Khudoberganov that the Ministry of Internal Affairs was not "a holiday resort" or a "sanatorium" and replied to Bekzod Kazymbekov that he was just telling the court "about torture, not about [his] crimes". He is furthermore said to have accused the defendants of "making up" the allegations of torture in order to "get away from (their) criminal responsibility". The magistrate reportedly failed to order any impartial and prompt investigation to be carried out into the allegations of torture. No independent evidence was reportedly produced as a proof of the charges against the defendants. Iskander Khudoberganov was reportedly arrested in Tajikistan on 24 August 2001 and handed over to Uzbek law enforcement officials from the MVD on 5 February 2002. He was reportedly detained in the basement of the MVD in Tashkent where he was pressured to confess to a murder and a robbery. He was allegedly told that if he did not confess, he would die there and his family would never find out about his fate. He was reportedly beaten with clubs, metal rods, a chair, kicked in his kidneys and twice given electric shocks. As a result, he reportedly agreed to confess. Subsequently, he was reportedly transferred to the building of the SNB in Tashkent on 12 February 2002. There, he was allegedly also beaten, deprived of sleep and was administered injections against his will. During the investigation process, he was reportedly kept in incommunicado detention. His family is said to have found out about his arrest only in March 2002. In February 1999, Iskander Khudoberganov had reportedly gone into hiding after

E/CN.4/2003/68/Add.2
page 64

finding out that he was wanted by the authorities on charges of "terrorism" and "religious extremism". In order to ascertain his whereabouts, the police is said to have detained his 58-year-old father Erkin Khudoberganov and his brother Sanzhar several times. At the end of February 1999, both men reportedly had to be hospitalized as a result of ill-treatment by the police. On 21 February 1999, his father was reportedly taken to the basement of the SNB, handcuffed to the heating and kicked by four officers. As a result, he reportedly suffered a heart attack. The police are furthermore said to have threatened his mother that they would take his brother Sanzhar, if she did not tell them where Iskander Khudoberganov was. As a result, she reportedly had a heart attack on 24 February 1999. Sanzhar Khudoberganov was said to have been held at the SNB office in Tashkent for a week, where he was reportedly kicked and beaten in the stomach, including with rubber truncheons, and subsequently required an emergency operation for his injuries. In August 1999, the two men and Iskander Khudoberganov's pregnant wife Fazilat Khudoberganova were said to have been summoned to the Tashkent city police department, where they were made to watch two of the defendants in the case, Bekzod Kazymbekov and Nosirkhon Khakimov, being tortured by the police. Nosirkhon Khakimov's body was reportedly covered in blood as a result of serious beatings, and Bekzod Kasimbekov was reportedly placed in a gas mask, with the air supply being restricted, whilst officers were beating him all over his body. The officers are said to have threatened to do the same to Sanzhar Khudoberganov and Fazilat Khudoberganova, if she did not inform them about the whereabouts of her husband and incriminate him. Fazilat Khudoberganova reportedly fainted at the sight of the two men being tortured. The two men were reportedly told that if they did not take the blame, their wives would also be brought in and raped before their eyes. When they refused to confess, Nosirkhon Khakimov was reportedly hit on the head and collapsed. Sanzhar Khudoberganov was reportedly also kept detained for two days and beaten. Nosirkhon Khakimov and Bekzod Kasyombekov were reportedly serving prison terms of eight years each since April 2000 when they were convicted on anti-State charges. Both men had alleged that these charges had been imposed based on a confession extracted under duress. Although these statements had been noted in the official court protocol in the Chirchik City Court in the Tashkent region, no impartial investigation of these allegations was carried out. Nosirkhon Khakimov and Bekzod Kasyombekov's parents are also said to have been ill-treated. During parts of the trial at Tashkent City Criminal Court at the end of 2002, Iskander Khudoberganov was reportedly drugged or very weak. He was reportedly held in incommunicado detention throughout most of the trial, and was denied all medical treatment, including for tuberculosis. His sister, who had asked to represent him, was allegedly denied access to him during parts of the trial. The lay judges in the case were said to have been totally disinterested, partly slept through the trial, and once remarked that the case was clear and that the defendants were guilty. It is alleged that the General Procurator claims that he had never received any complaint regarding this case. However, the Special Rapporteur was provided with several letters addressed to him by relatives of Iskander Khudoberganov. Hearings on appeal at the Tashkent City Court were scheduled at the end of January. Finally, it is reported that Iskandar Khudoberganov's sister received a letter from the Ombudsman indicating that there is no basis for the Ombudsman to intervene.

-----