## SUPPLEMENTAL DECLARATION OF BARRY E. CARTER

I, Barry E. Carter, declare and state as follows:

1. I filed in this case a Declaration on International Law and Its Applicability in U.S. Law, dated February 7, 2007. I stand by my statements in that Declaration.

2. Plaintiffs, however, recently wrote in their Opposition to the U.S. Zeromax Defendants' Revised Motion to Dismiss the Amended Complaint in its Entirety (Opp. Mem), dated December 21, 2007, that: "Notably, Professor Carter's Report does not address the issue of whether the act of state doctrine can be raised by a party who contributed to orchestrating the same acts that it then attempts to use as a shield." (Page 31, fn 25.) Let me take this opportunity to respond.

3. Plaintiffs are correct that I did not directly address in my Declaration their argument that the parties which "orchestrated" or "procured" governmental acts at issue in a case are thereby prohibited from raising the act of state doctrine as a defense.[1] The reason is that I did not then, and do not now, read the Plaintiffs' First Amended Complaint as alleging that the Defendants in this case were the parties who "orchestrated" or "procured" the state-initiated regulatory proceedings and official decree whereby ROZ Trading lost its interest in Coca-Cola Bottling Uzbekistan (CCBU).[2]

4. However, in case this Court might find worth considering the Plaintiffs' new assertions about an "orchestration" exception to the act of state doctrine, I address the issue briefly below.

---

[1] Plaintiffs make this assertion in their Opposition Memorandum at pages 17-18, 29, 27, and 29-31.
[2] Plaintiffs do allege in their First Amended Complaint that Gulnora Karimova and President Karimov were involved in the "sham proceedings." (E.g., para. 28.) However, these individuals are not Defendants in this action.

1

A.   **The Act of State Doctrine Is Applicable in this Case**

5.   The act of state doctrine is well-established in this country. The U.S. Supreme Court enunciated a broad formulation in *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done with its territory." The evolution of this doctrine is discussed in my initial Declaration at paragraphs 44-52. I will avoid repeating that material here.

6.   The doctrine is definitely applicable in this case. As discussed in my initial Declaration, Plaintiff ROZ Trading lost its interest in CCBU through state-initiated regulatory proceedings and an official Cabinet of Ministers decree. As alleged in the Complaint, the government of Uzbekistan was the cause of the Plaintiffs' alleged injuries. Muzimpex was a third-party purchaser that later obtained in 2004 its interest in CCBU through an official privatization sale of the state's interest. The Zeromax Defendant that held an ownership interest in Muzimpex might be described as an indirect third-party purchaser or even a fourth-party purchaser. (See Declaration, paras. 23-30.)

7.   Plaintiffs still seem to recognize the essential role of these governmental acts in their present assertions. In their recent Opposition Memorandum (at page 27), Plaintiffs acknowledge that: "Uzbekistan expropriated, through sham proceedings, ROZ's interest in CCBU. There simply is no dispute that ROZ's interest in CCBU was confiscated and taken from Plaintiffs."

8.   Plaintiffs now seem to want to get around these facts by asserting that Defendants "orchestrated" the various official, formal government acts—e.g., the

2

decisions of the Supreme Economic Court (Defendants' Revised Motion to Dismiss, at 3-4; Declaration para. 27); the official decree of the Cabinet of Ministers of Republic of Uzbekistan (Rev. Mot. to Dismiss at 4; Declaration at 28); and the privatization sale of government of Uzbekistan's interest in CCBU by the State Property Committee (Rev. Mot. to Dismiss at 5-6; Declaration at 29.)

9. Plaintiffs' "orchestration" assertions essentially consist of alleged acts of Gulnora Karimova and President Karimov. In their recent Opposition Memorandum, Defendants argue that "Gulnora Karimova, a private citizen who controls Defendants, masterminded the Uzbek 'proceedings' against Plaintiffs upon which Defendants now rely for their act of state defense." They cite the declaration of what appears to be a disaffected employee of Ms. Karimova, Farhod Inogambaev. Plaintiffs even go so far as to argue that "Ms. Karimova created the very 'acts' upon which the Defendant companies" now rely to invoke the act of state doctrine. (Plaintiffs' Opp. Mem. at 30-31.)

10. The courts have allowed an exception to the applicability of the act of state doctrine in a few cases—e.g., where there is an applicable treaty that says the doctrine does not apply. *Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia*, 729 F.2d 422 (6th Cir. 1984). See generally Barry E. Carter, Phillip R. Trimble & Allen S. Weiner, *International Law* 628-658 (5th ed. 2007) (section on act of state doctrine).

B. **The Act of State Doctrine Does Not Include an Exception for "Orchestration" by the Parties Claiming It**

11. I do not believe, however, that the courts presently recognize an exception to the act of state doctrine (or, in other words, a bar to applying it) in situations where the private parties are alleged to have "orchestrated" or "procured" the relevant governmental acts.

12. The cases that Plaintiffs cite in their Opposition Memorandum do not constitute strong precedent for an "orchestration" exception and they are distinguishable from the present case. First, in several of Plaintiffs' cited cases, the act of state doctrine had no application, for among other reasons, "because the validity of no foreign sovereign act is at issue." *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 410 (1990).[3] These cases include, besides *Kirkpatrick* itself, *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 59 (D.D.C. 2004) (Opp. Mem. at 30) (plaintiffs "are not challenging the legality of the actions of the Saudi government"); *Republic of Philippines v. Westinghouse Elec. Corp.*, 774 F. Supp. 1438, 1466 (D.N.J. 1991 (Opp. Mem. at 30) ("the legality of the PNPP contract is simply not at issue"); *Industrial Investment Development Corporation v. Mitsui & Co.*, 594 F.2d 48 (5th Cir. 1979) (Opp. Mem. at 19) ("neither the validity of those [Indonesia] regulations nor the legality of the behavior of the Indonesian government is in question here").

---

[3] It is worth noting that, in his opinion for the U.S. Supreme Court in *Kirkpatrick*, Justice Scalia indicated that the U.S. Department of State had raised the possibility of making a distinction between the motivation for and the validity of a state's acts. Rather than adopt this distinction, the Court's unanimous decision was based on the determination that the "doctrine has no application to the present case because the validity of no foreign sovereign act is at issue." *Kirkpatrick, supra* at 410. As I have indicated above, regulatory actions and an official ministerial decree from the government of Uzbekistan took ROZ Trading's interests. These formal governmental acts were definitely involved in this case. (See paragraphs 6, 8 above.)

4

13.     Second, other cases that Plaintiffs cite involved defendants' anti-competitive practices, mostly federal antitrust claims. The activities of the private defendants allegedly constituted violations of these antitrust laws. Any foreign government involvement seems not to have been an essential element in the private parties' violation of the federal antitrust laws. *U.S. v. Sisal Sales Corp.*, 274 U.S. 268, 276 (1927) (Opp. Mem. at 29-30) (though "aided by discriminating legislation," the private parties "by their own deliberate acts, here and elsewhere, . . . brought about forbidden results within the United States"); *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 608 (9th Cir. 1976) (Opp. Mem. at 29) ("[T]here is no indication that the actions of the Honduran court and authorities reflected a sovereign decision that Timberlane's efforts should be crippled"). In contrast, in this case, the validity of Uzbekistan's sovereign acts is at issue, and Plaintiffs fail to allege any conduct (unlawful or otherwise) on the part of the Defendants that "procured" the acts of state, let alone any such conduct that is severable from the adjudication of the validity of the underlying acts of state.

**C.     Recognizing an "Orchestration" Exception to the Act of State Doctrine Would Be Inconsistent with the Doctrine's Policies and Practicalities**

14.     The present policies underlying the act of state doctrine, as recognized recently by the U.S. Court of Appeals for the District of Columbia, are applicable here: "The policies underlying the doctrine include 'international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its foreign relations." *World Wide Minerals v. Republic of*

*Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002), quoting from *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.* 493 U.S. 400, 408 (1990).

15.  Allowing an "orchestration" exception to the act of state doctrine would, first, be sharply inconsistent with the policies underlying the act of state doctrine listed above. Litigation over the exception would require the parties before the U.S. court to delve into the reasons for a particular governmental act. As someone who has not only studied and written about government decision-making, but who has also served at times in the Department of Defense, on the National Security Council staff of the White House, and in the Department of Commerce, I believe that most government decisions are reached on the basis of multiple considerations and often involve input from many individuals and organizations. Determining exactly what led to a decision or how much impact a certain person or organization had on a decision can often be difficult if not impossible. Hence, when a party claims that another party raising the act of state doctrine has "orchestrated" or "procured" the governmental acts in question and thus cannot invoke the acts as a defense, the resulting process of discovery and debate would in many situations require the parties and the court to address the motives (lofty and otherwise) of the government's decision-makers and the analyses and facts they employed. This discovery and debate will be about the actions of *foreign* officials. Allowing this type of discovery to proceed would seem to be anomalous, because under similar circumstances, the U. S. government would be able to invoke governmental privilege to prevent such determinations regarding its own decision-making process. Specifically, the United States could invoke the deliberative process privilege to preclude discovery of governmental documents "'reflecting advisory opinions, recommendations,

6

and deliberations that are part of a process by which Government decisions and policies are formulated.'" *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (discussing the so-called "deliberative process" privilege and quoting from *Carl Zeiss Stiftung v. V.E.B. Cart Zeiss, Jena*, 40 F.R.D. 318 (D.D.C. 1966)); *McPeek v. Ashcroft*, 202 F.R.D. 332, 334 (D.D.C. 2001) (holding that the deliberative process privilege applied to a subordinate's recommendation to his superior of a proposed course of action). Turning to the policies underlying the act of state doctrine cited above, given the deliberative privilege accorded the U.S. government, it would be against principles of international comity for a U.S. court to permit the same inquiry and discovery to proceed against a foreign sovereign about its decision-making process. Moreover, there would likely be a lack of comity from the perspective of foreign courts because it is highly doubtful that the U.S. Executive Branch or Congress would submit to searching inquiries and analysis from foreign plaintiffs in foreign courts. Creating an "orchestration" exception also calls into question the respect of the United States for the sovereignty of foreign nations on their own territory. And, the friction over inquiries about foreign officials' decision-making would likely cause problems for the U.S. Executive Branch in its foreign relations.

16.     Likewise, a new "orchestration" exception would be severely limited by the "realities of the fact finding competence of the court." *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 77 (2d. Cir. 1977). Discovery regarding foreign officials and foreign government documents in foreign countries is clearly difficult for parties to undertake, and U.S. courts are limited in how they can assist. The danger, as evidenced in this case, is that one party, such as the plaintiffs here, might submit the declaration of a disgruntled

7

employee alleging actions by the foreign employer (who is not a party to this suit) vis-à-vis the foreign government. Whatever the merits of the allegations, it seems extraordinarily difficult for the defendants to obtain the discovery necessary in the foreign country to allow the court to address these allegations carefully.

17. Any "orchestration" exception, and the resulting discovery and litigation, would also run counter to the well-established policies under the U.S. Constitution and laws to allow persons to associate freely and to petition the government for redress of grievances. The U.S. Supreme Court has made clear that persons should have a right to lobby for laws and for regulations, with only narrow exceptions. See *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138, 140 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 669 (1965). Not so incidentally, such activities can provide useful information to government officials. When there has been, as is usually the case, substantial lobbying and providing of information before a government decision, the Noerr-Pennington line of cases and other authorities do not diminish the official nature of the resulting governmental act.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 23rd day of January 2008 in Washington, D.C.

By: *Barry Carter*
Barry E. Carter